Ellen Dowd, Esq.
State Bar Number 141206
2658 Del Mar Heights Road #228
Del Mar, California 92014
(858) 342-8360
Fax (858) 755-6348
ellendowd@sbcglobal.net

**Attorney for Plaintiff, C.S**

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.S., by and through his Conservator, MARY STRUBLE, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF EDUCATION, a State Agency <br> Defendant. | CASE NO.: 08 CV 0226 W AJB <br><br> CLASS ACTION COMPLAINT FOR: <br> (1)) VIOLATION OF INDIVIDUALS WITH EDUCATION DISABILITIES ACT (IDEA) 20 U.S.C. § 1400, ET SEQ; <br> (2) VIOLATION OF SUPREMACY CLAUSE; <br> (3) VIOLATION OF EQUAL PROTECTION CLAUSE; AND <br> (4) COMPLAINT FOR PERMANENT INJUNCTION. |

Plaintiff, C.S. by and through his Conservator, MARY STRUBLE ("Plaintiff"), for his class action complaint against Defendant, CALIFORNIA DEPARTMENT OF EDUCATION ("Defendant"), alleges as follows:

## I.

## JURISDICTION AND VENUE

1. This court has original jurisdiction of this action under 28 U.S.C. § 1331 because it arises under the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1400, et seq., and related Federal regulations. Additional claims in this case arise under the laws of the State of California, California Education Code

ORIGINAL

§ 56000, et seq. and related California State regulations. Supplemental jurisdiction over these state claims is conferred under 28 U.S.C. § 1367 (a).

2.    Venue is proper in this Court under 28 U.S.C. § 1391(b). Plaintiff resides within the County of San Diego, in the Southern District of California. Defendant is a state agency with offices throughout the state, including San Diego, in the Southern District of California. All of the events affecting Plaintiff occurred within the Southern District of California.

## II.

## NATURE OF ACTION

3.    This action is brought as a class action on behalf of all special education students ("Students"), and their parents, who had Administrative Due Process Hearings heard by Defendant's contractor, California Office of Administrative Hearings, Special Education Division ("OAH"), Administrative Law Judges ("ALJs"), between July 1, 2005 and present (the "Class Period"), and who have received less than complete relief as afforded under IDEA. The remedy being sought is for a Permanent Injunction enjoining Defendant from renewing, contracting with, or otherwise engaging OAH and its ALJs, as its contractor to provide Due Process Hearings and Mediations beginning July 1, 2008, when its current contract expires. This Permanent Injunction is required due to OAH's violations of IDEA, and Defendant's failure to oversee and correct OAH's actions, in violation of IDEA, which has harmed, and will continue to harm Plaintiff and the Class, as set forth below.

4.    During the Class Period, Defendant, as recipient of $29 million of federal funds, ear-marked for provision of due process to California's special education students, contracted with OAH to conduct Mediations and Due Process Hearings throughout the state in order to enforce IDEA as it applies to Students rights to a free appropriate public education (FAPE"), and failed to supervise, audit, account, or uphold IDEA, which enabled OAH to administer Due Process

Hearings and render Decisions that are contrary to IDEA and related laws and procedures because the OAH ALJs do not have the minimum required knowledge, training, or expertise required by IDEA, to the great detriment of disabled students, and their parents, who are the intended third party beneficiaries of the Interagency Agreement between Defendant and OAH.

5.    During the Class Period, Defendant and OAH were bound by an Interagency Agreement under which the $29 million of federal funds were entrusted to Defendant, as the local agency, to either conduct the Mediations and Due Process Hearings, or to contract with an outside agency to conduct them.

6.    The requirements of the Interagency Agreement, specify that OAH "agrees to conduct due process hearings in accordance with regulations section 3080 et seq., Title 5, California Code of Regulations." A true copy of the Interagency Agreement is attached hereto as Exhibit 1.

7.    Additionally, the Interagency Agreement, Exhibit 1, requires that each of OAH ALJs complete 80 hours of training before any ALJ conducts any Due Process Hearings, and requires 80 hours additional training annually. Upon information and belief, to date, one week in November has been dedicated to training, with additional sporadic one-day training, from time to time. However, this falls far short of 80 hours, and hearings were conducted between July, 2005 and November, 2005 by ALJs without the required 80 hours of training.

8.    Title 5, California Code of Regulations § 3082.1 sets forth the minimum Qualifications and Training of Hearing Officers, which states, in pertinent part:

(a) The hearing shall be conducted by a hearing officer knowledgeable in administrative hearings who satisfies the requirements set forth herein and who is employed by, or under contract with, a state agency or nonprofit organization that has entered into an agreement with the department to conduct due process hearings.

(b)  Hearing officers shall be attorneys licensed to practice law in California for at least five years immediately preceding his or her appointment, of which at least two years shall have involved contested cases in a trial court or the conduct of formal hearings or inquiries, and shall have involved experience in the presentation of evidence and the examination of witnesses before trial courts or quasi-judicial administrative bodies.  Experience acquired as a hearing officer in formal quasi-judicial administrative proceedings may be substituted year for year to the required two years of experience.

(c)  In addition to the "Minimum Qualifications" as set forth in subdivision (b), no hearing officer may assume his or her duties unless the presiding officer of the body responsible for conducting due process hearings determines that he or she:

(1)  Possess knowledge of the provisions of 20 U.S.C. sections 1400 et seq., federal and state regulations pertaining to that title, and legal interpretations of that title by federal and state courts;

(2)  Possess knowledge of the provisions of Education Code sections 56000 et seq., federal and related state statutes and implementing regulations, and the legal interpretations of those statutes and regulations by federal and state courts;

(3)  Possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice;

(4)  Possess the knowledge and ability to render and write decisions in accordance with appropriate, legal practice.

(d)  The contractor responsible for conducting due process hearings shall ensure every hearing officer has completed at least 80 hours of training before conducting a due process hearing...(emphasis supplied).

9.     The Interagency Agreement also requires that the presiding ALJs are responsible for ensuring that the ALJs are properly trained and knowledgeable prior to conducting Due Process Hearings.

III.

**THE PARTIES**

10.    During the Class Period, Plaintiff and each member of the Class participated as a party in an Administrative Due Process Hearing concerning the rights of a disabled student before the OAH ALJs, in order to exhaust administrative remedies, and to seek relief afforded under IDEA and related statutes.  These ALJs were required to be knowledgeable and trained in special education law, and to be governed, monitored, overseen and supervised by Defendant.

11.    Neither Plaintiff nor any member of the Class participated in training the OAH ALJs.

12.    During the Class Period, and continuing, the OAH ALJs are not properly trained, are not knowledgeable in special education law, and related statutes and case law interpretations of these laws, have no expertise, which is the specific requirement for exhaustion of remedies, and, to date, due to the lack of monitoring, governance, oversight and management of Defendant, OAH's ALJs have written Decisions that are contrary to law, unduly favorable to school districts, and which deny a free appropriate public education to disabled students.

13.    Additionally, Defendant, to whom OAH ALJs are required to collect and report data, has continuously overlooked the OAH ALJs' false statements, mischaracterizations of Hearing outcomes, and skewed statistics which are published by OAH under the auspices of Defendant, on Defendant's website. Defendant, by its failure to monitor, is responsible for OAH's intentionally defrauding Plaintiff and members of the Class.

