**EXHIBIT 1**



**CALIFORNIA
DEPARTMENT OF
EDUCATION**

1430 N STREET
SACRAMENTO, CA
95814-5901

**JACK O'CONNELL**
State Superintendent of
Public Instruction
PHONE: (916) 319-0800

July 20, 2005

Ronald L. Diedrich, Director and Chief Administrative law Judge
Department of General Services-Office of Administrative Hearings
560 J Street, Suite 300
Sacramento, CA 95814

Dear Mr. Diedrich:

Subject: Agreement #4427

1. ____ Submitted for your approval are four copies of the attached agreement. Please
sign in the contractor's signature box and return all four copies to the Contracts
Office at the address noted below. When final approval is obtained for this
agreement, an approved copy will be mailed to you.

Contracts Office
California Department of Education
1430 N Street, Suite 2213
Sacramento, CA 95814

2. ____ Please attach one copy of board resolution/certified board minutes or excerpt
of board minutes authorizing person to sign in your behalf and approving the
agreement.

3. ____ Please also sign and return: Certification CCC-304.

4. _x_ Enclosed is one fully executed copy for your records.

Sincerely,

*Margie Burke*

Margie Burke, Staff Services Manager II
Contracts Office

11/21/2005  16:51    916995         PAGE  04/24

STATE OF CALIFORNIA
**STANDARD AGREEMENT**
STD 213 (Rev 06/03)

| | |
|---|---|
| AGREEMENT NUMBER | 4427 |
| REGISTRATION NUMBER | |

1. This Agreement is entered into between the State Agency and the Contractor named below:

STATE AGENCY'S NAME
**California Department of Education (CDE)**

CONTRACTOR'S NAME
**Department of General Services, Office of Administrative Hearings (DGS/OAH)**

2. The term of this Agreement is:   June 1, 2005   through   June 30, 2008

3. The maximum amount
   of this Agreement is:   $ 29,068,955.25
   Twenty-Nine Million, Sixty-Eight Thousand, Nine Hundred Fifty-Five Dollars & Twenty-Five Cents

4. The parties agree to comply with the terms and conditions of the following exhibits which are by this reference made a part of the Agreement.

| | |
|---|---|
| Exhibit A – Scope of Work | 5 page(s) |
| Exhibit B – Budget Detail and Payment Provisions | 10 page(s) |
| Exhibit C* – General Terms and Conditions | GIA 101 |

Check mark one item below as Exhibit D:
☒ Exhibit - D Special Terms and Conditions (Attached hereto as part of this agreement)    2 pages
☐ Exhibit - D* Special Terms and Conditions

Exhibit E – Additional Provisions    page(s)

Items shown with an Asterisk (*), are hereby incorporated by reference and made part of this agreement as if attached hereto. These documents can be viewed at www.ols.dgs.ca.gov/Standard+Language

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

**CONTRACTOR**

CONTRACTOR'S NAME (if other than an individual, state whether a corporation, partnership, etc.)
Department of General Services – Office of Administrative Hearings

BY (Authorized Signature)

DATE SIGNED (Do not type)
May 31, 2005

PRINTED NAME AND TITLE OF PERSON SIGNING
Ronald L. Diedrich, Director and Chief Administrative Law Judge

ADDRESS
560 J Street, Suite 300
Sacramento, CA 95814

California Department of General Services Use Only

JUN  8

**STATE OF CALIFORNIA**

AGENCY NAME
California Department of Education

BY (Authorized Signature)

DATE SIGNED (Do not type)
6/1/05

PRINTED NAME AND TITLE OF PERSON SIGNING
Gerald C. Shelton, Director, Fiscal and Administrative Services Division

ADDRESS
1430 N Street, Suite 2213, Sacramento, CA 95814

☐ Exempt per

916 327 5233   P.03/23        SPECIAL EDUCATION DIV        NOV-21-2005  15:55

11/21/2005  16:51    9169980    PAGE  05/24

CALIFORNIA DEPARTMENT OF EDUCATION
CONTRACTS OFFICE

# ENCUMBRANCE SHEET

CO-610 (Rev. 6/01)

| | | CONTRACT NO. 4427 | A.M. NO. |
|---|---|---|---|

**CONTRACTOR'S NAME**
Department of General Services/Office of Administrative Hearings

| AMOUNT ENCUMBERED | PROGRAM CATEGORY (CODE AND TITLE) | | FUND TITLE | |
|---|---|---|---|---|
| UNENCUMBERED BALANCE | (OPTIONAL USE) | | | |
| ADJ. INCREASING ENCUMBRANCE | ITEM | CHAPTER | STATUTE | FISCAL YEAR |
| ADJ. DECREASING ENCUMBRANCE | OBJECT OF EXPENDITURE (CODE AND TITLE) | | | |

| AMOUNT ENCUMBERED $ 349,834.00 | PROGRAM CATEGORY (CODE AND TITLE) Office of Administrative | | FUND TITLE Federal | |
|---|---|---|---|---|
| UNENCUMBERED BALANCE | (OPTIONAL USE) 01198/0663 (J423-14) PC#023 PC#84027011 | | Funds Available | |
| ADJ. INCREASING ENCUMBRANCE | ITEM 6100-001-0890 | CHAPTER 208 | STATUTE 2004 | FISCAL YEAR 04/05 |
| ADJ. DECREASING ENCUMBRANCE | OBJECT OF EXPENDITURE (CODE AND TITLE) 38202 | | | |

| AMOUNT ENCUMBERED $ 7,761,877.25 | PROGRAM CATEGORY (CODE AND TITLE) Office of Administrative | | FUND TITLE Federal | |
|---|---|---|---|---|
| UNENCUMBERED BALANCE | (OPTIONAL USE) 01198/0663 (J423-14) PC#023  PC#84027011 | | APPROVED UPON ENACTMENT OF BUDGET ACT | |
| ADJ. INCREASING ENCUMBRANCE | ITEM 6100-001-0890 | CHAPTER BA | STATUTE 2005 | FISCAL YEAR 05/06 |
| ADJ. DECREASING ENCUMBRANCE | OBJECT OF EXPENDITURE (CODE AND TITLE) 38202 | | | |

| AMOUNT ENCUMBERED $ 9,979,640.00 | PROGRAM CATEGORY (CODE AND TITLE) Office of Administrative | | FUND TITLE Federal | |
|---|---|---|---|---|
| UNENCUMBERED BALANCE | (OPTIONAL USE) 01198/0663 (J423-14) PC#023  FC#84027011 | | APPROVED UPON ENACTMENT OF BUDGET ACT | |
| ADJ. INCREASING ENCUMBRANCE | ITEM 6100-001-0890 | CHAPTER BA | STATUTE 2006 | FISCAL YEAR 06/07 |
| ADJ. DECREASING ENCUMBRANCE | OBJECT OF EXPENDITURE (CODE AND TITLE) 38202 | | | |

| AMOUNT ENCUMBERED $10,977,604.00 | PROGRAM CATEGORY (CODE AND TITLE) Office of Administrative | | FUND TITLE Federal | |
|---|---|---|---|---|
| UNENCUMBERED BALANCE | (OPTIONAL USE) 01108/0663 (J423-14) PC#023  FC#84027011 | | APPROVED UPON ENACTMENT OF BUDGET ACT | |
| ADJ. INCREASING ENCUMBRANCE | ITEM 6100-001-0890 | CHAPTER BA | STATUTE 2007 | FISCAL YEAR 07/08 |
| ADJ. DECREASING ENCUMBRANCE | OBJECT OF EXPENDITURE (CODE AND TITLE) 38202 | | | |

| I hereby certify upon my own personal knowledge that budgeted funds are available for the period and purpose of the expenditure stated above. | | T.B.A NO. | B.R. NO |
|---|---|---|---|
| SIGNATURE OF ACCOUNTING OFFICER | | DATE 05/26/05 | |

11/21/2005  16:51   9169⬤   PAGE  06/24

**Department of General Services**
**Office of Administrative Hearings**
**Interagency Agreement No. 4427**
**May 25, 2005**
**Page 1 of 5**

## EXHIBIT A
## SCOPE OF WORK

### A. GENERAL SCOPE

State and federal law provides that all children with disabilities are entitled to a free and appropriate public education under the Individuals with Disabilities Education Act (20 United States Code section 1400 et seq., as amended by Public Law No. 108-446) and Part 30 of the California Education Code, commencing with Education Code section 56000. Eligible pupils and their parents are entitled to procedural safeguards with respect to disagreements concerning decisions about assessment, eligibility program development, placement, and a free appropriate public education. A request for due process, including mediations and administrative hearings, may be made under 20 U.S.C. section 1415 et seq. and EC section 56500.1 et seq. Department of General Services, Office of Administrative Hearings ("OAH") agrees to provide such hearing and mediation services pursuant to and in accordance with the requirements of federal and state laws and regulations, including all services as specifically detailed in this agreement.

### B. SUPPORT STAFF

OAH agrees to maintain or provide administrative, supervisory and other support staff to operate the mediation and hearing process, including staff who will: (1) provide detailed information to callers, including information regarding hearing procedures; (2) receive, calendar, and monitor and report on the status of cases for mediation and hearing; (3) issue notices, including notice of hearing date, mediation date, calendar status, pre-hearing conference date, motion and related-filing deadlines; (4) arrange for interpreters or special accommodations; (5) arrange for transcription of hearing audiotapes and distribution; (6) prepare cases for storage and maintain closed file inventory system; (7) perform functions in connection with communication items identified.

### C. TRAINING

1. OAH agrees to provide special education unit ALJs specialized training regarding IDEA (including amendments made by Public Law 108-446), Education Code section 56000 et seq., and related regulations, as well as global skills training, as specified below. Trainings will be designed to ensure that all ALJs meet the minimum training standards specified in section 3082.2 of Title 5, California Code of Regulations.

2. Presiding ALJs will determine when ALJs have a working knowledge of the laws and regulations governing services to students who qualify for services under the IDEA and related California laws and regulations, and the programmatic aspects of special education, services, and supports. Only ALJs who have the level of expertise specified in proposed regulations section 3082.2 will be assigned mediation and hearing duties.

Department of General Services
Office of Administrative Hearings
Interagency Agreement No. 4427
May 25, 2005
Page 2 of 6

3. OAH, with stakeholder input and in coordination with CDE, will provide 80 hours of specialized training annually in special education law and issues, mediation techniques, pre-hearing processes, and current pedagogical issues. Annual training will also address consistency in procedures and practices. ALJs will receive training that addresses the global competencies for all adjudicative proceedings. This global skills training will address such topics as the dynamics of mediation, listening and communication skills, interest-based mediation, techniques to avoid impasse, writing clear and complete mediation agreements.

## D. MEDIATIONS/DUE PROCESS HEARINGS

1. OAH agrees to maintain a separate specialized unit of Administrative Law Judges (ALJs) these ALJs meet the minimum qualifications specified in section 3082.1 of Title 5, California Code of Regulations, are to function as officers and mediators. OAH agrees that the ALJs will work with the parties to resolve their disputes. ALJs will be assigned a mix of hearings and mediations, with each case typically being assigned a hearing-ALJ and a mediation-ALJ. In no case will OAH assign an ALJ who facilitates a mediation to preside over a hearing in the same case.

2. ALJs will be responsible for managing mediations through to impasse or resolution, and prepare a written mediation agreement if successful. A single case file will be maintained, but all materials related to the mediation will be sealed and not reviewed by or discussed with the hearing ALJ. Assigned ALJs will coordinate with regard to scheduling.

3. OAH will conduct mediations and due process hearings at a location that is convenient to the parents. OAH will prepare, in consultation with CDE, a form "Notice of Mediation" to advise the parties of procedure and their responsibilities, including materials each is required to bring to the mediation.

4. OAH will assign the special education unit ALJs to regional offices throughout the State, and they will be supervised by a local Presiding ALJ. OAH will assign these Presiding ALJs on an exclusive and full-time basis to administer the hearing and alternative dispute resolution program in their assigned office. Presiding ALJs will supervise the special education ALJs in their respective offices; assure training and mentoring of ALJs and support staff; rule on continuance requests and other pre-hearing law and motion matters; oversee the technical operation of the program; evaluate ALJs; and review ALJ decisions for legal sufficiency, logic, and clarity.

5. OAH, in consultation with CDE, agrees to devise a "Request to Set" form by which a party may request a hearing and/or mediation. The form will be available on the Internet, filed electronically, or in written form. OAH calendar staff will process these requests, assign a case number, enters relevant information on OAH's computerized case management and tracking system.

Department of General Services
Office of Administrative Hearings
Interagency Agreement No. 4427
May 25, 2005
Page 3 of 5

6.  OAH agrees to conduct due process hearings in accordance with regulations section 3080 et seq., Title 5, California Code of Regulations.

7.  OAH agrees that it will ensure that the communication needs of non-English speaking parties and hearing-disabled parties are accommodated in hearings, pre-hearing conferences, mediations, and related proceedings. OAH will use interpreters who are certified by a court or government agency provided certification is available in the required language; the parties acknowledge and that not all languages have a certification examination. Additionally ALJs may provisionally qualify an interpreter when necessary pursuant to Title 1, section 1032.

E.  **COMMUNICATIONS/INFORMATION SHARING**

1.  OAH will work with CDE to provide information for and to update the CDE Web site pages pertaining to the Special Education Hearing Office as posted at http://www.cde.ca.gov/sp/se/ds/. OAH will be given administrative rights to the SEHO database. OAH will provide CDE with a liaison for issues pertaining to the Web site.

2.  In consultation with CDE, OAH will prepare consumer brochures for special education proceedings, which will be widely disseminated to LEAs and parents of students with disabilities. At a minimum, all public forms, procedures, and brochures shall be made available in English and the five foreign languages most commonly spoken in California schools: Spanish, Vietnamese, Hmong, Cantonese, and Tagalog.

3.  OAH will update the OAH Hearing Manual, adding chapters for special education mediations and hearings, including information regarding special education legal and procedural issues and will revise the manual as needed to incorporate substantive changes in laws or regulations. OAH will work closely with the CDE to customize procedures as necessary.

4.  Upon completion of a hearing, OAH will submit hard copies of the decisions to CDE. On a monthly basis, OAH uploads all redacted reports to CDE's hearing decision database.

5.  OAH, in consultation with CDE, will update the publication "Notice of Procedural Safeguards" and make copies available to parties and the public.

6.  OAH will update and provide an attorney and advocate list to parties (as required by law) and the public.

7.  OAH will maintain the Special Education Hearing Office Advisory Committee of attorneys, advocates, parents, and school employees and will schedule semiannual meetings with the committee, one in northern California and one in southern California.

Department of General Services
Office of Administrative Hearings
Interagency Agreement No. 4427
May 25, 2005
Page 4 of 5

### F.  DATA COLLECTION AND REPORTING

1. When OAH opens a case for mediation or due process, it will notify the Procedural Safeguards Referral Service Unit of the case number, the date that the case opened, the name of the complainant, the school district involved.

2. OAH will provide CDE, on at least a quarterly basis, with the following information:

   a.  Mediations: 1) Number of mediations not related to hearing requests; 2) number of mediations related to hearing requests; 3) number of mediation agreements not related to hearing requests; 4) number of mediation agreements related to hearing requests; 5) number of mediations pending

   b.  Due process hearings: 1) Number of hearing requests; 2) number of hearings held; 3) number of decisions issued after timelines and extension expired; 4) number of hearings pending; 5) number of expedited hearings;

   c.  In addition, OAH will provide case status; district from which the request originated; prevailing party; demographic descriptors; and duration and results of any mediation and due process decisions, including any mediated agreements. The contractor must have the ability to provide CDE with the costs of hearings and/or mediations on both an aggregate and individual basis.

3. OAH will develop, report to CDE on, and implement recommendations for system improvement.

4. OAH will develop and provide to parties an evaluation form for completion by parties who participate in mediations and/or hearings. OAH shall review and provide CDE a summary report of the evaluations on a quarterly basis.

5. OAH will gather, analyze, and report to CDE statistical data on productivity of hearing officers and mediators.

### G.  TRANSITION

1. OAH agrees to hire staff and purchase Information Technology systems, including computers, network switches, and other equipment for the purpose of developing and expanding the current case management system and a calendaring system to accommodate a separate and complete special education system.

2. OAH agrees to find and lease office space for special education units and order and purchase office equipment and supplies for new staff. The accounting and billing system, including provision for audit reports, will be expanded, and OAH agrees to have in place a parent and LEA notification plan. In consultation with CDE, OAH agrees to develop and finalize an initial training program for ALJs.

Department of General Services
Office of Administrative Hearings
Interagency Agreement No. 4427
May 25, 2005
Page 5 of 5

3.  Subject to paragraph G.4, OAH will accept for filing and take all necessary and appropriate steps to resolve all special education due process and mediation matters submitted on or after July 1, 2005.

4.  OAH will refer those due process matters submitted between July 1, 2005, and December 31, 2005, in which the parties request mediation to McGeorge, which will assign a mediator. In those cases, McGeorge shall contract with a mediator, calendar mediations, prepare mediation agreements and carry out all related administrative functions necessary to the mediation. OAH is not responsible for any such matter referred to McGeorge unless and until it is returned to OAH by McGeorge. Any such matter that remains pending on June 30, 2006, will be transferred to OAH for handling in accordance with the terms of this agreement.

5.  OAH acknowledges and agrees that McGeorge will continue to provide all due process hearing and/or mediation services required in those matters filed prior to July 1, 2005, that are pending on that date. Any such due process matters that remain pending on June 30, 2006, will be transferred to OAH. With CDE's assistance, OAH agrees to meet with McGeorge to plan for the disposition of any such pending matters, including the physical transfer of files.

6.  With CDE's assistance, OAH agrees to meet with McGeorge to plan for the disposition of any matters pending as of June 30, 2005.

7.  OAH agrees, in consultation with CDE and where possible, McGeorge, to complete a notification plan for the public, parents and LEAs, including contact names, addresses, fax and telephone numbers, and publicize and advice regarding new procedures and disposition of pending matters.

H.  CONFIDENTIALITY

OAH agrees to implement and enforce any provision in the law concerning confidentiality of information and/or records relating special education hearings and mediations.

I.  PROJECT REPRESENTATIVES

The CDE project representative during the term of this Agreement will be Allison Smith (916) 327-3932. The OAH project representative during the term of this Agreement will be Ronald L. Diedrich (916) 445-4926.

11/21/2005 16:51 9169960

Department of General Services
Office of Administrative Hearings
Interagency Agreement No. 4427
May 25, 2005
Page 1 of 2

### EXHIBIT B
### BUDGET DETAIL

1. **INVOICING AND PAYMENT**

   A. For services satisfactorily rendered, and upon receipt and approval of the invoice, the State agrees to compensate the Contractor for actual expenditures incurred in accordance with the rates specified herein, which is attached hereto and made part of this agreement.

   B. The invoice shall include the Agreement # 4427 and shall be submitted at the end of the contract period in duplicate to:

   California Department of Education
   Administrative Services Unit – Special Education Division
   1430 N Street, Suite 2401
   Sacramento, CA 95814
   Attention: Allison Smith

2. **BUDGET CONTINGENCY CLAUSE**

   A. It is mutually agreed that if the Budget Act of the current year and/or any subsequent years covered under this Agreement does not appropriate sufficient funds for the program, this Agreement shall be of no further force and effect. In this event, the State shall have no liability to pay any funds whatsoever to Contractor or to furnish any other considerations under this Agreement and Contractor shall not be obligated to perform any provisions of this Agreement.

   B. If funding for any fiscal year is reduced or deleted by the Budget Act for purposes of this program, the State shall have the option to either cancel this Agreement with no liability occurring to the State, or offer an agreement amendment to Contractor to reflect the reduced amount.

3. **PAYMENT**

   A. Costs for this Agreement shall be computed in accordance with State Administrative Manual Sections 8752 and 8752.1.

   B. Nothing herein contained shall preclude advance payments pursuant to Article I, Chapter 3, Part 1, Division 3, Title 2 of the Government Code of the State of California.

