1   "Petitioner alleges in Issue VII that the District failed to provide Petitioner with copies of the

2   specified documents that hinders Petitioner's ability to prosecute this due process action.

3   Petitioner does not allege that the District denied Student a FAPE by purportedly not producing

4   the requested documents.  Instead, Petitioner alleges a discovery issue, which if it still exists,

5   should be addressed to OAH in a motion and not a due process complaint."  (Emphasis added).

6       While ALJ Peter Paul Castillo issued the Order in Exhibit "B," in the instant case, he

7   issued an Order of Sufficiency stating just the opposite—"the issue whether the District provided

8   parents with a copy of the disputed IEP and BSP is an issue for hearing, not an issue for a

    NOI..."

9       Respondent cannot adequately prepare a defense in this action without an opportunity to

10  receive and review the educational records.  The withholding of said records may very well be a

11  denial of FAPE, however, after the reauthorization of IDEA, Respondent no longer has the right

12  to present issues in a due process hearing.

13      Respondent has been and continues to be prejudiced by the unjustifiable actions of

14  Petitioner.  Accordingly, Respondent seeks an Order of Dismissal Without Prejudice in order to

15  put this case on hold until after the educational records are received and reviewed.  Alternatively,

16  Respondent seeks an Order of Continuance of the Hearing currently scheduled for July 19, 2007,

17  in order to obtain and review the educational records.  It should be noted that Respondent's

18  request for an Order to obtain these records, and for a subpoena duces tecum are still

19  outstanding.  However, even if OAH issues the Order and/or subpoena, Respondent does not

    have adequate time to retrieve ands review the records in time to defend this action.

20  Dated: July 9, 2007                                        Respectfully submitted,

21

22

23                                                             Ellen Dowd, Attorney for
                                                               Respondent, ▓▓▓▓▓▓▓▓▓▓

24

25

26

27

28

████████ **Chronology Re: Educational Records**

1.      IEP 5/30/07-District agrees to provide a complete copy of records within 5 school days.

2.      6/13/07-I received a call from the District on June 6, 2007 indicating that the records have been copied, and that the 4,400 pages of records will be released upon payment of $861.20.  I notified counsel for the District that my clients do not have the means to pay for the records.

3.      6/15/07-I cite additional authority for provision of records at no charge.

4.      6/18/07-Counsel for the District, Steven Lake e-mails me that he will investigate the charges for the records.

5.      6/19/07- I re-request the records at no charge.

6.      6/19/07- District files another Due Process Complaint to enforce the 5/30/07 and 3/26/07 IEPs.  In the new Due Process Complaint, District makes reference to various school records that have not been provided to me.

7.      6/20/07- I protest that at the very least the Due Process Complaint should have attachments of the IEPs in issue, to ensure that both sides are referencing the same exact documents.

8.      Due Process is scheduled for 7/19/07—this has created a greater urgency in receiving and reviewing the 4,400 pages of records.

9.      6/25/07-I request a subpoena duces tecum for the school records.  The CCP states that the adjudicative body "shall issue the subpoena duces tecum at the request of a party."  There is no requirement for payment of fees to a party.

10.    6/25/07- District again opposes my request for records.

11.    6/26/07-OAH determines that the Due Process Complaint is sufficient without attaching copies of the IEPs in issue.  OAH states that the provision of the IEPs is an issue for hearing.

12.    6/26/07-I again request that an Order or Subpoena be issued for the records.

13.    6/26/07- District files a supplemental opposition to providing records.

14.    6/27/07- I file a formal Response to the Due Process Complaint indicating that I need to review all records in order t prepare for hearing.

15.    6/27/07- I request records by e-mails (3 x).

16.    6/28/07- Steven Lake e-mails that he will get back to me regarding my updated records request.

17.    6/29/07- Steven Lake advises that the "District is firm on the records" meaning that I can't examine them and pay for what I need, I have to pay for all 4,400 pages, sight unseen.

18.    7/2/07- District opposes a continuance of the Due Process scheduled for 7/19/07.  District had previously agreed to continue to August 27th, but now is bullying parents.

19.    7/3/07- I make another request for records indicating that making this an issue for hearing in inappropriate, as, ethically, I cannot prepare for hearing without the records.


OAH has not communicated with me at all regarding the withholding of records, the requested Order for provision of records, the Subpoena duces tecum, the request for continuance, or the continued harassment and unlawful conduct of the District.


Dated:  July 4, 2007                                Respectfully submitted,

                                                    _Ellen Dowd_

                                                    Ellen Dowd, Attorney for
                                                    Respondent, ▮▮▮▮▮▮▮▮

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

In the Matter of:

CAPISTRANO UNIFIED SCHOOL
DISTRICT,

                Petitioner,

v.



                Respondent.

OAH CASE NO. N2007060627

**ORDER DENYING MOTION TO
CONTINUE; ORDER DENYING
REQUEST FOR OAH TO ISSUE
SUBPOENA DUCES TECUM;
ORDER SETTING PREHEARING
CONFERENCE**

      On June 25, 2007, Ellen Dowd, attorney for Student, sent a letter to the Office of Administrative Hearings (OAH) requesting that OAH issue a subpoena duces tecum (SDT) to petitioner Capistrano Unified School District (District) and a request to continue the July 19, 2007 due process hearing. On June 25, 2007, Steven Lake, attorney for the District, filed a response to Ms. Dowd's letter. On June 26, 2007, Ms. Dowd sent another letter to OAH requesting an SDT. On June 26, 2007, Mr. Lake filed a supplemental response to Ms. Dowd's request to produce records. On July 2, 2007, Mr. Lake sent both a letter requesting that the July 6, 2007 mediation be canceled and a separate opposition to continuing the due process hearing. On July 3, 2007, Ms. Dowd sent a letter requesting a response from OAH regarding the documents that she alleges are being withheld by the District.

BACKGROUND

      Ms. Dowd explained in her June 25, 2007 letter that the District has not provided her a copy of Student's records as requested and that she is engaged in a dispute with the District over whether the District should charge Student for those documents. For "purposes of enforcement," she requested that OAH issue the SDT to Student, rather than issuing it herself. Once the documents are released, she would need additional time to review the 4,400 pages and would not be prepared to proceed on July 19, 2007. Ms. Dowd further explained that District is seeking to $661 from her clients to provide the documents, which her clients cannot afford to pay. Ms. Dowd further states that the District should have notified her of the voluminous nature of the documents and she would have made other

arrangements, including inspecting the file to establish which documents she needed, before it copied the entire file. In her July 3, 2007, Ms. Dowd indicated that she became involved in the case in March 2007. There are no declarations attached to any of the letters received by Ms. Dowd.

Mr. Lake argues that the District has provided Student a copy of his "entire file" on March 30, 2006 and provided copies of Student's testing protocols on October 20, 2006, at no charge to Student. The District argues that it is reasonable and permissible by statute to charge the cost of copying the documents, which was $661.20, since it had provided the Student his records on the two prior dates. The District argues that the request from Ms. Dowd was for a "complete copy" of Student's file, which is nearly 4,400 pages in length, and it promptly provided those documents. The District noted that Ms. Dowd has not provided any declarations that Student's parents cannot afford to pay the cost of reproducing the documents. The District also contends that it is not withholding any documents from Student, but has made the documents available to Ms. Dowd for her to pick up since June 6, 2007. Further, Mr. Lake contends that even if OAH issued an SDT, the District is not prevented from charging for the cost of copying the documents.

## APPLICABLE LAW

A parent has the right to examine all student records of his or her child and to receive copies of those records. (Ed. Code, § 56504.) A school district may charge no more than the actual cost of reproducing those records unless the "cost effectively prevents the parent from exercising the right to receive the copy or copies," in which case, the copies shall be reproduced at no cost to the parent. (*Ibid.*)

OAH has authority to issue an SDT upon a showing of reasonable necessity by a party. (Cal. Code Regs., tit. 5, § 3082, subd. (c)(2)). However, the Education Code is silent on whether an attorney may issue an SDT. Because the Education Code does not specifically provide guidance on the SDT issue for attorneys, OAH analogizes to the Code of Civil Procedure (CCP) and to the Administrative Procedures Act (APA). or what requirements apply.

The APA provides also provides that an attorney of record for a party may issue an SDT in accordance with the CCP.[1] (Gov. Code, § 11455.20, subd. (a).) CCP section 1985, subdivision (c), provides that an attorney of record in an action may sign and issue an SDT to require production of the matters or things described in the subpoena. OAH permits an attorney of record in a special education matter to sign and issue SDT's consistent with this provision. CCP section 1985, subdivision (b), specifies that service of an SDT shall include a copy of an affidavit showing good cause for the production of the matters and things

---

[1] California Code of Regulations, title 5, § 3089, specifies that the subpoena provisions of the Administrative Procedure Act, found in California Government Code sections 11450.05 to 11450.30, do not apply in special education due process hearing matters.

described in the subpoena, specifying the exact matters or things desired to be produced, setting forth in full detail the materiality thereof to the issues involved in the case, and stating that the witness has the desired matters or things in his or her possession or under his or her control.

## REQUEST FOR OAH TO ISSUE AN SDT

Student has requested that OAH issue an SDT on his behalf as an enforcement mechanism. Student has not shown a reasonable necessity that would warrant OAH issuing an SDT. (Cal. Code Regs., tit. 5, § 3082, subd. (c)(2)). The District has indicated the documents are available to Student at the cost of reproduction, which it has statutory authority to charge unless the cost "effectively prevents" the parents from receiving those copies. Notably, Student has not provided any evidence by way of sworn affidavit that his parents are effectively prevented from receiving the copies because of the cost. Accordingly, the request that OAH issue an SDT for the Student's records is denied.

## MOTION TO CONTINUE

A due process hearing may be continued only upon a showing of good cause. (Ed. Code, § 56505, subd. (f)(3).) Here, the documents have been available to Student since June 6, 2007, and the protracted dispute over their release does not amount to good cause at the current time. Both parties have within their power the ability to resolve this unnecessary dispute and should cooperate in seeing that any documents that are not otherwise in the possession of Student are provided in a timely manner. Student's motion to continue the due process hearing is denied. The denial of the motion to continue is without prejudice.

Because the motion to continue has been denied and the hearing is set on the initial hearing date, the parties are ordered to attend a mandatory prehearing conference on July 13, 2007, at 10:00 a.m. The parties are further directed to file a prehearing conference statement within three business days of that date. The prehearing conference statement shall include the following:

      a.    Each party's estimate of the time necessary to complete the Due Process Hearing;

      b.    A concise statement of the issues that remain to be decided at the Due Process Hearing and the proposed resolution of such issues, based upon those issues raised in the due process hearing request;

      c.    The name of each witness the party may call at the Due Process Hearing, a brief summary of the subject of the expected testimony of the witness, and a description of the issue to which the testimony of the witness relates;

      d.    The name and address of each expert witness the party intends to call at the Due Process Hearing, a brief summary of the opinion that the expert is expected to give, and a description of the issue to which the testimony of the expert relates;

3

e.    An attached copy of each expert's current resume and any report that the expert will rely upon at the hearing;

f.    A list of documentary evidence that the party intends to present, and a description of any physical or demonstrative evidence; and

g.    The need for an interpreter or special accommodation at the due process hearing.

## ORDER

1.    Student's request for OAH to issue an SDT for his records is denied.

2.    Student's request to continue the due process hearing is denied.

3.    The parties are ordered to attend a mandatory telephonic prehearing conference on July 13, 2007, at 10:00 a.m. The parties are further directed to file a prehearing conference statement within three business days of July 13.

4.    All dates are otherwise confirmed.

DATED: July 5, 2007

RICHARD M. CLARK
Administrative Law Judge
Special Education Division
Office of Administrative Hearings

4

## PROOF OF SERVICE

I, **Laura Gutierrez**, declare as follows: I am over 18 years of age and have no interest in the action within; my place of employment and business address is:

**Office of Administrative Hearings
Special Education Division
2349 Gateway Oaks
Suite 200
Sacramento, CA 95833-4231**

On **July 05, 2007**, I served a copy of the following entitled action:

### ORDER - OAH CASE NO. - 2007060627

to each of the person(s) named below, at the address set out next to each name, by the following method:

Ellen Dowd
Attorney at Law
2658 Del Mar Heights Rd #228
Del Mar, CA 92014
Facsimile Only: 858-755-6348

Steven Lake
Best Best & Krieger LLP
655 West Broadway, 15th Floor
San Diego, CA 92101
Facsimile Only: 619-233-6118

☐ **US MAIL** — by enclosing the action in a sealed envelope and placing the envelope for collection and mailing on that date and at the Office of Administrative Hearings, . . State of California, following ordinary business practices. I am readily familiar with the Office of Administrative Hearings' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

☒ **FACSIMILE TRANSMISSION** — by personally transmitting to the above-named person(s), who has previously agreed to receive documents via facsimile transmission, to the facsimile number(s) shown above, on the date and time listed below, from facsimile machine number (916) 263-0554, pursuant to California Rules of Court, rules 2003-2008, Government Code section 11440.20, and California Code Regulations, title 1, section 1008, subdivision (d). A true copy of the above-described documents(s) was transmitted by facsimile transmission and the transmission was reported as complete and without error. A copy of the transmission report, properly issued by the transmitting machine, is attached to this proof of service.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and this Declaration was executed at **Sacramento, California** at

**4:08 PM** on the **5** of **July**, 2007. _____
Laura Gutierrez

## AMENDED PROOF OF SERVICE

I, **Hector Portela**, declare as follows: I am over 18 years of age and have no interest in the action within; my place of employment and business address is:

**Office of Administrative Hearings**
**Special Education Division**
**2349 Gateway Oaks, Suite 200**
**Sacramento, CA 95833-4231**

On **July 10, 2007**, I served a copy of the following entitled action:

**ORDER DENYING MOTION TO CONTINUE; ORDER DENYING REQUEST FOR OAH TO ISSUE SUBPOENA DUCES TECUM; ORDER SETTING PREHEARING CONFERENCE-OAH CASE NO. – 2007060627**

to each of the person(s) named below, at the address set out next to each name, by the following method:

Ellen Dowd, Esq.
Facsimile: (858) 755-6348

Steven Lake, Esq.
Best Best & Krieger, LLP
Facsimile: (619) 233-6118

☐ **US MAIL** — by enclosing the action in a sealed envelope and placing the envelope for collection and mailing on that date and at the Office of Administrative Hearings, City of Sacramento, County of Sacramento, State of California, following ordinary business practices. I am readily familiar with the Office of Administrative Hearings' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

☒ **FACSIMILE TRANSMISSION** — by personally transmitting to the above-named person(s), who has previously agreed to receive documents via facsimile transmission, to the facsimile number(s) shown above, on the date and time listed below, from facsimile machine number (916) 263-0554, pursuant to California Rules of Court, rules 2003-2008, Government Code section 11440.20, and California Code Regulations, title 1, section 1008, subdivision (d). A true copy of the above-described documents(s) was transmitted by facsimile transmission and the transmission was reported as complete and without error. A copy of the transmission report, properly issued by the transmitting machine, is attached to this proof of service.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and this Declaration was executed at Sacramento, California at **4:55 PM** on the **10** of **July**, 2007. _____

Hector Portela

1  Ellen Dowd, Esq.
   State Bar Number 141206
2  2658 Del Mar Heights Road #228
   Del Mar, California  92014
3  (858) 342-8360

4

5  **Attorney for Respondent,** ▇▇▇▇▇▇▇▇

6

7

8                  **BEFORE THE STATE OF CALIFORNIA**

9                  **OFFICE OF ADMINISTRATIVE HEARINGS**

10                  **SPECIAL EDUCATION DIVISION**

11

12 In The Matter Of                    )  Case No.: N 2007060627
                                        )
13 CAPISTRANO UNIFIED SCHOOL           )  RESPONDENT, ▇▇▇▇▇▇▇▇▇▇S
   DSTRICT,                            )  MOTION/DECLARATION FOR
14                                      )  RECONSIDERATION OF ORDER
                                        )  DENYING CONTINUANCE
15          Petitioner,                 )
                                        )  Hearing Date: July 19, 2007
16 v.                                   )  Time:  9:30 a.m.
                                        )
17 ▇▇▇▇▇▇▇▇                             )
                                        )
18                                      )
          Respondent.                   )
19                                      )
                                        )
20 _____ )

21 **To Petitioner, CAPISTRANO UNIFIED SCHOOL DISTRICT and its attorney of record:**

22         **Respondent,** ▇▇▇▇▇▇▇▇ moves OAH to Reconsider its Order Denying

23 Continuance dated July 5, 2007 and first served on Respondent July 10, 2007, and moves for an

24 Order Granting Continuance in accordance with Government Code § 11524, and 1 California

25 Code of Regulation § 1020.

26         In support of this Motion, Respondent, by and through his counsel states:

27         1. I am an attorney admitted to the Courts of the State of California, and currently am

28 attorney of record for Respondent, David Newman.  All facts stated of my own personal

knowledge, and if called as a witness to these facts, could and would truthfully and competently testify.

2.      On May 30, 2007 Respondent requested a copy of all of his educational records, which was agreed to by the District.

3.      On June 6, 2007 the District informed Respondent that the records were copied and available at a cost of $861.20. The District advised that there were 4,400 pages of records.

4.      Written correspondence between Respondent's counsel and counsel for the District ensued. The District's counsel advised that the District's charge for copying was 15 cents per page, resulting in a revised cost of $661.20.

5.      To date, the District has withheld the 4,400 pages of documents, without which, pursuant to FRCP Rule 11, an attorney may not undertake signing any documents in the defense due to lack of adequate investigation.

6.      California Education Code § 49069 states that parents have an absolute right to access their student's school records, and that withholding of records by the District is prohibited.