14.    Moreover, as the exhaustion requirement of IDEA is mandatory, attempts by Students to circumvent this requirement based upon the abject lack of training and lack of expertise of the OAH ALJs, has resulted in federal courts throughout the state dismissing IDEA lawsuits on the grounds of failure to exhaust

administrative remedies, at least once indicating in the Order of Dismissal that "if Plaintiffs believe that the ALJ assigned to hear the case is not qualified, they may exercise a peremptory challenge or seek disqualification of the ALJ, " citing Cal. Code Regs. tit. 1 §§1034, 11512(c) 2007, or to raise the issue of the non-qualification on appeal. (USDC, SDCA Case No. 06CV2451 BTM (RBB).

15.    The IDEA specifies a 45-day time period from the time the case number is assigned to the time of Decision, 20 U.S.C. § 1415(g)(2). The purpose of this stringent timeline is to protect the rights of Students, who are either in an inappropriate school program, or not in school at all. Due to the lack of qualification of the OAH ALJs, and the lack of governance by Defendant, in all but a slim percentage of cases during the Class Period, has the Student obtained the relief requested, resulting in an appeals process that can take years, which is time lost for disabled students.

16.    Plaintiff, Christopher Struble, is an 18-year old, conserved student who qualifies for special education under the eligibility category of Autism.

17.    On September 4, 2007, Plaintiff filed a Mediation and Due Process Request (the "Due Process Complaint") with OAH against Fallbrook Union High School District ("the District"). The gravamen of the Due Process Complaint was that during 4 years of high school, Plaintiff and his parents had never been advised by the District of graduation options, including the difference between a Certificate of Completion and a High School Diploma, until the end of the 2006-2007 school year, during which Plaintiff was a senior. Thus, the District prevented Plaintiff's parents from meaningfully participating in his IEP due to the lack of discussion of graduation options, and the District's predetermined placement offer—the District's Transition Program, which was a denial of FAPE.

18.    The remedy sought by Plaintiff was compensatory education, for Plaintiff to attend a  non-public school capable of providing a FAPE, and

conferring a diploma in the State of California, at District expense, so Plaintiff could earn his high school diploma.

19.     The Administrative Due Process Hearing was held October 16-19, 2007.

20.     On November 20, 2007, a Decision ("the Decision") was rendered by OAH ALJ Susan Ruff, in which she held that the District's actions, as stated in paragraph 16, above, constituted procedural violations of IDEA which amounted to a denial of FAPE to Student.  The Decision (a true copy of which is attached hereto as Exhibit 2), correctly states the two-prong mandate under *Rowley* requiring the ALJ to first look at procedural violations to determine if there is a denial of FAPE, and then, if necessary, determine whether there were any substantive violations.

21.     The Decision, Conclusions of Law 10-12, determined under the first prong that there were procedural violations that amounted to a denial of FAPE, rendering Plaintiff the prevailing party.  The remedy for a denial of FAPE that impacts a student's education opportunity is compensatory education, which is within the broad, equitable discretion of the ALJ.

22.     Rather than ending the Factual Findings and Conclusion of Law with Plaintiff as the prevailing party, and fashioning a remedy, the ALJ went on to examine every substantive issue and rule on them, even though they are moot under the two-prong approach.  In doing this, the ALJ, in addition to ruling that Plaintiff was the prevailing party on the ultimate issue for which relief was sought, also ruled, unnecessarily that the District was the prevailing party on some lesser issues.  This minimizes Plaintiff's prevailing party status.

23.     Moreover, rather than award compensatory education as the appropriate remedy by operation of law, the ALJ ordered Plaintiff and the District to attend an IEP Team Meeting to agree on an appropriate remedy.  This is unlawful under IDEA as it delegates the ALJ's authority to the District, which is collusive and unethical.  IDEA due process hearings "may not be conducted by an

employee of the State educational agency or the local agency involved in the education or care of the child." 20 U.S.C. § 1415(f) (3).

24. Plaintiff is an 18-year old special education student with an average non-verbal IQ, who has been out of school since May, 2007, and, who, due to the lack of governance of Defendant over the training, knowledge and ethics of the OAH ALJs, has no compensatory education because OAH's Decision does not comport with the law in that it delegates the provision of compensatory education to the IEP Team, which includes the director of special education for the District, in violation of 20 U.S.C. § 1415(f)(3). On December 13, 2007, in order to obtain appropriate relief, Plaintiff filed an appeal against the District, USDC,SDCA Case No. 07 CV 2328 JAB (CAB). Defendant, CDE, is not a party to that appeal.

25. Defendant, CDE, is a public entity organized and existing under the laws of the State of California, with the capacity to be sued. CDE has offices in Sacramento, California, but oversees the provision of education throughout the State of California through offices in Counties, including the County of San Diego, located at 6401 Linda Vista Road, San Diego, California 92111, and within the jurisdictional boundaries of this Court. CDE receives federal funds from the United States Department of Education pursuant to IDEA, and is mandated to engage an agency within the state to provide parents of disabled students with an impartial due process hearing under 20 U.S.C. § 1415 (f)(1)(A), and other dispute resolution methods.

26. At all times during the Class Period, Defendant had the duty to oversee, monitor and govern the actions and publications of OAH ALJs pursuant to the Interagency Agreement, in which Defendant received $29 million in federal funds to specifically to provide Mediation and Due Process Hearings for special education students throughout the state by qualified Hearing Officers. The

specified intended beneficiaries of the Interagency Agreement, by its own terms and by operation of law, are special education students and their parents.

27.    Defendant failed to discharge its duties under the Interagency Agreement, resulting in denial of the rights of special education students, including Plaintiff and members of the Class, under IDEA and related statutes.

## IV.

## CLASS ACTION ALLEGATIONS

28.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class ("the Class") consisting of all special education students who participated in Administrative Due Hearings before OAH ALJs between July 1, 2005 to present, and continuing ("the Class Period"), and failed to obtain complete relief requested, or were subject to the relief granted to school districts, and were damaged thereby.

29.    The Class is so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained from the records maintained by Defendant, or its agents, as of September 30, 2007, 279 hearings were conducted in which the Student completely prevailed in 29. Therefore, the Class may be comprised of a minimum of 250 members throughout the State of California.

30.    Plaintiff's claims are typical of the claims of the members of the Class since all members of the class failed to be awarded relief available to them under IDEA due to the OAH ALJs lack of training, lack of knowledge of the law, and the rendering of faulty and unlawful Decisions, which Defendant failed to monitor and/or correct in accordance with the Interagency Agreement and IDEA.

31.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel competent and experienced in complex federal litigation and special education law, and Plaintiff has no interests antagonistic to or in conflict with the other members of the Class.

32.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.  The likelihood of individual Class members prosecuting separate claims for a Permanent Injunction is remote.  The damages suffered by Individual Class members is ongoing, and many, or most of the Class Members have had to undertake appellate review of the OAH ALJ's Decisions at their own expense.  To require the Class Members to undertake the expense and burden of individual litigation for Permanent Injunction makes it impossible for Class Members individually to seek redress for the wrongs perpetrated by Defendant.  It is desirable for all concerned to concentrate this litigation in this particular forum. No unusual difficulties are likely to be encountered in the management of this Class Action.

33.    A class action is also superior to other available methods for the fair and efficient adjudication of this controversy because, if Plaintiff's claim against the District is resolved quickly, as hoped, another, equally representative Plaintiff can substituted as the named Plaintiff.