   C. Costs shall be computed in accordance with Exhibit B.1 which is attached hereto and by this reference incorporated herein.

11/21/2005  16:51    9169996                                    PAGE  12/24

Department of General Services
Office of Administrative Hearings
Interagency Agreement No. 4427
May 25, 2005
Page 2 of 2

4.    **CONTRACTS FUNDED BY THE FEDERAL GOVERNMENT**

   A.    It is mutually understood between the parties that this contract may have been written
         before ascertaining the availability of congressional appropriation of funds, for the mutual
         benefit of both parties, in order to avoid program and fiscal delays which would occur if the
         contract were executed after that determination was made.

         This contract is valid and enforceable only if sufficient funds are made available to the
         State by the United States Government for Fiscal Years 05/06, 06/07 and 07/08, covered
         by this agreement for the purposes of this program. In addition, this contract is subject to
         any additional restrictions, limitations, or conditions enacted by the Congress or any statute
         enacted by the Congress, which may affect the provisions, terms, or funding of this
         contract in any manner.

         It is mutually agreed that if Congress does not appropriate sufficient funds for the program,
         this contract shall be amended to reflect any reduction in funds.

         The department has the option to void the contract under the 3-day cancellation clause or
         to amend the contract to reflect any reduction of funds.

         The recipient shall comply with the Single Audit Act and the reporting requirements set
         forth in OMB Circular A-133.

Department of General Services
Office of Administrative Hearings
Interagency Agreement No. 4427
May 25, 2005
Page 1 of 1

## EXHIBIT C
## GENERAL TERMS AND CONDITIONS

1.  APPROVAL: This Agreement is not valid until signed by both parties and approved by the Department of General Services, if required.

2.  AUDIT: The agency performing work under this Agreement agrees that the awarding department, the Department of General Services, the Bureau of State Audits, or their designated representative shall have the right to review and to copy any records and supporting documentation pertaining to the performance of this Agreement if it exceeds $10,000. The agency performing work agrees to maintain such records for possible audit for a minimum of three (3) years after final payment, unless a longer period of record retention is stipulated.

3.  PAYMENT: Costs for this Agreement shall be computed in accordance with State Administrative Manual Section 8752 and 8752.1.

4.  AMENDMENT: No amendment or variation of the terms of this Agreement shall be valid unless made in writing, signed by the parties, and approved as required. No oral understanding or agreement not incorporated in the Agreement is binding on any of the parties.

5.  SUBCONTRACTING: All subcontracting must comply with the requirements of the State Contracting Manual, Section 3.06.

6.  ADVANCE PAYMENT: The parties to this interagency agreement may agree to the advancing of funds as provided in Government Code Sections 11257 through 11263.

7.  DISPUTES: The agency performing work under this Agreement shall continue with the responsibilities under this Agreement during any dispute.

8.  TIMELINESS: Time is of the essence in this Agreement.

9.  TERMINATION: Either agency reserves the right to terminate this agreement upon one-hundred and twenty (120) days written notice to the other. The agency providing the services shall be reimbursed for all reasonable expenses incurred up to the date of termination.

Department of General Services
Office of Administrative Hearings
Interagency Agreement No. 4427
May 25, 2005
Page 1 of 3

## EXHIBIT D
## SPECIAL TERMS AND CONDITIONS

1.    OAH will submit quarterly reports to the contract monitor. These reports will address activities conducted and planned as well as concerns or obstacles. These reports will also include the data reported in quarterly data reports.

2.    A monthly status report will be prepared and will accompany the monthly invoices.

3.    OAH will work closely with the contract monitor and other CDE staff assigned to the project.

4.    OAH will make all data collected available for placement on the CDE Web site.

5.    OAH will propose any suggested changes in the law through the contract monitor to CDE.

6.    OAH will ensure that all travel reimbursements will be consistent with the rates established by the state Department of Personnel Administration.

7.    OAH will work through the contract monitor to ensure that all eligible contractor staff and subcontractors will obtain state rates for travel to minimize the cost to the state.

8.    OAH will provide the contract monitor each January 15 with a projection of costs for the remainder of the fiscal year so that budget revisions and contract amendments can be initiated as necessary.

9.    OAH will inform the contract monitor when changing professional project personnel.

10.    All material developed under the terms of this agreement will become the property of the California Department of Education.

11.    OAH will maintain accounting records and other evidence pertaining to costs incurred and will make them available to CDE during the period of the interagency agreement and for five years after final payment on the agreement.

12.    OAH will permit CDE to audit, review, and inspect OAH's activities, books, documents, papers, and records during the progress of the work and for five years following final payment. All documents associated with mediations and hearings will be retained for the same time period.

13.    All equipment budgeted to be purchased by OAH for the Special Education Hearing Office will be owned by CDE. OAH will work with CDE through the contract monitor on the transfer and disposition of equipment no longer needed by the contractor.

Department of General Services
Office of Administrative Hearings
Interagency Agreement No. 4427
May 25, 2005
Page 3 of 3

f.   The time scheduled for hearings and/or mediations which are cancelled or continued on
     such short notice that OAH can not re-schedule that time for the ALJ.  It is anticipated that
     this will happen infrequently and that OAH will make every effort to find other billable
     activities in which the ALJ can engage.

g.   Reimbursement for the cost of transcripts, not to exceed the actual cost to OAH for this
     service.

h.   Electronic recording of hearing or proceedings will be reimbursed at the flat rate of $30.00
     per day.  This does not include the costs of transcript preparation.

Department of General Services
Office of Administrative Hearings
Interagency Agreement No. 4427
May 25, 2005
Page 1 of 8

EXHIBIT B.1
BUDGET

## BUDGET SUMMARY

| | |
|---|---|
| June 1, 2005 – June 30, 2005 | $349,834.00 |
| July 1, 2005 – June 30, 2006 | 7,761,877.25 |
| July 1, 2006 – June 30, 2007 | 9,979,640.00 |
| July 1, 2007 – June 30, 2008 | 10,877,604.00 |
| TOTAL | $29,088,955.25 |

Department of General Services
Office of Administrative Hearings
Interagency Agreement No. 4427
May 26, 2005
Page 2 of 8

**BUDGET DETAIL (FY 2004-2005)**
**BUDGET YEAR JUNE 1, 2005 – JUNE 30, 2005**

**TOTAL SALARIES AND WAGES**                                          **$272,334**

PRESIDING JUDGES (4)                                                     $32,750
ADMINISTRATIVE LAW JUDGES (20)                                         $155,817
LEGAL SECRETARIES (17)                                                   $55,633
LEGAL SUPPORT SUPERVISORS (4)                                            $14,417
STAFF SERVICES MANAGERS (2)                                              $10,500
ACCOUNTANT                                                                $2,917

**TOTAL ALJ TRAINING INCLUDING PERDIEM AND TRAVEL**                    **$66,000**

PRINTING COSTS                                                            $3,400
POSTAGE                                                                   $3,400
COMMUNICATIONS                                                            $3,400
GENERAL EXPENSES                                                          $7,300

**TOTAL TRANSITION COSTS**                                             **$349,834**

Department of General Services
Office of Administrative Hearings
Interagency Agreement No. 4427
May 25, 2005
Page 3 of 18

**BUDGET DETAIL (FY 2006-2008)**
**BUDGET YEAR JULY 1, 2005 – JUNE 30, 2006**
(as adjusted for contract transition)

| | Personnel Years | COST | Adjustment for Transition Svcs | Adjusted Budget |
|---|---|---|---|---|
| TOTAL SALARIES AND WAGES | 68.0 | $5,137,576.00 | | |
| SALARY SAVINGS (5 percent) | (3.4) | ($256,876.90) | | |
| NET TOTAL SALARIES AND WAGES | 64.6 | $4,880,699.10 | | |
| STAFF BENEFITS | | $1,450,420.59 | | |
| | | | | |
| TOTAL PERSONAL SERVICES | 64.6 | $6,331,119.69 | $1,305,642.44 | $5,032,477.25 |
| | | | | |
| OPERATING EXPENSES AND EQUIPMENT | | | | |
| GENERAL EXPENSE | | | | $88,000 |
| PRINTING | | | | $41,000 |
| COMMUNICATIONS | | | | $41,000 |
| POSTAGE | | | | $41,000 |
| TRAVEL | | | | $111,000 |
| TRAINING | | | | $550,000 |
| FACILITIES OPERATIONS | | | | $1,216,000 |
| DATA PROCESSING | | | | $109,000 |
| EXPENDABLE EQUIPMENT | | | | $89,000 |
| TOTAL OPERATING EXPENSES AND EQUIPMENT | | | | $2,285,000 |
| | | | | |
| TOTAL STATE OPERATIONS EXPENDITURES | | | | $7,307,477.25 |
| | | | | |
| FILING FEES ($66 per case) | | | | $257,400 |
| TRANSLATOR COSTS | | | | $197,000 |
| | | | | |
| TOTAL | | | | $7,761,877.25 |

11/21/2008  16:51    91695

Department of General Services
Office of Administrative Hearings
Interagency Agreement No. 4427
May 23, 2006
Page 3 of 9

## DETAIL OF SALARY AND WAGES

| CLASSIFICATION | POSITIONS | SALARY RANGE | | FISCAL YEAR COST | Adjustment for work reduced by McGeorgE (-33.478%) | Adjusted Budget 100%-IIB |
|---|---|---|---|---|---|---|
| ALJ II (Supv) | 4.0 | $7,420 - | $9,576 | 399,070.00 | | |
| ALJ | 40.0 | $7,071 - | $9,597 | 3,749,250.00 | | |
| Legal Secretary | 17.0 | $2,559 - | $3,623 | 809,124.09 | | |
| Legal Support Supervisor | 4.0 | $3,277 - | $3,095 | 174,706.02 | | |
| Staff Services Manager I (Spec) | 2.0 | $4,749 - | $5,716 | 126,958.00 | | |
| Accountant I (Spec) | 1.0 | $2,632 - | $3,369 | 73,663.00 | | |
| **TOTAL SALARIES AND WAGES** | 68.0 | | | 5,457,970.00 | | |
| SALARY SAVINGS (19.5%) | -3.4 | | | -268,070.50 | | |
| **NET SALARIES AND WAGES** | 64.6 | | | 4,889,899.50 | -1,008,840.30 | 3,871,958.54 |
| | | | | | | |
| **STAFF BENEFITS DETAIL** | | | | | | |
| OASDI | | 7.650% | | 373,373.48 | | |
| HEALTH INSURANCE | | $4,387 /employee | | 282,408.20 | | |
| RETIREMENT | | 14.230% | | 694,523.48 | | |
| WORKER'S COMPENSATION | | 0.710% | | 34,922.86 | | |
| INDUSTRIAL DISABILITY LEAVE | | 0.076% | | 3,676.49 | | |
| NONINDUSTRIAL DISABILITY LEAVE | | 0.100% | | 4,880.73 | | |
| UNEMPLOYMENT INSURANCE | | 0.010% | | 483.67 | | |
| VISION/DENTAL | | $842 /employee | | 56,077.23 | | |
| **TOTAL BENEFITS** | | | | $1,459,430.63 | -828,301.93 | $1,196,918.48 |
| **TOTAL** | | | | $6,341,17,645 | -1,838,645.43 | $6,022,407.25 |

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

|  |  |
|---|---|
| In the Matter of:<br><br>STUDENT,<br><br>                     Petitioner,<br><br>v.<br><br>FALLBROOK UNION HIGH SCHOOL DISTRICT,<br><br>                     Respondent. | OAH CASE NO. N2007090067 |

## DECISION

Administrative Law Judge (ALJ) Susan Ruff of the Office of Administrative Hearings, Special Education Division, State of California (OAH), heard this matter on October 16, 17, 18, and 19, 2007, in Fallbrook, California.

Ellen Dowd, Esq., represented Petitioner (Student) at the hearing. Student's mother was present throughout the hearing. Student was not present.

Sharon Watt, Esq., of Filarsky & Watt, represented Respondent Fallbrook Union High School District (District) at the hearing. Sallie Hunt, Director of Special Education, was present at the hearing on behalf of the District.

Student's due process complaint was filed on September 4, 2007. On September 7, 2007, the parties agreed to waive the 30-day resolution session period and proceed to hearing. At the close of the hearing on October 19, 2007, the parties requested time to file written closing argument. The matter was taken under submission on November 6, 2007, upon receipt of the parties' written closing argument. The parties stipulated that the deadline for preparation of the Decision in this matter would be extended until two weeks after the receipt by OAH of the written closing argument (November 20, 2007).[1]

---

[1] Because of the waiver of the resolution session period, the 45-day time limit for hearing and decision began to run the day after September 6, 2007. (Ed. Code, § 56501.5, subd. (d).) The parties stipulated to an

In the District's written closing argument, the District attached an exhibit and requested that the ALJ take official notice of that exhibit. Student filed an objection to that request. If the District wished to have its "exhibit" considered as evidence, the District should have produced the exhibit to Student's counsel prior to the hearing in accordance with the requirements of Education Code section 56505, subdivision (e)(7), and sought to introduce the document into evidence during the hearing. The District made no attempt to introduce the document into evidence or to keep the record open to permit the District to obtain the document. The District does not give a sufficient reason for attempting to introduce an "exhibit" after the close of evidence when Student has no chance to respond. The District's request is denied. (Ed. Code, § 56505, subd. (e)(8).)[2]

## ISSUES[3]

1.    Did the District fail to offer and provide a free appropriate public education (FAPE) to Student during the 2005-2006 school year when Student was in the eleventh grade in one or more of the following ways:

    a.    Failure to provide parents with options for Student's graduation.

    b.    Failure to write any handwriting goals.

    c.    Failure to provide occupational therapy services for handwriting.

    d.    Failure to take appropriate action when Student failed to make progress to meet goals.

    e.    Failure to provide a behavior support plan, and/or failure to write adequate behavioral goals.

2.    Did the District fail to offer and provide a FAPE to Student during the 2006-2007 school year when Student was in the twelfth grade in one or more of the following ways:

---

extension of the deadline to give the ALJ sufficient time to review the evidence and written closing argument of the parties.

[2]  To help provide clarity in the record, the District's closing brief was marked as Exhibit 94. Student's closing brief was marked as Exhibit X, and Student's Errata Pages were marked as Exhibit Y.

[3]  This list of issues is modified from the list in Student's due process complaint filed on September 4, 2007. During the hearing, Student requested and received permission to withdraw some of the issues in the due process complaint. In addition, a few of the issues listed above have been revised for clarification purposes. In its closing brief, the District states that "the Hearing Officer ruled that Petitioner would not be allowed to proceed" on certain issues. That characterization is not accurate. Instead, it was Student who requested and received permission to withdraw certain issues from this matter. The limiting of certain issues was also done at Student's request.

2

a.      Failure to write any handwriting goals.

b.      Failure to provide social skills training.

c.      Failure to provide occupational therapy services for handwriting.

d.      Failure to timely provide communication logs.

e.      Failure to timely provide a behavior support plan.

f.      Staff insensitivity to words and actions that trigger anxiety in Student.

g.      Staff insensitivity to parental concerns.

h.      Failure to provide any educational program (such as home hospital or itinerant teacher) after May 3, 2007.

i.      Failure to provide parents or Student with options for graduation, and/or predetermination of placement.

j.      Failure to provide a safe learning environment.


## FACTUAL FINDINGS

*Did the District Deny Student a FAPE During the 2005-2006 School Year by Failing to Provide Student's Parents with Options for Student's Graduation? Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Provide Student's Parents with Options for Student's Graduation and/or Predetermining Student's Placement?[4]*

1.      Student is an 18-year-old man who lives within the Fallbrook Union High School District. Student's parents have educational rights for Student. During the 2005-2006 and 2006-2007 school years at issue in this case, Student attended Fallbrook High School and was eligible for special education under the category of autism.

2.      Student contends that the District failed to provide Student and his parents with sufficient information regarding Student's graduation options, thereby denying Student a FAPE. Student also contends that the District made a predetermination of placement at the June 2007 IEP meeting. The law provides that parents have a right to participate in the development of the individualized education program (IEP) for their child. Part of their participation includes the right to be informed of the availability of FAPE and all available alternative educational programs, both public and nonpublic. On or before a Student's

---

[4] Because the same factual findings are necessary to decide both of these issues, they will be addressed under the same heading of this Decision.

sixteenth birthday, the Student's IEP must include information regarding Student's options for postsecondary goals and transition after high school.

3.     Student is considered to be in the "high-functioning" range of the autism spectrum. His cognitive ability is in the average range, but his disability impedes his academic and social progress. He has significant problems with communications, social interaction, auditory memory, perseverating on issues, and anxiety. His educational areas of need during the 2005-2006 and 2006-2007 school years included reading comprehension, math, social skills, problem solving and vocational skills. During those two school years Student was placed in a special day class (SDC) for most of his academic subjects because of significant academic delays.

4.     California law provides two different "tracks" by which a special education student can complete high school. If the student is capable of meeting the requirements to obtain a high school diploma, the student is said to be on a "diploma" track. If a special education student does not have the capability of meeting the requirements for a high school diploma, the child may be placed on a track which leads to a certificate of completion. For example, a certificate of completion might be awarded when a student's limited cognitive abilities make it impossible for the student to pass an algebra class necessary to earn a diploma or to pass the California High School Exit Exam (CAHSEE). The requirements for attaining a diploma from Fallbrook High School include passing an algebra class and passing the CAHSEE.

5.     A student who obtains a certificate of completion from the District can still participate in the graduation ceremony at the high school. In addition, community colleges such as Palomar Community College permit students without high school diplomas to enroll in some of the college classes.

6.     In some cases a special education student who completes high school and obtains a certificate of completion from the District may be permitted to return for another year of high school as a "super senior" or "second year senior."

7.     The District offers a "transition program" for special education adults after high school. The program is designed to teach adults the basic skills necessary for adult life and working in the community.

8.     There are also nonpublic schools which provide education to special needs adults after they have completed high school.

9.     Prior to reaching high school age, Student attended school in the Fallbrook Union Elementary School District. During Student's middle school years, Student began attending the Country School, a nonpublic school. During the 2003-2004 school year, Student's first year in the District, Student continued to attend the Country School at the District's expense. During the summer of 2004, Student was gradually transitioned to Fallbrook High School, which Student attended for Student's remaining three years of high

school. On May 3, 2007, about a month before the end of Student's senior year of high school, Student's parents pulled Student from the high school based upon the recommendation of Student's private psychiatrist.

10.    One of the main factual disputes in this case involves whether the District staff provided Student's parents with sufficient information about Student's options for graduation. Student's mother testified that at no time did the District staff inform Student's parents during any IEP meetings prior to June 2007 that Student would not achieve a high school diploma when he graduated from Fallbrook High School. According to Student's high school report cards, he received mostly As and Bs, and Student's mother believed he was doing well in his classes. She stated that she first learned Student would not graduate with a diploma late in the 2006-2007 school year, when counsel she had retained explained that to her. She said that the District staff never explained what the checked boxes regarding certificate of completion in the IEPs meant. Student wants to earn a diploma. Had Student's mother realized he was not on a diploma track, she would have taken steps to understand why or change it.

11.    The District witnesses dispute the testimony of Student's mother. The District contends that Student's mother was aware that Student was working toward a certificate of completion, not a diploma, at all times while he was at Fallbrook High School. Sallie Hunt, the District's Director of Special Education, testified that the issue of a certificate of completion was discussed at every single IEP meeting in which goals and objectives were discussed since the time Student transferred from the Country School, except possibly one IEP meeting called by Student's parents to discuss problems with Student's one-to-one aide. It was always understood that he was working toward a certificate of completion. Hunt described one conversation she had with the parents in the winter of the 2006-2007 school year, in which she stated that the only thing Student could not do without a diploma was join the military and that was not an option for him.