7.      California Education Code §§ 5650(1)(b)(3) and 56504 mandate that for a special education student , "a public agency may charge no more than the actual cost of reproducing the records, but if this cost effectively prevents the parents from exercising the right to receive the copy or copies the copy or copies shall be reproduced at no cost."

8.      Respondent has relentlessly requested that due to financial hardship to the parents, that these records be provided without cost.

9.      During the pendancy of the communication about records, counsel discussed potential continuance of the Due Process Hearing scheduled for July 19, 2007, and the District agreed in writing to continue the Hearing until August 20 or August 27, 2007. Parents agreed to the August 27, 2007 date. The District has now reneged on its agreement to continue.

10.     Respondent has discharged his duty to meet and confer with opposing side regarding continuance as provided by title 1 California Code of Regulations § 1020.

11.     There is no justification for the District withholding Respondent's records. This amounts to suppression of evidence which is prohibited by the California State Bar Rules of Professional Conduct, Rule 5-220, which states, "A member shall not surppress any evidence that the member or the members client has a legal obligation to reveal or produce."

12.    In issuing the July 5, 2007 Order, the ALJ suggested that it is the parents' burden to produce declarations of financial insufficiency. The parents' attorney, after reasonable investigation, signed a motion to this effect under Rule 11. The parents' financial rights of privacy are protected by both the U.S. and California Constitutions, and this subject matter is private and collateral, so there is no discovery about it relevant to this case.

13.    On the other hand, the District's finances are a matter of public record. Therefore, the appropriate inquiry isn't whether the parents have an extra $661.20 lying around after being forced to prepare for not one, but two back-to-back due process hearings, but rather, is the "actual cost" to the District of photocopying these records, as attested by the District's counsel really 15 cents per page.

14.    Exhibit "A" attached hereto is a letter for an Orange County Public agency that clearly indicates that the actual cost is closer to 1.1 cent per copy, which would bring the cost down to a manageable $48.49. Obviously we would need an audit to determine the exact cost, but until that is conducted, it appears the District is not only obstructing justice, but is demanding a financial windfall.

15.    California Business & Professions Code § 6068(a) requires that it is the duty of an attorney to support the Constitution and laws of the United States and this state. This would include attorneys acting as ALJs. IDEA and California Education Code are both very clear on the absolute right of parents to access and obtain their student's educational records.

16.    I have drafted a letter to obtain these records through Family Educational Rights and Privacy Act (FERPA). This procedure for obtaining access to records takes 45 days (20 U.S.C. § 1232). Therefore, I am requesting a continuance of 60 days in order for me to access and review these records.

17.    There is absolutely no prejudice to the District in allowing this continuance because (1) Student is not currently in school, and will not start school until September 4, 2007; (2) respondent will be filing an appeal of Case No. N2006120443, which will make Student's stay put for the pendency of the appeal the 3/22/04 IEP; (3) the District and parents have agreed in writing to hold another IEP in September, 2007 within the first few weeks of school, which could effectively moot the IEPs in issue in this Due Process.

18.    If this request for continuance is denied, in accordance with California

Government Code § 11524, I will bring seek judicial review within 10 working days of the Order Denying Continuance (actually, I will file on the first Order Denying Continuance), which will stay the Due Process Proceedings until I have an opportunity to file the appeal, which will establish stay put, and moot the Due Process.

19.    There is a telephonic Trial Setting Conference schedule for tomorrow, July 13, 2007 at 2:00 p.m.  I respectfully request that this Conference be tape recorded so that I may obtain a transcript of it for use in judicial review.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 12th day of July, 2007 at San Diego, California.

# Long Beach Area Council

Boy Scouts of America

401 East 37th Street • PO Box 7338
Long Beach CA 90807-0338
(562) 427-0911    Fax (562) 492-9437

March 14, 2007



Long Beach CA 90808

Dear Sir:

I understand that you heard we recently conducted a study of costs relating to office duplication issues and that you were interested in our findings.

The LBAC serves over 10,000 young people and 2,500 adult volunteers throughout the Long Beach, Lakewood, Signal Hill, Bellflower, and Catalina service area. The administration of these programs requires the efforts of over 30 employees who constantly need to deal with issues of communications and publishing.

We came to a place recently where the equipment we have used became outdated and in some cases inoperable. We needed to make changes in our operation as well continue to meet the needs of the organization.

While we have now elected to outsource our quarterly newsletter to all volunteers, virtually all other items are printed in-house. There are two levels of duplication that we utilize in order to effectively manage our projects.

We use an ink duplicator for routine "flyers" type duplication. This is a slightly lower cost method of duplicating those things that in essence become trash within 24 hours. The system is an improvement over the old mimeograph system. It is based on making a master then printing up to 2,000 copies per master. Because the master costs about 25¢ each then we determined that unless you were printing over 50 copies it was better cost effectively to use a photo copier.

Our ink duplicator had died from overuse and the age of it prevented us from fixing it since parts were no longer available. The Gestetner machine that we selected to purchase through XCS Company was a refurbished unit that we were able to get for $4,900 which should last us easily 5 years. The service contract on that machine is

Exhibit "A"

calculated at 1.1¢ each copy but that includes the ink cost. The only additional cost is for masters and paper. Paper at Staples cost $30.99 for a box of 5,000 sheets, which equals 0.62¢ each (less than a penny). The cost of the master divided by 100 copies comes out to 1/4 ¢. Depreciation for a machine rated for 150,000 per month (a useful life of 5 years) gives me an incremental cost of ½ of 1/10th of a cent.

| | |
|---|---|
| Service Contract Cost | .01100 |
| Paper Cost | .00620 |
| Depreciation of Equipment | .00005 |
| Total per copy cost | 1.725¢ |

We had three copiers that were in various stages of effectiveness. All of them were in the 6-7 year old range. Again, because of their age, the cost to maintain them was becoming too much for us from a cost benefit perspective. And sometimes the reliability of the equipment fluctuated. (I had to go to Kinko's early one morning before a board meeting to copy the financial report because our copier was down.

I found that the Konica copier available from IBE Systems met our needs very well at a purchase price of $9,975. Not only did it provide me with great digital copies but I also utilize its scanning features to produce electronic files (for document management) though an interface with my desktop computer through our network.

And, being a digital system the service contract was offered by the vendor at the rate of 1¢ per copy. Because it is rated at a lower level of copies per month the incremental depreciation cost also goes up (we estimate use at 15,000 copies monthly).

| | |
|---|---|
| Service Contract Cost | .01000 |
| Paper Cost | .00620 |
| Depreciation of Equipment | .00111 |
| Total per copy cost | 1.731¢ |

Incrementally the increased cost does not seem significantly different but the added feature of the scanning for document management really makes it worthwhile.

I would be happy to share with you the vendor contact information on either of these systems if you are interested. We are very happy with their service and response to our needs. Training is a little unstructured but they are trying.

If I can provide further information on these matters, please feel free to contact me at my office or email me at chuck.clark@longbeachbsa.org anytime.

Sincerely,

Chuck Clark
Chief Financial Officer

**OfficeMax** ®

FedEx Kinko's

March 21,2007 09:55                    Page: 1
Receipt #: 471264
MasterCard #: XXXXXXXXXXX2016
2007/03/21 09:51

| Qty | Description | Amount |
|-----|-------------|--------|
| 50 | ES B&W S/S White 8.5 x11 | 4.50 |

$450 \div 50 = \boxed{9¢}$ EACH

|  |  |
|--|--|
| SubTotal | 4.50 |
| Taxes | 0.37 |
| Total | 4.87 |

The Cardholder agrees to pay the issuer of the
charge card in accordance with the agreement
between the Issuer and the Cardholder.

5301 Lakewood Blvd.    (562) 531-9800
Lakewood, CA  90712
www.fedexkinkos.com
Please recycle this receipt.

**CUSTOMER COPY**

OfficeMax #609
4949 LAKEWOOD BLVD.
LAKEWOOD, CA.  90712
(562) 790-2334

Tell us about your shopping experience
and enter to win 1 of 5 prizes at
www.officemax.com/store/survey
or to enter w/o purch., send a 3"x5"
card with name, address and phone # to
OfficeMax-Shopping Experience
Sweepstakes, 263 Shuman, Naperville, IL
60563. U.S. residents 18+ only. Void
where prohibited.

| | |
|--|--|
| 998100000672 | $2.45 |
| SS B&W LTR SS 20#Wht | |
| 35 @ $0.07 | |
| 072512148288 | $3.99 |
| Energel 0.7MM Black 3/pk. | |

| | |
|--|--|
| SubTotal | $6.44 |
| Tax 8.250% | $0.53 |
| TOTAL | $6.97 |
| Debit | $6.97 |

Card number:  XXXXXXXXXXXX2016
Authorization

                                    91441516
0609 00002 81295 9 03/21/07
        00332092 09:43:37 AM

ORDER BY PHONE 1-877-OFFICEMAX



0609002812900010321070  01

**ELLEN DOWD, Esq.**
**Special Education Legal Center**
**2658 Del Mar Heights Road #228**
**Del Mar, California  92014**
**(858) 342-8360        Fax: (858) 755-6348**

# Fax

| | | |
|---|---|---|
| To: | OAH | |
| Fax: | 916-263-0890 | Pages (9)  (Including Fax Cover) |
| Re: | Capistrano Unified School | Date:   7/12/07 |
| | District v. ███ | |
| | ██████/N200706027 | |

CC: Steven Lake, Esq.        619-233-6118
    Jack Clarke, Esq.        951-686-3083

## --NOTICE--

The information contained in this facsimile message is ATTORNEY CLIENT PRIVILEGED and CONFIDENTIAL INFORMATION, intended only for the use of or individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that ant dissemination, distribution or copying of this message is strictly prohibited.  If you have received this facsimile in error, please notify sender by telephone at 858-342-8360, and return the written communication to the above address by mail.

BROADCAST REPORT

```
TIME : 07/12/2007 17:01
NAME : EJDESQ
FAX  : 8587556348
TEL  :
SER.# : 000B7J133636
```

| PAGE(S) | 09 |
|---------|----|

| DATE | TIME | FAX NO./NAME | DURATION | PAGE(S) | RESULT | COMMENT |
|------|------|--------------|----------|---------|--------|---------|
| 07/12 | 16:52 | 19162630890 | 03:00 | 09 | OK | ECM |
| 07/12 | 16:56 | 16192336118 | 02:26 | 09 | OK | ECM |
| 07/12 | 16:59 | 19516863083 | 02:25 | 09 | OK | ECM |

```
BUSY: BUSY/NO RESPONSE
NG  : POOR LINE CONDITION
CV  : COVERPAGE
PC  : PC-FAX
```

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of:<br><br>CAPISTRANO UNIFIED SCHOOL DISTRICT,<br><br>          Petitioner,<br><br>v.<br><br>          Respondent. | OAH CASE NO. N2007060627<br><br><br>**ORDER DENYING MOTION FOR RECONSIDERATION** |

On June 25, 2007, Ellen Dowd, attorney for Student, filed with the Office of Administrative Hearings (OAH) a request for subpoena duces tecum (SDT) for Student's educational records from Capistrano Unified School District (District). On June 25, 2007, Steven Lake, attorney for the District, filed a response to Ms. Dowd's letter. On June 26, 2007, Ms. Dowd sent another letter to OAH requesting an SDT. On June 26, 2007, Mr. Lake filed a supplemental response to Ms. Dowd's request to produce records. On July 5, 2007, OAH issued an order denying Student's request for SDT.

Ms. Dowd initially argued that the District has not provided her a copy of Student's records as requested and that she is engaged in a dispute with the District over whether the District should charge Student for those documents. For "purposes of enforcement," she requested that OAH issue the SDT to Student, rather than issuing it herself. The District requests payment of the costs for copying the Student's records.[1]

Mr. Lake argued that the District has provided Student a copy of his "entire file" on March 30, 2006 and provided copies of Student's testing protocols on October 20, 2006, at no charge to Student.[2] The District argues that it is reasonable and permissible by statute to charge the cost of copying the documents. The District also contends that it is not withholding any documents from Student, but has made the documents available to Ms. Dowd for her to pick up since June 6, 2007. Further, Mr. Lake contends that even if OAH

---

[1]     The District seeks $661.20 for the cost of copying the records. This amounts to $0.15 per copy.

[2]     A due process hearing involving this student has also been held. Documentary evidence was received and that decision was issued in June 2007

issued an SDT, the District is not prevented from charging for the cost of copying the documents.

On July 13, 2007, Student filed a motion and declaration for reconsideration of the July 5, 2007, order denying his request for SDT. Student's request for reconsideration reasserts his position that the District is withholding documents that are needed for his investigation and that the District is suppressing evidence by not providing the documents without charge. Student also argues that the actual cost of reproducing the copies should be 1.1 cents per copy rather than the 15 cents per copy the District is charging. Essentially, Student is requests that OAH issue an order requiring the District to provide the requested records at no cost to parents. The District's opposition to the motion for reconsideration was submitted on July 17, 2007.

## APPLICABLE LAW

OAH will generally entertain a timely motion to reconsider a ruling when the party seeking reconsideration establishes new facts, law and/or changed circumstances warranting reconsideration of the prior order or decision.

A parent has the right to examine all student records of his or her child and to receive copies of those records. (Ed. Code, § 56504.) A school district may charge no more than the actual cost of reproducing those records unless the "cost effectively prevents the parent from exercising the right to receive the copy or copies," in which case, the copies shall be reproduced at no cost to the parent. (*Ibid.*)

OAH has authority to issue an SDT upon a showing of reasonable necessity by a party. (Cal. Code Regs., tit. 5, § 3082, subd. (c)(2)). However, the Education Code is silent on whether an attorney may issue an SDT. Because the Education Code does not specifically provide guidance on the SDT issue for attorneys, OAH analogizes to the Code of Civil Procedure (CCP) and to the Administrative Procedures Act (APA), or what requirements apply.

The APA provides also provides that an attorney of record for a party may issue an SDT in accordance with the CCP.[3] (Gov. Code, § 11455.20, subd. (a).) CCP section 1985, subdivision (c), provides that an attorney of record in an action may sign and issue an SDT to require production of the matters or things described in the subpoena. OAH permits an attorney of record in a special education matter to sign and issue SDTs consistent with this provision. CCP section 1985, subdivision (b), specifies that service of an SDT shall include a copy of an affidavit showing good cause for the production of the matters and things described in the subpoena, specifying the exact matters or things desired to be produced,

---

[3] California Code of Regulations, title 5, § 3089, specifies that the subpoena provisions of the Administrative Procedure Act, found in California Government Code sections 11450.05 to 11450.30, do not apply in special education due process hearing matters.

setting forth in full detail the materiality thereof to the issues involved in the case, and stating that the witness has the desired matters or things in his or her possession or under his or her control.

OAH has authority to hear matters when there is a proposal or refusal to initiate or change the identification, assessment, or educational placement of the child. (Ed. Code 56501.)

## DISCUSSION

In this matter, Student has not presented any new facts, law, and/or changed circumstances. Student's motion for reconsideration simply reasserts his position regarding the request for and SDT. As stated in the July 5, 2007 order, Student has requested that OAH issue an SDT on his behalf as an enforcement mechanism. Student has not shown a reasonable necessity that would warrant OAH issuing an SDT. (Cal. Code Regs., tit. 5, § 3082, subd. (c)(2)). The documents are available to Student at the cost of reproduction, which the District has statutory authority to charge. Student has presented no evidence that the parents are being prevented from receiving the copies. Nor has Student has presented evidence that OAH has jurisdiction to determine whether the "cost effectively prevents the parents from receiving those copies" or what a reasonable cost for providing copies would be. The jurisdiction for the current dispute over records lies with the California Department of Education Procedural Safeguards Unit or with a court of competent jurisdiction.

Accordingly, the request that OAH reconsider its order and issue an SDT for the Student's records is denied.[4]

IT IS SO ORDERED

DATED: July 19, 2007

SHERIANNE LABA
Presiding Administrative Law Judge
Special Education Division
Office of Administrative Hearings

---

[4]    Student's attorney has not been precluded from issuing an SDT as an officer of the court. This order pertains only to Student's request that OAH issue an SDT.

3

**EXHIBIT 15**

**Ellen Dowd**
**Attorney At Law**
**State Bar # 141206**
**2658 Del Mar Heights Road #228**
**Del Mar, California 92014**
**(Tel) 858-342-8360  (Fax) 858-755-6348**

September 21, 2007

Hon. Judith Kopec
Administrative Law Judge
Office of Administrative Hearings
Special Education Division
2349 Gateway Oaks Drive, Suite 200                    <u>VIA FAX# 916-376-6319</u>
Sacramento, California 95833

Re:   Capistrano Unified School District v. █████████
        OAH Case Number: 2007060627

Dear Judge Kopec:

As you recall, in this case the District refused to allow parent to examine and select educational records of their son, and would only provide all of the records upon payment of $661.20, which is not within my clients' financial means.  Therefore we did not have the 4,400 pages of records that were sitting in the District office prior to the Due process Hearing in this case.

On August 28, 2007 you ruled that you would not keep the record open in order to receive the Final Order from Superior Court holding that failure to provide educational records is a denial of FAPE.

I am requesting that you reconsider your ruling, as the Final Order (attached) has just been made available, and clearly states that failure to provide educational records prior to a due process hearing "significantly infringe" upon student's participation in the process, which is a denial of FAPE.

In order to prevent a similar appeal and remand, I am requesting that you render a Decision that this procedural violation significant enough to be a denial of FAPE, and rule in favor of the Student.