34.    There are questions of law and fact common to the members of the Class which predominate over any questions affecting any individual members. These common questions of law and fact include, but are not limited to:

(a)    Whether Defendant violated the IDEA and the Interagency Agreement when it selected OAH and its ALJs to carry out the mission of the IDEA mandate for Due Process Hearings to be conducted by trained, experienced hearing officers, who have knowledge of special education law, and related laws, regulations, procedures and the writing of Decisions?

(b)    Whether numerous complaints by parents of disabled students, and parent attorneys, with regard to the lack of training of OAH ALJs, and the resulting ongoing prejudice to disabled students, have not been adequately addressed, nor remedied by Defendant?

(c)    Whether Defendant failed to monitor and enforce the training requirements of the OAH ALJs which specify 80 hours of training for each ALJ each year, and, in particular require 80 hours of training before an OAH ALJ can be assigned to preside over a special education due process hearing?

(d)    Whether Defendant allowed OAH to misrepresent its efficiency, effectiveness and expertise in the Quarterly Reports mandated to be published by Defendant to the public, without oversight, accounting, or verification of OAH's representations and data?

(e)    Whether Defendant adopted and endorsed OAH's misrepresentations in Defendant's annual application for federal funding to the United States Office of Special Education Programs (OSEP), thereby continuing the disbursement of federal funds designed to benefit special education students and their parents, to unqualified OAH ALJs?

(f)    Whether Defendant allowed OAH to change its rules and procedures without Defendant's permission, as required under the Interagency Agreement?

(g)    Whether, based upon past wrongs, which have caused the Class ongoing and irreparable harm, Defendant should be enjoined from awarding the next Interagency Agreement, effective July 1, 2008 to OAH's ALJs, which will obligate Defendant to issue a request for proposal to qualified bidders, such as law schools, and require Defendant to award the next Interagency Agreement upon a guaranteed commitment that the hearing officers being thoroughly trained in special education laws, regulations, procedures, and will have the ability to write Decisions that comport with the law, and that are not based upon a "template", and, most importantly, who are exclusively hearing only special education cases?

(h)    Whether there is a compelling public interest to prevent unqualified ALJs from further violating IDEA so as to give rise to a Preliminary and Permanent Injunction?

35.    Time is of the essence in certifying the Class, which will be the subject of discovery timely propounded, as well as public record acts requests, which have been ongoing, and are the basis of the information and belief alleged in this Complaint.

36.    Time is of the essence in enjoining Defendant from awarding the Interagency Agreement to OAH, which will be further addressed in an Application for Temporary Restraining Order against Defendant, to be filed after assignment of a case number herein.

37.    No monetary or equitable harm will ensue to Defendant in the granting of a Permanent Injunction enjoining Defendant from re-awarding the Interagency Agreement to OAH.  Defendant has the opportunity to award the federal funds earmarked for provision of mediations and due process hearings to an agency which can demonstrate that its hearing officers possess the minimum requirements set forth in the Interagency Agreement to be effective on July 1, 2008.  Many attorneys representing disabled students throughout the state are willing to volunteer time and materials to ensure that the selected agency's hearing officers have a minimum of 80 hours of training prior to July 1, 2008. Additionally, any of OAH's ALJs may apply to the next agency that receives the Interagency Agreement, and, if accepted, can receive appropriate training under the IDEA and related statutes to potentially offset the bias toward the districts, and start dispensing justice for students.

## V.

## SUBSTANTIVE ALLEGATIONS

### A.    The IDEA

38.    The IDEA requires state education agencies, which receive federal funds for providing education to children with special needs,  comply with the provisions of IDEA in identifying eligible students, ("Child Find"), and providing a free appropriate public education ("FAPE"), to all children with disabilities

through individualized education programs (IEPs"), pursuant to 20 U.S.C. § 1415(a).

39.     An IEP is a written statement for each child with a disability that is developed and revised in accordance with 20 U.S.C. § 1414(d) of the IDEA, and is designed to meet each child's unique needs. 20 U.S.C. § 1401(14).

40.     Under the IDEA, specifically, federally-funded state agencies must "establish and maintain procedures in accordance with [20 U.S.C. § 1415]...to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE]...by such agencies."  20 U.S.C. § 1415(a).

41.     Under the IDEA, a child eligible for, but not provided a FAPE, and his or her parents, is afforded two procedural avenues to guarantee relief for a local educational agency's (ie., the school district's) failure to provide a FAPE: (1) an opportunity to present a complaint to the state agency (CDE) through a complaint procedure; and (2) an opportunity to participate in a due process hearing, pursuant to 20 U.S.C. § 1415(b)(6)(f).  When a complaint is filed against a local educational agency, but remains unresolved "to the satisfaction of the parents within 30 days of receipt of the complaint, the due process hearing may occur." 20 U.S.C. § 1415(f)(B)(ii).

42.     Alternatively, under the IDEA, the parties to a due process complaint may enter into a written settlement agreement pursuant to the mediation process, which is "enforceable in any state court of competent jurisdiction or in a district court of the United States." 20 U.S.C. § 1415(e)(2)(F)(iii).

43.     Pursuant to 20 U.S.C. § 1415(f)(1), whenever a due process complaint has been received,  the parent shall have an opportunity for an impartial due process hearing which shall be conducted by the state education agency.  In order

to be eligible for federal funding, as required by IDEA, California has established impartial mediation and due process hearing procedures through the provision of the Agreement from CDE to OAH, which, by its terms, gave OAH sole authority over special education due process hearings on July 1, 2005.

44.    Pursuant to 20 U.S.C. § 1415(f)(3)(A)(ii) and (iii), a due process hearing must be:

> [H]eard by a hearing officer who possesses knowledge of, and the ability to understand, the provisions of the IDEA, federal and state regulations pertaining to the IDEA, the legal interpretations of the IDEA by federal and state courts, ... possesses the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice...and possesses the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice.  (See, also California Education Code § 56505(c)(1)).

**B.    Comparison of Due Process Hearing Data Under OAH and Under its Predecessor, Special Education Hearing Office "SEHO".**

45.    Prior to July 1, 2005 the agency responsible for resolving disputes between parents and local educational agencies was the Special Education Hearing Office ("SEHO") of the McGeorge School of Law.

46.    Upon information and belief, under SEHO, quarterly data collection was required, and in years in which SEHO held the agreement to provide due process services, from the late 1980s through June 30, 2005, the average percentage of cases in which the parents of the disabled student prevailed, and were awarded relief, was slightly greater than 50%.

47.    While not ideal, SEHO's level of experience, knowledge of special education laws, and application of said laws to facts in rendering decisions, were commensurate with the requirements of IDEA.  Under SEHO, parents had a level

playing field, which generally humbled the schools districts, and did not show favoritism to them.

48.    The award of the Interagency Agreement to OAH on May 25, 2005, with projected implementation date of July 1, 2005, did not enable adequate training of potential administrative law judges ("ALJ's"), the great majority of whom were hired by OAH with absolutely no special education experience, which has denied disabled students and their parents, including Plaintiff, access to their due process rights under IDEA.

49.    The Interagency Agreement provides that the ALJs have training to "meet the minimum training standards specified in Section 3082.2 of Title 5, California Code of Regulations," and that, "Presiding ALJ's will determine when ALJ's 'have working knowledge of the laws and regulations governing services to students who qualify for services under the IDEA...[O]nly ALJ's who have the level of expertise specified in the proposed regulations, Section 3082.2 will be assigned mediation and hearing duties'". (Exhibit "1" hereto—Scope of Work-Training).