12.    Other District witnesses supported Hunt's testimony. Margaret Martineau, the school psychologist who assisted with Student's social skills group during the 2005-2006 school year, testified that there was always discussion at the IEP meetings about certificates of completion, and they decided from the beginning that Student would be on a non-diploma track. Carla Crane, Student's case manager and special education teacher during his senior year, testified that she believed that Student's mother understood that Student would be getting a certificate of completion. Crane could not recall a specific conversation about the topic, but she stated that Student's mother made comments such as "I understand he is on a certificate program."

13.    In order to determine what information was or was not given to Student's parents by the District staff and the significance of that information, it is necessary to review

the IEP meeting reports, beginning with the May 21, 2003 meeting that occurred prior to the time Student began school in the District.[5]

14.    Although Student was still in middle school and not yet within the jurisdiction of the District at the time of the May 21, 2003 IEP meeting, Sallie Hunt, the District's Director of Special Education, attended the meeting. Student's mother and father also attended the meeting. The notes of the meeting indicate that Student would be taking the "CAPA" (California Alternative Performance Assessment) rather than the standard state achievement testing given to all students. The CAPA is designed as an alternative test for students who are not performing at grade level. Under the preprinted language in the IEP stating "Differential Performance Standards for Graduation Required," the handwritten notation states: "to be determined." There is no mention in the IEP notes of any discussion regarding high school graduation or a high school diploma.

15.    A follow-up IEP meeting was held in June 2003. Ms. Hunt also attended that meeting. There is no reference to high school graduation or certificates of completion in the IEP. In April 2003, Student's parents sent a written request asking that Student be exempted from statewide testing during Student's eighth grade year.

16.    Student attended the Country School during his first year of high school. An IEP meeting was held on January 13, 2004, to review Student's progress and his placement at the Country School. On April 28, 2004, the District sent CAPA materials to the Country School for testing. The evidence did not establish whether Student took this test at the Country School. Student's mother testified that no one explained to her that Student would need to take the state's standardized achievement tests in ninth grade in order to obtain a diploma. School psychologist Margaret Martineau also could not remember an IEP discussion about whether exempting Student from taking high school standardized testing would prevent him from getting a diploma.

17.    On May 11, 2004, Student's annual IEP meeting was held. Student's mother was in attendance. The "special factors" page of the IEP under the "transition" section contains a handwritten notation stating: "preparing for certificate of achievement." Miguel Espinoza, one of Student's special education instructors at Fallbrook High School the following year, attended the meeting. He could not recall whether there was a conversation at the meeting concerning a certificate of completion and admitted that the phrase "preparing for a certificate of achievement" could have been written before the meeting. The IEP stated that Student would take the CAPA. The remaining IEP meeting notes do not reflect any discussion about a certificate of completion or diploma.

18.    Student began attending Fallbrook High School during the 2004-2005 school year. He took most of his academic classes in the school's "Bridge" program, an SDC

---

[5] These school years are prior to the statute of limitations period, but they are relevant to the current issue. If events at these earlier IEP meetings had given the parents the information they needed, there might have been no need for the District to give the parents the same information at a later date.

designed for pupils who, because of their disabilities, were unable to gain educational benefit from general education classes. Although the Bridge program is an SDC, it is possible for a pupil to start in the Bridge program and ultimately attain a high school diploma, depending on the pupil's individual abilities.

19.    On November 3, 2004, an IEP meeting was held to review the three-year (triennial) assessment done of Student. Ms. Martineau had administered cognitive testing as part of the triennial assessment. She reported to the IEP team that Student scored in the average range of intelligence on an untimed, nonverbal intelligence test. The handwritten notes of the meeting reflect Martineau's report.

20.    During the hearing, Ms. Martineau testified that she believed her test results were a fair measure of Student's true cognitive ability. She explained that Student's parents were very concerned about Student's anxiety and did not want him "melting down." Martineau had thought that Student might be able to make it on a diploma track, but the IEP team determined that it was better to make Student comfortable in the District's Bridge program with a modified curriculum. There are no specific handwritten notes in the IEP to reflect the team's decision to keep Student off a diploma-bound track. The IEP reflects that Student was reading at a fifth grade level and his math was at approximately a third grade level.

21.    Mr. Espinoza recalled that the team exempted Student from statewide assessments because they felt Student could not handle the anxiety or frustration of taking the tests, but Espinoza could not recall whether there was a discussion at the meeting about whether Student's failure to take tests would impede Student's ability to graduate with a diploma.

22.    The IEP reflects the team's decision to exempt Student from state testing. Under the California State Assessment heading, the notes contain the number "40." This was the District's numerical code indicating that the parents had requested that Student not be involved in statewide testing. Another handwritten note beside it explained the reason as "parents' request." The IEP also noted that the "promotion standards" would be according to the IEP, not the District standards. The IEP meeting notes conclude that "An Individual Transition Plan will be written in May."

23.    The State or District Wide Assessment sheet in the IEP contains pre-printed language in tiny print stating: "The IEP team, including parent(s) or guardian(s), anticipates that the student will not be a candidate for a regular high school diploma but rather will be a candidate for a certificate of educational achievement/completion." That box has been checked on the document. There is large, handwritten language farther up on the page stating: "Significant academic delays in all areas preclude success on any/all CA standardized assessments."

24.    Aside from the checked box on the assessment page, there is no mention in the IEP meeting notes of a discussion regarding a diploma or certificate of completion. Ms.

Hunt, who took the notes at the meeting, explained that she does not record everything in her handwritten notes if there is already information on a topic elsewhere in the IEP.

25.    Student's transcript shows that Student got As in all his classes during his tenth grade year and mostly As during his eleventh grade year. Mr. Espinoza explained that Student's classes were special education classes which taught core curriculum, but at a modified level. An individual could tell they were special education classes by looking at the course number on Student's transcript. Espinoza testified that he had a discussion with the parents that the classes were special education. At some point during the 2005-2006 school year, Ms. Martineau spoke with Student about his long term goals, and he said he wanted to go to college. She thought it was a good goal for him – students in the District's Bridge program do attend college.

26.    On May 31, 2005, another IEP meeting was held. Student was having difficulty with the one-to-one aide assigned to him, and the team recommended that he work with classroom aides instead of having a one-to-one aide assigned to him. The notes reported that Student had made excellent progress in reading and was performing at a sixth grade level. The team determined that Student would be placed in a regular education classroom for life sciences and physical education the following school year.

27.    On October 19, 2005, an IEP team meeting was held. The meeting was called by Student's mother to discuss the situation with Student's aide support. Student's mother and father both attended the meeting. The meeting notes reported that Student had been moved from the general education science class to an SDC class. Student had been stressed and overwhelmed by the volume of work in the general education science class, and the work was too academically challenging for him, even when modified. The notes state that "Mr. Espinoza presented a draft of some Individual Transition Plan activities." The notes do not elaborate on what was discussed about those activities, and the IEP does not contain a copy of the draft.

28.    Student's next annual IEP review was held on November 30, 2005. Both of Student's parents attended the meeting. The IEP contained the same State or District Wide Assessment sheet as the November 2004 IEP had. Once again there was a box checked next to the tiny, pre-printed language on the form stating: "The IEP team, including parent(s) or guardian(s), anticipates that the student will not be a candidate for a regular high school diploma but rather will be a candidate for a certificate of educational achievement/completion." Mr. Espinoza explained that he wrote some of the handwritten notes on that page prior to others and identified some of the IEP notes as being written during the meeting. He said the box next to the statement regarding the certificate of completion was checked during the meeting.

29.    The evidence does not support Mr. Espinoza's statement in that regard. Mr. Espinoza testified from a photocopy of the exhibit. However, when the original exhibit was subsequently entered into evidence, it was clear that the comments written during the meeting were in blue ink while the ones written before the meeting were in black ink. The

mark in the box next to the certificate of completion language was in black ink, so the box was obviously checked prior to the start of the meeting.

30.    The individualized transition plan (ITP) page of the IEP was also written in black ink, indicating that the form had been filled out prior to the meeting. The only blue ink on the page was in the page numbering at the top and the ink used to cross out the word "draft" which had been written on the page. The ITP had the box for "letter/certificate" checked instead of the box for "diploma." Under the heading of "unsubsidized part-time employment" the ITP listed the word: "Paleontology." No one at the meeting discussed with Student whether it was realistic for him to try to become a paleontologist. Under the heading "Part-time college" and the heading "regular wage scales" it stated "TBA." According to Mr. Espinoza, this meant "to be arranged." The ITP mentioned participation in the Community Based Instructional Program (CBI), but made no mention of attending the District's transition program after high school. The CBI program permitted a student to practice job skills in the community. The students worked at different job sites, learned about how to act at a job site, learned to fill out time sheets, and similar skills.

31.    As with the November 2004 IEP, the California State Assessment section of the November 2005 IEP listed the word "40" based on the "parents' request." That was also written in black ink, indicating that it was filled out before the meeting. Someone had written in blue ink on the IEP that Student would attempt the reading portion of the "CAT-6" (the state standardized testing). The meeting notes (written in blue ink) mention that Student was making excellent progress in reading and would be moved to a resource English class from the Bridge program. The resource program was designed for Students who had a higher level of achievement than the Bridge Program, but were still not ready to be placed in a general education reading class. The blue-ink notes make no mention of an IEP discussion about a certificate of completion or diploma. Espinoza testified that it was not necessary to include that in the notes, because it was already listed in other places in the IEP.

32.    Student's next annual IEP was held on November 27, 2006, during Student's senior year. Both of Student's parents attended the meeting. The IEP notes indicate that "Parents are concerned that [Student] is not ready to 'graduate' and/or move on to Transition program." The word "graduate" was placed in quotations in the IEP, but the District witnesses did not explain why. School psychologist Sandra Magaro testified that Student's parents did not ask questions about whether Student would get a certificate or diploma at that IEP meeting. They just talked about the graduation coming up.

33.    The promotion criteria box in the IEP is checked for "District," not "IEP" as it had been the previous year. The graduation plan has a box checked beside a pre-printed statement: "To participate in high school curriculum leading to a Certificate of Completion." This pre-printed information is in larger type than the tiny statements regarding certificates of completion in the prior IEPs. Above that pre-printed statement is another pre-printed statement about attaining a high school diploma, which does not have the box checked.

34.     The meeting notes state that "[Student's] parents want him to be a second year senior next year. Mrs. Hunt suggested that he have a four period day with work activities in the afternoon." There is a page attached called "Transition Services" which recited that Student had not passed the California High School Exit Exam (CAHSEE) or an algebra class. It also showed that Student had completed 210 out of 230 credits needed for graduation. Hunt testified that the purpose of having Student come back to high school the following year as a "super-senior," was not to enable Student to get a diploma. Instead, the District considered it because Student's mother, at that time, thought Student was "blossoming" in high school.

35.     Around December 2006 and January 2007, Student's parents began to investigate options for Student for the following year. In approximately January 2007, the District suggested that Student go to Palomar Community College and attempt the placement test. Student's parents were concerned that he was not ready to go to Palomar College. Ms. Hunt testified that there were also discussions about having Student attend the District's transition program the following year, and the parents went to visit that program in December 2006. On December 5, 2006, Student's mother sent an email stating, in part: "At this point we are looking at [Student] taking ROP to be a Vets Assistant – of course this may change before he graduates, but for now it appears do-able."

36.     Student continued to receive excellent grades during his time at Fallbrook High School. For example, Student received a B- in his computer class during his junior year and a B- in his first semester of his foods and nutrition class in his senior year. These were both general education classes, not SDC or resource classes. Webber Comella, the computer class teacher, testified that Student's grade was probably inflated, but gave no indication that he informed Student's parents of the inflated grade or reported that to Student's IEP team. On the few occasions when Student's grades in a class dropped significantly, Student's parents were concerned and sent emails to District staff to find out what had happened. For example, in March 2007, when Student's parents learned from a progress report that Student was getting a D+ in his foods and nutrition class, Student's mother sent an email to Student's case manager to find out what they could do to help bring his grade up.

37.     On February 12, 2007, Student signed a document entitled "Student's Statement Regarding School Attendance" which stated that "[Student] will participate in an Adult Transition Program" the following year. The document makes no mention of a diploma or certificate of completion.

38.     As discussed in Factual Findings 75 – 131 below, Student's behavioral problems began to escalate in the middle of his senior year. On March 21, 2007, the IEP team held a meeting to discuss Student's behavior support plan. There is no indication that the IEP team discussed the certificate of completion or diploma at that meeting.

39.     On May 3, 2007, Student's parents withdrew Student from Fallbrook High School based on the advice of Student's private psychiatrist. Student has not attended

10

Fallbrook High School or any other school program since that time and has been living at home with his parents.

40.    On May 10, 2007, another IEP meeting was held to review Student's triennial assessment. Although Student's three-year review was not due until November 2007, Student's parents wanted an update of how he was doing and the District wanted to help determine Student's placement for the following year. Therefore the District conducted the triennial assessment a few months early. The cover sheet of the IEP listed Student's "exit date" as June 14, 2007, and the "exit reason" as "72 Grad HS other than diploma." The IEP summarized Student's academic skills as follows: Reading: "Can read a 10th grade level literature text; has only literal level of comprehension;" Written Expression: "Can write a paragraph or a letter. Can use a wordprocessor and spell check;" Mathematics: "Can solve basic arithmetic problems without a calculator."

41.    The IEP had the box checked for certificate of completion under graduation plan. Student's mother testified there was no discussion at that meeting about the certificate of completion and she never noticed the box regarding the certificate of completion being checked. No one told her that Student would have to pass the CAHSEE to graduate. Ms. Hunt thought there must have been some discussion about a diploma at that meeting, because Student' mother wrote a follow-up email with a proposed goal involving algebra.

42.    Student's final IEP meeting during the 2006-2007 school year was held on June 7, 2007. It was held a week before the end of the 2006-2007 school year (which ended June 14, 2007). The IEP had a box checked stating that Student would earn a certificate of completion and another box stating that: "Beginning no later than grade 9" Student's parents must be informed that as of the 2005-2006 school year Student must pass the CAHSEE to obtain a diploma. Student's mother raised the issue of Student achieving a high school diploma during that meeting.

43.    For the first time in all the IEPs, the written meeting notes for the June 2007 IEP meeting describe a discussion regarding a high school diploma. The notes state: "[Student's mother] said [Student] would like to earn a high school diploma. Mrs. Hunt said the Algebra I and Geometry requirements will be stumbling block. Additionally, he will need to attempt and probably need to pass the Exit Exam. It is unlikely that Student could do that." During the lunch break of the meeting, Ms Hunt retrieved pages from the CAHSEE to demonstrate the difficulty level of the mathematics on the test. However, there was no discussion at the meeting regarding whether the "stumbling blocks" might be overcome, or whether, with appropriate education and supports, Student might be able to achieve a high school diploma. Student's mother believes that Hunt had "given up" on Student at that point. There was no further discussion of the subject at the meeting.

44.    The IEP team discussed two possible placements for Student during the meeting: either Student could return for another year at Fallbrook High School as a "super-senior" or Student could attend the District's transition program which is also located on the Fallbrook High School Campus. Student's mother did not want Student to return to

11

Fallbrook High School in either program and asked about a different school. The IEP meeting notes do not indicate that any discussion of other possibilities took place. No witness at the hearing indicated that other possibilities were discussed.

45.    On June 12, 2007, Ms. Hunt sent a follow-up letter to the parents with the District's final FAPE offer. The letter stated, in part: "I realize that the [parents] are still contemplating [Student's] academic potential. Nonetheless, the district is offering a placement at the Fallbrook Union High School District Transition Program."

46.    There are two relevant evidentiary considerations here: 1) what graduation options were discussed with the parents in the IEPs leading up to the District's final placement offer; and 2) what was discussed at the June 2007 IEP meeting where the placement offer was made?

47.    There is evidence to support both Student's and the District's positions regarding what was discussed at the pre-June 2007 IEP meetings concerning a certificate of completion/diploma. The strongest evidence in favor of the Student's position is the testimony of Student's mother. Student's mother was a credible witness. She was calm, direct and articulate in her answers. She is correct that anyone reviewing Student's transcript would see nothing to indicate he was not working toward a diploma – instead they would see what appeared to be a very good student who got mostly As and Bs. At all times the parents' actions were consistent with those of people who thought their son was working toward a diploma. For example, on the occasions in which Student's grades dropped, his parents immediately contacted the District to find out why. When Student's parents learned from their counsel that Student was not on a diploma track, they immediately addressed the issue at the IEP team meeting and requested IEP goals (such as an algebra goal) to help him on that path.

48.    In addition, the IEP documents themselves support Student's position. At no point do the handwritten notes written during the meetings reflect a discussion regarding a diploma track or certification of completion track until the June 2007 IEP meeting. Although boxes were checked on the IEP forms to show Student was working toward a certificate of completion, in at least one instance (the November 2005 IEP) it is clear that those were checked before the meeting, so they do not mean a discussion took place during the meeting.

49.    On the other hand, there is also evidence to support the District's position. The District witness testified that Student's parents understood Student was working toward a certificate of completion, not a diploma, although many of them could not recall specific discussions on the subject. Ms. Hunt testified that the subject of a certificate of completion was discussed at almost every meeting. However, the written IEP evidence does not support her statement. For example, the fact that the November 2005 IEP had all the information regarding testing and the tiny box regarding a certificate of completion marked prior to the meeting implies that there was no discussion.

12

50.    The strongest evidence for the District was the testimony of Margaret Martineau. In November 2004, when her testing revealed that Student had average intelligence, Martineau said there was a discussion about whether Student could earn a diploma and the team decided to opt for a path that would decrease Student's anxiety. However, it does not appear that this District understanding regarding the non-diploma path was adequately communicated to the parents. The District undoubtedly told the parents that the Bridge program and modified curriculum would be less stressful for their son. But did they plainly tell the parents that their choices would prevent their son from working toward a diploma? If so, one would assume that something would be written in the meeting notes. After all, the IEP team was making a momentous decision that placed a student who potentially had the intellectual capability of attaining a diploma on a track that would <u>not</u> lead to a diploma. Although handwritten notes are not required in an IEP, logic would indicate that *some* notation of that decision and the parents' understanding of the consequences of their choice would have been written in the meeting notes. The fact that such a notation is absent strongly indicates that no such discussion took place or that it was so watered down by the District staff that the parents never really understood the consequences of the choices they were making.

51.    The checked boxes on the IEPs are also evidence in favor of the District's position, but as stated above, in at least one case, it is certain the box was checked and information written prior to the meeting. The only time a hand-written notation appears (instead of just a checked box) in all the IEPs before June 2007, was in the May 2004 IEP, which occurred just prior to Student transferring from the Country School to Fallbrook High. There is a handwritten statement on the "special factors" page that says "preparing for certificate of achievement." That same page discusses Student's anxiety and need for modified instruction. That is some evidence that a discussion took place. However, the statement does not say "instead of a diploma" or mention diploma at all. Once again, there is no mention in the notes that the parents understood that their choices regarding Student's anxiety would prevent him from achieving a diploma. Student's mother testified unequivocally that she never understood he was not working toward a diploma.

52.    The November 2006 IEP contains an ambiguous handwritten statement about the parents' concern that Student was not ready to "graduate" and move on to the transition program. It was unclear why the word "graduate" was in quotation marks, but it does not prove there was a discussion about certificates of completion or diplomas. The parents could easily have believed that the transition program was just another place student could go after receiving his diploma, just as Palomar College was.

53.    Although there is evidence for both positions, Student's evidence is sufficient to "tip the balance" in Student's favor. No doubt the District employees were sincere in their belief that the parents understood, but the evidence does not support a finding that the District adequately informed the parents. Student met his burden of proving that the District committed a procedural violation of IDEA by failing to provide Student's parents with options for graduation.

13

54.    Likewise, Student has met his burden of proof on the issue of failure to discuss options/predetermined placement at the June 2007 IEP meeting.  As discussed above, once the diploma issue was raised by Student's parents at the June 2007 IEP meeting, the discussion focused around why Student was not currently capable of attaining a diploma. There was no discussion of whether Student might be able to attain a diploma within two or three years, and if so, what would be the most appropriate program to help him attain that goal.  There was no discussion of whether the District's transition program could help him work toward a diploma or whether there were other possible placements that could help him if the District's programs could not.