Respectfully yours,

Ellen Dowd

Encl.
CC:   Steven Lake, Esq.              619-233-6118

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPARTMENT 40**

| | | | |
|---|---|---|---|
| Date: 9/19/07<br>Honorable:  ANN I. JONES | Judge | E. GARCIA | Deputy<br>Clerk |
| A. COMICK, C.A. | Bailiff | A. JOKO (CSR# 12272) | Reporter |

(Parties and Counsel checked if present)

| | |
|---|---|
| BC363711<br>DAMON LAMPKIN<br>VS<br>COMPTON UNIFIED SCHOOL<br>DISTRICT | Counsel for Plaintiff:  DAVID M. GREY (X)<br><br>Counsel for Defendant: DANIEL L. GONZALEZ (X) |

## RULING OF SEPTEMBER 19, 2007 HEARING

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

SEP 1 9 2007

The court having read the papers and heard the arguments rules as follows:

John A. Clarke, Executive Officer/Clerk

By_____, Deputy

## I. BACKGROUND

In this case, the plaintiffs have sued the defendants for a (1) partial reversal of a decision by the Office of Administrative Hearings ("OAH") in a case involving plaintiff Damon Lampkin, and (2) asserting a violation of IDEA, 20 U.S.C. §1400, *et seq* and California Education Code.

Damon was born in 1993 and was a seventh grade student at Willowbrook Middle School in Compton.  Damon attended school in the ABC school district before entering the defendant Compton Unified School District ("Compton") .  Although Damon was in the seventh grade, he was functioning substantially below grade level.  In fact, Damon was at an elementary school fourth grade level. Specific academic weaknesses were noted in spelling, reading comprehension, letter-word identification, reading comprehension and math computation.  Despite his sub par academic achievement, Damon has average to above average intelligence.

A psychological assessment of Damon was performed in September 2005 by Compton.  An IEP meeting was held in October 2005.  After the October meeting, Damon was home schooled due to Compton's unwillingness to offer an appropriate individual educational program ("IEP") or educational plan.

This is an appeal of a decision by the OAH denying Damon all other relief except the ruling that Damon was entitled to 20 hours of Lindamood-Bell tutoring in reading.

1

| |
|---|
| Minutes<br>Entered<br>9/19/07<br>County Clerk |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPARTMENT 40**

| | | |
|---|---|---|
| Date: 9/19/07 | | |
| Honorable:   ANN I. JONES | Judge | E. GARCIA | Deputy Clerk |
| A. COMICK, C.A. | Bailiff | A. JOKO (CSR# 12272) | Reporter |

(Parties and Counsel checked if present)

BC363711
DAMON LAMPKIN
VS
COMPTON UNIFIED SCHOOL
DISTRICT

Counsel for Plaintiff:  DAVID M. GREY (X)

Counsel for Defendant: DANIEL L. GONZALEZ (X)

Plaintiffs base their appeal on a number of grounds.  Specifically, they allege both procedural and substantive errors in the OAH decision.  Procedurally, plaintiffs argue that they were deprived of an opportunity to participate meaningfully in the hearing because of the failure to produce requested student records.  Plaintiffs also assert that there were a number of other procedural shortcomings in Damon's case, including:  a failure to assess Damon properly in areas of suspected disability;  a failure to hold IEP meetings in the time prescribed by law, and a failure to provide services that Compton agreed to provide.

Compton counters that although the ALJ found that Compton was remiss in not producing some of Damon's records, plaintiff cannot establish how these missing records would have resulted in a different outcome or how this procedural omission resulted in a deprivation of Damon's right to a free, appropriate public education ("FAPE").  Compton further argues that the ALJ's decision on the assessment issue was based on substantial evidence considered by the ALJ.

II. STANDARD OF REVIEW

Upon conclusion of a special education student's due process administrative hearing pursuant to Education Code §56501 and 20 U.S.C. §1415(f), the student may appeal the OAH decision or file a civil action in the Superior Court pursuant to Education Code §56505(k) and 20 U.S.C. §1415(i).

"Judicial review in cases alleging a violation of Individual Disability Act ("IDEA") differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review."  See Ojai Unified School Dist. v. Jackson, 4 F.3d 1467, 1471 (9th Cir. 1993) .  Thus, a less deferential standard is applied to the agency decision than may apply in other contexts.  Id.

2

| Minutes |
|---|
| Entered |
| 9/19/07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPARTMENT 40**

| Date: 9/19/07 | | | | |
|---|---|---|---|---|
| Honorable: ANN I. JONES | Judge | E. GARCIA | | Deputy Clerk |
| A. COMICK, C.A. | Bailiff | A. JOKO (CSR# 12272) | | Reporter |

(Parties and Counsel checked if present)

BC363711
DAMON LAMPKIN
VS
COMPTON UNIFIED SCHOOL
DISTRICT

Counsel for Plaintiff:  DAVID M. GREY (X)

Counsel for Defendant: DANIEL L. GONZALEZ (X)

---

## III.    FAILURE TO FURNISH PLAINTIFFS WITH REQUESTED SCHOOL RECORDS

At the outset, plaintiffs bear the burden of proving a violation.  Schaffer v. Weast, 546 U.S. 49, 57-58, 62 (2005).  As set forth below, plaintiff have met that burden.

The first violation identified by plaintiffs is the failure by Compton to furnish requested school records as required by Education Code §§ 56504(b)(3) and 49060 and 20 U.S.C. § 1415(b)(1).  Plaintiffs requested these records on seven different occasions.  Despite these numerous requests, Compton did not provide the required records.  Compton's failure to provide the records was the subject of a Pre-Hearing Conference Order, dated May 10, 2006.  Under that order, Compton was to produce all of Damon's records by May 11, 2006.  In addition, Compton was ordered to provide a declaration from its custodian of records specifying what steps were taken to produce documents.

Despite that clear order, Compton failed to provide plaintiffs with a complete set of student records in advance of the administrative hearing.  At the hearing, Mr. Davis, a school psychologist who assessed Damon, and Ms. Caumeran (a tutor at Compton) testified that they possessed certain records that had never been produced.  Davis testified that he had notes of his classroom observations of Damon, as well as perhaps other documents, that were never produced.  (Davis Testimony 22: 1-22).  Davis also testified that a preliminary draft of his psycho-educational report evaluating Damon was not available.  (Id. at 22-16).  Ms. Caumeran, who was Damon's tutor, testified that she performed two reading assessments that were not produced.  (Caumeran Testimony 100-102: 1-3).  Even though she failed to produce the documents, Caumeran was allowed to testify as to the results.  Moreover, the decision referred to these results as evidence that Compton had provided Damon with an educational benefit.

California Education Code §56504 states:

The parent shall have the right and opportunity to examine all school records of his or her child and to receive copies pursuant to this section and to Section 49065 within five business days

3

| Minutes |
|---|
| Entered |
| 9/19/07 |
| County Clerk |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPARTMENT 40

| | | |
|---|---|---|
| Date: 9/19/07 | | |
| Honorable:   ANN I. JONES | Judge   E. GARCIA | Deputy Clerk |
| A. COMICK, C.A. | Bailiff   A. JOKO (CSR# 12272) | Reporter |

(Parties and Counsel checked if present)

| | |
|---|---|
| BC363711<br>DAMON LAMPKIN<br>VS<br>COMPTON UNIFIED SCHOOL<br>DISTRICT | Counsel for Plaintiff:  DAVID M. GREY (X)<br><br>Counsel for Defendant: DANIEL L. GONZALEZ (X) |

after the request is made by the parent, either orally or in writing. The public education agency shall comply with a request for school records without unnecessary delay before any meeting regarding an individualized education program or any hearing pursuant to Section 300.507 or Sections 300.530 to 300.532, inclusive, of Title 34 of the Code of Federal Regulations or resolution session pursuant to Section 300.510 of Title 34 of the Code of Federal Regulations and in no case more than five business days after the request is made orally or in writing.

Compton does not dispute that it failed to provide all of Damon's school records prior to the OAH hearing. Even the Administrative Law Judge acknowledged in his decision that Compton failed to provide all of Damon's school records, and that this failure constituted a violation of Damon's rights under the Education Code.

Rather, the ALJ, and Compton, contend that that failure did not rise to the level of a denial of FAPE because plaintiffs could adduce no evidence detailing how documents they'd never seen or otherwise been allowed to review or consider translated into a loss of educational opportunity for Damon or infringed upon plaintiffs' participation in the IEP process.

The court finds the reasoning of the ALJ and the position of Compton to be wholly incomprehensible. The burden should not be put on Damon or his parents to explain or speculate how particular documents withheld by the defendants would help in case.   Rather, as in this case, plaintiffs have demonstrated that the omitted records are material to the adjudication and have pointed to testimony where the withheld records were relied upon by the party withholding production.

Access to *all* of the records of a child for whom special educational services are being sought is a hallmark of the procedural protections afforded under IDEA.  The provisions set out in the Education Code embody the importance of access to information as the prerequisite to a full and fair administrative proceeding.  Under federal provisions, as well, all parties are provided with the opportunity "to examine all records relating to such child and to participate in meetings" thereafter having been informed of the complete state of the educational record.  See 20 U.S.C. §1415(b)(1). To saddle the plaintiffs with having to prove any further prejudice from Compton's admitted failure to comply with the law and the court's orders is clearly impermissible.  Nor is sufficient to present a

4

| Minutes |
|---|
| Entered |
| 9/19/07 |
| County Clerk |



## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### DEPARTMENT 40

| | | |
|---|---|---|
| Date: 9/19/07 | | |
| Honorable:   ANN I. JONES | Judge | E. GARCIA | Deputy Clerk |
| A. COMICK, C.A. | Bailiff | A. JOKO (CSR# 12272) | Reporter |

(Parties and Counsel checked if present)

BC363711
DAMON LAMPKIN
VS
COMPTON UNIFIED SCHOOL
DISTRICT

Counsel for Plaintiff:  DAVID M. GREY (X)

Counsel for Defendant: DANIEL L. GONZALEZ (X)

---

parent with the record at the hearing and expect them to process that information, prepare a complete examination and incorporate it into their case as Compton believes.

Moreover, given the nature of the materials not produced, it is incomprehensible how the ALJ could have concluded that documents withheld from the plaintiffs in this case did not abridge or seriously undermine their ability to participate fully in the administrative process regarding Damon's need for an IEP.  Specifically, Alma Caumeran, Damon tutor, was allowed to testify regarding certain tests that she'd administered and her conclusions based thereon – despite her admission that she'd never provided a copy of those tests to plaintiffs.  Given the plaintiffs' concerns about the adequacy of the objective information underlying Caumeran opinions and their inability to prepare in advance of her testimony, it cannot be concluded that this omission did not "significantly infringe" upon plaintiffs' participation in the process.  See W.G. v. Board of Trustees of Target Range School Dist. No. 23, 960 F.2d 1479, 1484 (9th Cir. 1992)(procedural inadequacies that seriously infringe on the parents' opportunity to participate in the process "clearly result in the denial of a FAPE").

Other educational records not produced in advance of the hearing also seriously infringed on Damon's parents' ability to participate in the process.  Mr. Davis' testimony on behalf of Compton was challenged by plaintiffs, in part because of a failure to conduct an adequate assessment.  Mr. Davis' notes and drafts were directly relevant to the issue of whether his observations and empirical findings were predicated on a thorough investigation, or whether (as plaintiffs believe) his opinions rested on little more than "snap shot" observations and unanswered questions.  Without the benefit of his contemporaneous observations notes and interim reports, the extent and sufficiency of Davis' opinions could not be adequately challenged by plaintiffs' or their expert at the hearing.

The court does not find that there is evidence in the record to support Compton's assertion that the Davis' notes are not educational records of the sort required to be produced under the California Education Code or federal law.  See 20 U.S.C. § 1232(g)(a)(4).  There is nothing in the record to suggest that Davis' records were in his sole possession and not revealed to any person except a substitute.  Id., at subpart (B)(i).  And, as for the Caumeran tests, although she testified that the documents were in her sole possession, there is nothing to suggest that these tests were "personal

5

| Minutes |
|---|
| Entered |
| 9/19/07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPARTMENT 40

Date: 9/19/07
Honorable: ANN I. JONES          Judge    E. GARCIA          Deputy Clerk

A. COMICK, C.A.                   Bailiff  A. JOKO (CSR# 12272)   Reporter

(Parties and Counsel checked if present)

BC363711
DAMON LAMPKIN
VS                                    Counsel for Plaintiff: DAVID M. GREY (X)
COMPTON UNIFIED SCHOOL
DISTRICT                              Counsel for Defendant: DANIEL L. GONZALEZ (X)

teaching notes" otherwise not revealed to anyone. See J.P. v. W. Clark County Schools, 230 F. Supp. 2d 910, 949 (S.D. Ind. 2002).

The failure to afford plaintiffs' essential information needed to adequately prosecute their claim at an administrative hearing or to successfully impeach testimony being adduced by Compton's witnesses constitutes a serious procedural inadequacy and interfered with parental participation in the process. As such, the failure to produce these records undermines the very essence of the IDEA and, in this case, resulted in a denial of an FAPE.


IV.    REMAINING ISSUES

In light of the court's conclusion that the plaintiffs' procedural protections were violated, the court declines to reach the other bases upon which plaintiffs seek a reversal of the OAH decision.


V.    FURTHER PROCEEDINGS

The court requested both parties to provide the court with additional authority regarding what proceedings should follow this decision.

As the court has found that the failure by the school district to produce records was a violation of FAPE, the question remains what remedy is appropriate at this juncture. Plaintiffs contend that remand is not appropriate and that the defective and incomplete record adduced by the administrative hearing officer in this case supports and order compelling Compton to provide certain assessments – issues that the court clearly declined to reach. Defendant seeks a narrow remand, solely for the purpose of allowing a limited number of records to be received by plaintiffs and to re-open the proceeding only to allow the hearing officer to consider what, if any, impact the omission of the documents had on his or her decision. This proposal fails to address the procedural due process defects inherent in the court's decision finding a denial of FAPE. Neither counsel has provided any relevant authority on this issue nor have they properly construed the scope of the court's ruling.

6

Minutes
Entered
9/19/07
County Clerk

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPARTMENT 40**

| | | | |
|---|---|---|---|
| Date: 9/19/07 | | | Deputy |
| Honorable:  ANN I. JONES | Judge | E. GARCIA | Clerk |
| | | | Reporter |
| A. COMICK, C.A. | Bailiff | A. JOKO (CSR# 12272) | |

(Parties and Counsel checked if present)

BC363711
DAMON LAMPKIN
VS
COMPTON UNIFIED SCHOOL
DISTRICT

Counsel for Plaintiff:  DAVID M. GREY (X)

Counsel for Defendant: DANIEL L. GONZALEZ (X)

Accordingly, the court shall issue its own order.  On remand, the Office of Administrative Hearings shall initiate a *de novo* review of those issues presented in the appeal of Damon Lampkin.[1]  This review must necessarily include the production of all records by the school, and the hearing officer shall allow both parties to adduce testimony from the persons from whom documents will now be produced, with ample time afforded to plaintiffs to receive these materials and to prepare effective examination of these witnesses.  As the deprivation of process is the basis for the court's ruling, the remand shall afford all parties full and fair process to participate effectively in the proceeding.

**Notice is to be given by the moving party.**


**It is so ordered.**


9|19|07
**Date**

**ANN I. JONES**

**Ann I. Jones, Judge**

---

[1] The appeal to this court did not challenge the OAH's finding that Compton denied Lampkin FAPE by failing to provide RSP, by failing to conduct a 30 day annual IEP, or the finding that compensatory education was appropriate.  Thus, the remand cannot possibly encompass these issues.

7

| |
|---|
| Minutes |
| Entered |
| 9/19/07 |
| County Clerk |

**ELLEN DOWD, Esq.**
**Special Education Legal Center**
**2658 Del Mar Heights Road #228**
**Del Mar, California  92014**
**(858) 342-8360          Fax: (858) 755-6348**



# Fax

| To: | Hon. Judith Kopec/OAH | | |
|---|---|---|---|
| Fax: | 916-376-6319 | | Pages (9) (Including Fax Cover) |
| Re: | Capistrano Unified School District v. ███████ ███████/N2007060627 | Date: | 9/21/07 |

CC: Steven Lake, Esq.        619-233-6118

## --NOTICE--

The information contained in this facsimile message is ATTORNEY CLIENT PRIVILEGED and CONFIDENTIAL INFORMATION, intended only for the use of or individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that ant dissemination, distribution or copying of this message is strictly prohibited.  If you have received this facsimile in error, please notify sender by telephone at 858-342-8360, and return the written communication to the above address by mail.

BROADCAST REPORT

```
TIME  : 09/21/2007 09:11
NAME  : EJDESQ
FAX   : 8587556348
TEL   :
SER.# : 000B7J133636
```

| PAGE(S) | 09 |
|---------|----|

| DATE | TIME | FAX NO./NAME | DURATION | PAGE(S) | RESULT | COMMENT |
|------|------|--------------|----------|---------|--------|---------|
| 09/21 | 09:04 | 19163766319 | 03:01 | 09 | OK | ECM |
| 09/21 | 09:08 | 16192336118 | 03:02 | 09 | OK | ECM |

```
BUSY: BUSY/NO RESPONSE
NG  : POOR LINE CONDITION
CV  : COVERPAGE
PC  : PC-FAX
```

**EXHIBIT 16**

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

In the Matter of:

CAPISTRANO UNIFIED SCHOOL
DISTRICT,

                      Petitioner,

v.

                      Respondent.

OAH CASE NO.  N2007060627

## DECISION

    Judith A. Kopec, Administrative Law Judge (ALJ), Office of Administrative Hearings, Special Education Division, State of California, heard this matter on August 28 through 30, 2007, in San Juan Capistrano, California.

    Steven E. Lake, Attorney at Law, represented Capistrano Unified School District (District).  Leisa Winston, Program Specialist for District, also attended.

    Ellen Dowd, Attorney at Law, represented Student.  Student's mother (Mother) also attended.  Ms. Dowd and Mother left the hearing after Ms. Dowd presented an opening statement.  No further appearance was made by or on behalf of Student or his parents (Parents).  Neither Student nor Parents testified or presented any evidence.  A Spanish language interpreter was present to assist Mother.