50.    The Agreement specifies that an official website be maintained by OAH for the dissemination of data; to wit: http://www.cde.ca.gov/sp/se/ds/. The biographies of the OAH special education division ALJ's are provided on this website. Of the 80 ALJ's whose biographies are initially listed, only six biographies reference any knowledge of special education. Three of the six had been hearing officers at SEHO, or at OAH from 1984 to 1986 when OAH previously had a special education interagency agreement. Two of the six had previously worked at CDE. The last one of the six, states in his biography, "National Judicial College—various subject matters, including special education."[1]

---

[1] This is the biography of Karl Engeman, the former Presiding ALJ in Sacramento.

51.    On the official website a few ALJ's report that they attended 40 hours of "conducting an administrative hearing" training in October, 2005, and a few ALJ's indicated undertaking mediation training in October, 2005 and June, 2006. No ALJ represented in his or her biography any recent training sessions specifically on special education laws and procedures.

52.    Also on the official website are the Quarterly Reports required to be provided by OAH to CDE under the Agreement. These reports show a significant decrease in hearing decisions in favor of students. In fact, as set forth in more detail in the section below, entitled, "C. Defendant's Misrepresentations During the Class Period," while the Quarterly Report for the Quarter January 1, 2006-March 31, 2006, paints a rosy picture that, "Students had positive outcomes in more than a quarter of the cases heard," the Quarterly Report shows that only 3 cases of 31 which were decided, were decided fully in favor of the student, which is only 10%. Additionally, in this Quarter, none of the decisions rendered were made within the 45-day timeline under the IDEA.

53.    This is representative of the types of misrepresentations initiated by OAH, and adopted by Defendant, not only in its publication of the Quarterly Reports, but also in the data provided by Defendant to the United States Office of Special Education Programs (OSEP), as a prerequisite for annual federal funding.

**C.    Defendant's Misrepresentations During the Class Period.**

54.    Plaintiff incorporates by reference each and every allegation of Paragraphs 1 through 53 of the Complaint as though fully set forth hereat.

55.    As a requirement for federal funding under the Interagency Agreement, Defendant must receive, review and publish data concerning OAH's administration of Mediations and Due Process Hearings, which is published on Defendant's official website. (Copies of the Quarterly Reports are attached hereto as Exhibits "3"-"10" hereto).

56.    For Quarters July 1, 2005-December 31, 2005, OAH decided 32 special education cases, albeit without the required 80 hours of training.  Of these decisions, 50% were in favor of districts, 19% were in favor of parents, and 31% were split decisions.  No data was available in this report concerning how many of the decisions were rendered within the statutory 45-day timeline. (Ex. 3, p. 3).

57.    For Quarter January 1, 2006-March 31, 2006, OAH decided 31 cases, about which the report stated, "Students had positive outcomes in more than a quarter of the cases heard." (Ex. 4, p. 6).  Actually, only 3 cases were decided fully in favor of the student (10%), 23 cases were decided fully in favor of the district (74%) and 5 cases were split decisions (16%).  (Ex. 4, p. 6). The report further stated, "9 decisions were rendered within the 45-day or extended timelines." (Ex. 4, p. 7).  The actual number of decisions rendered with the statutory 45-day timeline was zero (0) (Ex. 4, p. 7).  The number of decisions within the extended timeline was 9, and 22 decisions were rendered after the timelines and extensions had expired. (Ex. 4, p. 7).

58.    For Quarter April 1, 2006-June 30, 2006, which is the close of the first year, OAH had the Interagency Agreement, OAH decided 56 special education cases.  Only 2 cases were decided fully in favor of the student (4%), 38 cases were decided fully in favor of the district (67%) and 16 cases were split decisions (29%). (Ex. 5, p. 7). Students don't file for due process to obtain partial relief, so the 4% success rate (although, it was not misrepresented in the Quarterly Report), is devastating.  What was misrepresented in this Quarterly Report was, "Of the 56 decisions rendered, 32 (57%) were issued within the requisite timeframe and 24 were issued after the established timeframe." (Ex. 5, p.7).  Actually, only 2 decisions were rendered within the statutory 45-day timeline (3.5%) (Ex 5, p. 8), 28 decisions were decided within the "extended" timeline, and 25 decisions were issued after the timelines and extensions had expired (Ex. 5, p. 8).  This report states, "OAH recognized the need to improve decisions timelines."  (Ex. 5, p. 3).

No comments by Defendant were made addressing this on its official website, nor, upon information and belief, was any corrective action by Defendant taken.

59.    IDEA's strict mandate for decisions to be rendered within 45-days (20 U.S.C. § 1415(g)(2); 34 C.F.R §300.511(a)) is to promote speedy exhaustion of remedies, in order to facilitate the provision of FAPE to a student. Neither OAH, nor Defendant has published any guidelines about what an "extended timeline" is. Typically, on the last day of hearing, with the ALJ's decision looming, the ALJ will ask parent for an extension of time in which to write the decision. Parent can either agree under duress, or refuse, to student's peril. OAH has taken up to 6 and 8 months to render decisions in certain cases. This not only denies student a FAPE, in violation of IDEA, but it impedes the appeal process, which, as detailed below, parents have had to avail themselves in at least 30% of the OAH decisions.

60.    For Quarter July 1, 2006-September 30, 2006, OAH decided 39 special education cases. Only 3 cases were decided fully in favor of the student (7.5%), 24 cases were decided fully in favor of the district (61.5%) and 12 cases were split decisions (31%). (Ex. 6, p. 5). The report further stated, "Of the 39 decisions issued, 28 (72%) were issued within the requisite timeframe and 11 were issued after the established timeframe" (Ex. 6, p. 5). The actual number of decisions rendered with the statutory 45-day timeline was 3 (7.6%). The number of decisions within the extended timeline was 24, and 11 decisions were rendered after the timelines and extensions had expired. (Ex. 6, p. 6).

61.    For Quarter October 1, 2006-December 31, 2006, OAH decided 26 special education cases. The report states, 'Parents prevailed or received split decisions in 38 percent of the cases." (Ex. 7, p. 5). Actually, of the 26 cases decided, only 4 cases (15%) were decided fully in favor of parent, 16 cases were decided fully in favor of the district (61.5%) and 6 cases were split decisions (31%). (Ex. 7, p. 5). Again, parents don't file for due process for partial relief. A typical example of a parent/student partially prevailing is the parent being

reimbursed $1,500.00 for an outside assessment of the student, with the student remaining in the inappropriate school program. No parent would undertake the rigors of the due process hearing for $1,500.00 and no FAPE. The report further stated, "Of the 26 decisions issued, 25 (96%) were issued within the requisite timeframe and one (1) was issued after the established timeline." (Ex. 7, p. 6). The actual number of decisions rendered with the statutory 45-day timeline was 2 (7.6%). The number of decisions within the extended timeline was 22, and 1 decision was rendered after the timelines and extensions had expired. (Ex. 7, p. 6).