55.    It appears that, by June 2007, the District had given up on Student.  In a December 13, 2006 email sent to Student's television technology teacher, Hunt talked about Student lacking the "intellectual capacity" to really learn in the class.  When Student's mother mentioned the possibility of a diploma in the June meeting, Hunt brought in pages of the CAHSEE to prove how impossible that was.  During her testimony, Hunt made it clear that the offer to have the Student return to Fallbrook High School as a "super senior" had nothing to do with Student earning a diploma.

56.    The evidence at the hearing showed that Student had made significant academic gains while in high school.  His reading had improved from a fifth grade level to a tenth grade level.  His math skills had also improved.  Given the District's own assessment which found Student's cognitive ability to be in the average range, the progress Student made in high school, Student's desire to work toward a diploma, and his parents' concern about the issue, there should, at the very least, have been some discussion at the IEP meeting about whether there were supports or programs that might be appropriate for Student to help Student achieve a diploma.  Instead, the District presented only two possible programs, neither of which would help Student work toward a diploma.  The failure to have that discussion constituted a procedural violation of IDEA.[6]

*Did the District Deny Student a FAPE During the 2005-2006 and 2006-2007 School Years by Failing to Include a Handwriting Goal in Student's IEP and/or Failing to Provide Occupational Therapy Services for Handwriting?[7]*

57.    Student contends that handwriting, particularly cursive writing, was an area of unique need for Student, and that the IEP should have contained goals and occupational therapy (OT) services to help Student make progress in that area.  An IEP is required to contain goals and objectives to address a student's areas of unique need.  In addition, a district is supposed to provide designated instruction and services (DIS services), including OT services, if those services are necessary for a student to benefit from special education.

---

[6]  Whether these procedural violations led to a substantive denial of FAPE will be discussed in the Legal Conclusions, *infra.*

[7]  These four issues have been grouped together in this section of the Decision, because they are based upon the same factual findings.

14

58.    A review of Student's IEPs shows that handwriting was recognized as an area of need for Student almost as soon as Student began attending Fallbrook High School. The November 3, 2004 IEP noted that Student's fine motor skill "displays weakness – especially with writing." Student's father told the IEP team that he would like to see Student's handwriting improve in "legibility, size and speed" and requested that a handwriting goal be included in the IEP. The IEP team added "smaller, legible handwriting" as part of a goal involving Student reading a passage and writing about that passage.

59.    That IEP goal continued in effect until Student's next annual IEP on November 30, 2005. The November 30, 2005 IEP notes state that Student's "fine motor skills are improving but [he] still lacks in strength. [Student] prefers to print rather than use cursive." That IEP contained no goal related to handwriting.

60.    The November 27, 2006 IEP contained virtually the same statement as the IEP from the previous year: "Fine motor skills are improving. [Student] prefers to print rather than use cursive." Once again, there was no handwriting goal contained in the IEP.

61.    On December 5, 2006, Student's mother sent an email to Carla Crane, Student's case manager, asking for a handwriting goal to be included in Student's IEP related to Student signing his name in cursive. Crane responded with an email stating that handwriting was a "classroom goal," but that a goal could be added to his IEP for that.

62.    At the March 21, 2007 IEP meeting the team added a goal that Student would be able to "sign his name in cursive without a model." The "baseline" for the goal stated that he could sign his name in cursive with a model. Crane presented this goal to the IEP team. Crane had noticed earlier in the year that Student was unable to sign his name, and the parents requested the goal, so the District decided to add it. Crane said she had worked on that skill with Student prior to March 2007, even though there was no IEP goal. The District's evidence included a sheet in which Student had practiced signing his name in cursive. Although the sheet was undated, Crane testified that it was created in January 2007.

63.    The May 10, 2007 IEP noted that Student "prefers to print but has been working on…writing his name in cursive without a model."

64.    Student and the District submitted various documents in evidence which contained Student's "signature." In very few of these did Student's "signature" appear in cursive writing. For example: On May 5, 2005, Student printed his name instead of signing it. He did the same thing on March 22, 2006. On June 6, 2006, Student properly signed his name in cursive on a document. However, after that, Student printed his name instead of signing it in documents dated November 27, 2006, February 12, 2007, May 3, 2007, and May 9, 2007.

65.    Student's teachers also differed in their opinions about whether Student could write his name in cursive. Mr. Espinoza thought that Student could accurately write his name in cursive. Lynette Shires, Student's foods and nutrition teacher during his senior year,

testified that Student never used cursive writing in her class. Kristine Heckman, who worked with Student in the CBI program, testified that Student was unable to sign his name when she worked with him. Ms. Martineau testified that Student is able to communicate in writing and does not need a writing goal. Sandra Magaro, the school psychologist who tested Student during the 2007 triennial assessment, believed that he did not need a handwriting goal because he can use a computer.

66.    Mary Reisman, Student's SDC teacher for the 2005-2006 school year, testified that teaching a pupil his or her cursive signature is a main priority of the SDC class, but she did not believe Student needed a handwriting goal because his handwriting was legible.

67.    Student's failure to write his name in cursive was not caused by a fine motor deficit. Sandra Magaro administered the Beery Developmental Visual Motor Integration Test to Student as part of the 2007 triennial assessment and determined that Student's fine motor skills are in the average range. Student's expert Cynthia Norall agreed that Student's writing issues were not due to fine motor problems. The documentary evidence showed that at various times Student was physically capable of signing his name in cursive, although it is not clear whether he was able to sign it without copying from a model.

68.    The evidence supports a finding that Student's 2005-2006 and 2006-2007 IEPs should have contained a handwriting goal regarding Student's use of cursive to sign his name. There is no dispute that using cursive writing to sign his name was an important area for Student to learn. The District's own SDC teacher discussed the importance of a cursive signature. It is also clear that a cursive signature was an area of need for Student. Student's use of a cursive signature was rare and did not appear to be generalized by him to environments outside of class. If he had an actual IEP goal instead of just informal classroom goals, his progress could have been monitored, and the IEP team could have determined whether he used the skill outside of the classroom. His failure to use cursive despite having the motor ability to do so should have been of concern to the IEP team and prompted a discussion during the IEP meetings.

69.    However, the evidence does not support a finding that Student required OT services relating to handwriting. All the testing done of Student indicated that his fine motor abilities were in the average range. He had the capability of signing his name and did sign his name on more than one occasion. Student presented no testimony from an OT expert to counter the District's triennial assessment findings. Student failed to meet his burden to prove that the District failed to provide Student with necessary OT services in the area of handwriting.

*Did the District Deny Student a Free Appropriate Public Education During the 2005-2006 School Year Due to Student's Failure to Make Sufficient Progress to Meet His IEP Goals?*[8]

---

[8]  Since the failure of a Student to meet one or more of his or her IEP goals is not, in and of itself, a violation of IDEA, it is presumed that Student contends that the District failed to take appropriate action when the

70.   In Student's written closing argument, Student clarified that this contention involves Student's problem solving goal that was in his 2005-2006 IEP. Student does not contend that Student failed to make progress on his other goals, and the evidence shows that Student did make progress on other goals.

71.   Student's November 30, 2005 IEP contained a problem solving goal that stated: "By November 2006, [Student] will have learned two strategies for problem solving and will have used such strategy 4 or 5 times, when facing a difficult situation, as measured by case manager/psychologist records."

72.   School psychologist Martineau drafted the goal. It was based on a "four-step" method of problem solving that she had developed and used in the social skills group she ran. She added a fifth step when she worked with Student because of Student's unique behavioral needs. The speech-language therapist who supervised Student in the CBI program also worked with Student on this goal. Student made substantial progress on the goal during the 2005-2006 school year, although he did not fully achieve the goal. When Martineau retired at the end of the 2005-2006 school year, she reported his progress to Sandra Magaro, the school psychologist who took her place. They discussed the matter and determined that it would be best to keep the goal in the next IEP unchanged because he had not yet achieved it.

73.   The same goal appeared in the November 2006 IEP. Magaro carried the goal over into the next IEP unchanged because Student was new to her and she was not sure just how far he had come in terms of meeting the goal. When she worked with him, she saw progress on the goal, but he had still not met the goal so they continued to work on it.

74.   The evidence supports a finding that Student did make progress on this goal during the 2005-2006 school year. The testimony of Martineau and Magaro is undisputed that progress had been made. Student's good behavior and good grades between November 2005 and November 2006 also reflect the progress he made. There was no violation of FAPE.

*Did the District Deny Student a FAPE During the 2005-2006 School Year by Failing to Provide a Behavior Support Plan (BSP), and/or Failure to Write Adequate Behavioral Goals? Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Timely Provide a BSP and/or Failing to Provide a Safe Learning Environment?[9]*

75.   When a Student's behavior impedes his learning or that of others, a school district is required to consider the use of positive behavioral interventions and supports, and other strategies to address that behavior. When a child exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives of the child's

---

goals were not met. However, because the evidence does not support a finding that Student failed to make sufficient progress, there is no need to reword this goal to clarify what Student intended.

[9] These issues are grouped together because they involve the same factual findings.

IEP, a district must develop a formal behavior intervention plan (BIP), which becomes part of the child's IEP. Serious behavior problems include behaviors which are self-injurious, assaultive, or cause serious property damage or other severe behavior problems that are pervasive and maladaptive for which instructional/behavioral approaches in the student's IEP are found to be ineffective.

76.     There is no dispute that Student's behaviors impede his learning. Every IEP that Student had during his time at Fallbrook High School noted that his behaviors impeded his learning. The November 30, 2005 IEP called for the following interventions to address Student's behavior: "Counseling, problem solving techniques, 're-grouping' time." In addition, the IEP contained a problem-solving goal related to behavior, as discussed in Factual Findings 70 – 74 above.

77.     Student had some behavioral incidents during the 2005-2006 school year. Prior to the November 2005 IEP meeting, Student's parents were concerned about the insensitive treatment of Student by his one-to-one aide, and a special IEP meeting was held on October 19, 2005. The aide was removed from working with Student. Student was also moved from his general education life sciences class to an SDC class because the stress of the regular class was overwhelming to him and caused him to have emotional "melt-downs."

78.     There was also an incident around October 2005, in which some boys were bullying Student. The substitute teacher in the class did not assist Student when Student spoke with the teacher about it. Student reported to his parents that when he spoke with Mr. Espinoza about it, Espinoza did not do anything about it either.

79.     The next incident in the 2005-2006 school year occurred five months later in March 2006, when Student was in a general education computer class. Student caught some other boys in class looking at a pornographic website and reported it to the teacher. Webber Comella, the teacher in that class, explained that Student was almost "euphoric" when he reported the improper conduct and thereafter continued to dwell on the episode, even after Comella told Student that he would deal with it. At one point, Student complained to his parents that there were "gang-bangers" in the class so he was afraid to attend the class, that Students were making fun of him, and that students were eating, drinking and jumping all around in class.

80.     Mr. Comella denied that students in his class were eating, drinking and jumping all around. He also denied that there were any "gang-bangers" in his class and denied that Student was afraid to come to his class. He explained that, when Student continued to dwell on the incident with the pornography website, Comella told Student that he could not keep going after the boys verbally or he would get in trouble. However, Comella denied that Student got in trouble with the other boys.

81.     There were no other significant behavioral incidents during Student's 2005-2006 school year.

18

82.    The parties dispute how accurate Student's representations were regarding the events that happened to him. Student's mother believed her son's reports of the events that happened at school and relied upon his version of events when she contacted the school about his behavioral issues. Student's mother was a very credible witness, but her information about events was only as accurate as the source from which it came. The evidence supports a finding that Student was not always accurate in his description of events and would sometimes exaggerate events or believe that events were directed at him when they were not. For example, at one point he complained that a sign-language interpreter and a deaf student were signing about him. However, when the teacher questioned Student, it turned out that he did not even understand sign language.

83.    Cynthia Norall testified as an expert witness on behalf of Student. Dr. Norall is an autism specialist who is the director of Comprehensive Autism Services and Education, Inc., an agency that provides services to county regional centers for autistic children. Dr. Norall is a licensed educational psychologist and has provided training for school districts. She has been employed by school districts in autism-related positions in the past.

84.    Dr. Norall explained that Student's disability causes him to dwell on events. He has a heightened sense of justice and can be very sensitive if he believes he has been wronged. He can relive an incident over and over in his mind, almost as if a video was playing. Because of his autism, he misreads social cues.

85.    The evidence does not support a finding that there were "gang-bangers" in Student's computer class. Instead, it appears that Student's perseveration on the "pornography event" caused him to exaggerate events and develop fears that were unfounded.

86.    The evidence also does not support a finding that Student needed a BSP during the 2005-2006 school year. The incidents in the early part of the school year were dealt with by removing Student's one-to-one aide and changing him to a less stressful science class. The later incident in March 2006 seems to be an isolated event. Although Student did perseverate about it, it did not keep him from completing the class or getting a B- in the class. Student's other grades for that school year also indicate he had a good year and Ms. Martineau's testimony confirmed that he made progress in his social skills and problem solving. The evidence also does not support a finding that the District failed to provide Student with sufficient behavioral goals during that year. As stated in Factual Findings 70 – 74, Student had a problem solving goal in his IEP. That problem solving goal was directly related to the heart of Student's behavioral problems – his perseveration about the actions of others.

87.    Student's behavior problems escalated during his senior year. In September 2006, Student reported an incident in which a girl told Student to stick out his tongue. When he complied, she pressed her two fingers on the side of his throat and asked him if it hurt. Ms. Crane sent an email to Student's mother stating that the teacher would watch the girl and her interactions with Student. There was no report of further incidents involving this girl.

88.    On September 22, 2006, there were email exchanges between the District and Student's parents about Student being unusually aggressive in class. However, Student's actions were due to medication issues and were resolved.

89.    On November 27, 2006, Student's annual IEP was held. The IEP team found that Student's behavior impeded learning. Under the statement "If yes, specify positive behavior interventions, strategies, and supports" the box was checked under "behavior goals." The IEP contained a goal on problem solving and a goal on initiating friendships.

90.    Between September and December, there were minor incidents between Student and other pupils, which were dealt with through an informal "mediation" process on campus.

91.    On December 7, 2006, Student was upset by the bullying of another boy in class. He went to the office of Ms. Magaro, the school psychologist who led his social skills group, and telephoned his mother. Magaro was about to start the group when he arrived. She asked him if she could start the group and then come back to talk to him. He agreed. She got someone else to facilitate the social skills group, but when she came back to speak to Student, he was gone.

92.    Student's parents came to the campus and learned that the campus police were looking for their son. Student's parents discovered Student sitting in a fetal position beside the chain link fence where his parents typically pick him up after school. He was very upset and later told them he did not want to go back to school.

93.    On January 18, 2007, a behavior support plan (BSP) was prepared for Student. It addressed Student's conduct in perseverating about other children's problems and perceived injustice.

94.    When the second semester of Student's senior year began, Student was bullied by other boys in his English class. On February 23, 2007, the boys squirted water on Student's back with water bottles. Student was very upset by this incident. On February 26, Student's parents took him to their private psychiatrist because Student suffered an emotional melt-down as a result of these experiences.

95.    Student began avoiding his English class. On some occasions he went to the office. On March 1, 2007, he left class and went to the "dungeon." The dungeon was a room next to the cafeteria which was used for meetings. It was somewhat hidden from the general student population of the school and Student felt safe there. Ms. Crane reported to the parents that Student was asking for passes to get out of some of his other classes as well.

96.    On March 1, 2007, Student's parents sent an email to Ms. Hunt which stated, in part, that the BSP was not working and requested that the school prepare a behavior intervention plan (BIP).

97.    Hunt sent an email in response to the parents on the same day stating, in part: "A Behavior Intervention Plan is only written when the student's behavior is dangerous to himself or others. I don't think [Student's] issues are truly dangerous but they are certainly problematic." She said she would talk with Student's case manager and the school psychologist about meeting to review the BSP.

98.    On approximately March 6, the District assigned a one-to-one aide to work with Student in his English class.

99.    On March 8, 2007, Student skipped his fifth period English class and went to the dungeon again. On March 9, 2007, Student was bothering another child in his fourth period class. Crane chastised Student for it and kept him after class during fourth period. She reported that he was unusually argumentative recently.

100.    Student suffered an emotional "melt-down" at home that night. When his parents asked him about it, he said that a substitute teacher in the fifth period English class had allowed the boys who bullied Student to play very loud music. Student has sensory issues as a result of his disability and was troubled by the loud music. However, when he asked to leave the class, he was told he could not.

101.    On March 16, 2007, Ms. Crane sent an email to Student's parents explaining that Student had been quiet all week and had started attending fifth period again. Student told his parents that he did not bother talking to Ms. Crane any more because it would not do any good and that no one listened to him.

102.    On March 21, 2007, the District completed a Functional Analysis Assessment (FAA) report and prepared a BIP. The FAA/BIP was reviewed at an IEP meeting held the same day. Student's mother attended the meeting and took the plan home to discuss it with Student's father. She signed her approval for the plan on March 23, 2007.

103.    During the week of March 29, 2007, Student's behavior improved. Student's parents explained to Ms. Crane that they had promised him a reward if he behaved well that week.

104.    During the following week (the week before spring break), Student's behaviors escalated dramatically. On April 3, 2007, Student had an incident in a class in which he struck another student. When confronted by the teacher, he first lied and said he had not done so. When the teacher explained that both she and the aide had seen it happen, he said the student was "bugging" him. However, the other student had been sitting quietly at his chair. While the teacher went to check the other boy, Student went to the table and sat down. He then slammed his hands on the table and flipped it over. The teacher had the aide remove the other pupils from class and called for the school psychologist. She was able to calm Student down. He said he did not know why he hit the other boy. It was just a reaction.

21

105.    On April 4, 2007, Student's foods and nutrition teacher chastised Student in class. Student told his mother that the teacher said, "This is the last time I'm going to help you with this! Next time you are on your own!" Student reported that the teacher had said that modifying the work for Student was very labor intensive and that she was doing more work than Student was.

106.    Lynette Shires, the teacher in the general education foods and nutrition class, testified that Student's version of what happened was not completely accurate. She explained that she had given the pupils an assignment to write about vitamins and minerals and what effect they have on the body. She modified Student's assignment and made a special packet for him. He lost it twice, so she photocopied it a third time for Student's mother. Student was procrastinating and not working on the project in class. Shires told him that she wanted him to start working on it before she would help him. He became upset that she wanted him to do something that he did not want to do. Student was getting a D in the class because he was not completing assignments.

107.    On that same day, Student reported to his one-to-one aide that another child in his English class had thrown a paper and hit him in the head. The teacher and the aide did not see it happen or see any paper on the floor. When the aide was walking Student to his next class, Student began arguing with the aide about what she was supposed to do as part of his IEP. The aide felt offended that Student was telling her what to do. She did not know what was in his IEP. The District does not usually tell aides what is in an IEP, but instead instructs them regarding how to work with pupils as needed.

108.    On April 5, 2007, there was an assembly about driving safety for all the high school students in which there was an accident simulation. Student's parents felt this would be too upsetting for Student and asked that he be excused from it. Apparently there was miscommunication between District staff and Student went to the assembly anyway. It is not clear whether he was sent there by the teacher or went on his own when the other students went. Student was very upset by what he saw during the assembly.

109.    The same day, another student threw a "stink bomb" into Student's drama class. The parties dispute the facts of that incident. The campus security guard who gave Student's parents a ride to Ms. Crane's office reported that one of the other students in class threw the "stink bomb" at Student, hitting him in the hand. Ms. Crane reported that Student had hit the other boy. Student subsequently told his mother that a particular boy had run into the class, thrown the stink bomb at Student and hit him in the hand, then run off. When Student confronted the other boy after the other pupils had left class, the boy had called him names (including "retard" and "psycho") and accused him of making up the story. In response, Student hit the boy on the head.