## PROCEDURAL HISTORY

    On December 13, 2006, District filed a request for a due process hearing (complaint) concerning its reassessments of Student and its offer of FAPE at the October 17 and December 5, 2006 IEP team meetings, which is OAH Case Number 2006120443 (referred to as *Newman I*).  OAH issued a decision on June 29, 2007, finding that District prevailed on all issues.  On August 13, 2007, Student appealed the decision to the United States District Court, Central District of California.

District filed a complaint on June 19, 2007, which is the pending matter (referred to
as *Newman II*). On June 20, 2007, Student requested that OAH order District to attach to the
complaint copies of the individualized education program (IEP) documents and behavior
support plan that were at issue. Student contended that District refused to provide him copies
of his educational records. OAH treated Student's request as a notice of insufficiency under
Title 20 United States Code section 1415(b)(2)(A). On June 26, 2007, OAH issued an order
finding that District was not required to attach copies of the documents to the complaint, and
denying Student's challenge to the complaint.

On June 25, 2007, Student requested that OAH issue a subpoena duces tecum for
District to produce copies of his educational records. Student requested that OAH issue a
subpoena instead of his attorney doing so "for purposes of enforcement." In addition,
Student requested that the hearing, which was scheduled for July 19, 2007, be continued.

On July 3, 2007, Student requested that OAH issue an order requiring District to
provide copies of his educational records.

On July 5, 2007, OAH issued an order denying Student's request for a subpoena
duces tecum. The request was denied because Student did not show reasonable necessity for
OAH to issue the subpoena, as required by California Code of Regulations, title 5, section
3082, subdivision (c)(2). The order also denied Student's request for a continuance because
good cause was not shown, as required by Education Code section 56505, subdivision (f)(3).
OAH also ordered that the parties participate in a prehearing conference on July 13, 2007.

On July 9, 2007, Student filed a motion to dismiss the complaint without prejudice, or
in the alternative, to continue the hearing. Student contended that the complaint should be
dismissed until he received copies of his educational records. Similarly, Student contended
that if the complaint was not dismissed, the hearing should be continued until he received
and reviewed the records.

On July 10, 2007, OAH continued the July 19, 2007 hearing when it learned that
Student did not receive the July 5, 2007 order. In addition, District filed a prehearing
conference statement stating that the hearing would require more than the one day that was
scheduled.

On July 12, 2007, Student filed a motion for reconsideration of OAH's order dated
July 5, 2007, that denied Student's request to continue the July 19, 2007 hearing. On
July 13, 2007, Student filed a motion for reconsideration of OAH's order dated July 5, 2007,
that denied Student's request that OAH issue a subpoena duces tecum.

On July 19, 2007, OAH issued an order denying Student's request for reconsideration
of OAH's order denying his request for a subpoena duces tecum. Student did not present any
new facts, law, or changed circumstances to support the request for reconsideration. Student
did not show a reasonable necessity for OAH to issue the subpoena duces tecum. District
made copies of the records available to Student for the cost of reproduction, which District

had authority to do. Student did not show any evidence that his parents were being prevented from receiving the copies. Student did not show that OAH had jurisdiction to determine whether the cost of reproduction effectively prevented his parents from receiving the copies under Education Code section 56504.

On August 13, 2007, Student filed a notice of automatic stay of due process proceedings. Student contended that the appeal of *Newman I* operated as an automatic stay of the proceedings in *Newman II*. Student contended that his stay put rights in *Newman I* prevented District from implementing the IEP and behavior support plan that are at issue in *Newman II*, and also prevented OAH from hearing *Newman II*. Student also contended that the only relief available to District was declaratory relief. Student contended that OAH had no jurisdiction to hear this matter, because OAH has no jurisdiction to award declaratory relief under California Code of Regulations, title 5, section 3089.

On August 17, 2007, District filed a motion for determination of Student's stay put placement. District contended that Student's stay put placement was governed by the IEPs that were at issue in *Newman I* because the circumstances have significantly changed since the date of the last agreed upon and implemented IEP, dated March 22, 2004.

On August 20, 2007, OAH conducted a status conference. Mr. Lake and Ms. Dowd appeared. Student was given an opportunity submit a response to District's motion for determination of a stay put placement and opposition to Student's notice of automatic stay.

On August 24, 2007, OAH issued an order denying Student's request for a stay of the proceedings in *Newman II* and denying District's request for a determination of a stay put placement. No authority was found to support Student's contentions that the appeal of *Newman I* barred the hearing in *Newman II* from proceeding, or that District was limited to only declaratory relief. No authority was found to support District's contention that it was entitled to a determination of Student's stay put placement. OAH also deferred any determination of Student's stay put rights to the federal court hearing the appeal in *Newman I*.

During Student's opening statement at the hearing in this matter, Ms. Dowd contended that she was ethically precluded from representing her client in the hearing because of District's alleged failure to provide copies of Student's records. Mother was offered an opportunity to request a continuance of the hearing to seek other representation. Mother responded that she did not want anyone else to represent her and Student in this matter.

Ms. Dowd requested reconsideration of OAH's order denying the automatic stay and finding jurisdiction for the hearing to proceed. Ms. Dowd contended that the reasoning in OAH's order dated August 24, 2007, was incorrect. Ms. Dowd was allowed the opportunity to present her contentions, over District's objection. The request for reconsideration was denied. Ms. Dowd also requested that the hearing record remain open so that she could submit a copy of a court ruling concerning an appeal of an unrelated OAH decision that a

3

school district's failure to provide educational records was a denial of a free and appropriate public education (FAPE). The request was denied. Ms. Dowd and Mother left the hearing.

The hearing record remained open for the submission of written closing argument, which was received, and the record was closed on September 10, 2007.

On September 21, 2007, Student submitted a request for reconsideration of the denial of his request to keep the record open for submission of a court order finding that a school district failing to provide educational records prior to a hearing denied the student a FAPE. Student attached a copy of the order of the Los Angeles County Superior Court that he wished to submit into the record. Student's request for reconsideration is denied. Student provided no legal basis supporting the request, and none is found. Student had multiple opportunities to present legal and factual arguments supporting his contentions concerning his educational records. OAH repeatedly considered Student's contentions and found them to be without legal basis. Student's latest request does not provide any new or different facts, circumstances or law in support of reconsideration. Both the facts and the procedural posture of the Superior Court case are distinguishable. Student also contends that "in order to prevent a similar appeal and remand," OAH should render a decision in this matter that District denied him a FAPE by failing to provide him copies of his educational records. Student provided no legal basis permitting him to seek, or OAH to issue, a decision in this matter with such a finding.

## ISSUES

1.      Did District offer Student appropriate supports and strategies to meet his behavioral needs in the March 26, 2007 behavior support plan?

2.      Did District offer Student a FAPE in the May 30, 2007 individualized education program (IEP)?

## FACTUAL FINDINGS

*Background Information*

1.      Student is a 15-year-old boy currently in the ninth grade at District's San Juan Hills High School (San Juan). He was first found eligible for special education services in the category of other health impaired when he was in the second grade in the Poway Unified School District. His family moved into the District during the 2003-2004 school year when Student was in fifth grade. He attended District's Wagon Wheel Elementary School (Wagon Wheel) for fifth grade. He attended private schools for the sixth and seventh grades.

2.      Student returned to the District in eighth grade and attended Las Flores Middle School (Las Flores) for the 2006-2007 school year. Student received special education and

4

related services at Las Flores under a 30-day interim placement and later as a stay put placement once Parents disagreed with District's offer. Consistent with the services Student received in fifth grade at Wagon Wheel, he was placed in collaborative classes in English and mathematics, and received one 30-minute "pull out" session of speech and language therapy each week, and 60 minutes of occupational therapy consultation services each month.[1] A behavior support plan developed for Student when he was in fifth grade was also in place.

*Student's Needs in the Area of Behavior in March 2007*

3.      If an IEP team determines that a child's behavior impedes his or her learning, or that of others, it must consider using positive behavioral interventions and supports, and other strategies to address the behavior. Behavior intervention includes behavioral instruction to produce improvement in the child's behavior through skill acquisition and the reduction of the problematic behavior. Behavioral goals must be addressed in an IEP to the extent that the behaviors affect the child's educational progress.

4.      Melissa Primicias (formerly Melissa Wilson) conducted a psychoeducational reassessment in September 2006.[2] As part of the reassessment, she administered two behavior rating scales to Parents and Student's teachers: the Conner's Rating Scale, Revised, Long Version, and the Behavior Assessment Scales for Children, Second Edition. The teachers' responses did not indicate any areas of either developing or clinically significant behavior in the school setting. Parents' responses identified areas of developing concern at home, such as hyperactivity, withdrawal, oppositional behavior, impulsive behavior, and emotional lability. Ms. Primicias determined that at the time of the reassessment, Student's social and emotional functioning did not significantly impact learning, even though he may have had significant behavioral difficulties at home.

5.      The IEP team met on October 17, 2006, to review Student's 30-day interim placement and to begin his triennial review. Ms. Primicias presented her psychoeducational report to the team. District members of the IEP team determined that he did not need a behavior support plan because he was acting appropriately at school.

6.      As the fall 2006 semester progressed, Student's teachers noticed a change in his behavior. He was distracted, not following through on work assignments, being defiant, and socializing during classes. He began expressing anger and resistance to the instructional support he received. For example, he refused to fill out daily checklists required by his fifth

---

[1] A collaborative class is taught by a general education teacher with the full-time assistance of a special education teacher in the classroom. Both general education and special education students are enrolled in a collaborative class. "Pull out" services are provided in a setting other than the student's classroom.

[2] Ms. Primicias holds a master's degree in school psychology and a pupil personnel services credential. She has been a school psychologist for District since 2005. Prior to this, she was a school psychologist for San Diego Unified School District for three and one-half years.

grade IEP. Another IEP team meeting was conducted on December 5, 2006, and the team discussed Student's behavior. District's team members recommended that a behavior assessment be conducted. They also recommended a behavior support plan be developed to address the increase in Student's behaviors that were impeding his learning. Parents did not consent to the behavior assessment.

7.    Another IEP team meeting was held on January 31, 2007, and the team discussed Student's behavior and the proposed assessment plan. Parents consented to the assessment plan on that date. The plan provided for a social/emotional/adaptive behavior assessment to determine if there were any social/emotional concerns that significantly impacted Student's learning. It also provided for a behavior evaluation to determine the behavioral difficulties that significantly impacted Student's ability to learn and, if so, to determine their causes.

*Behavior Assessment*

8.    Dr. Rebecca von Duering performed the social/emotional and behavior assessment in March 2007.[3] She reviewed prior assessments and reports, observed Student in a variety of educational settings, considered information received from his teachers, interviewed Mother, and employed several standardized assessment tools, including the Beck Depression Inventory, Second Edition, the Behavior Rating Inventory of Executive Function (BRIEF), the Behavior Assessment System for Children, Second Edition, and the Social Behavior Assessment Inventory (SBAI).

9.    Mother was concerned that Student felt different from his peers, was angry, frustrated and depressed, and had low self esteem. She also believed that he had attention deficit hyperactivity disorder. Dr. von Duering found that Student did not exhibit low self esteem, depression, or attention deficit hyperactivity disorder.

10.    Student's results on the BRIEF, which evaluates attention processing, identified several areas of concern, including working memory, planning/organization, organizing materials, and task completion. The results on the SBAI, which evaluates specific social skills, identified three areas of concern: gaining attention, completing tasks, and quality of work. The BRIEF and SBAI both use rating scales that were completed by Parents and Student's teachers. The areas of concern were identified by both Parents' and teachers' ratings, and were corroborated by qualitative information provided by school staff members. Dr. von Duering determined that some of Student's behavior may be resulting from his negative feelings toward Parents and his desire to oppose what they want him to do. Regardless of the motivation for the behavior, Dr. von Duering identified three areas of behavior that impeded Student's ability to learn: inappropriately gaining attention, not completing his school tasks, and not turning in quality work.

---

[3] Dr. von Duering holds a master's degree and a doctoral degree in education with an emphasis in school psychology. She also holds a clear pupil personnel services credential and is nationally certified by the National Association of School Psychologists. She has been a school psychologist with District since August 2003.

*March 26, 2007 Behavior Support Plan*

11.    Dr. von Duering prepared a behavior support plan to address the three educationally significant behaviors she identified in her assessment: inappropriately gaining attention, not completing school tasks, and not turning in quality work. She gathered baseline data for each of the target behaviors regarding its frequency, duration and intensity; identified situations occurring before and after the behavior; and proposed possible reasons for the behavior. According to the behavior support plan, Student engaged in each of the behaviors one to 10 times per class period, each behavior lasted one to ten minutes, and each behavior was of moderate intensity. While this consistency among the three behaviors raises a question about the validity of the data, there is no evidence showing they are not accurate.

12.    The behavior support plan indicates that Student engaged in each of the behaviors to avoid a task or activity, gain the attention of adults or peers, or to avoid a person. The plan notes that while Student rejected attention given to him by staff, particularly special education staff, he did not complete tasks or turn in quality work unless he was given individual attention. Replacement behaviors are identified, such as asking for help or an extension of time to complete an assignment. Reinforcements are suggested, such as early dismissal from class. The plan outlines several intervention strategies, including checking for understanding, providing choices, and prompting the expected behaviors. The plan requires that data be collected weekly and there be weekly communication between school staff and Parents. The plan establishes measurable criteria for each behavior to determine when the plan may be terminated.

13.    An IEP team meeting was held on March 26, 2007, to discuss the behavior assessment and proposed behavior support plan. Dr. von Duering revised her behavior assessment report and behavior support plan at Parents' request. The team, including Parents, agreed that the behavior support plan correctly identified the behaviors that impeded Student's learning. The District team members recommended that an additional behavior goal be added to the IEP in the area of gaining attention, which is discussed in Factual Finding 46. Parents did not agree to the behavior support plan.

14.    The March 2007 behavior support plan identified the behaviors that impeded Student's learning as a result of the collection and evaluation of data from a variety of sources, including Student, Parents, teachers, and standardized assessment tools. The plan addressed the seeming inconsistency between Student's tendency to inappropriately seek attention, not complete tasks, and not turn in quality work when adult attention was low, while at the same time consistently rejecting individual attention given to him by school staff, especially special education staff. The plan identified strategies that are reasonably expected to provide Student the skills necessary to reduce the problematic behaviors and improve his behavior. There is no evidence that Student engaged in any other behaviors that impeded his learning. The behavior support plan met Student's unique needs in the area of behavior.

7

*May 31, 2007 IEP*

15.     A school district must provide a program of special education and related services that meets the child's unique needs and is reasonably calculated to provide some educational benefit. When determining whether the IEP provides a student a FAPE, it is evaluated as of the time it was developed. In addition to the substantive requirements of a FAPE, a school district must comply with the procedural requirements of the law. Specific people must participate in each IEP team meeting, including, among others, the parents and a special education teacher. An IEP must include statements of the child's present levels of academic achievement and functional performance (present levels of performance); measurable annual goals; a description of how progress toward the goals will be measured; when periodic progress reports will be made; and the specific special education services, related services, supplementary services, and modifications that will be provided.

*Information Available to District*

16.     District conducted Student's triennial review upon his return to the District in fall 2006. District performed psychoeducational, occupational therapy, academic, transition, and speech and language reassessments as part of the triennial review. Student was also reassessed for eligibility for community mental health services.

17.     Karen Riegert conducted an occupational therapy reassessment in September and October 2006.[4] Ms. Riegert determined that Student demonstrated average to superior skills in his written and typed abilities, visual-perceptual and visual-motor skills, and bilateral dexterity and coordination abilities. She also determined that he exhibited typical sensory processing patterns which enabled him to perform effectively in his educational setting. Ms. Riegert concluded that Student had no deficits requiring any occupational therapy services.

18.     Lori Steiner performed Student's speech and language reassessment in September 2006.[5] Ms. Steiner provided speech and language services to Student under his IEP at Wagon Wheel, which identified pragmatics as an area of weakness. She determined that Student's skills in the areas of articulation, voice and fluency were all age-appropriate. His scores on the Comprehensive Assessment of Spoken Language, including pragmatics, were within the average to superior ranges for his age. Ms. Steiner concluded that Student was not eligible for special education in the category of speech and language impairment, and did not require any speech and language services.

---

[4] Ms. Riegert is a licensed occupational therapist and has been an occupational therapist for District for three years.

[5] Ms. Steiner holds a master's degree in communicative disorders, and a clinical rehabilitative services credential. She has been a speech and language pathologist for District since 1997.

19.    Melissa Primicias conducted a psychoeducational reassessment in September 2006. Student's scores on the Weschler Abbreviated Scale of Intelligence indicated he was functioning within the superior range of cognitive ability. The results on the Woodcock-Johnson Test of Cognitive Abilities, Third Edition, indicated that Student functioned in the low to below average range in processing speed. Ms. Primicias recommended that Student be considered eligible for special education in the category of specific learning disability based on Student's processing weakness, and a significant discrepancy between his level of cognitive functioning and his academic achievement in the area of mathematics. The IEP team met on October 17, 2006, to begin his triennial review. District members of the IEP team agreed with Ms. Primicias's recommendation concerning eligibility.

20.    The Orange County Health Care Agency, Behavioral Health Services (Orange County) assessed Student in November 2006 for community mental health services, which he had previously received from March 2004 to April 2005. Orange County determined that Student did not exhibit signs of attention deficit hyperactivity disorder, or any mental illness that affected his ability to benefit from his special education program, and did not qualify for community mental health services.

21.    Barbara Coppola conducted an academic reassessment in October 2006.[6] Student's results on the Woodcock Johnson III Tests of Achievement (WJ-III) indicated that his reading comprehension skills were in the very superior range, basic reading and written language skills were in the high average range, math reasoning and written expression skills were in the average range, and math calculation skills were in the low average range. The only area of academic deficit was in mathematics.