62.    For Quarter January 1, 2007-March 31, 2007, OAH finally started keeping (erroneous) data on appeals filed as a result of OAH's decisions. The report stated, "Since July, 2005, two OAH cases have been remanded on appeal for additional clarification. OAH is unaware of any cases being reversed or overturned." (Ex. 8, p. 1). This skewed data is due to the fact that OAH, while mandated to do so, never collected any written information about appeals until this time. This statement arose from the fact that OAH was notified of a remand. The next statement about appeals is anecdotal, at best. In this quarter OAH decided 35 special education cases. Only 4 cases were decided fully in favor of the student (11.4%), 9 cases were decided fully in favor of the district (25.7%) and 22 cases were split decisions (62.8%). (Ex. 8, p. 5). The report further stated, "Of the 35 decisions issued, 34 (97%) were issued within the requisite timeframe." (Ex. 8, p. 4). The actual number of decisions rendered with the statutory 45-day timeline was 4 (8%). The number of decisions within the extended timeline was 30, and 1 decision was rendered after the timelines and extensions had expired. (Ex. 8, p. 6). During this quarter, for the first time, OAH started reporting data on the number of pro per parents going to hearing. In this quarter 11 pro per parents took hearings to decision. (Ex. 8, p. 5). However, there was no reported data on how many pro per parents prevailed, and no reported data about how many pro per cases were dismissed. However, due to OAH's bias against pro per parents and advocates,

since, in this quarter, students only prevailed completely in 4 cases, the success rate for the 11 pro per parents could not be more than 4 out of 11, and, based on OAH's bias, this would be very surprising.

63.    For Quarter April 1, 2007-July 1, 2007, the end of the second year of the Agreement, OAH decided 40 special education cases. Only 6 cases were decided fully in favor of the student (15%), 22 cases were decided fully in favor of the district (52.5%) and 13 cases were split decisions (32.5%). (Ex. 9, p. 5). The report further stated, "Of the 40 decisions issued, 37 (93%) were issued within the requisite timeframe and 11 were issued after the established timeframe (Ex. 9, p. 5). The actual number of decisions rendered with the statutory 45-day timeline was 10 (25%). The number of decisions within the extended timeline was 27, and 3 decisions were rendered after the timelines and extensions had expired. (Ex. 9, p. 6). The Quarterly Report updates the number of appeals taken, as follows, "Since July, 2005, 77 cases have been appealed." (Ex. 9, p. 1). This implies that since July 1, 2005 of the 259 special education decisions rendered 77 decisions, or 30% have been appealed. This appears to be very low estimate, because Plaintiff's counsel alone, since July 1, 2005 has appealed 7 cases; to wit:

> USDC, SDCA 06 CV 2357 BEN (RBB)
>
> USDC, SDCA 06 CV 2378 JAH (BLM)
>
> USDC, CDCA EDCV 06-923 JFW (PLAx)
>
> USDC, CDCA EDCV 07-1586 AHM (OPx)
>
> USDC, CDCA SACV 07-939 DOC (RNBx)
>
> USDC, CDCA SACV 07-1348 DOC (RNBx)
>
> USDC, SDCA 07 CV 2328 LAB (CAB).

While 30% is a high number of appeals, among the approximately 170 attorneys throughout the state who represent students, if one of these attorneys accounts for 7 appeals, it is likely that the total number of appeals is far greater than 77. The purpose of the due process hearing under IDEA is not to establish the right to

appeal to federal court; it is to obtain a FAPE for a student. Unfortunately, this is not being done at the administrative level.

64.    For Quarter July 1, 2007-September 30, 2007, which is the last quarter for which Quarterly Reports are currently available, OAH decided 20 special education cases. Only 1 case was decided fully in favor of the student (5%), 12 cases were decided fully in favor of the district (60%) and 7 cases were split decisions (35%). (Ex. 10, p. 8). The report further stated, "Overall 95% of decisions were issued within the requisite timeline. (Ex. 10, p. 8) and 11 were issued after the established timeframe." (Ex. 10, p. 8). The actual number of decisions rendered with the statutory 45-day timeline was 2 (10%). The number of decisions within the extended timeline was 17, and 1 decision was rendered after the timelines and extensions had expired. (Ex. 10, p. 8).

65.    During the week of October 2, 2006, U. S. Department of Education, Office of Special Education Programs (OSEP) conducted a verification visit to CDE and OAH to "determine how they use their general supervision, State-reported data collection, and statewide assessment systems to assess and improve State performance and to protect child and family rights." (OSEP letter to Jack O'Connell dated February 2, 2007, Exhibit "11" hereto, p. 1).

66.    OSEP made the following conclusion concerning Defendant's general supervision of compliance with IDEA, "Based upon the information provided to OSEP during the verification visit, it appears that CDE's general supervision system is reasonably designed to ensure the identification and timely correction of noncompliance. However, OSEP cannot, without also collecting data at the local level, determine whether the system is fully effective in identifying and correcting noncompliance." (Ex. 11, p. 2).

67.    Part of the data given to OSEP by OAH and CDE were the percentages of quarterly compliance regarding the timeliness of due process hearing decisions within the 45-day period designated in 34 C.F.R § 300.511(a)

and (c), for the first three quarters of 2006.  The data provided to OSEP by OAH and CDE regarding timeliness of OAH's decisions (Ex. 11, p. 7) was:

January-March 2006:    "29% compliance."    Actually, no decisions (0%) were issued within the 45-day period (Paragraph 57, above).

April-June 2006:    "59% compliance."    Actually, 2 decisions of 56 (3.5%) were issued within the 45-day period (Paragraph 58, above).

July-September 2006    "72% compliance."    Actually, 3 decisions of 39 (7.6%) were issued within the 45-day period (Paragraph 60, above).

68.    OSEP concluded that by February 1, 2008, "the State must submit data demonstrating compliance with the due process hearing requirements in 34 CFR §300.515(a) and (c) of the final Part B regulations.  Failure to demonstrate compliance at that time may affect the State's status under section 616(d) of the IDEA." (Ex. 11, p. 14).  The data collected regarding the 45-day timeline after October, 2006 is false and misleading.  Whatever Defendant provided to OSEP on February 1, 2008 is unknown to Plaintiff.

### D.    Defendant's Violations During the Class Period  Not Published in the Quarterly Reports.

69.    Plaintiff incorporates by reference each and every allegation of Paragraphs 1 through 68 of the Complaint as though fully set forth hereat.

### (i)    Presiding Over Non-Special Education Cases

70.    The Interagancy Agreement mandates that "OAH agrees to maintain a separate specialized unit of Administrative Law Judges...OAH will assign these Presiding ALJs on an exclusive and full time basis..." Exhibit 1(D)(1) and (4) (emphasis supplied).

71.    Despite this mandate, and despite the fact that in July, 2007, only 2 out of 20 decisions were issued within the 45-day timeline, the OAH Special Education Division Presiding ALJ, Sherianne Laba, was scheduled to preside over real estate cases, and, based upon personal observation of Plaintiff's counsel, did

and (c), for the first three quarters of 2006. The data provided to OSEP by OAH and CDE regarding timeliness of OAH's decisions (Ex. 11, p. 7) was:

January-March 2006:    "29% compliance."    Actually, no decisions (0%) were issued within the 45-day period (Paragraph 57, above).

April-June 2006:    "59% compliance."    Actually, 2 decisions of 56 (3.5%) were issued within the 45-day period (Paragraph 58, above).

July-September 2006    "72% compliance."    Actually, 3 decisions of 39 (7.6%) were issued within the 45-day period (Paragraph 60, above).