110.    Florene Villane, the drama teacher, testified that a student from outside the room threw the "stink bomb" and it landed near a trash can. It did not hit Student. Student was concerned about the teacher and ran to pick it up. After he picked it up, he grew upset because he could not get the smell off his hands. She told him he could wash his hands, and

22

he went to the resource teacher's room. Villane said the boy that Student blamed for the incident did not throw the "stink bomb." The other boy could not have thrown it, because he was inside the class when the "stink-bomb" was thrown into the class from outside.

111.    The evidence supports Villane's version of the events. The "stink bomb" was thrown from outside class, so the boy blamed by Student could not have thrown it. It appears that the security guard who spoke with the parents had heard rumors and not the correct story. Student's version of the events is contradictory – if the other boy had run into the class, thrown the stink bomb, and then run off, how could the boy have still been in the room after class for Student to confront?

112.    Crane sent an email to the drama teacher in which she stated that Student "has started to become physical and we really need to address this. He has had a problem everyday this week."

113.    On Sunday, April 8, 2007, during spring break, Student parents sent an email to Hunt explaining that Student was seeing a private mental health professional, in part, because of their concerns about the incidents at school. They asked that the District immediately assign an autism consultant to assess the situation with Student.

114.    On April 16 and 17, 2007, after spring break, Student told his parents that he did not want to go back to Fallbrook High School and he did not feel safe there.

115.    On April 18, 2007, Hunt responded to the parents' April 8 email. She asked to meet with the parents and the mental health professional. She said the District did not have an autism consultant immediately available, but she would discuss seeking additional support and staff for Student after the meeting with the mental health professional.

116.    On April 19, 2007, Student's private psychiatrist Dr. Ong wrote a letter to Ms. Hunt which stated, in part:

> [Student's] current symptoms of anxiety, depression and anger outburst have been reportedly intensified by his current level of school placement. I have collaborated with Mr Mark Luciano (Educational Consultant) today and he feels the same way after a brief classroom observation while [Student] is in class. It is my opinion that current school placement for [Student] is not adequate in maximizing his educational & behavioral needs.

117.    On April 25, 2007, during Magaro's triennial assessment of Student, Student reported that he was very sad, did not want any further testing, and put his head down on the desk.

118.    On May 3, 2007, Student's parents pulled Student from school and did not let him return to Fallbrook High School.

23

119.    On May 9, 2007, Dr. Ong wrote another letter to Ms. Hunt, stating:

> I saw [Student] last May 3, 2007 with our crisis therapist, Nancy Zieve, LCSW. Mother had picked up [Student] after school in an agitated state. His current school placement is not adequate in meeting [Student's] mental & emotional needs, subsequently, he is not learning to his potential. It is my recommendation that [Student] will be taken off his current school while placement in a new school is being assess (sic). Please feel free to collaborate with me with your concerns.

120.    Another IEP was held on May 10, 2007, to discuss the results of the triennial assessment. During the meeting, Ms. Hunt recommended that Student start seeing the school psychologist individually to help him deal with his anxiety so he could return to school. The IEP notes reflect that Student's mother "said she won't force him to do that."

121.    On May 14, 2007, Ms. Hunt sent a letter to Student's parents with a request for authorization to speak with Ong. Neither Student's parents nor Student consented to this request. Student's mother testified that, based on advice of counsel, she did not believe she could consent because it would violate Student's privacy.

122.    On June 7, 2007, the District provided an assessment plan to Student's parents, requesting their authorization to conduct a social/emotional behavior assessment of Student. Student's parents did not consent to that assessment. Student's parents requested an independent educational assessment of Student.[10]

123.    Student subsequently retained Cynthia Norall to conduct an independent assessment of Student. Dr. Norall reported that Student became distressed when she began asking him about how he got along in high school. He became more upset during the writing and mathematics portions of her assessment. Ultimately he "shut-down" and curled up in a fetal position in the waiting room. In her opinion, his reaction was because of the stress and anxiety that resulted from his time at Fallbrook High School. She believed that, because of his disability, he relived the incidents that occurred there over and over in his mind. She believes he should never go back there.

124.    Ms. Martineau, who worked with Student in the social skills group during his junior year, opined that Student's shut-down in Norall's office was probably because he was overwhelmed by the amount of testing Norall gave to Student. Martineau said that Student tended to shut-down when he was tired and felt overwhelmed by his school work. She would never have tested him as long on a single day as Norall did. Martineau's testimony, supported by her many months of working with Student, makes sense. It was the mathematics portion of the assessment which caused Student the most trauma, but there was

---

[10]    Student withdrew his request for reimbursement for Dr. Norall's independent assessment. The validity of the District's triennial assessment and the propriety of the District's June 7 request for a further assessment are not at issue in the instant case. There is a separate, District-filed case involving assessment issues.

no evidence that he suffered from bullying or teasing in his math class. Instead, it was the English class where most of the bullying took place.

125.    The evidence does not support a finding that the District failed to provide Student with a safe learning environment. Although some boys in Student's English class bullied Student and squirted him with water, the District responded by assigning a one-to-one aide to be with Student during that class. Aside from the bullying, there was no evidence of any physical danger to Student. The evidence did not establish that the "stink-bomb" was thrown at Student or even that it hit Student. Instead, aside from the water incident, the physical altercations involving Student during his second semester senior year involved Student hitting other boys, not the reverse. Student's feeling of being unsafe appears to be the result of his own persevering over various events rather than the events themselves.

126.    Dr. Ong's letters do not change this. Although his second letter stated that the school was not meeting Student's mental and emotional needs, his letter does not elaborate on the basis for his opinion. Dr. Ong did not testify at the hearing and the District was not given leave to contact him. Although he recommended that Student not attend Fallbrook High any longer, he did not state that Student was unsafe there. Dr. Norall's opinion that Student was reliving events at school was important, but not enough to prove Student was unsafe. The evidence established that he exaggerated events in his mind when he perseverated on them, so what he was reliving may have been different from what actually happened.

127.    The evidence also does not support a finding that the District failed to timely provide a BSP or BIP. The incidents prior to December 2006 were minor difficulties with other students that were handled effectively with mediation. There was one serious incident in December, but most of Student's serious behavioral issues began during his final semester of his senior year.

128.    The District reacted to the second semester problems appropriately, first by preparing a BSP in January 2007. When the behaviors continued to escalate, the District conducted an FAA and prepared a BIP. Most of Student's severe behaviors occurred *after* the preparation of the BIP on March 21, 2007, not before, and occurred during the week before spring break. After Dr. Ong wrote his first letter in April 2007, Student continued to attend the high school until May 3, 2007. The evidence did not establish what triggered Student's "melt-down" on May 3 that caused his parents to withdraw him from school.

129.    The District followed the proper progression of moving from IEP supports, to a BSP to a formal FAA and BIP. Although Ms. Hunt told the parents on March 1, 2007, that no BIP was necessary, an FAA was conducted and a BIP was prepared and signed only three weeks later. Ms. Hunt's statement is not enough to prove that the District acted improperly.

130.    Student also contends that the behavioral goal in the IEP, which dealt with problem solving, was inadequate. However, it appears that it dealt with the heart of

25

Student's behavioral issues – his inability to deal with a problem with another student or in class.

131. Student has failed to meet his burden of proving that the District denied him a FAPE by failing to provide a BSP or adequate behavioral goals during Student's 2005-2006 school year or by failing to timely provide a BSP/BIP or failing to provide a safe learning environment during the 2006-2007 school year.

*Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Provide Student with Social Skills Training?*

132. School Psychologist Sandra Magaro provided Student with a social skills group once a week during the 2006-2007 school year. Student also had the option of coming to her office when he needed a sensory break. In Student's written closing argument, Student does not dispute that the social skills group meetings took place. Instead Student contends that Student should have had one-to-one social skills training or have been placed in a nonpublic school. The evidence does not support Student's position. Student's own expert Dr. Norall recommended that Student participate in her social skills group called a "friends club." There is also no evidence that Student's social skills training had to be provided by a nonpublic school. Magaro was well qualified to handle the social skills training. Although Dr. Norall recommended "social coaching" for Student with a behavioral aide, she did not testify that the social skills group provided by Magaro during Student's senior year was inadequate. Norall also believed that mediation was important for Student. The District witnesses testified that the school staff used mediation as a strategy for Student during Student's 2006-2007 school year.

133. Student has the burden to show that the District failed to provide social skills training during the 2006-2007 school year. Student failed to meet that burden.

*Did the District deny Student a FAPE During the 2006-2007 School Year by Failing to Timely Provide a Communication Log Between the District and Student's parents?*

134. There is no specific requirement in IDEA that a school district provide a daily or weekly log of communications between the school staff and a child's parents. However, if the IEP calls for a log to be provided, then it must be provided.

135. Student's parents have requested and received communication logs from the schools that Student attended before he came to the District. Student's May 11, 2004 IEP and November 3, 2004 IEP called for Student's parents to receive weekly progress reports. The November 30, 2005 IEP, on the other hand, called for only a progress summary report once a semester. The November 27, 2006 IEP does the same.

136. The evidence in the file shows that in January 2007, Ms. Crane, Student's case manager, started sending weekly reports to the parents. However, even earlier in the year, there was a continual communication by email between Student's parents and Ms. Crane.

There was no lack of communication between Student's parents and the District staff at any time during the 2006-2007 school year.

137.    Student failed to meet his burden of proving that the District denied him a FAPE by failing to timely produce communication logs.

*Did the District Deny Student a FAPE During the 2006-2007 School Year Because of Staff Insensitivity to Words and Actions that Trigger Anxiety in Student or Because of Staff Insensitivity Toward Student's Parents?[11]*

138.    Student contends that the attitude of District staff was insensitive toward words and actions that escalated Student's anxiety. While "insensitivity" is not a specific basis for a denial of FAPE, it is possible that sufficient insensitivity by school district staff might constitute a failure by the staff to comply with a student's IEP. The law requires a District to comply with the terms of an IEP in order to provide a student with a FAPE. Likewise, although the law does not specifically prohibit district staff from being insensitive toward parents, if that insensitivity rises to the level that it deprives the parents of the ability to participate in the IEP process, it could constitute a procedural violation of IDEA.[12]

139.    Student cites to several incidents in which the District staff demonstrated insensitivity to Student. On December 13, 2006, Ms. Hunt sent an email to Student's television technology teacher in which she stated that Student did not have the intellectual capacity for his class and the best Student might be in the television field is a "gofer."

140.    On January 10, 2007, Ms. Hunt complained to District staff that they needed a formal communication plan so that Student's parents "don't come running over here every time he sneezes." Hunt also demonstrated insensitivity by asking if Student was a bigot when Student had complained about other students bullying him in one of his classes.[13]

141.    As stated in Factual Findings 105-106 above, there was an occasion in which Student's foods and nutrition teacher grew impatient with Student because he was procrastinating on a project and spoke sternly to him.

142.    In addition, Student's parents filed a complaint in December 2006 because of rude treatment that Student's mother and Student had received from a traffic guard near the campus parking lot.

---

[11] These two issues are grouped together because the same factual findings support both.

[12] Student's counsel did not state the legal basis for these allegations in Student's written closing argument or cite to any cases relating to "insensitivity."

[13] Ms. Hunt's testimony also demonstrated her insensitivity to the parent's concerns. At one point during direct examination, Hunt went beyond the scope of one question asked by her counsel in order to comment that Student's parents complained about a teacher scolding Student for his flatulence in class. Hunt's testimony appeared to be designed to belittle Student's parents.

143.    Although there is no dispute that these comments were made or that they demonstrated a level of insensitivity toward Student and his parents, they are not sufficient to amount to a denial of FAPE, either procedurally or substantively.

144.    Ms. Hunt was not one of Student's instructors. She was an administrator at the school. Any insensitivity she displayed would not have affected Student or triggered anxiety on his part. Likewise, the parking attendant was not a trained educator who worked with Student on his IEP goals. The one incident with Student's foods teacher, even if it occurred in precisely the way Student described, was not alone enough to constitute a failure to comply with Student's IEP. There were many other staff members to whom Student could go for support.

145.    All of Student's teachers and counselors who testified at the hearing demonstrated genuine concern for Student's well being and a desire to help him with his education. While Hunt may have complained about Student's parents in her emails, her staff did their best to address the concerns of Student and his parents in a timely and courteous manner. The record is full of instances in which the staff responded quickly to emails sent by Student's parents and met with Student's parents to address Student's educational and behavioral issues.

146.    Student did not meet his burden of proving that the staff insensitivity toward him denied him a FAPE.

147.    Likewise, the evidence does not support a finding that staff insensitivity toward Student's parents constituted a procedural violation of FAPE. There is no indication that Hunt's comments regarding Student being a "gofer" or the parents rushing in "every time he sneezes" were sent to the parents or intended to be read by them. While these comments and Hunt's testimony do indicate a bit of a callous attitude toward Student's parents, that attitude did not prevent Student's parents from participating in Student's IEP process. These were not frightened parents who were cowed into accepting whatever a callous District forced upon them. Instead, these were concerned, dedicated parents who tried their best to work with the District, but were unafraid to challenge the District when necessary for their son's education. There was no denial of FAPE.

*Did the District Deny Student a FAPE by Failing to Provide Student with an Educational Program (such as home hospital or an itinerant teacher) after May 3, 2007?*

148.    Student contends that the District denied Student a FAPE by failing to provide Student with any education between May 3, 2007, when Student's parents pulled Student from high school, until the end of the school year on June 14, 2007. A school district is required to provide a continuum of program options, including home hospital or itinerant teachers, if necessary to meet a student's unique needs.

149.    Student's parents pulled Student from Fallbrook High School on May 3, 2007, based on Dr. Ong's recommendation. At the May 10, 2007 IEP meeting, Student's parents

28

requested that Student's assignments be sent home. Ms. Hunt told them that not all of the general education assignments could be done at home but that assignments could be modified to some degree. The District recommended that the school psychologist Ms. Magaro see Student on an individual basis to help deal with his anxiety so he could return to school. Student's parents refused.

150. The District did not explore any other options for providing Student with an education at that meeting. The District did not call an emergency IEP or take steps to get Student back into school after that date.

151. On May 14, 2007, the District sent a release to Student's parents and Student so the District could speak with Dr. Ong. As stated above in Factual Finding 121, Student's parents refused to sign it.

152. On June 7, 2007, the final IEP meeting of Student's 2006-2007 school year was held. The District offered Student a placement for the 2007-2008 school year, but did not address the remaining school time in the 2006-2007 school year.

153. Student did not attend Fallbrook High School from May 3, 2007, to the end of the 2006-2007 school year, and did not complete his final semester classes.

154. The evidence does not support a finding that the District failed to provide Student with an educational program between May 3, 2007, and the end of the 2006-2007 school year on July 14, 2007. Student's parents pulled Student from Fallbrook High School based on the recommendation of Student's psychiatrist, but they refused to allow the District to speak with that psychiatrist to find out the basis for his opinion. The District requested authorization from both Student's parents and Student to speak with Dr. Ong. There was no evidence at hearing that the parents asked their son whether he would consent to have the District speak with Dr. Ong. In addition, Student's parents did not permit the school psychologist Ms. Magaro to speak with Student about returning to school. Dr. Ong's letter did not state that continued attendance at Fallbrook High School would be mentally or emotionally damaging or dangerous for Student. It merely said he was not "learning to his potential" there. That alone was not sufficient to warrant a home placement.

155. Without input from Dr. Ong or Ms. Magaro, the District could only rely on its recent triennial assessment to determine an appropriate placement for Student for the remainder of the school year. That assessment did not find any basis for home hospital or itinerant teacher services. Based on that information, the District offered Student an educational program at Fallbrook High School between May 3, 2007, and the end of the school year. That offer was consistent with the legal requirement that the District provide FAPE in the least restrictive environment. There was no violation by the District.

29

*Factual Findings Related to Proposed Remedies*

156.    Student requests compensatory education in a nonpublic school (NPS) as a remedy for the District's denial of FAPE.  Student presented evidence related to the Fusion Learning Center and the services it provides.  However, the evidence established that the Fusion Learning Center is not a certified NPS with the State of California.  Student's expert Dr. Norall mentioned other possible schools, but Student provided no specific information regarding the programs at those schools or whether they would accept Student in their classes.  Dr. Norall believes that Student has the capability of attaining a diploma if an appropriate school program is provided.  Student wants to attain a diploma, but does not wish to go back to the Fallbrook High School campus.  Student's parents also wish to have Student work toward a diploma.

## CONCLUSIONS OF LAW

*Burden of Proof*

1.    The Student, as the party who filed the due process request, has the burden of proof in this proceeding.  (*Schaffer v. Weast* (2005) 546 U.S. 49 [126 S.Ct. 528, 163 L.Ed.2d 387].)

*The Requirements for a Free Appropriate Public Education*

2.    Under the federal Individuals with Disabilities Education Act (IDEA) and corresponding state law, students with disabilities have the right to a FAPE.  (20 U.S.C. § 1400 et seq.; Ed. Code, § 56000 et seq.)  FAPE means special education and related services that are available to the student at no cost to the parents, that meet the state educational standards, and that conform to the student's IEP.  (20 U.S.C. § 1401(a)(9); Cal. Code Regs., tit. 5, § 3001, subd. (o).)

3.    In *Board of Education of the Hendrick Hudson Central School District v. Rowley* (1982) 458 U.S. 176 [102 S.Ct. 3034] (*Rowley*), the Supreme Court discussed what is required for an offer of FAPE.  The court held that "the 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to" a child with special needs.  (*Id.* at p. 201.)  *Rowley* expressly rejected an interpretation of the IDEA that would require a school district to "maximize the potential" of each special needs child "commensurate with the opportunity provided" to typically developing peers.  (*Id.* at p. 200.)  Instead, *Rowley* interpreted the FAPE requirement of the IDEA as being met when a child receives access to an education that is "sufficient to confer some educational benefit" upon the child.  (*Id.* at pp. 200, 203-204.)  In resolving the question of whether a school district has offered a FAPE, the focus is on the adequacy of the school district's proposed program.  (See *Gregory K. v. Longview School District* (9th Cir. 1987) 811 F.2d 1307, 1314.)

4.     The congressional mandate to provide a FAPE to a child includes both a procedural and a substantive component. In *Rowley, supra,* 458 U.S. 176, the United States Supreme Court utilized a two-prong test to determine if a school district had complied with the IDEA. First, the district is required to comply with statutory procedures. Second, a court will examine the child's IEP to determine if it was reasonably calculated to enable the student to receive educational benefit. (*Id.* at pp. 205 – 207.)

5.     However, not every procedural violation of IDEA results in a substantive denial of FAPE. (*W.G. v. Board of Trustees of Target Range School District* (9th Cir. 1992) 960 F.2d 1479, 1484.) According to Education Code section 56505, subdivision (f)(2), a procedural violation may constitute a substantive denial of FAPE only if it:

(A)     Impeded the child's right to a free appropriate public education;

(B)     Significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or

(C)     Caused a deprivation of educational benefits.

*Did the District Deny Student a FAPE During the 2005-2006 School Year by Failing to Provide Student's Parents with Options for Student's Graduation? Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Provide Student's Parents with Options for Student's Graduation and/or Predetermining Student's Placement?*

6.     Parents are an important part of the IEP process. Parents have the right to participate in the development of the IEP for their child and "to be informed of the availability under state and federal law of free appropriate public education and of all available alternative programs, both public and nonpublic." (Ed. Code, § 56506, subd. (d).)

7.     A district must have a continuum of program options available to special education students to meet their needs. (Ed. Code, § 56360.) The continuum of program options includes, "instruction in the home, in hospitals, and in other institutions to the extent required by federal law or regulation." (Ed. Code, § 56361, subd. (i).) "Services provided by nonpublic, nonsectarian schools, as defined pursuant to Section 56034, and nonpublic, nonsectarian agencies, as defined pursuant to 56035, shall be available." (Ed. Code, § 56365, subd. (a).)