22.    Ms. Coppola also conducted a transition plan assessment in October 2006. She administered the Career Decision-Making Inventory (CDM) and interviewed Student. The CDM explores a student's interests in specific areas. Student's highest score was in the arts. He was very interested in playing the drums and pursuing a career in music. Based on this assessment, Ms. Coppola prepared a transition plan identifying Student's need to complete middle school and enter high school, start advocating for himself, and develop positive interactions with adults. Ms. Coppola also drafted three transition goals which were adopted at the October 17, 2006 IEP team meeting, as further discussed in Factual Finding 49.

*May 31, 2007 IEP Team Meeting and District's Offer*

23.    An IEP team meeting was conducted on May 31, 2007, to discuss Student's transition to high school. The meeting was attended by, among others, Parents and their attorney; Michele Knutsen, Student's general education mathematics teacher; Barbara

---

[6] Ms. Coppola holds a master's degree in education with an emphasis in special education, and educational specialist instruction credentials in mild/moderate and moderate/severe disabilities. She has been a resource specialist with District since 2000. Ms. Coppola was Student's special education case manager at Las Flores and was his resource teacher in his collaborative mathematics class.

9

Coppola, Student's special education mathematics teacher; Lori Steiner, Student's speech and language therapist; Dr. von Duering, school psychologist; Karen Nelson, program specialist; and Janie Hoy, Assistant Principal at San Juan. Parents permitted Student to attend the meeting for about 20 minutes. All required participants attended the IEP team meeting.

24.    District offered Student the program that had been developed and offered during the prior meetings in October and December 2006, and January and March 2007, adjusted for the class schedule at San Juan, the high school that Parents selected. The IEP includes three goals in each of the areas of mathematics, behavior, and transition. District offered Student placement in a collaborative algebra class and a directed resource study skills class.

*Student's Unique Needs*

25.    District must provide special education and related services to meet each of a student's unique needs, including academic, social, health, emotional, communicative, physical, and vocational needs.

26.    As determined in Factual Finding 21, Student had an academic need in mathematics, particularly in the area of mathematical calculations. The results of a mathematics skills inventory identified specific deficits in the areas of fractions, decimals, and mathematical operations involving fractions. Student had no other needs in the area of academics.

27.    As determined in Factual Finding 10, Student had needs in the area of behavior. He did not complete school tasks and assignments, did not gain the attention of others in appropriate ways, and did not perform quality school work. Student had no other needs in the area of behavior that affected his educational progress.

28.    As determined in Factual Finding 22, the transition plan developed for Student in October 2006 identified his transition needs as completing middle school and entering high school, starting to advocate for himself, and developing positive interactions with adults. By May 2007, Student was well on his way to completing middle school. Student and Parents had decided that he would attend San Juan. Student no longer had a need for assistance with this aspect of his transition to high school.

29.    As determined in Factual Finding 14, Student tended to reject the attention of teachers trying to help him with school work, while at the same time needing assistance in order to perform work consistent with his abilities. He needed to learn self-advocacy skills in order to benefit from the classroom, and prepare him for life-long learning. Similarly, Student needed to interact appropriately with different adults to benefit from school and life beyond. There is no evidence that Student had other transition needs.

30.　As determined in Factual Findings 17 and 18, Student no longer had any needs in the areas of speech and language or occupational therapy. There is no evidence that Student had any other social, health, emotional, communicative, physical, or vocational needs.

*Present Levels of Performance*

31.　An IEP must include a statement of the student's present levels of performance that includes the manner in which the disability affects his participation in appropriate activities. An IEP that does not contain adequate present levels of performance or objective criteria may be cured if the required information was known to the parents and the IEP team members who developed the IEP.

32.　Student's present level of performance in mathematics describes his difficulty manipulating fractions and decimals. His baseline performance in mathematics was based on a math skills inventory. The IEP also includes interim benchmarks toward achieving each goal. The IEP includes adequate present levels of performance in the area of mathematics.

33.　Student's present level of performance in the area of behavior states that he was completing and turning in assignments in all of his classes except math. This neither accurately described Student's work completion in May 2007, nor addressed all of his behavioral needs. Similarly, the baseline for work completion addressed his performance in mathematics in October 2006, when the first behavior goal was written, not his performance in May 2007. Warren Nagano, Student's general education social sciences teacher, and Susan Smith, his special education English teacher, both testified that Student did not consistently turn in assignments, or turn in complete assignments. In addition, the March 2007 behavior support plan found that he did not submit complete tasks in three of his six classes.

34.　The work completion goal includes an initial benchmark, but this does not constitute an adequate present level of performance. The first benchmark requires that Student complete and turn in assignments with one prompt 70 percent of the time. This creates the inference that Student completed and turned in assignments with one prompt less than 70 percent of the time. However, it does not identify whether this occured in all of his classes, or only some of them. The IEP team members, including Parents, were aware of Student's failure to complete his assignments, as it was discussed at several IEP meetings. However, there is no evidence that the IEP team members had sufficient information concerning Student's present level of performance concerning the completion of assignments. The IEP does not contain an adequate present level of performance concerning Student's completion of assignments.

35.　The IEP includes a baseline that Student had trouble gaining the attention of peers appropriately, which was based on the behavior assessment. This merely identifies an area of need; it does not provide any information concerning the nature or circumstances of the behavior. There is no evidence that the IEP team members had sufficient information

11

concerning Student's present level of performance in this area. The IEP does not contain an adequate present level of performance concerning Student's need to appropriately gain the attention of others.

36. The IEP does not contain any present level of performance concerning Student's need to turn in quality work. There is no evidence that the IEP team members had sufficient information concerning Student's present level of performance in this area.

37. Student's present level of performance in the area of transition to post-school activities states that he needs to complete middle school and enter high school. As determined in Factual Finding 28, this was not an area of need for Student in May 2007. This present level of performance is not adequate.

38. The IEP includes a baseline concerning Student's need for self-advocacy indicating that he did not ask teachers for assistance when he did not understand concepts or procedures. This merely restates his need to develop skills in this area. There is no evidence that the IEP team members had sufficient information concerning Student's present level of performance in this area. The IEP does not include an adequate present level of performance in the area of self-advocacy.

39. Student's present level of performance in the area of positive problem-solving skills indicates that he did not always use positive problem-solving strategies with adults. It merely restates his need to develop skills in this area. There is no evidence that the IEP team members had sufficient information concerning Student's present level of performance in this area. The IEP does not include an adequate present level of performance in this area.

*Measurable Goals that Meet Student's Unique Needs*

40. An IEP must include a statement of measurable annual goals designed to meet the student's needs resulting from the disability that enable the student to be involved in and made progress in the general curriculum, and that meet the student's other educational needs that result from the disability.

*Mathematics*

41. District offered mathematics goals that were initially presented at the October 2006 meeting in the areas of fractions, decimals, and mathematical operations involving fractions. The goals were based on the mathematics content standards for seventh grade. Each of these goals is measurable.

42. District proposed goals in mathematics that met Student's needs in the area of mathematics. The goals appropriately address Student's need to develop proficiency with fractions, decimals and mathematical operations involving fractions so that he could progress to more advanced mathematics.

*Behavior*

43.    District offered Student behavior goals in the areas of completing his work assignments, completing his homework planner/agenda, and appropriately gaining the attention of peers.

44.    The IEP includes two goals concerning Student's needs in the area of completing work assignments. The first was added in October 2006 because Student was doing poorly in mathematics and was failing to submit assignments. The goal provides that Student will complete and turn in assignments with prompting 90 percent of the time. As determined in Factual Findings 33 and 34, the IEP does not contain an adequate present level of performance concerning Student's work completion. Without an adequate present level of performance, it is difficult to determine if the goal adequately addressed Student's needs or whether progress can be accurately evaluated. The goal does not include a clear standard by which it can be measured because it does not specify whether it applies to all of Student's classes, or just some of them. There is no evidence that the IEP team members had sufficient information concerning objective evaluation criteria for this goal. This goal is not objectively measurable.

45.    The second goal concerning Student's need to complete his work provides that Student fill out his homework planner/agenda on a daily basis 95 percent of the time. This goal was added in December 2006 because Student began to show resistance to keeping an agenda. Parents requested a goal in this area because his failure to write down his assignments caused problems at home. The goal includes an accurate baseline. Student's progress on this goal can be objectively measured.

46.    The goal concerning Student's need to appropriately gain the attention of peers was added in March 2007 because it was identified as a need in his behavior assessment. The goal provides that Student gain the attention of a peer by calling the peer by name and asking appropriate and relevant questions 90 percent of the time. This goal does not include a clear standard by which it can be measured because it does not identify when and where the behavior will be measured. There is no evidence that the IEP team members had sufficient information concerning objective evaluation criteria for this goal. This goal meets Student's needs, but it is not objectively measurable.

47.    The IEP does not include a goal concerning Student's third need in the area of behavior, the need to perform quality work. Although the March 2007 behavior support plan addressed this area of need, the behavior support plan was not incorporated into the IEP. The IEP does not require that the behavior support plan be implemented for Student. Student needs the behavior support plan to meet his behavioral needs.

*Transition to Post-School Activities*

48.    When a student turns 16 years of age, the IEP must include appropriate measurable goals concerning the transition to post-school activities. These goals must relate

to the student's training, education, employment, and, if appropriate, independent living skills.

49.    Student does not turn 16 year of age until June 17, 2008. His next annual IEP is due on October 17, 2007. Nevertheless, the IEP team determined that he needed goals in the area of transition to post-school activities. District offered Student three transition goals that were initially presented in October 2006. The goals concern Student's needs to identify a high school to attend, develop self-advocacy skills, and use positive problem-solving strategies with adults.

50.    As determined in Factual Finding 28, Student did not have a need to identify a high school to attend in May 2007. While it may have been an appropriate goal for Student when initially presented in October 2006, it was unnecessary in May 2007.

51.    The goal concerning self-advocacy requires Student to discuss difficulties he is having with his teachers. It requires him to go to his teachers and discuss any difficulties or needs in four of five trials. The goal seeks to develop a skill in Student that will assist him in his education and benefit him beyond high school. As determined in Factual Finding 38, the IEP does not include an adequate present level of performance. The goal does not include a clear standard by which it can be measured because it does not specify whether it applies to all of Student's classes, or just some of them. In addition, it is not clear how staff will determine when Student did not ask for assistance. There is no evidence that the IEP team members had sufficient information concerning objective evaluation criteria for this goal. The goal is not objectively measurable.

52.    The goal concerning problem-solving strategies requires Student to develop and use positive problem-solving strategies when interacting with adults with 80 percent accuracy in three of four opportunities. Learning to respond appropriately to adults in a variety of situations is a skill that will assist Student's transition to life after school. As determined in Factual Finding 39, the IEP does not include an adequate present level of performance. The goal does not include a clear standard by which it can be measured. It is unclear what "80 percent accuracy in three of four opportunities," means when evaluating positive problem-solving strategies with adults. There is no evidence that the IEP team members had sufficient information concerning objective evaluation criteria for this goal. The goal is not objectively measurable.

*Measurement of Progress and Notification of Progress Toward Goals*

53.    The IEP includes a description of the manner in which progress toward each of the goals will be measured. The methods include observation, work samples and curriculum-based assessment, or some combination of these. In addition, the IEP includes a statement that a pupil's parents will be informed of the pupil's progress toward goals at least as often as parents are informed of the progress of pupils without disabilities. The IEP complies with the legal requirement to include these two elements.

*Descriptions of Special Education Services and Program Modifications or Supports*

54.    A child with a disability must be educated with children who are not disabled to the maximum extent appropriate. When determining whether a placement is the least restrictive environment for a child, four factors are evaluated and balanced:  the educational benefits of placement in the less restrictive environment, the non-academic benefits of placement in the less restrictive environment, the effect the presence of the child with a disability has on the teacher and children in the less restrictive environment, and the cost of placing the child in the less restrictive environment.

*Collaborative Algebra Class*

55.    District offered Student a collaborative algebra class taught by a general education teacher with the full-time assistance of a special education teacher in the classroom. Both general and special education students attend a collaborative class.    At the May 2007 IEP team meeting, Parents requested that Student be placed in a pull out special education algebra class, which is a more restrictive environment than the collaborative class.

56.    There is no evidence that Student requires a pull out special education algebra class to meet his needs.  Student was successful in the collaborative pre-algebra class at Las Flores.  Student received grades of A and C- in pre-algebra in the academic quarters prior to the May 2007 IEP.  Student's results on District's yearly mathematics assessment, Capistrano Objectives for Reaching Excellence (CORE), showed an improvement of 10 points over the course of the school year.[7]  An increase of four or five points is generally considered very good.  Not only does Student not require the intensive instruction in a special education pull out mathematics class, it may impede his learning.  Student responds negatively to being singled out for attention in the classroom and does not like receiving special education services.  There appears to be a correlation between Student's negative classroom behaviors and his receiving increased attention as a result of special education and related services.  The collaborative mathematics class allows him to be in a general education setting while also receiving additional assistance, including small group or individual instruction, that he needs to address his deficits in the area of mathematics.  The collaborative algebra class will allow Student to advance appropriately toward attaining his goals in mathematics, be involved in and make progress in the general education curriculum, and be educated and participate with peers who do not have disabilities.  The collaborative math class is the least restrictive environment for Student.

*Resource Class in Study Skills*

57.    District offered Student a resource class in study skills.  It is a directed, small group class taught by a special education teacher that teaches organizational skills and study habits.  This class will allow Student to advance toward attaining his behavior goal to use his

---

[7] All students in the District take the CORE test in mathematics in the fall and spring of each year to evaluate their progress over the course of the school year.

homework agenda, and to make progress in the general curriculum. It will also assist Student to develop skills to complete homework assignments.

### Extended School Year Services

58.    Parents requested that Student be provided extended school year services. The IEP team discussed the request, but the consensus of the District's members was that Student did not need extended school year services. There is no evidence that Student requires these services to maintain progress on his goals or to prevent regression of skills, or that he is unable to recoup skills in the same amount of time that his general education peers do.

### Program Modifications

59.    District offered Student extra time, up to one additional week, without penalty to complete assignments or take tests in all curricular areas. District also offered Student the use of visual graphic organizers for essays or projects as needed. There is no evidence that Student required any additional modifications.

### Other Special Education Services

60.    There is no evidence that Student requires any other special education services to meet his unique needs. As determined in Factual Finding 21, Student's reassessments did not identify that he had any other academic deficits. His skills in the areas of reading comprehension, reading skills, written language and written expression range from very superior to average. He received passing grades in all subjects during the second half of the school year.

### Related Services

61.    District did not offer Student any related services. As determined in Factual Findings 17 and 18, Student's reassessments determined that he did not have any deficits and did not require any services in the areas in which he had previously received services, speech and language or occupational therapy. There is no evidence that Student requires any related services to benefit from his education.

## LEGAL CONCLUSIONS

*Did District offer Student appropriate supports and strategies to meet his behavioral needs in the March 26, 2007 behavior support plan?*

1.    As the petitioner, District has the burden of proving that it complied with the law. (*Schaffer v. Weast* (2005) 546 U.S. 49, 62 [126 S.Ct. 528].)

2.     A child with a disability has the right to a FAPE under the Individuals with Disabilities Education Improvement Act (IDEA) and California law. (20 U.S.C. §1412(a)(1)(A); Ed. Code, § 56000.) A FAPE is defined in pertinent part as special education and related services that are provided at public expense and under public supervision and direction, that meet the State's educational standards, and that conform to the student's IEP. (20 U.S.C. § 1401(9); Cal. Code Regs., tit. 5, § 3001, subd. (o).) Special education is defined in pertinent part as specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability that are needed to assist the child to benefit from instruction. (20 U.S.C. § 1401(29); Ed. Code, § 56031.) Special education related services include in pertinent part developmental, corrective, and supportive services, such as speech-language pathology services, as may be required to assist a child with a disability to benefit from special education. (20 U.S.C. §§ 1401(26), 1410(22); Ed. Code, § 56363.) A child's unique educational needs are to be broadly construed to include the child's academic, social, health, emotional, communicative, physical and vocational needs. (*Seattle Sch. Dist. No. 1 v. B.S.* (9th Cir. 1996) 82 F.3d 1493, 1500, citing J.R. Rep. No. 410, 1983 U.S.C.C.A.N. 2088, 2106.)

3.     An IEP team must consider whether a child's behavior impedes his or her learning or that of others. (20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.346(a) (2)(i); Ed. Code, § 56341.1, subd. (b)(1).) If the team determines that it does, it must consider the use of positive behavioral interventions and supports, and other strategies to address the behavior. (*Id.*)

4.     Federal law does not impose any specific requirements for a functional behavior assessment or behavior intervention plan. (*Alex R. v. Forrestville Valley Community Unit School Dist. #221* (7th Cir. 2004) 375 F.3d 603, 615.) When a child exhibits a serious behavior problem, such as self-injurious or assaultive behavior, California law imposes specific and extensive requirements for the development of a functional analysis assessment and a behavior intervention plan. (Cal. Code Regs., tit. 5, §§ 3001, subd. (f), 3052.)