68.    OSEP concluded that by February 1, 2008, "the State must submit data demonstrating compliance with the due process hearing requirements in 34 CFR §300.515(a) and (c) of the final Part B regulations. Failure to demonstrate compliance at that time may affect the State's status under section 616(d) of the IDEA." (Ex. 11, p. 14). The data collected regarding the 45-day timeline after October, 2006 is false and misleading. Whatever Defendant provided to OSEP on February 1, 2008 is unknown to Plaintiff.

## D.    Defendant's Violations During the Class Period Not Published in the Quarterly Reports.

69.    Plaintiff incorporates by reference each and every allegation of Paragraphs 1 through 68 of the Complaint as though fully set forth hereat.

### (i)    Presiding Over Non-Special Education Cases

70.    The Interagency Agreement mandates that "OAH agrees to maintain a separate specialized unit of Administrative Law Judges...OAH will assign these Presiding ALJs on an exclusive and full time basis..." Exhibit 1(D)(1) and (4) (emphasis supplied).

71.    Despite this mandate, and despite the fact that in July, 2007, only 2 out of 20 decisions were issued within the 45-day timeline, the OAH Special Education Division Presiding ALJ, Sherianne Laba, was scheduled to preside over real estate cases, and, based upon personal observation of Plaintiff's counsel, did

receive training in one real estate licensure case presided over by ALJ Venturino on July 19, 2007, and then presided over a real estate case on that date (and ruled against the licensee)(Exhibit "12" hereto). Presiding ALJ Laba also permitted ALJ Kopec to preside over real estate cases on July 31, 2007 (Exhibit "13" hereto), in violation of the Interagency Agreement and in violation of the letter and spirit of IDEA. This was apparently done due to lack of oversight by Defendant.

### (ii)    **Failure to Provide Educational Records**

72.    Failure to provide educational records is a denial of FAPE under IDEA. However, OAH has continued to deny students educational records for those parents who cannot afford to pay for photocopying, in violation of 34 C.F.R.§300.562(a) and California Education Code § 56504, which states, "A public agency may charge no more than the actual cost of reproducing the records, but if this cost effectively prevents the parents from exercising the right to receive the copy or copies, the copy or copies shall be reproduced at no cost." The district and OAH, through Presiding ALJ Laba, colluded to deny student the educational records he needed to defend a due process hearing against the district (Exhibit "14" hereto).

73.    As a result of OAH's denial of educational records, and lack of oversight of Defendant, on August 28, 2007, at the district's due process hearing against student, which was presided over by ALJ Kopec, student's counsel could not ethically defend the case without reviewing the 4,400 pages of records being withheld by the district. Plaintiff's counsel made an opening statement requesting that the record be held open in order to consider an Order pending in Superior Court, County of Los Angeles on this very issue, which was scheduled to be issued on September 19, 2007.

74.    On September 21, 2007, student's counsel received the Superior Court Order, and requested in writing that OAH reconsider the August 28, 2007 ruling

not to keep the record open to take judicial notice of the Order (Exhibit "15" hereto).

75.    In her decision, (Exhibit "16") on October 1, 2007,  ALJ Kopec indicates that:

> On September 21, 2007, Student submitted a request for reconsideration of the denial of his request to keep the record open for submission of a court order finding that a school district failing to provide educational records prior to a hearing denied that student a FAPE. Student attached a copy of the order of the Los Angeles County Superior Court that he wished to submit into the record. <u>Student's request for reconsideration is denied</u>. Student provided no legal basis supporting the request, and none is found.  Student had multiple opportunities to present legal and factual arguments supporting his contentions concerning his educational records. OAH repeatedly considered Student's contentions and found them to be without legal basis.  Student's latest request does not provide any new or different facts, circumstances or law in support of reconsideration.  Both the facts and the procedural posture of the Superior Court case are distinguishable.  Student also contends that 'in order to prevent similar appeal and remand,' OAH should render a decision in this matter that District denied him a FAPE by failing to provide him copies of his educational records. <u>Student provided no legal basis permitting him to seek, or OAH to issue, a decision in this matter with such a finding.</u> ( Ex. 16, p 4). (Emphasis supplied).

**(iii)    Delegating Compensatory Education to The IEP Team**

72.    According to the United States Supreme Court, if a district denies a FAPE to a student, the remedy compensatory education, as a matter of law. *School Committee of Burlington v. Mass. Dept. of Education,* 471 U.S. 359, 369 (1985). Once a student proves that the district denied student a FAPE, "compensatory

education is an appropriate means for providing a free appropriate public education." *Letter to Anonymous,* 21 IDELR 1061(OSEP 1994).

73.    While the hearing officer has broad discretion in fashioning the equitable remedy of compensatory education, *Burlington, supra* at 369, and can "grant such relief it determines is appropriate" 20 U.S.C § 1415(e)(2),  this discretion cannot be delegated to the IEP Team.  An IDEA due process hearing may not be conducted by "an employee of the State educational agency or the local educational agency involved in the education or care of the child." (20 U.S.C. §1415(f)(3)).  This was upheld in the case of *Board of Education of Fayette County, Kentucky v. L.M.,* ___ F. 3d. ___(6th Cir. 2007), which cited *Reid ex rel. Reid v. District of Columbia,* 401 F. 3d 516, 526 (D.C. Cir. 2005).

74.    Nevertheless, in Plaintiff's Due Process Hearing before ALJ Ruff , in the Decision issued on November 20, 2007, the Order states, in pertinent part, "The District is ordered to schedule a new IEP meeting within 30 days of the date of receipt of this decision...the IEP team will discuss and consider placements... including NPS placements." (Ex. 2, p. 37).  The ALJ already determined that the public school senior year program, and the public school transition program were not appropriate for Plaintiff.(Ex. 2, p. 36, ¶ 30).  The Order in the Decision goes on to state, "Nothing in this Decision is intended to prevent either party from filing a further due process proceeding regarding any proposal made at that IEP meeting." (Ex. 2, p. 37).

75.    Not only does this unlawfully delegate the remedy of compensatory education to the local educational agency, it also requires Plaintiff to exhaust remedies twice, which, in the case of Plaintiff, who has not been provided any education since May, 2007, is unduly delaying the provision of FAPE to Plaintiff.

76.    Accordingly, after receiving the Decision from ALJ Ruff, Plaintiff requested a Modification of the Order (Exhibit 17, hereto) both to ALJ Ruff and

Chief Presiding ALJ Ronald Diedrich, to have the ALJ, rather than the IEP team, fashion the remedy. This Modification of Order was denied by ALJ Ruff (Exhibit 18, hereto), and Chief ALJ Diedrich (Exhibit 19, hereto).

77.    In Chief Administrative Law Judge Diedrich's denial of the Modification dated December 7, 2007, states, "Thank you for bringing to my attention the underlying legal issue for which modification is sought. I will bring this interesting legal issue to the attention of the Presiding Administrative Law Judges so that future training on that subject may be conducted." The ALJs were supposed to have been trained in writing decisions that complied with IDEA before July 1, 2005.

### (iv)    Allowing Districts Unauthorized Discovery in Due Process

78.    There is no right to discovery in special education due process proceedings. The extensive discovery procedures available in civil proceedings is deemed inappropriate for administrative adjudications, which should be simple, quick and inexpensive.   9 Witkin, California Procedure, Administrative Proceedings, Section 85 p. 1133 (4th Ed. 1997).