8.     Beginning no later than the effective date of the IEP in effect when the pupil reaches the age of sixteen, the meeting must include consideration of postsecondary goals and transition services for the pupil. (Ed. Code, § 56341.5, subd. (e).)

9.     The IDEA contemplates that decisions will be made by the IEP team during the IEP meeting. It is improper for the district to prepare an IEP without parental input, with

31

a preexisting, predetermined program and a "take it or leave it" position. (*W.G., supra*, 960 F.2d, at p. 1484.)

10.   As set forth in Factual Findings 1- 56, the evidence supports a finding that the District failed to provide Student's parents with options for Student's graduation. While the District personnel understood that Student was being placed on a track that would not lead to a diploma, they did not effectively and appropriately communicate that to Student's parents.

11.   The failure of the District to adequately keep the parents informed constituted a procedural violation of IDEA. As set forth in Legal Conclusion 5, in order to determine if that procedural violation also constituted a substantive violation of FAPE, it is necessary to look at the factors set forth in Education Code section 56505, subdivision (f)(2). In the instant case, the second factor is the key. The failure to properly inform the parents about the options for Student's graduation significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a FAPE to Student. Student's parents were making critical decisions regarding Student's classroom placement and testing. Without full knowledge that the choices they were making would affect their son's ability to attain a diploma, they could not make informed decisions. Their decisions could easily have been different if they knew the correct information.

12.   Likewise, the District's predetermination of placement at the June 2007 IEP meeting significantly impaired the parents' opportunity to participate in the decisionmaking process. The school presented two placement options, neither of which was intended to assist Student with possibly attaining a diploma. When the parents attempted to participate in the process, they were closed out without a discussion of other reasonable alternatives. Even though the District proposed two placements instead of the one placement proposed in the *W.G.* case, the District was still predetermining what the placement would be and then refusing to consider other options. The District's actions denied Student a FAPE.

*Did the District Deny Student a FAPE During the 2005-2006 and 2006-2007 School Years by Failing to Include a Handwriting Goal in Student's IEP and/or Failing to Provide Occupational Therapy Services for Handwriting?*

13.   An IEP must include a statement of measurable annual goals, including academic and functional goals designed to meet the individual's needs that result from the individual's disability to enable the pupil to be involved in and make progress in the general education curriculum and meet each of the pupil's other educational needs that result from the disability. (Ed. Code § 56345, subd. (a)(2).) An IEP must also include related services (called "designated instruction and services" in California) which are necessary to assist an individual with special needs to benefit from special education. (20 U.S.C. § 1401(26); Ed. Code, § 56363, subd. (a).) These services may include occupational therapy. (Ed. Code, § 56363, subd. (b)(6).)

14.   As set forth in Factual Findings 57 - 69, the Student had needs in the area of handwriting with respect to the ability to sign his name in cursive. Student's IEP did not

address those needs until March 2007. Although Student worked on signing his name in class, he did not have the systematic oversight of an IEP, and, as a result, was very erratic on the use of a cursive signature. Student met his burden of proving that the failure to include a handwriting goal in the IEP denied Student a FAPE. However, Student did not meet his burden with respect to the need for OT services. All the individuals who assessed Student agreed that his writing problems were not caused by a fine motor deficiency. Student did not call an OT expert to state that Student required such services in order to consistently sign his name in cursive.

*Did the District Deny Student a Free Appropriate Public Education During the 2005-2006 School Year Due to Student's Failure to Make Sufficient Progress to Meet His IEP Goals?*

15.    The law requires an IEP team to meet at least annually "to determine whether the annual goals for the pupil are being achieved, and revise the individualized education program, as appropriate, to address among other matters the following: (1) Any lack of expected progress toward the annual goals and in the general curriculum, where appropriate...." (Ed. Code, § 56341.1, subd. (d).) An IEP meeting must be called when the "pupil demonstrates a lack of anticipated progress." (Ed. Code, § 56343, subd. (b).)

16.    As set forth in Factual Findings 70 - 74, Student did not meet his burden of proving that Student failed to meet his goals during the 2005-2006 school year. Instead, the evidence showed that Student made substantial progress on the problem solving goal in question. The inclusion of the goal in the following IEP was not improper.

*Did the District Deny Student a FAPE During the 2005-2006 School Year by Failing to Provide a BSP, and/or Failure to Write Adequate Behavioral Goals? Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Timely Provide a BSP and/or Failing to Provide a Safe Learning Environment?*

17.    When a child's behavior "impedes the child's learning or that of others," a school district must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." (20 U.S.C. § 1414(d)(3)(B)(i).) When a child "exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives" of the child's IEP, a district must develop a formal behavior intervention plan (BIP), which becomes part of the child's IEP. (Cal. Code Regs., tit. 5, § 3001, subd. (f).) Serious behavior problems are defined as "behaviors which are self-injurious, assaultive, or cause serious property damage or other severe behavior problems that are pervasive and maladaptive for which instructional/behavioral approaches in the student's IEP are found to be ineffective." (Cal. Code Regs., tit. 5, § 3001, subd. (aa).) Before a BIP is developed, the district must conduct a functional analysis assessment (FAA). (Cal. Code Regs., tit. 5, § 3052, subd. (a)(3).) An FAA is a detailed assessment of a child's behavior, which includes, among other things, systematic observation of the occurrence of the targeted behaviors, systematic observation of immediate antecedent events associated with the behavior and the consequences of the behavior. (Cal. Code Regs., tit. 5., § 3052, subd. (b)(1).)

33

18.    As set forth in Factual Findings 75 - 131, Student did not meet his burden of showing that the District failed to respond appropriately to Student's behavioral issues. The few behavioral incidents that Student had during the 2005-2006 school year were easily handled by the IEP supports in place. There was no need for a BSP or any behavior goals besides the problem solving goal in the IEP. When that situation changed during the middle of the 2006-2007 school year, the District responded appropriately, first with a BSP and then a BIP.

19.    Student also failed to meet his burden to show that the District failed to provide him with a safe learning environment. On each occasion that Student was subjected to bullying by peers or insensitive treatment by aides, the District took action to correct the circumstance. Because the District had no opportunity to speak with Student's psychiatrist and because the parents would not let Student talk to the psychologist after May 3, 2007, the District was hampered in its efforts to provide any changes necessary to deal with Student's continued "melt-downs." There was no denial of FAPE in this regard.

*Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Provide Student with Social Skills Training?*

20.    As set forth in Factual Findings 132 – 133, the evidence did not establish that the District failed to provide Student with social skills training. There was no denial of FAPE.

*Did the District deny Student a FAPE During the 2006-2007 School Year by Failing to Timely Provide a Communication Log Between the District and Student's parents?*

21.    As set forth in Factual Findings 134 – 137, the evidence did not establish that the District was required to provide a communication log to the parents during the 2006-2007 school year. There was no requirement in the IEP for such a log and Student has cited to no legal authority that a District must produce a communication log to all parents of special education pupils. The District began providing weekly updates in January 2007, but even before that, there was constant email communication between Student's parents and the District. There was no procedural violation and no denial of FAPE.

*Did the District Deny Student a FAPE During the 2006-2007 School Year Because of Staff Insensitivity to Words and Actions that Trigger Anxiety in Student or Because of Staff Insensitivity Toward Student's Parents?*

22.    Student cites to no legal authority stating that staff insensitivity may constitute a denial of FAPE. However, it is possible that, if the District's insensitivity prevents meaningful participation by the parents in the IEP process, it might constitute a procedural violation. In addition, if District staff is insensitive to a special education student's needs to the extent that the District is no longer following Student's IEP, it might constitute a denial of FAPE. As set forth in Factual Findings 138 – 147, Student did not meet his burden of showing that any insensitivity by District staff toward Student or his parents was severe

enough to prevent the parents from participating in the process or constitute a failure to follow Student's IEP. There was no denial of FAPE.

*Did the District Deny Student a FAPE by Failing to Provide Student with an Educational Program (such as home hospital or an itinerant teacher) after May 3, 2007?*

23.    As stated above in Legal Conclusion 7, a district must have a continuum of program options available for special education students. Special education and related services may be provided in the home or hospital if the IEP team recommends such instruction or services. (Cal. Code Regs., tit. 5, § 3051.4, subd. (a).) "For those individuals with exceptional needs with a medical condition such as those related to surgery, accidents, short-term illness or medical treatment for a chronic illness, the individualized education program team shall review, and revise, if appropriate, the individualized education program whenever there is a significant change in the pupil's current medical condition." (Cal. Code Regs., tit. 5, § 3051.4, subd. (c).) When recommending placement for home instruction, the IEP team must have a "medical report from the attending physician and surgeon or the report of the psychologist, as appropriate, stating the diagnosed condition and certifying that the severity of the condition prevents the pupil from attending a less restrictive placement." (Cal. Code Regs., tit. 5, § 3051.4, subd. (d).)

24.    As set forth in Factual Findings 148 – 155, the District provided Student with an educational program in the Fallbrook High School between May 3, 2007, and the end of the school year. According to the triennial assessments conducted by the District shortly before the May 2007 IEP meeting, that was the appropriate program for Student. Based on a letter from Student's psychiatrist, Student's parents pulled Student from the high school on May 3. However, neither Student nor his parents gave the District permission to speak with the psychiatrist, and Student's parents declined an offer to have the District's psychologist speak with Student. The psychiatrist's letter dealt with Student's learning potential, not any physical or mental harm that would result from his placement in the high school. Without anything more, it would not have been appropriate for the District to place Student in a home environment. There was no denial of FAPE.

*What is the Appropriate Remedy for the Denial of FAPE?*

25.    As stated above in Legal Conclusions 1 – 24, the District failed to provide Student with a FAPE during the 2005-2006 and 2006-2007 school years because the District failed to inform Student's parents regarding Student's graduation options, predetermined Student's placement during the June 2007 IEP meeting, and failed to provide Student with a handwriting goal related to signing his name in cursive writing until March 21, 2007. Student seeks compensatory education "at a certified NPS, with all services, and with special education transportation" to remedy the denial of FAPE.

26.    Compensatory education is an equitable remedy designed to "ensure that the student is appropriately educated within the meaning of the IDEA." (*Parents of Student W v. Puyallup School District, No. 3* (9th Cir. 1994) 31 F.3d 1489, 1497.) There is no obligation

to provide a day-for-day compensation for time missed. The remedy of compensatory education depends on a "fact-specific analysis" of the individual circumstances of the case. (*Ibid.*) The court is given broad discretion in fashioning a remedy, as long as the relief is appropriate in light of the purpose of special education law. (*School Committee of the Town of Burlington, Massachusetts v. Department of Education* (1985) 471 U.S. 359, 369 [105 S.Ct. 1996].)

27.     Looking at the facts in the instant case, it is questionable whether Student needs compensatory education at all. As set forth in Factual Finding 56, Student made significant educational progress while in high school. He went from a fifth grade reading level to a tenth grade reading level in three years. His math skills also improved greatly. Although placement is not at issue in this case, the evidence introduced at the hearing indicated that Fallbrook High School was the appropriate placement for Student in the least restrictive environment for the three years Student attended there. It is partly because of Student's significant progress that attaining a high school diploma is a possibility for him at this time.

28.     On the other hand, even though Student made educational progress in his high school years, he was not progressing toward a diploma because of the choices the IEP team made. If his parents had understood the consequences of their choices, they might have made other choices. For example, they might have encouraged standardized testing of their son rather than agreeing to exempt him from testing every year. They might have asked for more goals in mathematics, such as the goals they sought in June 2007, once they realized that he needed algebra to graduate.

29.     The evidence has established that Student lost educational opportunity due to the District's failure to properly inform his parents about his non-diploma track. Some measure of compensatory education is appropriate.

30.     The more difficult question is what type and/or amount of compensatory education would make up for the educational opportunities which Student lost. The District's transition program is not designed to give Student the opportunity to work toward a diploma. Based on Ms. Hunt's testimony that allowing Student to return to high school as a "super senior" was not intended to allow Student to earn a diploma, it does not appear that another year at Fallbrook High School is the appropriate compensatory remedy.

31.     However, Student presented very little evidence on the subject of the appropriate compensatory remedy. The Fusion Learning Center is not a state certified NPS, and Student did not present specific evidence about other NPS programs. Under these circumstances, Student did not meet his burden of proving that an NPS placement should be ordered to provide compensatory education to Student.

32.     The appropriate remedy under these circumstances is to require the District to hold a new IEP meeting to allow the IEP team to discuss appropriate placement and services to permit Student to work toward a high school diploma.

33.    A new IEP meeting will also remedy the denial of FAPE based on predetermination of placement. Because the District predetermined the proposed placement at the June 2007 IEP meeting, the District failed to consider other possible options for Student's education. The appropriate remedy is to order the District to hold another IEP meeting to consider a placement which will permit Student, with appropriate supports and services, to work toward a diploma. The IEP meeting should be held at a time when Student's expert Dr. Norall and/or any other experts Student wishes to invite to the meeting may be present. The IEP team should specifically address the issue of placement, services and supports necessary to help Student work toward a diploma. Possible NPS placements should be considered by the IEP team. If the IEP team is unable to agree upon an appropriate placement, nothing in this Decision would stop either party from seeking further relief through a future due process proceeding.

34.    The IEP team should also make certain that a handwriting goal for Student's cursive signature is included in Student's next IEP. That will be sufficient to remedy the failure to include a handwriting goal in the past IEPs.

## ORDER

1.    The District is ordered to schedule a new IEP meeting within 30 days of the date of receipt of this Decision. The meeting will be scheduled at a time convenient to Student, Student's parents, Student's counsel, and any experts Student chooses to bring to the meeting.

2.    At that meeting, the IEP team will discuss and consider placements, goals and services that are designed to help Student work toward a high school diploma, including NPS placements.

3.    Nothing in this Decision is intended to prevent either party from filing a further due process proceeding regarding any proposal made at that IEP meeting.

## PREVAILING PARTY

Pursuant to California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided. In accordance with that section the following finding is made: Student prevailed on Issues 1 (a) and (b), and 2 (i). The District prevailed on the remaining issues.

## RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction. If an appeal is made, it must be made within 90 days of receipt of this Decision in accordance with California Education Code section 56505, subdivision (k).

Dated: November 20, 2007

SUSAN RUFF
Administrative Law Judge
Office of Administrative Hearings
Special Education Division

**EXHIBIT 3**

Office of Administrative Hearings
Special Education Division
July – December 2005 Report

Under the terms of the May 25, 2005 Interagency Agreement (No. 4427) the Office of Administrative Hearings (OAH) is to provide the California Department of Education (CDE) with a quarterly report on information relating to mediations, due process hearings and other information described in the section of the agreement relating to data collection and reporting. Although the agreement required OAH to process only those cases filed on and after July 1, 2005, and the prior contractor McGeorge School of Law Special Education Hearing Office (SEHO) was to continue responsibility for matters previously filed, OAH agreed, at CDE's request, to take responsibility for all pending due process requests with SEHO performing only the mediation portion of the work.

As the figures recited below reflect, the additional cases (1081 of a total of 2275 cases processed) essentially doubled the number of cases for which OAH had responsibility in the first six months of the contract period. Moreover, virtually all of the due process hearings held related to cases filed with SEHO before July 1, 2005, which were in "off calendar" status until one or both parties requested a hearing date.

OAH recognizes that quite apart from the very specific requirements of the Interagency Agreement, carefully tracking case management activities is critical to assess performance and identify important trends. Unfortunately, the unanticipated significant increase in caseload required OAH to essentially "triage" case management responsibilities, assigning the highest priorities to the opening of new cases and those referred from SEHO, daily law and motion activity, and activities directly related to those due process hearings that were heard and decided. This was, in part, the reason for the delayed issuance of a report for the first quarter of the contract period.

I.    Case Filings.

The number of total filings of special education cases through December 2005 was 2,275. They include 1,194 new cases that were filed directly with OAH on or after July 1, 2005. The total also includes 1,081 matters that were pending with SEHO, and then referred to OAH for hearing. These are referred to as "pipeline cases" and although these cases were not technically "new" filings, OAH added them to the category of open files included in the combined total tracked over this period. The monthly breakdown of cases filed through December 2005 is set forth below:

*1*

| 2005 | Pipeline Cases | New Cases | Combined Total |
|---|---|---|---|
| July | 454 | 147 | 601 |
| August | 130 | 205 | 335 |
| September | 117 | 204 | 321 |
| October [1] | 101 | 161 | 262 |
| November | 43 | 247 | 290 |
| December | 236 | 230 | 466 |
| **TOTALS** | 1081 | 1194 | 2275 |

Of the combined total of 2275, ten districts account for 1066 cases, or 46.8 percent of the total. The number of cases by school district is included as an attachment. The largest number involves the Los Angeles Unified School District (LAUSD) with 734 cases or 32.26 percent of total cases filed. This is followed by Capistrano USD (64 cases), Newport-Mesa USD (43 cases), Long Beach USD (43 cases), San Diego USD (36 cases), San Francisco USD (36), Tustin USD (32), Poway USD (31 cases), Irvine USD (26 cases) and Corona-Norco USD (20 cases).

II.    Closed Cases.

Over the period July through December 2005, 1071 cases were closed. These include cases that were dismissed, withdrawn by request of the parties, or that were resolved successfully prior to or after hearing. Of the 1071 closed cases, 636 were cases that were initially filed with SEHO, and 435 were cases that were filed with OAH on or after July 1, 2005. OAH has collected data by disposition category on only the 435 cases filed with OAH from July 1, 2005, because cases filed on or after this date are the only ones from which baseline data from opening to closing could be tracked. Accordingly, data on the 636 closed "pipeline cases" are not included within the scope of this report.[2]

Of the 1194 new cases filed with OAH since July 1, 2005, 435 were closed through December 2005.[3] Of the 435 closed cases, the petitioners were parent/child in 394 (90.6 percent) cases, and the districts were petitioners in 41 (9.4 percent) cases. A very high percentage of cases (73.1 percent) settled. Approximately 60 percent settled during resolution session or mediation, and the balance settled at the time of hearing or otherwise. Approximately 10 percent of cases were dismissed by reason of insufficiency of pleadings or inactivity, and 16 percent were withdrawn. Two cases filed since July 1, 2005, went through hearing and decision over this period. There were actually 32 due process hearings that resulted in decision over this period, but these were largely cases filed before July 1, 2005, and they were therefore not included in the resolution totals tracked.

---

[1] Through October 27, 2005
[2] OAH will continue to track the number of SEHO cases closed, but not by disposition category.
[3] This number is a bit understated because a significant number of cases awaiting issuance of a notice of dismissal were not included in this figure.

2

The breakout of closed cases that were initially filed with OAH on or after July 1, 2005, by resolution categories are set forth below:

| Disposition | Total | Percent |
|---|---|---|
| Settled: Resolution Session | 167 | 38.4 |
| Settled: Mediation | 93 | 21.4 |
| Settled: Hearing | 3 | .7 |
| Settled: Otherwise | 55 | 12.6 |
| Dismissed: Insufficient | 39 | 8.9 |
| Dismissed: Inactivity | 6 | 1.4 |
| Withdrawn | 70 | 16.1 |
| Hearing/Decision | 2 | .5 |
| **TOTAL** | 435 | 100 |

III.    Mediations.

OAH held no mediations in special education cases prior to January 1, 2006, so there are no reportable data regarding mediations for the period July 1 through December 2005. The Interagency Agreement provides that OAH would refer those due process matters submitted between July 1, 2005, and December 31, 2005, in which the parties requested mediation to SEHO, which would assign a mediator. OAH was not responsible for matters referred to SEHO for mediation until they were returned to OAH. Once returned they were calendared for hearing following a telephone status and/or prehearing conference with all parties. These cases often resolve prior to hearing following agreements reached between the parties, or after more formal settlement conferences before OAH.