5.     There are many behaviors that will impede a child's learning or that of others that do not meet the requirements for a serious behavior problem requiring a behavior intervention plan under California law. These less serious behaviors require the IEP team to consider and, if necessary, develop positive behavioral interventions, strategies and supports. (20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.346(a)(2)(i); Ed. Code, § 56341.1, subd. (b)(1).) In California, a behavior intervention is "the systematic implementation of procedures that result in lasting positive changes in the individual's behavior." (Cal. Code Regs., tit. 5, § 3001, subd. (d).) It includes the design, evaluation, implementation, and modification of the student's individual or group instruction or environment, including behavioral instruction, to produce significant improvement in the student's behavior through skill acquisition and the reduction of problematic behavior. (*Ibid.*) An IEP that does not appropriately address behavior that impedes a child's learning may deny a student a FAPE. (*Neosho R V Sch. Dist., v. Clark* (8th Cir. 2003) 315 F.3d 1022, 1028; *County of San Diego v. California Special Educ. Hearing Office* (9th Cir. 1996) 93 F.3d 1458, 1467-1468; *San*

*Rafael Elem. Sch. Dist. v. Cal. Special Educ. Hearing Office* (N.D.Cal. 2007) 482 F.Supp.2d 1152, 1161-1162; *Escambia County Bd. of Educ. v. Benton* (S.D. Ala. 2005) 406 F.Supp.2d 1248, 1265.) Nevertheless, a school district is not required to address a student's behavior problems that occur outside of school when the student demonstrates educational progress in the classroom. (*San Rafael Elem. Sch. Dist. v. Cal. Special Educ. Hearing Office, supra*, 482 F.Supp.2d at p 1160.) Behavioral and emotional goals must be addressed in an IEP only to the extent the student's behavior affects the student's educational progress. (*Id.* at pp. 1161-1162.)

6.      As determined in Factual Findings 11 through 14, District conducted a behavior assessment and developed a behavior support plan after Student's behavior began to deteriorate at the end of 2006. Dr. von Duering conducted the behavior assessment by gathering and considering both quantitative and qualitative data from a variety of sources, including Student, Parents, and teachers. The behavior support plan addressed the three behaviors that impeded Student's learning: inappropriately gaining attention, not completing school tasks, and not turning in quality work. The plan identified strategies that were reasonably expected to provide Student the skills necessary to reduce the problematic behavior and improve his behavior. The March 2007 behavior support plan met Student's needs in the area of behavior.

*Did District offer Student a FAPE in the May 30, 2007 IEP?*

7.      A school district must provide "a basic floor of opportunity . . . [consisting] of access to specialized instruction and related services which are individually designed to provide educational benefit to the [child with a disability]." (*Bd. of Educ. v. Rowley* (1982) 458 U.S. 176, 200 [102 S.Ct. 3034].) A school district is not required to provide either the best education to a child with a disability, or an education that maximizes the child's potential. (*Id.* at p. 197; *Gregory K. v. Longview School Dist.* (9th Cir. 1987) 811 F.2d 1307, 1314.) A school district must offer a program that meets the student's unique needs and is reasonably calculated to provide more than a trivial or minimal level of progress. (*Amanda J. v. Clark County Sch. Dist.* (9th Cir. 2001) 267 F.3d 877, 890, citing *Hall v. Vance County Bd. of Educ.* (4th Cir. 1985) 774 F.2d 629, 636.)

8.      A child with a disability must be educated with children who are not disabled to the maximum extent appropriate. (20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114(a)(2); Ed. Code, § 56342.) When determining whether a placement is the least restrictive environment for a child, four factors must be evaluated and balanced: the educational benefits of full-time placement in the less restrictive classroom; the non-academic benefits of full-time placement in the less restrictive classroom; the effect the presence of the child with a disability has on the teacher and children in the less restrictive classroom; and the cost of placing the child with a disability full-time in the less restrictive classroom. (*Ms. S. v. Vashon Island School Dist.* (9th Cir. 2003) 337 F.3d 1115, 1136-1137; *Sacramento City Unified School Dist. v. Rachel H.* (9th Cir. 1994) 14 F.3d 1398, 1404.)

9.     An IEP is evaluated in light of information available at the time it was developed; it is not judged in hindsight. (*Adams by and Through Adams v. Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149.) "An IEP is a snapshot, not a retrospective." (*Roland M. v. Concord Sch. Comm.* (1st Cir. 1990) 910 F.2d 983, 992; *Adams by and Through Adams v. Oregon, supra*, 195 F.3d at p. 1149, citing *Fuhrmann v. East Hannover Bd. of Educ.* (3d Cir. 1993) 993 F.2d 1031, 1041.) The IEP's goals and methods are evaluated as of the time they were developed to determine whether they were reasonably calculated to confer an educational benefit to the student. (*Adams by and Through Adams v. Oregon, supra*, 195 F.3d at p. 1149.)

10.     In addition to these substantive requirements, the Supreme Court recognized the importance of adhering to the procedural requirements of the IDEA. (*Bd. of Educ. v. Rowley, supra*, 458 U.S. at pp. 206-207.) To constitute a denial of a FAPE, procedural violations must result in the loss of educational opportunity; a serious infringement of the parents' opportunity to participate in the IEP process; or a deprivation of educational benefits. (*Amanda J. v. Clark County Sch. Dist., supra*, 267 F.3d at p. 892. This is codified in both federal and state law. (20 U.S.C. § 1415(f)(3)(E)(ii); Ed. Code, § 56505, subd. (f)(2).)

11.     The IEP team is composed of the parents of the child with a disability; at least one of the child's regular education teachers if the student is or may be participating in the regular education environment; at least one of the child's special education teachers or, if appropriate, at least one of the child's special education providers; a representative of the school district who meets specific requirements; a person who can interpret the instructional implications of evaluation results; other persons who have knowledge or special expertise regarding the student, at the discretion of the parent or school district; and the child, whenever appropriate. (20 U.S.C. § 1414(d)(1)(B); 34 C.F.R. § 300.321 (a); Ed. Code, § 56341, subd. (b).) As determined in Factual Finding 23, all necessary IEP team members participated in the May 30, 2007 meeting.

12.     An IEP must include a statement of the child's present levels of educational performance; a statement of measurable annual goals; the manner in which the student's progress toward meeting the goals will be measured; when periodic reports on the progress toward meeting the goals will be made; the special education and related services, supplementary aids and services, and modifications or supports to be provided; and the date the services begin and their anticipated frequency, location, and duration. (20 U.S.C. § 1414(d)(1)(A)(i); 34 C.F.R. §§ 300.320(a); Ed. Code, § 56345, subd. (a).) An IEP that fails to contain the child's present level of educational performance or objective evaluation criteria may be cured if the required information was known to the administrators and parents who had participated fully in the development of the IEP. (*W.G. v. Board of Trustees of Target Range School Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484-1485; *Cleveland Heights-University Heights City School Dist. v. Boss* (6th Cir. 1998) 144 F.3d 391, 399, citing *Doe v. Defendant I, supra*, 898 F.2d at p. 1190 [to do otherwise would "exalt form over substance."].)

19

13.    An IEP must include annual goals designed to meet the needs that result from the child's disability to enable the child to be involved in and make progress in the general curriculum, and that meet the child's other education needs that result from his or her disability. (20 U.S.C. § 1414(d)(1)(A)(i)(II); Ed. Code, § 56345, subd. (a)(2).) An IEP must include services, supplementary aids, modifications, or supports that will allow the student to advance appropriate toward attaining the annual goals, to be involved in and make progress in the general education curriculum, and to be educated and participate with other students with disabilities and those who do not have disabilities. (20 U.S.C. § 1414(d)(1) (A)(IV); Ed. Code, § 56345, subd. (a)(4).)

14.    As determined in Factual Finding 26, Student has unique academic needs in mathematics in the areas of fractions, decimals and mathematical operations involving fractions. As determined in Factual Findings 41 and 42, the May 2007 IEP includes measurable goals based on adequate present levels of performance for the mathematics goals. District's offer of a collaborative math class allows Student to receive instruction from general education teacher with general education peers while also receiving the individualized instruction from a special education teacher with special education peers. Student benefited from being in a collaborative math class during eighth grade. The mathematics goals and offered placement met Students needs in the least restrictive environment, and was reasonably calculated to provide educational benefit.

15.    As determined in Factual Finding 27, Student has behavioral needs in the areas of completing assignments, appropriately gaining the attention of peers, and performing quality work. As determined in Factual Findings 44 and 45, District offered two goals concerning the completion of assignments. One goal, requiring Student to complete assignments 90 percent of the time, was not based on an accurate present level of performance and is not objectively measurable. The second goal, requiring Student to fill out his homework agenda on a daily basis, had an accurate baseline and is objectively measurable. The deficiencies in the first goal are significant. With neither a clear statement of Student's present level of completing work assignments, nor a specific description of what is to be measured, effective implementation and evaluation of the goal rests with the discretion of District staff. There is no evidence that the IEP team members were aware of and agreed to objective evaluation criteria for this goal. Because of this, there is a significant risk that Student will not educationally benefit. Although the goal involving Student's homework agenda is an appropriate and measurable goal, it alone does not meet Student's significant need to complete his homework assignments.

16.    As determined in Factual Finding 46, District offered one goal concerning Student's need to appropriately gain the attention of peers. The goal was not based on an adequate present level of performance and was not objectively measurable. There is no evidence that the IEP team members were aware of and agreed to objective evaluation criteria for this goal. There is a significant risk that Student will not educationally benefit.

17.    As determined in Factual Finding 47, the IEP does not include a goal concerning Student's need to perform quality work and the IEP does not require that the behavior support plan be implemented. Student required implementation of the behavior support plan in order to meet his behavior needs.

18.    As determined in Factual Finding 57, District's offer of a resource class in study skills will assist Student in attaining his behavior goal to consistently use his homework agenda and to develop skills to complete his assignments. Since District's IEP team members proposed a goal in the area of completing assignments, they determined that the study skills class alone was not adequate to completely meet Student's need in the area of completing his work assignments.

19.    The May 2007 IEP did not include appropriate measurable goals in the area of behavior, did not require implementation of a behavior support plan, and did not provide adequate special education services to meet Student's needs in the area of behavior.

20.    The IEP in effect when a student reaches 16 years of age must include appropriate measurable postsecondary goals based upon age appropriate transition assessment related to training, education, employment and, where appropriate, independent living skills, and the transition services needed to assist the student in reaching those goals. (20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa), (bb); Ed. Code, §§ 56043, subd. (g)(1), 56345, subd. (a)(8).)

21.    As determined in Factual Finding 49, although District was not required to provide transition goals for Student in the May 2007 IEP, it did so. After determining that Student required transition goals in his IEP, District was required to comply with the requirements for those goals.

22.    As determined in Factual Finding 22, Student had transition needs concerning self-advocacy and developing positive interactions with adults. As determined in Factual Finding 51, District offered one goal concerning self-advocacy that requires Student to go to his teachers and discuss any difficulties he has. The goal was not based on an adequate present level of performance and was not objectively measurable. There is no evidence that the IEP team members were aware of and agreed to objective evaluation criteria. There is a significant risk that Student will not educationally benefit.

23.    As determined in Factual Finding 52, District offered one goal concerning problem-solving strategies that required Student to develop and use positive problem-solving strategies when interacting with adults. This goal was not based on an adequate present level of performance and was not objectively measurable. There is no evidence that the IEP team members were aware of and agreed to objective evaluation criteria. There is a significant risk that Student will not educationally benefit.

24.     As determined in Factual Finding 29, there is no evidence that Student needs to develop independent living skills. District did not offer appropriate measurable goals to meet Student's needs in the area of his transition to postsecondary activities.

25.     Extended school year services shall be included in a student's IEP if the IEP team determines that the services are necessary to provide a FAPE. (34 C.F.R. § 300.106; Ed. Code, § 56345, subd. (b)(3); Cal. Code Regs., tit. 5, § 3043, subd. (f).) Extended school year services shall be provided to a student who has unique needs and requires special education and related services in excess of the regular academic year. (Cal. Code Regs., tit. 5, § 3043.)

26.     As determined in Factual Findings 58 through 61, there is no evidence that Student requires additional special education services, including extended school year services, program modifications, or related services to meet his needs or to allow him to benefit from his education.

27.     As determined in Legal Conclusions 15 through 19 and 22 through 24, the May 30, 2007 IEP did not meet Student's needs in the areas of behavior and transition. The IEP was not reasonably calculated to provide educational benefit to Student.


## ORDER

1.     District offered Student appropriate supports and strategies to meet his behavioral needs in the March 26, 2007 behavior support plan.

2.     District did not offer Student FAPE in the May 30, 2007 IEP.


## PREVAILING PARTY

Education Code section 56507, subdivision (d), requires a decision to indicate the extent to which each party prevailed on each issue heard and decided. District prevailed on Issue 1. Student prevailed on Issue 2.

## PROOF OF SERVICE

I, **Rosie Ruiz**, declare as follows: I am over 18 years of age and have no interest in the action within; my place of employment and business address is:

**Office of Administrative Hearings**
**Special Education Division**
**2349 Gateway Oaks Suite 200**
**Sacramento, CA 95833-4231**

On **October 01, 2007**, I served a copy of the following entitled action:

**DECISION - OAH CASE NO. - 2007060627**

to each of the person(s) named below, at the address set out next to each name, by the following method:

Mrs. Newman
30 Homestead Drive
Trabuco Canyon, CA 92679

Ellen Dowd, Esq.
Attorney at Law
2658 Del Mar Heights Road #228
Del Mar, CA 92014

Steven Lake, Esq.
Best Best & Krieger, LLP.
655 West Broadway, 15th Floor
San Diego, CA 92101

☒ **US MAIL** – by enclosing the action in a sealed envelope and placing the envelope for collection and mailing on that date and at the Office of Administrative Hearings, City of Sacramento, County of Sacramento, State of California, following ordinary business practices. I am readily familiar with the Office of Administrative Hearings' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

XX  Regular Mail

☒ **FACSIMILE TRANSMISSION** – by personally transmitting to the above-named person(s), who has previously agreed to receive documents via facsimile transmission, to the facsimile number(s) shown above, on the date and time listed below, from facsimile machine number (916) 263-0554, pursuant to California Rules of Court, rules 2003-2008, Government Code section 11440.20, and California Code Regulations, title 1, section 1008, subdivision (d). A true copy of the above-described documents(s) was transmitted by facsimile transmission and the transmission was reported as complete and without error. A copy of the transmission report, properly issued by the transmitting machine, is attached to this proof of service.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and this Declaration was executed at **Sacramento, California** at

**4:55 PM** on the **1** of **October**, 2007. _____ Rosie Ruiz



State of California • Department of General Services • Arnold Schwarzenegger, Governor

# OFFICE OF ADMINISTRATIVE HEARINGS

| | | | | | |
|---|---|---|---|---|---|
| Sacramento | 2349 Gateway Oaks Drive, Suite 200 | Sacramento, | Ca 958334231 | (916) 263-0880 | (916) 263-0890 fax |
| Van Nuys | 15350 Sherman Way, Suite 300 | Van Nuys | Ca 91406 | (818) 904-2383 | (818) 904-2360 fax |
| Laguna Hills | 23046 Avenida De La Carlota, Suite 750 | Laguna Hills | Ca 92653 | (949) 598-5850 | (949) 598-5860 fax |

## FAX TRANSMITTAL INFORMATION PAGE

### SACRAMENTO

DATE:    10/1/2007          TIME:    5:09 PM.          NO. OF PAGES:    25
                                              (INCLUDING COVER SHEET)

TO:

Ellen Dowd, Esq.
Attorney at Law
2658 Del Mar Heights Road #228
Del Mar, CA 92014
Fax No. 858-755-6348

Steven Lake, Esq.
Best Best & Krieger, LLP.
655 West Broadway, 15th Floor
San Diego, CA 92101
Fax No. 619-233-6118

NAME:        Rosie Ruiz

OFFICE:      Office of Administrative Hearings

LOCATION:    2349 Gateway Oaks, Suite 200 Sacramento, CA 95833-4231

FAX NO:      (916) 263-0890              PHONE NO:    (916) 263-0880

### MESSAGE/INSTRUCTIONS

Attached please find

**DECISION – 2007060627**

**RE: Capistrano v. David Newman**

1

2  Ellen Dowd, Esq.
   State Bar Number 141206
3  2658 Del Mar Heights Road #228
   Del Mar, California 92014
4  (858) 342-8360

5

6  **Attorney for Petitioner,** 

7

8

9                    **BEFORE THE STATE OF CALIFORNIA**

10              **OFFICE OF ADMINISTRATIVE HEARINGS**

11                   **SPECIAL EDUCATION DIVISION**

12

13  In The Matter Of                        )  Case No.: N2007090067
                                            )
14  CHRISTOPHER STRUBLE                      )  PETITIONER, CHRISTOPHER
                                            )  STRUBLE'S SUPPLEMENT TO MOTION
15              Petitioner,                  )  FOR MODIFICATION OF DECISION
                                            )
16  v.                                       )
                                            )  Hearing Dates: October 16-19, 2007
17  FALLBROOK UNION HIGH SCHOOL              )  ALJ: Hon. Susan Ruff
18  DISTRICT,                                )
                                            )
19              Respondent.                  )
                                            )
20  _____        )__

21

22

23

24

25

26

27

28

Petitioner's Supplement To Motion for Modification of Decision                    0

# I.

## **SUPPLEMENTAL ARGUMENT**

### A.    **Under IDEA an ALJ Cannot Delegate Authority To An IEP Team to Fashion Compensatory Education.**

Student is an 18-year old young man who is determined to attain his high school diploma, which has been unlawfully precluded by the District. As such, Student does not have years to undertake an appeal, and eventually have the issue of compensatory education remanded to OAH, or whatever administrative body is conducting Due Process Hearings at that time.

Attached is a very recent 6th Circuit case, *Board of Education of Fayette County, Kentucky v. L.M.,* decided March 2, 2007. It upholds the mandate that "IDEA due process hearings "may not be conducted by an employee of the State educational agency or the local agency involved in the education or care of the child." (citing, *Reid ex rel. Reid v. District of Columbia,* 401 F. 3d 516, 526 (D.C. Cir. 2005, citing 20 U.S. C. § 1415(f) (3)).

If an IEP Team, which, by statute, must include a representative of the local educational agency, "the IEP Team would in effect exercise the officer's powers." *Reid,* 401 F. 3d at 526.