79.    IDEA specifically allows a party the right to confront, cross-examine and compel the attendance of witnesses. 20 U.S.C §1415(h)(2), 34 C.F.R §300.509(a)(2), Cal. Ed. Code § 56505(e)(3).

80.    Under IDEA there is no provision for a party to compel the production of documents. 20 U.S.C. §1415(h)(2), 34 C.F.R. §300.509(a)(3) provides that a party has "the right to present evidence as well as written and oral argument.'

81.    However, OAH overlooks the federal law when districts seek to harass parents and parentally-paid experts and private schools, by repeatedly serving subpoena duces tecum for production of documents. OAH's faulty rationale for this arises from a misinterpretation of state regulations as having

precedence over federal law, specifically, California Government Code and California Code of Regulations.

82.     Some of OAH's special education ALJs previous worked as general education ALJs conducting hearings such as beautician and mortuary licensure and waste management.  Subpoena duces tecum are allowed in these cases pursuant to California Government Code §§ 11450.05-11450.30.

83.     However, 5 C.C.R. § 3089 provides, "Partial Non-Applicability of Certain Sections of the Administrative Procedure Act to Special Education Due Process Procedures: Special education due process procedures shall not be subject to the following provisions of the Administrative Procedure Act-Government Code 11450.05-11450.30 (Subpoenas)."

84.     5 CCR §3082(c)(2), which is specifically authorized under Cal. Govt. Code §§11450.05-11450.50, states that the parties shall also have the right "to compel the attendance of witnesses.  The hearing officer shall have the right to issue Subpoenas (order to appear and give testimony) and Subpoenas Duces Tecum (order to produce documents or papers) upon a showing of reasonable necessity by a party."

85.     While Presiding ALJ Laba did not find good cause for Student's request that she issue a subpoena duces tecum to allow student to obtain his educational records before the start of a due process hearing (Ex. 14), OAH's ALJs are enforcing districts' "rights" to issue their own subpoena duces tecum, regardless of federal law and policy, regardless of whether the documents sought are privileged, protected by HIPPA or Cal. Welfare & Institutions Code § 6006, and regardless of the rule that all documents sought to be used at hearing must be disclosed at least 5 business days before the hearing.

86.     The rationale for OAH's policy to enforce district-issued subpoenas duces tecum is not the IDEA, or even the government code.  OAH derives its

newly-found authority from California Code of Civil Procedure, and holds that as long as the subpoena duces tecum complies with the technical requirements of the CCP, then the district can use a subpoena duces tecum in violation of the supremacy clause. OAH's official website even indicates that forms for General Jurisdiction cases include Subpoena Duces Tecum, however, Special Education forms do not include these. (Exhibit 20, hereto).

87.    In a recent due process hearing, from the time of student filing for due process, and in the 4 months until the due process hearing, the district personally served at least three separate rounds of subpoena duces tecum on parent, mental health facilities and non-public schools.  The district failed to disclose this during the prehearing conference.  Nevertheless, on the first day of hearing the ALJ brought in a sealed manila envelope in which mental health records, protected under Cal. W & I Code § 6006 were contained.  The district intended to use these records at hearing to embarrass parent and student.

88.    As a result of the district's issuance of the subpoena duces tecum, and the ALJ's determination that it complied with the technical rules under the CCP, the hearing in this due process case, which was scheduled to take 5 days, was extended to 7 days due, specifically, to the amount of time it took to argue the alleged "rights" of the district to proceed in this manner.  As a result, even after 7 days, the case had to be bifurcated, in order to deal with a new crop of district subpoenas duces tecum.  Here, student is in a parentally-placed residential facility, and is at risk to be discharged due to dwindling parent resources.  Rather than have a Decision by the end of February, in accordance with the 45-day rule, the parties have yet another two-day hearing on February 28th and 29th, sometime after which, a final Decision will be issued. (See, Exhibit 21, hereto).

(v)    **Mishandling of Conflict of Law Analysis Regarding Statute of Limitations.**

89.    Prior to the reauthorization of IDEA effective on July 1, 2005, IDEA did not specify any statute of limitations in due process filings.  Accordingly, due process filings under IDEA prior to July 1, 2005 looked to the to the limitations period under state law.  California Education Code §56501(r) states, "Any request for a due process hearing arising from subdivision (a) of Section 56501 shall be filed within three years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request..."  Therefore, the three-year statute was used until the reauthorization of IDEA.

90.    In the July 1, 2005 revisions, for the first time IDEA adopted its own statute of limitations, 20 U.S.C. § 1415(b)(6)(B), which states:

> An opportunity for any party to present a complaint...which sets forth an alleged violation that occurred no more that 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for presenting such a complaint under this part, in such time as the State law allows...

91.    This provision was to take effect on October 9, 2006, and California Education Code effective on October 9, 2006 contained a provision, § 56505(l-n), which limits the period to two years commencing on October 9, 2006.

92.    However, California Education Code § 56501(r), has not been repealed, and remains part of the Code.

93.    On September 1, 2007, due to the California legislature not taking any corrective action as to the two statutes of limitations, in accordance with IDEA's mandate to protect student's rights, and in view of the language in 20 U.S.C § 1415(b)(6)(B), which allows for the borrowing of a more favorable state statute of limitations, students started filing due process complaints for the three-year period.

This caused districts to file motions to limit issues, based upon the two-year statute of limitations.

94.    In deciding the districts' motions for limitation of issues, under federal question jurisdiction, a federal conflict of law analysis was required. However, rather than citing any federal case law for OAH's response that the two-year statute of limitations applies, Presiding ALJ Laba cites a California state appellate court case, holding, that when two acts governing the same matter cannot be reconciled, the later in time will prevail over the earlier. *Los Angeles Police Protection League v. City of Los Angeles,* 27 Cal. App. 4th, 168, 178). (Exhibit 22, hereto).

95.    OAH's position regarding the statute of limitations may be correct, however, the only way to determine this is by a detailed, federal conflict of law analysis that looks at federal case law. OAH's failure to consider this violates the supremacy clause.

### E.    Defendant Didn't Want to Award the Interagency Agreement to OAH In July, 2005.

96.    Plaintiff incorporates by reference each and every allegation of Paragraphs 1 through 95 of the Complaint as though fully set forth hereat.

97.    On March 9, 2004, Defendant issued a Board Decision, PSC No. 03-04 regarding the award of the of June 1, 2000-May 31, 2003 Interagency Agreement awarded to McGeorge ( SEHO), but contested by OAH on the basis that SEHO does not employ civil servants. (Exhibit 23, hereto).

98.    Among the concerns raised in this Board Decision was, "CDE, McGeorge and PAI also assert that OAH lacks sufficient professional and support staff to provide all the contracted services." (Ex. 23, p. 13). Defendant concluded, that although there was a preference to award the Interagency Agreement to civil servants, such as CDE, as opposed to a private agency, such as McGeorge (SEHO),

"...it is clear that the contracted services were of such a highly specialized or technical nature that the necessary expert knowledge, experience, and ability was not available in the civil service at the time the Contract was entered into."

99.    Based upon this decision, the Interagency Agreement remained with SEHO.

100.    On March 22, 2005, the emergency need for special education hearing services, leading up to the Interagency Agreement for July 1, 2005-June 30, 2008 was the subject of another Board Decision of Defendant, PSC No. 04-05 (Exhibit 24, hereto).