IV.    Due Process Hearings.

During this period there have been 32 due process hearings which resulted in decisions. Copies of all decisions have been provided to CDE and also posted on the OAH website. The decisions average 15 pages in length. The total days of hearing represented by these 32 cases number 96, with an average length of three days per hearing. The length of hearings ranged from one to eight days.

Of the 32 hearings, 50 percent were rendered in favor of local educational agencies (LEAs) and 19 percent were rendered in favor of parents. The remaining 31 percent were split decisions. This compares to the previous quarter (April – June 2005) when no decisions were rendered in favor of parents, and 62 percent were in favor of the LEAs.

An attorney or advocate represented parents in 75 percent of the cases. An attorney represented LEAs in 81 percent of cases. The student demographic included high school (53%), middle school (12.5%), elementary school (19%), preschool (12.5%) and unknown (3%).

3

| District Name | Cases |
|---|---|
| LOS ANGELES U.S.D. | 734 |
| CAPISTRANO U.S.D. | 64 |
| NEWPORT-MESA USD | 43 |
| LONG BEACH U.S.D. | 43 |
| SAN DIEGO U.S.D. | 36 |
| SAN FRANCISCO U.S.D. | 36 |
| TUSTIN U.S.D. | 32 |
| POWAY U.S.D. | 31 |
| IRVINE U.S.D. | 26 |
| CORONA-NORCO USD | 20 |
| GARDEN GROVE U.S.D. | 20 |
| ORANGE USD | 19 |
| SANTA ANA U.S.D. | 19 |
| MT. DIABLO USD | 18 |
| SAN RAMON VALLEY U.S.D. | 17 |
| OAKLAND U.S.D. | 16 |
| SAN JOSE USD | 15 |
| PASADENA U.S.D. | 15 |
| SANTA MONICA-MALIBU USD | 14 |
| TEMECULA VALLEY U.S.D. | 14 |
| COMPTON U.S.D. | 14 |
| SAN DIEGO CITY SCHOOLS | 14 |
| MANHATTAN BEACH U.S.D. | 13 |
| ANAHEIM CITY S.D. | 13 |
| CHULA VISTA E.S.D. | 12 |
| PLACENTIA-YORBA LINDA U.S.D. | 11 |
| ELK GROVE U.S.D. | 11 |
| RIALTO U.S.D. | 11 |
| WEST CONTRA COSTA USD | 11 |
| GLENDALE U.S.D. | 11 |
| DEL NORTE U.S.D. | 11 |
| CHINO VALLEY U.S.D. | 11 |
| BERKELEY U.S.D. | 10 |
| SAN LUIS COASTAL U.S.D. | 10 |
| SIMI VALLEY U.S.D. | 10 |
| TORRANCE U.S.D. | 10 |
| LAS VIRGENES U.S.D. | 10 |
| SAN DIEGUITO UNION H.S.D. | 10 |
| CULVER CITY U.S.D. | 10 |
| SACRAMENTO CITY U.S.D. | 10 |
| OCEAN VIEW S.D. | 10 |
| ANAHEIM U.H.S.D. | 10 |
| DOWNEY U.S.D. | 10 |
| MONTEBELLO USD | 9 |
| ANTELOPE VALLEY U.H.S.D. | 9 |
| FULLERTON ELEMENTARY S.D. | 9 |
| NORWALK/LA MIRADA U.S.D. | 9 |
| PALMDALE S.D. | 9 |

| | |
|---|---|
| FOLSOM CORDOVA USD | 9 |
| BELLFLOWER U.S.D. | 9 |
| ALHAMBRA S.D. | 9 |
| ALTA LOMA S. D. | 8 |
| BELMONT-REDWOOD SHORES E.S.D. | 8 |
| HUNTINGTON BEACH CITY S.D. | 8 |
| ABC U.S.D. | 8 |
| EAST SIDE UNION H.S.D. | 8 |
| CARLSBAD U.S.D. | 8 |
| REDONDO BEACH U.S.D. | 8 |
| SADDLEBACK VALLEY U.S.D. | 7 |
| YUCAIPA-CALIMESA JT. U.S.D. | 7 |
| MANTECA U.S.D. | 7 |
| LA CANADA U.S.D. | 7 |
| HUNTINGTON BEACH U.H.S.D. | 7 |
| SAN JUAN U.S.D. | 7 |
| FREMONT U.S.D. | 7 |
| POMONA U.S.D. | 7 |
| VISALIA U.S.D. | 6 |
| CONEJO VALLEY U.S.D. | 6 |
| PALOS VERDES PENINSULA USD | 6 |
| ACALANES U.H.S.D. | 6 |
| EAST WHITTIER CITY S.D. | 6 |
| CENTRALIA S.D. | 6 |
| CUPERTINO UNION S.D. | 6 |
| HACIENDA LA PUENTE USD | 6 |
| TRACY JT. U.S.D. | 6 |
| SANTA BARBARA H.S.D. | 6 |
| EVERGREEN S.D. | 6 |
| WESTSIDE UNION E.S.D. | 6 |
| MORENO VALLEY U.S.D. | 6 |
| EL RANCHO UNIFIED S.D. | 6 |
| FULLERTON JOINT UNION H.S.D. | 5 |
| WALNUT CREEK S.D. | 5 |
| MURRIETA VALLEY U.S.D. | 5 |
| BUENA PARK S.D. | 5 |
| SAN BERNARDINO CITY USD | 5 |
| ENCINITAS U.S.D. | 5 |
| HAYWARD U.S.D. | 5 |
| KERN H.S.D. | 5 |
| INGLEWOOD U.S.D. | 5 |
| GROSSMONT UNION H.S.D. | 5 |
| CLOVIS U.S.D. | 5 |
| BEVERLY HILLS U.S.D. | 5 |
| WILLIAM S. HART UHSD | 5 |
| PARAMOUNT U.S.D. | 5 |
| SAN CARLOS S.D. | 5 |
| RIVERSIDE U.S.D. | 5 |
| WHITTIER UNION H.S.D. | 5 |
| LYNWOOD USD | 5 |

| | |
|---|---|
| NATOMAS U.S.D. | 5 |
| GRANT JT. UNION H.S.D. | 4 |
| DRY CREEK JT. E.S.D. | 4 |
| SYLVAN UNION S.D. | 4 |
| ARCADIA U.S.D. | 4 |
| LIVERMORE VALLEY JT. USD | 4 |
| BANNING U.S.D | 4 |
| LANCASTER S.D. | 4 |
| CHAFFEY JT. U.H.S.D. | 4 |
| JURUPA U.S.D | 4 |
| HAWTHORNE SCHOOL DISTRICT | 4 |
| SAN GABRIEL U.S.D. | 4 |
| PAJARO VALLEY U.S.D. | 4 |
| HEMET U.S.D. | 4 |
| VACAVILLE U.S.D. | 4 |
| OCEANSIDE U.S.D. | 4 |
| SAN MATEO-FOSTER CITY S.D. | 4 |
| PALO ALTO U.S.D. | 4 |
| COVINA-VALLEY U.S.D. | 4 |
| EXETER U.S.D. | 4 |
| ESCONDIDO U.S.D. | 4 |
| CAMPBELL U.H.S.D. | 4 |
| DAVIS JT. U.S.D. | 4 |
| FONTANA USD | 4 |
| TEHACHAPI U.S.D. | 4 |
| FRESNO U.S.D. | 4 |
| PALM SPRINGS U.S.D. | 4 |
| LAKE ELSINORE U.S.D. | 3 |
| SAN MARCOS U.S.D. | 3 |
| CYPRESS S.D. | 3 |
| BREA-OLINDA USD | 3 |
| WHITTIER CITY S.D. | 3 |
| FAIRFIELD SUISUN U.S.D. | 3 |
| ROSEVILLE E.S.D. | 3 |
| LAFAYETTE S. D. | 3 |
| ALAMEDA USD | 3 |
| GLENDORA U.S.D | 3 |
| LOS NIETOS S.D. | 3 |
| MODESTO CITY SCHOOLS | 3 |
| DUARTE UNIFIED S.D. | 3 |
| SAN RAFAEL CITY SCHOOLS | 3 |
| WESTMINSTER S.D. | 3 |
| OXNARD ELEMENTARY SCHOOL | 3 |
| COLTON JOINT U.S.D. | 3 |
| WASHINGTON UNIFIED SD (W SAC) | 3 |
| ROCKLIN U.S.D. | 3 |
| RIO LINDA UNION S.D. | 3 |
| NAPA VALLEY U.S.D. | 3 |
| MENIFEE UNION ESD | 3 |
| NEWHALL SCH DIST | 3 |

| | |
|---|---|
| ALBANY U.S.D. | 3 |
| BURBANK U.S.D. | 3 |
| WOODLAND JT. U.S.D. | 3 |
| NEW HAVEN U.S.D. | 3 |
| UPLAND U.S.D. | 3 |
| HOLLISTER S.D. | 3 |
| TAMALPAIS UNION H.S.D. | 2 |
| LOS GATOS/SARATOGA JT. USD | 2 |
| MORGAN HILL USD | 2 |
| APPLE VALLEY U.S.D. | 2 |
| CALIF SCH FOR THE DEAF | 2 |
| SAN BRUNO PARK S.D. | 2 |
| JEFFERSON E.S.D. | 2 |
| VALLEY CENTER U.S.D. | 2 |
| VISTA U.S.D. | 2 |
| MENLO PARK CITY E.S.D. | 2 |
| CASTRO VALLEY U.S.D. | 2 |
| HANFORD E.S.D. | 2 |
| EL DORADO U.H.S.D. | 2 |
| SAN MIGUEL JT. U.S.D. | 2 |
| BASSETT USD | 2 |
| CERES U.S.D. | 2 |
| TEMPLE CITY U.S.D. | 2 |
| CLAREMONT U.S.D. | 2 |
| VICTOR E.S.D. | 2 |
| VICTOR VALLEY UNION H.S.D. | 2 |
| SWEETWATER UNION H.S.D. | 2 |
| CHARTER OAK U.S.D. | 2 |
| LAWNDALE S. D. | 2 |
| MOUNTAIN VIEW E.S.D. (ONTARIO) | 2 |
| SANGER U.S.D. | 2 |
| BAKERSFIELD CITY S.D. | 2 |
| EL SEGUNDO U.S.D. | 2 |
| MERCED COUNTY MENTAL HEALTH | 2 |
| VENTURA U.S.D. | 2 |
| LOS ALTOS U.S.D. | 2 |
| BURLINGAME E.S.D. | 2 |
| LODI U.S.D. | 2 |
| SAUGUS UNION S.D. | 2 |
| CORCORAN JT. U.S.D. | 2 |
| PLEASANTON U.S.D. | 2 |
| SONORA UNION H.S.D. | 2 |
| SAN LEANDRO U.S.D. | 2 |
| MONROVIA U.S.D. | 2 |
| FOUNTAIN VALLEY S.D. | 2 |
| ORANGE CO. HEALTH CARE AGENCY | 2 |
| GATEWAY U.S.D. | 2 |
| WEST COVINA USD | 2 |
| BONITA U.S.D. | 2 |
| SEBASTOPOL U.S.D. | 2 |

7

| | |
|---|---|
| ALVORD U.S.D. | 2 |
| MILPITAS USD | 2 |
| SANTA ROSA CITY SCHOOLS | 2 |
| CAMPBELL U.E.S.D. | 2 |
| REDLANDS U.S.D. | 2 |
| RIM OF THE WORLD U.S.D. | 2 |
| SPRECKELS U.S.D. | 2 |
| LAKEPORT U.S.D. | 2 |
| SULPHUR SPRINGS U.S.D | 2 |
| DESERT SANDS U.S.D. | 2 |
| PLEASANT VALLEY SD (CAMARILLO) | 2 |
| NORTH MONTEREY CO. U.S.D. | 2 |
| PANAMA-BUENA VISTA UNION S.D. | 2 |
| REDWOOD CITY E.S.D. | 2 |
| MOUNTAIN EMPIRE S.D. | 2 |
| LAKESIDE S.D. (LAKESIDE) | 2 |
| SANTA CLARA USD | 2 |
| AZUSA U.S.D. | 2 |
| NEWCASTLE E.S.D. | 1 |
| MOOR PARK U.S.D. | 1 |
| LEMON GROVE E.S.D. | 1 |
| AMADOR CO. USD | 1 |
| CAJON VALLEY U.S.D. | 1 |
| DIXIE E.S.D. | 1 |
| LUCIA MAR U.S.D. | 1 |
| LIBERTY UNION H.S.D. | 1 |
| MERCED UNION H.S.D. | 1 |
| DENAIR U.S.D. | 1 |
| SO. BAY U.S.D. (IMPERIAL BCH) | 1 |
| STANISLAUS UNION E.S.D. | 1 |
| OAK GROVE UNION S.D. | 1 |
| FALLBROOK UNION E.S.D. | 1 |
| COTATI ROHNERT PARK U.S.D. | 1 |
| NOVATO U.S.D. | 1 |
| YOLO CO. MENTAL HEALTH CHILD | 1 |
| MIDDLETOWN U.S.D. | 1 |
| NORTHERN HUMBOLDT U.H.S.D. | 1 |
| EUREKA UNION S.D. | 1 |
| SOUTH WHITTIER E.S.D. | 1 |
| OAK GROVE S.D. | 1 |
| ROSELAND S.D. | 1 |
| SNOWLINE JOINT U.S.D. | 1 |
| NEWARK U.S.D. | 1 |
| SANTA MARIA JOINT U.H.S.D. | 1 |
| GORMAN SCHOOL DISTRICT | 1 |
| LOS ALAMITOS U.S.D. | 1 |
| RESCUE UNION E.S.D. | 1 |
| YUBA CITY U.S.D. | 1 |
| CORONADO U.S.D. | 1 |
| EUREKA CITY S.D. | 1 |

| | |
|---|---|
| ENTERPRISE S.D. | 1 |
| LOWELL JT. S.D. | 1 |
| MARYSVILLE JT. U.S.D. | 1 |
| LITTLE LAKE CITY S.D. | 1 |
| WEST SONOMA CO. UNION HSD | 1 |
| HARMONY UNION S.D. | 1 |
| TULARE CO. SUPT. OF SCHOOLS | 1 |
| SANTA BARBARA CO. OFF. OF ED. | 1 |
| ATWATER E.S.D. | 1 |
| HERMOSA BEACH CITY E.S.D. | 1 |
| ORINDA UNION S.D. | 1 |
| SOUTH PASADENA U.S.D. | 1 |
| LUCERNE E.S.D. | 1 |
| PACIFIC GROVE U.S.D. | 1 |
| LOS ANGELES CO. OFFICE OF ED. | 1 |
| ONTARIO-MONTCLAIR S.D. | 1 |
| TAFT CITY S.D. | 1 |
| SAN LORENZO U.S.D. | 1 |
| WISEBURN E.S.D. | 1 |
| PERRIS E.S.D. | 1 |
| DELHI UNIFIED SCHOOL DIST | 1 |
| RAVENSWOOD CITY S.D. | 1 |
| HESPERIA U.S.D. | 1 |
| EL TEJON U.S.D. | 1 |
| LINCOLN U.S.D. | 1 |
| LA MESA-SPRING VALLEY S.D. | 1 |
| LOMPOC U.S.D. | 1 |
| VAL VERDE USD | 1 |
| LAKESIDE UNION ESD (HANFORD) | 1 |
| ST. HELENA S.D. | 1 |
| SEQUOIA U.H.S.D. | 1 |
| OXNARD UNION H.S.D. | 1 |
| MORONGO U.S.D. | 1 |
| PLACER CO. OFFICE OF ED. | 1 |
| TULARE CO./OFFICE OF EDUC | 1 |
| MAGNOLIA ELEM SCH DIST | 1 |
| SAN JACINTO U.S.D. | 1 |
| SANTA CRUZ CITY S.D. | 1 |
| ANTIOCH USD | 1 |
| ETIWANDA S.D. | 1 |
| WALNUT VALLEY U.S.D. | 1 |
| BARSTOW U.S.D. | 1 |
| SOLANO BEACH U.S.D. | 1 |
| MADERA UNIFIED SCHOOL DISTRICT | 1 |
| BUCKEYE S.D. | 1 |
| BUTTE CO DPT BEHAVIORAL HEALTH | 1 |
| COLFAX E.S.D. | 1 |
| SALIDA U.S.D. | 1 |
| TWIN HILLS UNION S. D. | 1 |

9

| | |
|---|---|
| MONTEREY PENINSULA USD | 1 |
| GLENN COUNTY MENTAL HEALTH | 1 |
| OROVILLE UNION H.S.D. | 1 |
| FRUITVALE S. D. | 1 |
| MERCED CITY ELEM S.D. | 1 |
| NEWMAN-CROWS LANDING USD | 1 |
| BALDWIN PARK U.S.D. | 1 |
| RIVERSIDE CO. OFFICE OF ED. | 1 |
| PORTERVILLE U.S.D. | 1 |
| CLOVERDALE U.S.D. | 1 |
| LEMOORE U.H.S.D. | 1 |
| OAKLEY UNION E.S.D. | 1 |
| BONSALL UNION S.D. | 1 |
| COACHELLA VALLEY U.S.D. | 1 |
| WINDSOR U.S.D. | 1 |
| GOLETA U.S.D. | 1 |
| WESTERN PLACER USD | 1 |
| KERN CO. SUPT. OF SCHOOLS | 1 |
| LA HABRA CITY S.D. | 1 |
| CASTAIC UNION S.D. | 1 |
| SARATOGA U.S.D. | 1 |
| LAGUNA BEACH U.S.D. | 1 |
| GARVEY S.D. | 1 |
| BYRON UNION S.D. | 1 |
| SANTA BARBARA S.D. | 1 |
| ALPINE CO. U.S.D. | 1 |
| CABRILLO U.S.D. | 1 |
| OAK PARK USD | 1 |
| PLEASANT VALLEY ESD(PENN VLY) | 1 |
| REED UNION S.D. | 1 |
| LOS BANOS USD | 1 |

10

EXHIBIT 4



OFFICE OF ADMINISTRATIVE HEARINGS

State of California

560 J Street, Suite 300, Sacramento, CA, 95814
916 445-4926 phone | 916 323-6439 fax
www.oah.dgs.ca.gov

·Department of General Services

### SPECIAL EDUCATION DIVISION
### QUARTERLY REPORT –  THIRD QUARTER 2005-06
January 1, 2006 – March 31, 2006

Effective June 1, 2005, the Office of Administrative Hearings (OAH) entered into an interagency agreement with the California Department of Education (CDE) to administer the mandated special education dispute resolution program.  That agreement obligates OAH to provide certain specified dispute resolution services in conformance with 20 U.S.C. section 1415 et seq., and California Education Code section 56500.1 et seq., as well as requires OAH to collect particular data on the operation of the program.  OAH is obligated to report on that data quarterly.

The interagency agreement further contemplates that during the 2005-06 fiscal year the operation of the special education dispute resolution program will be transitioned to OAH from the University of the Pacific, McGeorge School of Law (McGeorge or SEHO), which will also provide particular dispute resolution services during the 2005-06 fiscal year.  To the extent that the data reported herein relies on or relates to McGeorge's activities during or prior to the completion of the transition period, OAH cannot vouch for its accuracy because OAH was neither privy to nor had oversight over McGeorge's operation.

During the first three quarters of the 2005-06 fiscal year, OAH's obligations under the interagency agreement have undergone a number of modifications.  These modifications have resulted in significant, unanticipated changes in the nature and volume of the workload for which OAH is responsible.  This too has resulted in some anomalies in the data.

The agreement, as originally entered, required OAH to provide hearings for all cases filed after June 30, 2005, for which a hearing was required.   OAH was also obligated to take over all matters (hearings or mediations) still pending with McGeorge on June 30, 2006. Thereafter, from July 1, 2006, through June 30, 2008, OAH was required to provide all the services necessary to appropriately administer the special education dispute resolution program, as called for by the agreement and all applicable laws.