Additionally, in this case, Sallie Hunt, the Director of Special Education for the District, who, in the Decision was characterized in the Factual Findings as 'insensitive to the parents" and "belittling of the parents" (Decision, page 27, footnote 13), would be presiding over the IEP gloating that she has another opportunity to disregard the parents and Student.

Here, the ALJ is insensitive to the continuous slights delivered by Ms. Hunt, which are included in the Decision, to wit: that Student had limited intellectual capacity, and could only be a "gofer" in the television field (Decision, Factual Finding 139), to provide a written communication plan so that Student's parents "don't come running over here every time he sneezes" (Decision, Factual Finding 140), and "asking Student if Student was a bigot when he complained about other students bullying him" (Decision, Factual Finding 140).

In *L.M.* the Due Process Hearing was conducted and decided on January 30, 2004, when *L.M.* was in the 4th grade. The Circuit Court Decision was entered on March 2, 2007, more than three years later, when *L.M.* was in 7th grade. Then, it was remanded back to "have the

1   appropriate administrative body craft a remedy that complies with the IDEA." (*L.M.* Decision,
2   attached, at page 8).

3       Here, Student does not have three years to sit at home pondering why he is not working
4   toward his High School Diploma. "Compensatory education awards should aim to place disabled
5   children in the same position they would have occupied but for the school district's violation of
6   IDEA." *Reid,* 401 F. 3d at 518. The swiftest way for Student to attain his High School Diploma,
7   as evidenced by Exhibit Q is Fusion Academy. That was the requested remedy.

8       **B.    Under Burlington, an ALJ Cannot Deny An Appropriate Remedy If The**
9   **District's Offer is Inappropriate.**

10      Compensatory education is the remedy for denial of FAPE. The Decision correctly states
11  that the court has "broad discretion in fashioning a remedy, as long as the relief is appropriate in
12  light of the purpose of special education law." (Decision Conclusion of Law 26). The Decision
13  goes on to state that, "The District's transition program is not designed to give Student the
14  opportunity to work toward a diploma, and "... it does not appear that another year at Fallbrook
15  High School is the appropriate compensatory remedy." (Decision Conclusion of Law 30).

16      The District's offer of placement was the District's Transition program, which the
17  Decision correctly states cannot appropriately compensate Student because it will not allow
18  Student to work toward a diploma. The District withdrew its other, inappropriate offer of a
19  second senior year at Fallbrook High School. No other options were presented at Hearing except
20  for Fusion Academy, or social skills training with Dr. Cynthia Norall's group.

21      The U.S. Supreme Court case, *Burlington School Comm. v. Mass Dept of Ed.,* 471 U.S.
22  359 (1985) demonstrates the need for swift and appropriate relief, to avoid facing appeal, and
23  that " the review process is ponderous", and that "a final decision on the merits...in most
24  instances come a year or more after the school term covered by the IEP has passed." *Id.* at 370.

25      The IDEA directs the Court to "grant such relief it determines is appropriate." 20 U.S.C.
26  § 1415(e)(2). The type of relief is not further specified, except that it must be "appropriate."
27  This confers broad discretion on the court. *Id.* at 369.

28

Parents who have adequate means to unilaterally place their child in a private school that is "appropriate" to meet the child's needs when the District's placement offer was not appropriate, have the right to reimbursement. Here, the evidence and testimony of Student's mother showed that Fusion Academy was appropriate to meet Student's needs. If parents had the means to unilaterally place Student at Fusion Academy, he would have been working toward his diploma, and parents would be entitled to retroactive reimbursement. *Id.* at 370. However, where parents don't have the means, why should the child miss educational opportunities while the ponderous review process takes place? In the meantime, parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of the child if it turns out to be inappropriate, or pay for what they consider to be the appropriate placement." *Id.* at 370.

Simply put, if parents had the means, Student would be attending Fusion Academy in order to earn his diploma. There is no burden of proof regarding compensatory education. It is within the purview of the court to fashion this remedy in order to make Student whole. There was no documentary evidence that a school district cannot refer a student to Fusion Academy. To the contrary, Exhibit Q establishes that school districts do refer students, and, that Fusion is state accredited, well-staffed to meet Student's unique needs, and capable of conferring Student with a High School Diploma, as well as a full year of life skills. The evidence was clear that Student learned best in 1:1 or small groups. This is exactly what Fusion offers. The District, on the other hand, had Student in classes of thirty or more students which was problematic.

We are dealing with a sensitive, 18-year old young man, who desperately wants to be in school. The District failed Student, and parents found a remedy. Justice delayed is justice denied. In light of the fact that no other alternatives were suggested by the District (it adhered to its "take it or leave it" offer of a transition program), and it is the District, and the District alone who is charged with the duty to provide Student with a "free <u>appropriate</u> public education," which it failed to do, the remedy sought by Student is appropriate and should be awarded.

## II.

## CONCLUSION

The Decision is contrary to the letter and spirit of the law, is collusively deferential to the District and completely prejudicial to the Student's rights. The Decision should be modified to comport with the law, and to effectively provide a remedy within the broad discretion of OAH, without retaliation or diminution of compensatory education to Student as a result of this Motion.

Dated: November 21, 2007

Respectfully submitted,

Ellen Dowd, Attorney for
Petitioner, Christopher Struble

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0087p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

| | |
|---|---|
| BOARD OF EDUCATION OF FAYETTE COUNTY, KENTUCKY,<br><br>           *Plaintiff-Appellee,*<br><br>     *v.*<br><br>L.M., as legal guardian of T.D., a minor; L.M., on her own behalf; and T.D., by his legal guardian,<br>          *Defendants-Appellants.* | No. 06-5534 |

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 04-00266—Jennifer B. Coffman, District Judge.

Argued: February 2, 2007

Decided and Filed: March 2, 2007

Before: MARTIN, COLE, and GILMAN, Circuit Judges.

———————————

### COUNSEL

**ARGUED:** Marie Allison, ASSISTANT PUBLIC ADVOCATE, Lexington, Kentucky, for Appellants.  Robert L. Chenoweth, CHENOWETH LAW OFFICE, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Marie Allison, ASSISTANT PUBLIC ADVOCATE, Lexington, Kentucky, for Appellants.  Robert L. Chenoweth, CHENOWETH LAW OFFICE, Frankfort, Kentucky, for Appellee.

———————————

### OPINION

———————————

    RONALD LEE GILMAN, Circuit Judge.  This appeal is brought by a child with a disability within the meaning of the Individuals with Disabilities Education Act (IDEA). For the reasons set forth below, we **AFFIRM** the judgment of the district court insofar as it upheld the hearing officer's determination regarding the extent of the School District's violation of the IDEA, but **REVERSE** the court's affirmation of the compensatory-education award and **REMAND** the case with instructions to have the appropriate administrative body craft a remedy that complies with the IDEA.

# I.   BACKGROUND

T.D., a minor child, attended preschool and elementary school through the fourth grade under the jurisdiction of the Board of Education of Fayette County, Kentucky (the School District). He exhibited behavioral and academic problems beginning in kindergarten, but was not identified by the School District as a child with a disability within the meaning of the IDEA until May of 2003, just prior to the conclusion of T.D.'s fourth-grade school year. L.M., the child's legal guardian, requested a due process hearing pursuant to the IDEA, which was held by an impartial hearing officer in January of 2004. The hearing officer found that the child was denied a free appropriate public education (FAPE) for his third- and fourth-grade school years (2001-2002 and 2002-2003) due to the School District's failure to refer T.D. for special education after his second-grade year. To remedy this denial, the hearing officer awarded T.D. a compensatory-education package that included 125 hours of specified one-on-one instruction in reading and language skills.

The Exceptional Children's Appeals Board (Appeals Board) affirmed the hearing officer's finding that the child was denied a FAPE for the two years in question, but reversed the hearing officer's award of 125 hours of compensatory education in favor of a more fluid determination of appropriate compensatory education to be prepared by the child's Admissions and Release Committee (Committee). In Kentucky, this Committee is the equivalent of a student's Individualized Education Program (IEP) team under the IDEA.

T.D. was born in February of 1993 and attended elementary school in Fayette County from 1998 through 2003. He was referred for evaluation as a student with possible disabilities under the IDEA in January of 2003, during his fourth-grade school year. The School District conducted a comprehensive evaluation of T.D. shortly thereafter, and the Committee met on May 5, 2003 to review and act on the results of that evaluation. Among other things, the Committee determined that T.D. had been medically diagnosed with attention deficit hyperactivity disorder (ADHD) and that he also met the IDEA eligibility requirements for a reading disability.

The School District does not dispute T.D.'s eligibility under the IDEA. T.D. and his guardian, however, argued before the hearing officer that the School District should have referred T.D. for a disability evaluation under the IDEA's "child-find procedures" as early as kindergarten. Report cards from the first two grading periods of T.D.'s kindergarten year showed that T.D. struggled with behavioral and social skills, beginning language skills, and math. But by the end of T.D.'s kindergarten year, he was meeting expectations in all academic areas, even though he still exhibited behavioral problems. T.D.'s behavioral problems continued for the next three years, and he began experiencing severe academic problems as well. For example, his standardized test scores at the end of the second grade indicated that T.D. was reading "far below grade level" and was considered "at risk." His second-grade teacher requested assistance from a reading specialist and the school's psychologist, and discussed the possibility of a reading disability with the principal. The teacher did not, however, refer T.D. for a formal evaluation under the IDEA.

After T.D. completed the third grade, he was still reading far below grade level. The third-grade teacher recommended that T.D. repeat that grade. His guardian objected, however, and he was promoted to fourth grade. But T.D. attended summer school between the third and fourth grades under the School District's Extended School Services program.

In September of 2002, T.D.'s guardian notified the school that T.D. had been medically diagnosed with ADHD. The school principal then referred T.D. for an IDEA evaluation in November of that year. In February of 2003, the Committee determined that the referral was appropriate and warranted a full evaluation, which was completed in April of 2003. The Committee reviewed T.D.'s evaluation and met on May 5, 2003 to devise a plan of action. At the meeting, the Committee determined that T.D. met the eligibility requirements for special education due to several

disabilities, including his ADHD. The Committee held several meetings during May of 2003 to develop T.D.'s IEP. T.D.'s guardian, unhappy with the IEP as well as the timing of T.D.'s referral for special education, requested a due process hearing pursuant to the IDEA. The hearing officer conducted hearings throughout the fall of 2003 and rendered a written decision on January 30, 2004.

In her decision, the hearing officer concluded that the School District's failure to refer T.D. for a special-education evaluation in the second grade deprived him of a FAPE in the third and fourth grades: "This failure resulted in a loss of educational opportunity and constituted a denial of a FAPE." The hearing officer further concluded that the School District's failure to provide individualized Extended School Year (ESY) instruction during the summer of 2003 also constituted the denial of a FAPE. To remedy these violations, the hearing officer awarded T.D. 125 hours of compensatory education, consisting of one-on-one instruction in reading and language skills, as well as an "additional number of hours equal to the number of hours that [T.D.] would have been eligible for ESY, had the [Committee] considered and determined the need for ESY services in the Summer of 2003." Moreover, the hearing officer ordered the School District to invite T.D.'s private psychologist to the Committee meeting and to pay for the psychologist's attendance.

The School District appealed to the Appeals Board, which agreed with the hearing officer's factual findings but altered the remedy. Instead of requiring a certain number of hours of compensatory education, the Appeals Board "ordered T.D.'s [Committee] to prepare and carry out a plan for providing T.D. with compensatory education services and to meet as required to review and modify the plan, not less than once every twelve months, until the [Committee] determines that the award is fulfilled."

Unhappy with the Appeals Board's decision, the School District filed an action in federal district court, challenging the following two determinations made by the hearing officer and affirmed by the Appeals Board: (1) that T.D. was entitled to ESY instruction for the summer of 2003, and (2) that the School District pay for T.D.'s private psychologist to attend the Committee meeting. T.D. and his guardian asserted 11 counterclaims, 2 of which are the sole issues now on appeal: (1) that the School District denied a FAPE to T.D. during the 1999-2000 and 2000-2001 school years—T.D.'s first- and second-grade years, respectively—as well as during the summer of 2002, and (2) that the limited nature of the compensatory-education award with respect to the 2001-2002 and 2002-2003 school years and the summer of 2003 denied T.D. meaningful relief. The district court affirmed the Appeals Board's decision in its entirety. T.D. and his guardian timely appealed.

## II.    ANALYSIS

### A.    Standard of review

In a lawsuit brought to challenge an IDEA administrative finding, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). "The Supreme Court has construed this provision to mean that an initial reviewing court should make an independent decision based on the preponderance of the evidence but also should give 'due weight' to the determinations made during the state administrative process." *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)).

A district court thus reviews IDEA cases under a modified de novo standard, meaning that it may set aside administrative findings in an IDEA case "only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both."

*Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 519 (6th Cir. 2003) (citation and quotation marks omitted). More weight "is due to an agency's determinations on matters for which educational expertise is relevant." *Deal*, 392 F.3d at 849.

On appeal, we will reverse the district court's findings of fact only if they are clearly erroneous. *Id.* at 850. The district court's conclusions of law, however, are reviewed de novo. *Id.* Finally, "[m]ixed questions of law and fact, including the question of whether a child was denied a FAPE, are reviewed de novo," although the panel should accord "due deference to the state administrative hearing officer's decision." *Id.*

## B.    Timing of referral for IDEA eligibility

T.D. and his guardian first argue that the district court and the Appeals Board erred by failing to find that T.D. was denied a FAPE during the 1999-2000 and the 2000-2001 school years—his first and second grades. They also assert that T.D. was entitled to ESY instruction during the summer of 2002. The hearing officer found that the School District should have referred T.D. for evaluation in the second grade, and that the failure to do so resulted in the denial of a FAPE for only his third- and fourth-grade years. This finding was affirmed by both the Appeals Board and the district court.

The IDEA imposes a "child-find" requirement on the states: their schools must have policies and procedures in place to identify, locate, and evaluate children with disabilities who need special education and related services. 34 C.F.R. § 300.111(a)(1). Even children who are only suspected of having a disability, although they are progressing from grade to grade, are protected by this requirement. 34 C.F.R. § 300.111(c). T.D. and his guardian argue that the School District's failure to evaluate T.D. as early as kindergarten constituted a procedural violation of the IDEA child-find requirement that resulted in substantive harm to T.D.

A school district may be held liable for procedural violations of the IDEA that cause substantive harm to the student. *Metro. Bd. of Pub. Ed. v. Guest*, 193 F.3d 457, 464 (6th Cir. 1999). What a claimant must show to establish a procedural violation is a matter of first impression in this circuit. We now adopt the standard first articulated in *Clay T. v. Walton County Sch. Dist.*, 952 F. Supp. 817, 823 (M.D. Ga. 1997), which provides that the claimant "must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." This standard was also adopted by the district court below.

### 1.    First- and second-grade FAPE claim

The district court affirmed the Appeals Board's finding that the appropriate time for a referral was at the end of T.D.'s second-grade school year. It reasoned that "[i]t is difficult to assess whether a very young child is disabled or merely developing at a rate different from his peers, and the educational experts involved all seem to indicate that a hasty referral for special education can be damaging to a child." On appeal, T.D. and his guardian offer an exhaustive review of T.D.'s educational and behavioral problems in support of their contention that the School District ignored "clear signs" of his ADHD and reading disability as early as kindergarten. None of this evidence, however, is new information that the hearing officer did not already consider, nor does any of it show why the hearing officer's factual findings are clearly erroneous. An educational expert testified that T.D.'s performance in kindergarten should not have caused teachers to "jump to conclusions." The hearing officer, and later the Appeals Board, also gave due weight to expert testimony concluding that "the nature of ungraded primary school recognizes the progress of very young students is not uniform."



As the hearing officer noted, virtually all of the witnesses who testified at the due process hearing, including T.D.'s own expert, stated that T.D.'s difficulties would not necessarily indicate a disability or a need for special education, and that it would be inappropriate to rush to identify a child that young as disabled. School personnel similarly testified that T.D.'s behavioral and learning problems were not atypical of immature young boys.

The School District did not ignore T.D.'s early problems. It took appropriate action by implementing specialized reading instruction, Reading Recovery Program participation, and behavior-management strategies. Under the IDEA, the School District was required to provide a basic floor of educational opportunity consisting "of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 201. There is no additional requirement, however, "that the services so provided be sufficient to *maximize* each child's potential commensurate with the opportunity provided other children." *Id.* at 198 (citation and quotation marks omitted) (emphasis added). The School District provided additional services designed to aid T.D. in catching up to his peers in kindergarten and first grade, even though at that point he was not identified as being disabled within the meaning of the IDEA.

We agree with the district court that these services provided a basic floor of educational opportunity through T.D.'s second-grade school year. The interventions in kindergarten and first grade were moderately successful, at least during those years. By the end of kindergarten, for example, T.D. was meeting expectations in all academic areas. T.D. did not start to fall significantly below grade level until the middle of his second-grade year. No teacher suggested that he repeat a school year until after the third grade. In short, nothing in the record compels the conclusion that the School District either overlooked clear signs of disability before T.D. entered second grade or had no rational justification for failing to evaluate him prior to that time. *See Clay*, 952 F. Supp. at 823.

## 2.    *ESY instruction during the summer of 2002*

T.D. and his guardian also contend that T.D. was entitled to ESY instruction during the summer of 2002, following his third-grade year. In lieu of ESY, T.D. received summer school instruction through the School District's Extended School Services program. Extended School Services are available to students with or without disabilities. There is no evidence in the record regarding the nature of the instruction provided to T.D. that summer.