101.    Despite the serious misgivings expressed by Defendant about OAH in the earlier Board Decision, state employees contended that California was at risk of losing federal funding if the Interagency Agreement was not awarded to civil servants, citing, *Professional Engineers in California Government v. Department of Transportation.*

102.    Defendant still would not contract with OAH unless OAH "is diligently working to develop and implement a plan that would promptly transition the contracted work to state workers in accordance with Article VII and the state's civil service mandate." (Ex. 24, p. 9).

103.    The Interagency Agreement was awarded to OAH, and Defendant's prophesy came true.

104.    On November 5, 2007, the mandate of *Professional Engineers,* that limited the state's right to contract with private engineers was ruled unconstitutional.   *Professional Engineers in California Government v. Kempton,* 40 Cal. 4th 1016 (2007).

105.    Therefore, the very authority which caused Defendant to award the Interagency Agreement to OAH, is reversed, thereby allowing Defendant to freely contract with qualified agencies.

# V.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (VIOLATION OF IDEA)

106.    Plaintiff incorporates by reference each and every allegation of Paragraphs 1 through 105 of the Complaint as though fully set forth hereat.

107.    20 U.S.C § 1415(g)(2) mandates:

> Upon completion of the due process hearing, the
> Administrative Law Judge shall prepare a written,
> reasoned decision.  The decision shall include reason(s)
> for any nonpublic school placement or agency services
> or reimbursement for any nonpublic school placement or
> agency services.  The decision shall be mailed to all parties
> within 45 days from receipt of the request for a hearing.

108.    With regard to any extensions of the 45-day timeline, IDEA is explicit that such extensions may only be requested by one of the parties to the due process, not by the ALJ. "Either party to a hearing may request an extension from the Administrative Law Judge, which request shall be granted upon a showing of good cause.  Any extension shall extend the time for rendering a final administrative decision for a period only equal to the length of the extension." 34 C.F.R. § 300.511(c).

109.    In allowing OAH to repeatedly violate the 45-day timeline for decisions, Defendant has caused disabled students throughout the state to be deprived of their rights, to be forced to go without a remedy for extended periods of time, in violation of IDEA.

110.    In endorsing OAH's false and misleading data, and publishing it on Defendant's official website, as well as to OSEP, Defendant is enriching OAH to the detriment of disabled students, in violation of IDEA and the Interagency Agreement.

111.   In allowing OAH to delegate the compensatory education remedy to an IEP team, Defendant is in violation of IDEA.

112.   Defendant, in condoning OAH's allowance of school districts to issue subpoenas duces tecum, is in violation of IDEA, the 5-day rule, and expedient exhaustion requirements, to disabled students' detriment.

113.   IDEA specifically allows the issuance of Permanent Injunctions. *Honing v. Doe,* 484 U.S. 305 (1988).

114.   Therefore, Plaintiff is entitled to injunctive relief against Defendant.

## SECOND CAUSE OF ACTION

## (VIOLATION OF THE SUPREMACY CLAUSE)

115.   Plaintiff incorporates by reference each and every allegation of Paragraphs 1 through 114 of the Complaint as though fully set forth hereat.

116.   Article VI, Section 2, of the United States Constitution provides:

> This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, and any Thing in the Constitution of Laws of any state to the Contrary notwithstanding.

117.   The Supremacy Clause mandates that federal law preempts any state regulation of any matter over which Congress has expressly or impliedly exercised exclusive authority or which is constitutionally reserved for federal government.

118.   The authority to allocate federal funds for the provision of mediations and due process hearings for disabled students under IDEA is a matter over which the federal government has exclusive authority.

119.   Defendant, in authorizing and endorsing a lesser standard of qualifications of OAH's ALJs than is provided under IDEA, is in violation of the Supremacy Clause.

120.   In authorizing and endorsing the use of OAH's ALJs who have not met the minimum training requirements, are not knowledgeable and experienced in special education law, and who do not write decisions in accordance with the letter and spirit of IDEA, Defendant has caused, and continues to cause irreparable harm to disabled students, some of whom have been sitting home without any educational services for over a year, in violation of the Supremacy Clause.

121.   Defendant has allowed OAH's ALJs to usurp the federal government's exclusive power to allocate federal resources for the protection of rights of disabled students and their parents.

122.   Additionally, Defendant has allowed OAH's ALJs to substitute provisions of state law, when federal law is governing, in violation of the Supremacy Clause.

123.   Therefore, Plaintiff is entitled to injunctive relief against Defendant.

### THIRD CAUSE OF ACTION

### (VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE 14th AMENDMENT).

124.   Plaintiff incorporates by reference each and every allegation of Paragraphs 1 through 123 of the Complaint as though fully set forth hereat.

125.   The mandate for the IDEA arose after the landmark decision of *Brown v. Board of Education*. Parents of disabled children started to seek redress in court. Two District Court cases, *Pennsylvania Association for Retarded Children (PARC) v. Pennsylvania* (PA, 1971), and *Mills v. Board of Education,* (DC, 1972) provided the foundation for establishing the right of children with disabilities to a free, appropriate public education in the least restrictive environment by interpreting the equal protection guarantee of the 14th Amendment.

126.   The goals of IDEA were (1) to assure that all children with disabilities receive a free appropriate public education that emphasizes special education and

related services designed to meet their unique needs, (2) to protect the rights of children with disabilities and their parents and guardians, and (3) to assist the states in providing for the effective education of all children with disabilities. Federal funds are used to enable the states to comply with the mandate of IDEA.

127.   While disabled students are not a suspect class, or quasi-suspect class, subject to strict scrutiny under the Equal Protection Clause, disabled students are a protected class entitled to a balancing of consideration of the need of disabled students' for enforcement of laws specifically designed to protect them, as opposed to the "alleged" rights of districts to whittle away at these very protections.

128.   By Defendant's failure to properly oversee OAH's special education ALJs, and in allowing these ALJs to selectively enforce rights of disabled students, district's have been emboldened to eschew the settlement process of mediation, and to go to hearing in an attempt to mislead the ALJ into thinking that IDEA affords district's more rights than students, which has been endorsed by OAH and Defendant, to the extreme detriment of disabled students, who, at most, are prevailing in due process hearings only 10% of the time.

129.   Defendant's and OAH's actions in promoting the district's interests (such as in allowing subpoena duces tecum and unduly prolonging due process proceedings based upon district's self-serving arguments) rather than balancing the student's rights under the law, have violated the Equal Protection Clause and harmed students.

130.   Unless a Permanent Injunction issues, there is a strong likelihood that the flagrant violations of OAH for the past 2 ½ years will continue, to the continuing detriment of Students.

131.   Therefore, Plaintiff is entitled to injunctive relief against Defendant.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

1.     For a Temporary Restraining Order, Preliminary and Permanent Injunction pursuant to Fed. R. Civ. Pro. 65, enjoining Defendant from renewing or otherwise awarding the Interagency Agreement effective July 1, 2008 to OAH.

2.     For an order awarding Plaintiff's reasonable attorney fees and costs, pursuant to 20 U.S.C. § 1400, et seq., and Fed. R. Civ. Proc. 23 (h).

3.     For such other and further relief as the Court deems just and equitable.

Dated:  February 5, 2008

Ellen Dowd, Attorney for
Plaintiff, C.S.