At the time the agreement was entered into, OAH was not obligated to provide any dispute resolution services (hearings or mediations) for cases filed prior to July 1, 2005.  Also, the agreement precluded OAH from providing mediation services for any case filed between July 1, 2005, and December 31, 2005.  OAH was required to refer those matters to McGeorge.

At CDE's request, OAH agreed to amend the agreement in two respects.  First, OAH would agree to provide hearings for all cases in which a hearing was required and had not been commenced on or before the close of business on June 30, 2005.  That included cases which had been filed with McGeorge prior to July 1, 2005, and for which OAH was not responsible under the original agreement.

*1*

Second, OAH would agree that commencing on January 1, 2006, it would provide mediation services for all cases unresolved as of that date. That included cases which had been filed with, or referred to McGeorge prior to December 31, 2005, and for which OAH was not responsible under the original agreement.

OAH agreed to assume these additional responsibilities because CDE advised that it was unable to reach an agreement with McGeorge to handle this work and because OAH is committed to making sure that the special education dispute resolution program is fully available to California's special education students. That includes those students whose cases would have been lost or unduly delayed had OAH not agreed to take on this additional work.

Apart from the increased workload associated with conducting the additional and unanticipated special education mediations and hearings, the manner and timing of transferring the cases from McGeorge to OAH has been difficult. It has necessitated countless hours inventorying, reviewing and processing all of the many hundreds of McGeorge case files, some dating back a number of years.[1] OAH has reprioritized its operation to process these "pipeline" cases in a way designed to best address the pressing needs of the children involved in these additional cases.

As noted above, OAH agreed to provide certain specified dispute resolution services. Such services include conducting mediations and/or hearings in special education cases, as well as addressing all the procedural matters attendant to those proceedings. Matters to be resolved in those proceedings generally include issues related to the identification, eligibility, assessment, and/or educational placement of a student as they relate to his or her right to a free appropriate public education.

As a procedural matter, the parties (usually parents and school districts) to a special education dispute may seek a resolution of their disagreement through mediation prior to filing a request for a hearing. They may also engage in informal, non-adversarial means of resolution after a request for hearing has been filed, or even after a hearing has commenced. Resolution sessions are initially convened by local educational agencies, without the assistance of OAH within 15 days of receiving the parents' hearing request. If such a resolution session does not resolve the parties' dispute, then the parties may pursue mediation and/or participate in settlement conferences conducted by an administrative law

---

[1] McGeorge encouraged the use of "off calendar" status to continue a matter while mediation efforts were undertaken or the parties attempted to reach a negotiated settlement on their own. These matters typically remained off calendar until one party asked that the matter be placed back on calendar for a hearing. The approximately 1,000 pipeline cases received by OAH from McGeorge in the last 6 months of 2005 included cases that had been off calendar and were going back "on calendar" for a hearing, as well as cases that had been settled while at McGeorge but needed a dismissal order issued by OAH which had exclusive authority to do so after July 1, 2005. During the same period, OAH, as required by the interagency agreement with CDE, referred virtually all new case filings to McGeorge. These matters were also generally placed in "off calendar" status by McGeorge. This resulted in a large number of cases with no scheduled hearings. Since receiving these cases on January 1, 2006, OAH has diligently worked to determine the status of each of the McGeorge pipeline cases. It is expected that by June 30, 2006, each of these pipeline cases will either be placed back on calendar or closed, depending on the status of the case.

judge from OAH. The administrative law judges at OAH are trained and experienced in resolving cases through these informal means. The vast majority of cases resolve through such informal processes, which obviates the need for the more formal and adversarial hearing process.

To put this in perspective, for the quarter addressed in this report, 31 cases were resolved pursuant to a hearing out of the 865 cases that were closed. Thus, approximately 96.5 percent of the cases were resolved without the need for a hearing.

To gain a better picture of this dispute resolution process this report provides figures for the third quarter of 2005-06, including numbers related to new case filings, case closures, mediations and due process hearings.[2]

At the present time, there are approximately 1200 matters pending before OAH. This figure is arrived at by adding the total number of cases previously reported, plus the new filings over the third quarter of 2005-06, less the number of closed cases. This report necessarily focuses on data collected over the third quarter of 2005-06. Generally speaking, case filing data looks at the universe of new cases filed on or after January 1, 2006. However, data on closed cases includes cases filed prior to January 1, 2006, including cases filed with McGeorge prior to July 1, 2005. As data is collected over a longer time period, OAH will be better positioned to provide a more accurate picture of how cases have resolved since OAH assumed responsibility for conducting mediation and due process hearings in special education cases.

I. Case Filings.

The total number of new case filings for the period of January 1, 2006 through March 31, 2006 was 883. The monthly break out follows:

---

[2] Under the terms of the interagency agreement OAH is to provide CDE with a quarterly report on information relating to mediations, due process hearings and other information described in the section of the agreement relating to data collection and reporting. It is anticipated that about 4,600 cases will be filed with OAH's Special Education Division in fiscal year 2005-06. As noted in the previous report, the total number of filings of special education cases through December 2005 was 2,275.

|  | January | February | March | First Quarter 2006 |
|---|---|---|---|---|
| Student Filed Cases | 322 | 191 | 192 | 705 |
| District Filed Cases | 23 | 21 | 27 | 71 |
| Expedited Cases | 4 | 4 | 10 | 18 |
| Mediation Only Requests | 51 | 16 | 22 | 89 |
| Total Number of New Cases | 400 | 232 | 251 | 883 |

Of the combined total of 883 new cases, the largest number involves the Los Angeles Unified School District with 305 cases or 34.5 percent of total cases filed. This is followed by San Diego Unified School District with 21 new requests, Capistrano Unified School District with 16 requests, Newport-Mesa Unified School District with 14 new requests, Tustin and San Francisco Unified School Districts with 13 new requests each, and Long Beach Unified School District with 11 new requests. A complete breakdown by school district is attached and found at the end of this report.

II. Closed Cases.

Between January 1, 2006, and March 31, 2006, 865 cases were closed. These include cases that were dismissed, withdrawn by request of the parties, or that were resolved successfully prior to or after hearing. Of the 865 closed cases, 366 were cases that were initially filed with SEHO, and 499 were cases that were filed with OAH on or after July 1, 2005. Of the 865 cases closed during this quarter, 41 percent settled outside mediation and/or a resolution session and 17 percent settled in mediation,[3] for a total settlement rate of 57 percent. Success of the IDEA mandated resolution was minimal with only 12 cases being reported resolved in the mandated resolution session. A number of cases (16 percent) were withdrawn by the petitioner without a stated reason for withdrawal. A summary of the disposition status of these cases follows:

---

[3] Settlement during mediation is a case closure category, not a measure of success at mediation. For example, it does not encompass the significant number of matters that settled after progress toward settlement was made during mediation. The total number of closed cases also includes pipeline cases transferred to OAH after an unsuccessful mediation. Future quarterly reports will contain data on mediation success rates from the time a case is filed with OAH.

|  | OAH Cases | SEHO Cases[4] |
|---|---|---|
| Settled Outside Mediation or Resolution Session | 243 | 105 |
| Settled in Mediation | 114 | 32 |
| Settled in Settlement Conference | 0 | 3 |
| Resolved through Resolution Session | 12[5] | 0[6] |
| Withdrawn by Petitioner | 91 | 48 |
| Dismissed by Order of Administrative Law Judge | 9 | 2 |
| Dismissed via Notice of Insufficiency | 26 | 0 |
| Dismissed due to Inactivity | 4 | 176 |
| Total Number of Closed Cases | 499 | 366 |

As earlier noted, OAH devoted considerable time and resources to identifying aged SEHO cases that were in off calendar status and placing those matters back on calendar. Status letters were sent to all parties for cases that were in off calendar status. Approximately 21 percent of cases were dismissed due to a failure to respond to the status letter. A very small percentage of cases (.03 percent) were dismissed through the Notice of Insufficiency (NOI) process. This process was added by amendments to the federal Individuals with Disabilities Education Act (IDEA) on July 1, 2005. It permits a party to challenge the sufficiency of a due process request (or "complaint" in the language of the IDEA). The NOI challenge must be made to OAH within 15 days and OAH has five days to rule on the sufficiency of the complaint. The number of NOIs and their disposition is noted in the statistics relating to law and motion set forth in section VI below.

III. Mediations.

OAH began holding mediations on January 1, 2006. For the third quarter of 2005-06, OAH received 883 mediation requests, of which 794 were related to due process hearings, and 89 were mediation-only requests. The latter are requests for mediation by parties who are not also seeking a due process hearing.[7] Mediations are pending in the bulk of these cases. Yet of those held, there have been 146 successful outcomes, 136 in mediations related to due process hearings, and 10 in mediation-only matters.[8]

---

[4] These were cases initially filed with SEHO before July 1, 2005, for which OAH ultimately assumed responsibility as explained above.

[5] This figure appears to be understated. OAH does not always receive notice when cases resolve during resolution session and there is no requirement that parties communicate outcomes of resolutions sessions to OAH. The reported figure of 12 is based upon documentation contained in files that were closed over the first quarter of calendar year 2006.

[6] Amendments to the federal Individuals with Disabilities Education Act (IDEA) included a mandatory resolution session for all requests for due process hearings filed by parents. The amendments became effective July 1, 2005, so cases filed with SEHO were not subject to this requirement.

[7] During the first quarter of calendar year 2006, 29 mediation-only cases were closed.

[8] Although not required by either the interagency agreement or applicable law, in the future OAH will update the data on mediations with a "pull-out" report for the quarter which more precisely tracks the dispositions in each of the mediations actually conducted. The report will include those which resulted in a mediation agreement on the day of the mediation, those in which the parties entered into an "interim agreement" (typically to conduct additional assessments, view a proposed placement, or conduct an additional individualized education program



The pertinent mediation only statistics are as follows:

| | |
|---|---|
| Total Number of Mediation Requests | 883 |
| Number of Mediation-Only Requests | 89 |
| Number of Mediation requests related to Due Process Hearings[9] | 794 |
| Number of Mediation-Only Requests Resolved through Mediation | 10 |
| Number of Mediations related to Due Process hearing resolved through Mediation | 136 |
| Total Number of Pending Mediations [10] | 737 |

IV. Due Process Hearings.

During the third quarter of 2005-06, OAH received 794 new requests for a due process hearing and 509 cases were resolved through settlement agreements reached between the parties. Due process hearings were held in 31 cases which resulted in a final written decision. Copies of all decisions have been provided to CDE and also posted on the OAH website. The decisions average 14.4 pages in length. The longest decision was 24 pages and the shortest was 3 pages. The average length of hearing was 3.4 days. The length of hearings ranged from one to seven days.

Students had positive outcomes in more than a quarter of the cases heard. Of the cases heard, 3 cases (10 percent) were decided fully in favor of the student, 23 cases (74 percent) were decided in favor of the district, and 5 cases (16 percent) were split decisions. Students were represented by an attorney or advocate in 21 cases (68 percent) and unrepresented in 10 cases (32 percent). Districts were represented by an attorney or advocate in 27 cases (87 percent) and were unrepresented in 4 cases (13 percent).

Cases involving preschool students represented 6 percent of the cases heard, with 48 percent involving elementary school students, 19 percent involving middle school students, and 27 percent involving high school students. The issues for hearing involved students identified as specific learning disabled (9 cases), autistic-like (8 cases), other health impaired (7 cases), emotionally disturbed (3 cases), deaf (1 case), mentally retarded (1 case), speech and language disabled (1 case), and blind (1 case).

The districts brought two cases seeking approval to conduct assessments of students. The other issues addressed at hearing included denial of "free appropriate public education"

---

(IEP meeting), those that concluded with agreement in principle to be reduced to an enforceable written agreement, and those in which parties remained at impasse and a due process hearing was anticipated.

[9] In no case did the parties waive mediation at the time of requesting a due process hearing. For the fourth quarter of 2005-06, OAH will track the number of due process hearing and mediation requests in which mediation was initially requested but waived prior to hearing.

[10] This number represents the total number of cases requested, less the number of cases settled. In actuality, the total number of pending cases is a combination of the total number of cases reported previously plus the new filings reported here, less the number of closed cases. Based on that calculation, it is estimated that OAH currently has approximately 1200 matters pending.

(FAPE) claims (68 percent), eligibility for special education services (13 percent), and validity of assessments (29 percent). Of the remedies requested, 26 percent of cases requested reimbursement for services, 19 percent requested reimbursement for assessments, and 26 percent requested compensatory education.

Of the 31 decisions issued in the third quarter of 2005-06, 9 were rendered within the 45 day or extended timelines. Of the 31 decisions issued, 19 involved cases filed with SEHO, and 12 involved cases originated with OAH. For the 19 cases originated with SEHO the average timeline for decision was 42 days. For the cases originated with OAH, the average timeline for decision was 21 days.

Specific hearing statistics are summarized below:

| | |
|---|---|
| Total Number of Hearing Requests[11] | 883 |
| Number of Cases resolved through settlement | 509 |
| Number of Decisions Issued | 31 |
| Number of Decisions within 45 day timeline | 0 |
| Number of Decisions within extended timeline | 9 |
| Number of Decisions issued after timelines and extension expired | 22 |
| Number of pending matters[12] | 1200 |
| Number of expedited Hearings | 2 |
| Number of Hearing Requests resolved without a hearing | 865 |

V. Expedited Hearing Requests

For the third quarter of 2005-06, OAH received 18 requests for expedited hearings. An expedited hearing is a hearing that involves a parent's challenge to the school district's determination that misconduct was not the "manifestation" of the student's disability or the disciplinary placement. Under the IDEA, expedited hearings are to be held within 20 school days of the request for hearing. A decision in expedited cases is to be issued within 10 schools days after the hearing is concluded. Two cases proceeded to hearing on the expedited issues and 9 cases were settled without the need for a hearing. The specific statistics related to expedited hearings are as follows:

---

[11] This number represents the total number of new cases requested.
[12] As discussed in footnote 10 above.

| | |
|---|---|
| Total Number of Expedited Hearing Requests | 18 |
| Number of Settlement Agreements | 6 |
| Number of Expedited Hearings Held | 2 |
| Number of change of placement ordered | 0 |

## VI. Motions

Prehearing motions and Notices of Insufficiency (NOI) comprise a substantial amount of the work completed by administrative law judges. For the first quarter 2006, 264 prehearing motions and 141 NOIs were considered and ruled upon by OAH.  The breakdown of NOIs is as follows:

| | Sufficient | Insufficient | Partially Sufficient | Other [13] | Total |
|---|---|---|---|---|---|
| NOI | 43 | 47 | 12 | 1 | 103 |
| 2nd NOI | 16 | 11 | 1 | 0 | 25 |
| 3rd NOI | 9 | 4 | 0 | 0 | 13 |
| 4th NOI | 1 | 0 | 0 | 0 | 1 |

Motions for a stay put order, dismissal or continuance comprise nearly half of motions heard by OAH. The breakout of motions by type and number received is set forth below:

| Type Of Motion | Number Received |
|---|---|
| Add Party | 11 |
| Amend Complaint | 17 |
| Compel Production | 2 |
| Consolidate | 17 |
| Continue | 39 |
| Dismiss Case | 41 |
| Dismiss Party | 19 |
| Dismiss Issues | 11 |
| Expedite | 5 |
| Extend Time | 14 |
| Reconsideration | 17 |
| Reopen | 8 |
| Stay Put | 44 |
| Miscellaneous | 19 |
| Total | 264 |

---

[13] Represents cases that were withdrawn or settled before a ruling on the NOI was issued.

The above data provides an accurate picture of the special education dispute resolution process over the third quarter of 2005-06. OAH has successfully processed 865 cases through closure during this period, and issued hearing decisions in 31 other cases. Thus, 96.5 percent were resolved without the need for a due process hearing and decision. The vast majority of cases clearly resolve through informal processes, and without the need for more formal adjudication and decision. OAH has also diligently worked to address the considerable backlog of SEHO pipeline cases it inherited, all of which are expected to be placed back on calendar or closed by June 30, 2006. At the present time, there are approximately 1200 matters pending before OAH's Special Education Division.

## ATTACHMENT ONE

### NUMBER OF CASES FILED BY SCHOOL DISTRICT

| School District | Filings 01/01/06 To 03/31/06 |
|---|---|
| LOS ANGELES U.S.D. | 305 |
| SAN DIEGO U.S.D. | 21 |
| CAPISTRANO U.S.D. | 16 |
| NEWPORT-MESA USD | 14 |
| SAN FRANCISCO U.S.D. | 13 |
| TUSTIN U.S.D. | 13 |
| LONG BEACH U.S.D. | 11 |
| POWAY U.S.D. | 9 |
| ANAHEIM U.H.S.D. | 9 |
| COMPTON U.S.D. | 9 |
| TEMECULA VALLEY U.S.D. | 9 |
| SANTA ANA U.S.D. | 9 |
| PLACENTIA-YORBA LINDA U.S.D. | 8 |
| MURRIETA VALLEY U.S.D. | 8 |
| NATOMAS U.S.D. | 7 |
| ELK GROVE U.S.D. | 7 |
| SACRAMENTO CITY U.S.D. | 7 |
| YUCAIPA-CALIMESA JT. U.S.D. | 7 |
| WEST CONTRA COSTA USD | 6 |
| DUBLIN U.S.D. | 6 |
| CORONA-NORCO USD | 6 |
| ANTELOPE VALLEY U.H.S.D. | 6 |
| CHULA VISTA E.S.D. | 6 |
| IRVINE U.S.D. | 6 |

| | |
|---|---|
| MORENO VALLEY U.S.D. | 5 |
| CLOVIS U.S.D. | 5 |
| CONEJO VALLEY U.S.D. | 5 |
| VISTA U.S.D. | 5 |
| REDWOOD CITY E.S.D. | 5 |
| SAN RAMON VALLEY U.S.D. | 5 |
| SANTA MONICA-MALIBU USD | 5 |
| SIMI VALLEY U.S.D. | 5 |
| SADDLEBACK VALLEY U.S.D. | 4 |
| SAN DIEGUITO UNION H.S.D. | 4 |
| SAN JUAN U.S.D. | 4 |
| WESTSIDE UNION E.S.D. | 4 |
| SOUTH PASADENA U.S.D. | 4 |
| TORRANCE U.S.D. | 4 |
| CULVER CITY U.S.D. | 4 |
| EAST WHITTIER CITY S.D. | 4 |
| FAIRFIELD SUISUN U.S.D. | 4 |
| CHINO VALLEY U.S.D. | 4 |
| PASADENA U.S.D. | 4 |
| ORANGE USD | 4 |
| PALMDALE S.D. | 4 |
| JURUPA U.S.D | 4 |
| MANHATTAN BEACH U.S.D. | 4 |
| MODESTO CITY SCHOOLS | 4 |
| MANTECA U.S.D. | 3 |
| LANCASTER S.D. | 3 |
| LAS VIRGENES U.S.D. | 3 |
| HEMET U.S.D. | 3 |
| HOLLISTER S.D. | 3 |
| HUNTINGTON BEACH U.H.S.D. | 3 |
| PAJARO VALLEY U.S.D. | 3 |
| PALM SPRINGS U.S.D. | 3 |
| MT. DIABLO USD | 3 |
| OAKLAND U.S.D. | 3 |
| OCEAN VIEW S.D. | 3 |
| BONITA U.S.D. | 3 |
| DUARTE UNIFIED S.D. | 3 |
| FREMONT U.S.D. | 3 |
| GARDEN GROVE U.S.D. | 3 |
| GARVEY S.D. | 3 |
| GLENDALE U.S.D. | 3 |
| EAST SIDE UNION H.S.D. | 3 |
| CUPERTINO UNION S.D. | 3 |
| SEQUOIA U.H.S.D. | 3 |
| VALLEJO CITY U.S.D. | 3 |
| SWEETWATER UNION H.S.D. | 3 |
| VENTURA U.S.D. | 3 |
| SAN JOSE USD | 3 |
| REDLANDS U.S.D. | 3 |
| SANTA CLARA USD | 2 |