Under the IDEA, schools are required to provide Extended School Services as necessary in order to provide a child with a FAPE. 34 C.F.R. § 300.106(a). A school must provide these services, however, only if the child's IEP team determines that such services are necessary "for the provision of FAPE to the child." *Id.* But a claimant seeking an ESY must satisfy an even stricter test, because "providing an ESY is the exception and not the rule under the regulatory scheme." *Cordrey v. Euckert*, 917 F.2d 1460, 1473 (6th Cir. 1990). This court has held that the burden is on the claimant proposing an ESY to demonstrate, in a particularized manner relating to the individual child, that an ESY is necessary to avoid regression so severe that the child would not be able to catch up during the following school year. *Id.* "If the child benefits meaningfully within his potential from instruction under a proper IEP over a regular school year, then ESY service may not be required under the Act unless the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an ESY." *Id.* (brackets and quotation marks omitted). A claimant must show, in other words, that "an ESY is necessary to permit the child to benefit from his instruction." *See id.* (brackets and quotation marks omitted). Claimants can rely on expert opinion testimony to make this showing and are not required to present empirical proof of actual prior regression. *Id.* at 1471-72.

T.D. and his guardian have offered no evidence that the Extended School Services T.D. received in the summer of 2002 were in any way inappropriate or insufficient to meet his needs. They instead make a conclusory statement that the record "clearly establishes" that T.D. was in need of specialized ESY instruction during that summer. T.D. and his guardian also argue that because the hearing officer found that there was evidence of regression entitling T.D. to ESY instruction for the summer of 2003 (and that evidence of regression was cumulative from kindergarten on), *ipso facto* he was also entitled to ESY instruction during the summer of 2002. We reject this argument as inappropriate bootstrapping.

In any event, as noted by the district court, because T.D. has already received an award of compensatory education, a further award "based on the School District's failure to identify T.D. as a child with a disability after T.D.'s second-grade year would be premature at this point." T.D. and his guardian have failed to demonstrate that T.D. needed ESY instruction (instead of the Extended School Services that he did receive) during the summer of 2002 in order to benefit from the instruction provided to him during the previous school year. The hearing officer found that T.D.'s regression was cumulative from kindergarten on, but did not find that the regression during the summer of 2002 was severe enough to warrant the award of an ESY. T.D. and his guardian have offered no evidence in support of their claim to the contrary. Because T.D. and his guardian have not met their burden of showing why the exceptional remedy of ESY instruction was necessary, we will not disturb the district court's ruling on this ground.

## C.    Procedure for determining a compensatory-education award

In fashioning a remedy for the School District's denial of a FAPE for T.D.'s third- and fourth-grade school years, as well as for the summer following his fourth-grade year, the Appeals Board ordered T.D.'s Committee to prepare a plan for providing compensatory education to the student. The Appeals Board also ordered the Committee to meet periodically, not less than once every 12 months, to review and modify the plan until the Committee determines that the compensatory-education award had been fulfilled.

On appeal, T.D. and his guardian argue that this remedy is "vague, unenforceable," and "allows the school district to determine the remedy for its wrongdoing." They instead seek hour-for-hour compensation for each hour of the school day for the four years that T.D. was allegedly denied a FAPE (1,050 hours per year), plus hour-for-hour compensation for the alleged denial of specialized ESY instruction during the summers of 2002 and 2003 (325 hours per summer). Because we agree with the district court that T.D. was denied a FAPE for two years plus one summer, an hour-for-hour award would equal 2,425 hours (1,050 hours per year for two years plus 325 hours for the summer of 2003).

An award of compensatory education is an equitable remedy that a court can grant as it finds appropriate. 20 U.S.C. § 1415(i)(2)(C)(iii); *see also Park ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1034 (9th Cir. 2006) ("The courts have discretion on how to craft the relief and there is no obligation to provide a day-for-day compensation for time missed.") (citation and quotation marks omitted). We review the award granted by the Appeals Board and affirmed by the district court under an abuse-of-discretion standard. *See Park*, 464 F.3d at 1033.

The Appeals Board awarded compensatory-education services that it deemed sufficient to remedy the denial of a FAPE to T.D. for two years—covering his third and fourth grades—plus an additional award of time to cover the ESY instruction that he was entitled to but denied during the summer of 2003. Instead of ordering a specific number of hours as the hearing officer had done, however, the Appeals Board left it to T.D.'s Committee to determine the particular services necessary to remedy the denial of his FAPE. The Appeals Board reasoned that the total number of hours awarded was less important than "the amount of extra services that [T.D.] will receive in a

specific week, or over school breaks and the form of such services." In affirming the award, the district court described the plan as "innovative and likely to be more tailored to T.D.'s needs than an award of a particular number of hours predetermined without benefit of observing T.D.'s progression."

We agree with the district court and the Appeals Board that a flexible approach, rather than a rote hour-by-hour compensation award, is more likely to address T.D.'s educational problems successfully. *See Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005) (rejecting an hour-for-hour compensatory-education award in favor of a more flexible approach because some students may need only "short, intensive compensatory programs" while others may need extended programs that would exceed "hour-for-hour replacement of time spent without FAPE"). An appropriate award of compensatory education is "relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Parents of Student W. v. Puyallup Sch. Dist.*, No. 3, 31 F.3d 1489, 1497 (9th Cir. 1994).

T.D. may well need more than the 125 hours of compensatory education initially awarded by the hearing officer, but nothing in the record suggests that he needs hour-for-hour compensation in order to catch up to his peers. No one disputes that T.D. is a child of at least average intelligence. He has been shown to have an IQ score of 105. On the other hand, T.D.'s counsel stated at oral argument that this child reads at only a fifth-grade level despite the fact that he is now in the seventh grade. Although we are dismayed that no one has yet acted to remedy this deficiency during the two and a half years of pending litigation, we find no basis to claim that T.D., a child of average intelligence, needs over 2,400 hours of remedial instruction in order to arrive on an equal footing with his classmates. Such an award, in the absence of strong evidence in the record suggesting that so drastic a remedy is necessary, would border on punishment to the School District rather than an equitable remedy for a child in need. *See Reid*, 401 F.3d at 518 ("[C]ompensatory awards should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA.").

T.D. and his guardian also object to the Appeals Board's resolution on the basis that remanding the details of the compensatory-education award to T.D.'s Committee improperly allows the School District to determine the remedy for its own wrongdoing. This raises the fundamental issue of whether the details of a compensatory-education award can be remanded to the Committee and still comply with the statutory scheme of the IDEA. We review issues of statutory construction de novo. *United States v. Blood*, 435 F.3d 612, 618 (6th Cir. 2006). Although there is no Sixth Circuit precedent on point, a recent case from the District of Columbia Circuit, *Reid, supra*, is instructive.

In *Reid*, the hearing officer awarded the student in question 810 hours of compensatory education to remedy the school district's denial of a FAPE for four and a half years. 401 F.3d at 518. He also vested the student's IEP team with the power to reduce or discontinue compensatory services if and when the IEP team determined that the student either no longer needed or was no longer benefitting from the compensatory education. *Id.* Specifically, "[t]he team's decision that [the student] no longer needs or is not benefitting from this award of compensatory education services will terminate this award." *Id.* at 520. The district court affirmed. *Id.* On appeal, the District of Columbia Circuit reversed the district court's ruling, holding that, under the IDEA, hearing officers may not authorize IEP teams to reduce or discontinue awards of compensatory education. *Id.* at 526.

The *Reid* court began its analysis by noting that "IDEA due process hearings 'may not be conducted by an employee of the State educational agency or the local educational agency involved in the education or care of the child.'" *Id.* (citing 20 U.S.C. § 1415(f)(3)). An IEP team, in contrast, is statutorily *required* to include a representative of the local educational agency. 20 U.S.C. § 1414

(d)(1)(B)(iv). Because the IEP team was delegated the power to reduce or terminate the compensatory-education award initially set by the hearing officer, the court held that "the IEP team would in effect exercise the officer's powers." *Reid*, 401 F.3d at 526. "In sum, while the IEP team certainly must monitor [the student's] progress and coordinate compensatory relief with his current IEP, a delegation that permits the team to reduce or terminate his awarded amount of compensatory education exceeds the statute's bounds." *Id.* at 527. The fact that the IEP team was also comprised of nonemployees, including the student's mother, did not change the court's ultimate conclusion. *Id.* at 526. "Under the statute, the hearing officer may not delegate his authority to a group that includes an individual specifically barred from performing the hearing officer's functions." *Id.*

Certainly one could make the argument that because an IEP is comprised of a number of individuals, only one of which must be a representative from the School District, that the School District does not have control over the actions of the IEP team and therefore is not really performing the hearing officer's functions. But we believe that the *Reid* court takes the better approach, creating a clean and clear separation by barring altogether an IEP team's power to terminate a compensatory-education award. Under the statute, an IEP team consists of the disabled child's parents, at least one of the child's regular education teachers, at least one special education teacher of the child, a representative of the local educational agency (here, the School District), "an individual who can interpret the instructional implications of evaluation results," other individuals who have knowledge or special expertise regarding the child, and finally, "whenever appropriate, the child with a disability." 20 U.S.C. § 1414 (d)(1)(B). When the child is still enrolled in the school district that caused the violation, then, his IEP team may consist of three or more employees of that school district—potentially half of the IEP team. T.D. is not currently enrolled in the School District, so the possibility of the School District exerting an undue influence in his particular case is not great, but we decline to approve a practice that might have such an impermissible effect in the future. We therefore hold that neither a hearing officer nor an Appeals Board may delegate to a child's IEP team the power to reduce or terminate a compensatory-education award.

In the present case, the Appeals Board awarded "[t]wo years of compensatory education for the District's delay in identifying and providing education services to the student," as well as an additional award to compensate for the ESY instruction that T.D. should have received in the summer of 2003. The Appeals Board also authorized T.D.'s Committee to determine when the compensatory education award has been fulfilled. As previously noted, an Admissions and Release Committee in Kentucky is synonymous with an IEP team. *See* 707 Ky. Admin. Regs. 1:320. This case is therefore materially indistinguishable from *Reid*. Because we believe that *Reid* was correctly decided, we reverse the compensatory-education award and remand the case to the district court with instructions to reconsider the remedy awarded in a manner consistent with the foregoing analysis.

## III.    CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court insofar as it upheld the hearing officer's determination regarding the extent of the School District's violation of the IDEA, but **REVERSE** the court's affirmation of the compensatory-education award and **REMAND** the case with instructions to have the appropriate administrative body craft a remedy that complies with the IDEA. .

EXHIBIT 18

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of:<br><br>STUDENT,<br><br>                Petitioner,<br><br>v.<br><br>FALLBROOK UNION HIGH SCHOOL<br>DISTRICT,<br><br>                Respondent. | OAH CASE NO. N2007090067<br><br>ORDER DENYING STUDENT'S<br>MOTION FOR MODIFICATION OF<br>DECISION |

On November 20, 2007, the Office of Administrative Hearings, Special Education Division (OAH) issued a Decision in the above-entitled case. On November 20, 2007, Student filed a Motion for Modification of Decision. On November 21, 2007, Student filed a Supplement to Motion for Modification of Decision. On November 30, 2007, the District filed an opposition to Student's motion.

Student objects to the Decision for two reasons. First, Student objects that the Decision made findings as to all of the issues that Student raised in Student's due process complaint, rather than only making findings as to the procedural issues on which Student prevailed. Student also objects to the Decision because it did not, as a compensatory education remedy, order the District to prospectively place Student at the Fusion Academy.

DISCUSSION

Student provides no statutory or case authority that provides for a "Motion for Modification of Decision." However, based on Student's arguments, it appears that Student's motion is intended to be a Motion for Reconsideration of the Decision. OAH will generally reconsider a ruling upon a showing of new or different facts, circumstances or law justifying reconsideration, when the party seeks reconsideration within a reasonable period of time.

Student has provided no new or different facts, circumstances or law. Student presents no evidence or authority to show that the Fusion Academy is a certified non-public school within the meaning of Education Code section 56505.2, subdivision (a). At hearing,



Student chose to present the Fusion Academy as Student's only proposal for compensatory education. Student's own moving papers admit that "No other options were presented at Hearing except for Fusion Academy...."[1] Student provides no legal authority to show that referral to an IEP team (with directions to guide the team) was inappropriate when Student failed to present evidence of an appropriate compensatory remedy.

The case of *Board of Education of Fayette County v. L.M.* (6th Cir. 2007) 478 F.3d 307, cited by Student, does not provide such authority. In that case, the hearing officer had awarded a certain amount of compensatory education which was later taken away on appeal. That case does not address a situation in which the party with the burden of proof chooses to present evidence of only one possible remedy which is not an appropriate remedy as a matter of law.[2]

Student also cites no new facts, circumstances, or law to support Student's argument that the Decision should not have addressed all of the issues raised in Student's due process complaint. There is no basis for reconsideration of the Decision.

ORDER

Student's motion is denied.

Dated: December 6, 2007

SUSAN RUFF<br>
Administrative Law Judge<br>
Office of Administrative Hearings<br>
Special Education Division

---

[1] Student's moving papers also state that a social skills group was suggested at hearing as an appropriate compensatory remedy. However, neither Student's initial due process complaint nor Student's written closing argument requested that remedy. Even if that remedy had been raised at hearing, Student makes no showing of how that remedy would assist Student in working toward a diploma. It is not appropriate for compensatory education.

[2] The Decision in the instant case, unlike the one in the *L.M.* case, does not leave unfettered discretion in the hands of the IEP team, but instead directs the IEP team to fashion a program that will provide Student with the opportunity to work toward a high school diploma. It also provides guidance to the team by finding that placement in the District's transition program or placement at Fallbrook High School for another year would not be appropriate to provide the compensatory education that Student requires.

2



OFFICE OF ADMINISTRATIVE HEARINGS

State of California

2349 Gateway Oaks Drive, Suite 200, Sacramento, CA 95833-4231
General Jurisdiction – (916) 263-0550 phone / (916) 263-0554 fax
Special Education – (916) 263-0880 phone / (916) 263-0890 fax
www.oah.dgs.ca.gov

Department of General Services

December 7, 2007

Ellen Dowd, Esq.
Special Education Law Center
2658 Del Mar Heights Road #228
Del Mar, California 92014

Sharon Watt, Esq.
Filarksy & Watt, LLP
408 Bryant Circle, Suite C
Ojai, California 93023

RE:    *Christopher Struble v. Fallbrook Union High School District,*
       OAH Case No. 2007090067

Dear Ms. Dowd and Ms. Watt:

I have reviewed Ms. Dowd's November 30, 2007 letter in which she requests that I modify Administrative Law Judge Susan Ruff's decision in the above referenced case, as well as Ms. Watt's December 4, 2007 letter opposing that request.

I know of no legal authority, nor was any cited, which allows me to reconsider or modify a decision that has been issued by an administrative law judge. Accordingly, the request is denied. In denying this request I am making no determination as to the merit of the substantive legal allegations, or the propriety of Judge Ruff either granting or denying a request to reconsider her decision in this matter.

At this point, I am forwarding your correspondence to Judge Ruff who can rule upon the propriety and merit of Ms. Dowd's request.

I would also remind the parties that they have the right to appeal the matter to a court of competent jurisdiction.

---

Regional Offices

| Los Angeles | Oakland | San Diego | Laguna Hills | Van Nuys |
|---|---|---|---|---|
| 320 West Fourth Street | 1515 Clay Street | 1350 Front Street. | 23046 Avenida De La Carlota | 15350 Sherman Way |
| Suite 630 | Suite 206 | Suite 6022 | Suite 750 | Suite 300 |
| Los Angeles, CA 90013 | Oakland, CA 94612 | San Diego, CA 92101 | Laguna Hills, CA 92653 | Van Nuys, CA 91406 |
| (213) 576-7200 | (510) 622-2722 | (619) 525-4475 | (949) 598-5850 | (818) 904-2383 |
| Fax (213) 576-7244 | Fax (510) 622-2743 | Fax (619) 525-4419 | Fax (949) 598-5860 | Fax (818) 904-2360 |

Subject: *Christopher Struble v. Fallbrook Union High School District,*
         OAH Case No. 2007090067
December 07, 2007
Page 2


Thank you for bringing to my attention the underlying legal issue for which modification is sought.  I will bring this interesting legal issue to the attention of the Presiding Administrative Law Judges so that future training on that subject may be conducted.

Sincerely,

Ronald Diedrich
Director and Chief Administrative Law Judge
Office of Administrative Hearings
State of California

cc:     Susan Ruff, Administrative Law Judge
        Timothy Newlove, Presiding Administrative Law Judge
        Shane Berli, California Department of Education

**EXHIBIT 20**

# Subpoena Information

**OAH Subpoenas cannot be used in CSLB Arbitrations.**

**I want to receive copies of records held by an agency for my administrative hearing. How do I get them?**

You may request documents from an agency informally before your hearing.

You may also *subpœna* records from an agency to be produced at your hearing. A *subpœna duces tecum* means "bring with you under penalty of law" and compels an agency bring records that they have and to verify to the court that the documents or records have not been altered. The agency may do this by declaration or by direct testimony, as you require.

**The form on the internet is not signed. Can I sign it?**

Only the Office of Administrative Hearings or attorneys licensed in California acting on behalf of a party may sign a *subpœna*. If you are proceeding without an attorney, contact the regional Office of Administrative Hearings closest to you for a form signed by an Administrative Law Judge.

**What laws should I look at before sending a *subpœna* or a *subpœna duces tecum*?**

Code of Civil Procedure sections 1985-1987
Government Code sections 11450.05-11450.50, 68092.5-68093, and 68096.1-68097.10.

**I have received a *subpœna* to be a witness in a case. Can I be paid?**

Yes, according to Government Code Sections 11450.05 and 11450.50, you may request witness fees and mileage actually traveled both ways. You may request payment in advance of the hearing from the party at whose request the *subpœna* or *subpœna duces tecum* is issued.  *See Government Code sections 11450.05, 11450.50, 68092.5-68093, and 68096.1-68097.10.*

**Where do I find the forms?**

You can find the forms here