**EXHIBIT 5**

| Training Title | Presenter | Date | SE Hours | Med Hours | ALJ Hours | Materials |
|---|---|---|---|---|---|---|
| Audits & Audit Appeals | Art Lee | November 8, 2005 | .5 | | | |
| Advanced Administrative Law | National Judicial College | June 25, 2007 to June 28, 2007 | | | 32 | |
| ALJ Receiving Gifts | Scott Hallabrin | November 16, 2007 | | | 1.5 | ✓ |
| ALJ Ability to Order Assessments | Michael Herscher | March 3, 2008 | 1.25 | | | |
| Applied Behavior Analysis Demonstration | Hope Consulting | January 8, 2007 | 2.5 | | | |
| Aspects of Judging | Hon. Judy Herscher | November 14, 2007 | | | 1 | |
| Autism and 5th Category | Ron Huff, PhD | November 8, 2005 | 1 | | | |
| Autism in the Schools | Connie Kasari | April 7, 2008 | 1.25 | | | |
| Autism is a World | Video | Various | 1.5 | | | |
| Autism Programs | Doreen Lohnes, Marilyn Nehrbass, Debbie Woods | October 15, 2007 | 2.5 | | | ✓ |
| Autism Spectrum Disorder | Dr. John Brown | November 15, 2007 | 1 | | | |
| Basics of Psycho educational Testing | Professor Rona Leitner, CSUS | November 7, 2006 | 3.25 | | | |
| Basics of Psychometric Testing | Professor C. Christo, | November 7, | 3.75 | | | |

1

| | | 2006 | | | | | |
|---|---|---|---|---|---|---|---|
| BIPs v. BSP | CSUS ALJ Skarda | May 1, 2006 | 1 | | | | |
| Chandra Smith Modified Consent Decree | LAUSD | October 1, 2007 | 1.25 | | | | ✓ |
| Child Protective Services | Carol Christman | July 9, 2007 | 1.25 | | | | |
| Child Find/Assessment/Eligibility | PALJ Laba | February 27, 2008 | 2 | | | | |
| Conducting an Administrative Hearing | ALJ Hoover | September 12, 2005 | | 4 | | | |
| Cochlear Implants | Susan English | October 30, 2006 | 2.5 | | | | |
| Continuance Motions and PHCs | ALJ Laba | July 5, 2006 | 1.25 | | | | |
| Comprehensive Mediation Training | Nancy Yeend, The John Paul Jones Group | May 15, 2006 to May 19, 2006 | | 42 | | | ✓ |
| Conducting an Administrative Hearing | National Judicial College | October 17, 2005 to October 21, 2005 | | 40 | | | |
| Controlling the Courtroom | VHS tape American Bar Association | November 16, 2006 | 6 | | | | |
| Current Issues in Ethics | Professor Gregory Ogend, Pepperdine University | November 9, 2005 | | 2 | | | |
| Decision Writing Training | PALJ Engeman | August 7, 2006 | 3 | | | | |
| Decision Writing Training | PALJ Engeman | December 21, 2005 | 2 | | | | |
| Decision Writing Training | PALJ Engeman | May 8, 2006 | 3 | | | | |

2

| | | | | | | |
|---|---|---|---|---|---|---|
| Decision Writing Training | ALJ Laba | August 28, 2006 | 5 | | | |
| Decision Writing Training | ALJ Laba | August 29, 2006 | 5 | | | |
| Decision Writing Training | ALJ Laba | September 5, 2006 | 3 | | | |
| Decision Writing Training | Assistant Chief Lew and PALJ Engeman | May 15, 2006 | 3 | | | |
| Defensive Driving | DGS | March 20, 2008 | | | 3.5 | |
| Determining SLD | ALJ Laba | May 1, 2006 | .5 | | | ✓ |
| Determining Attorney Fees/Effect on Med | ALJ Skarda | August 7, 2006 | | 1.25 | | |
| Discipline and Remedies | PALJ Laba | March 17, 2008 | 2 | | | |
| Digital Recording Training | IT | March 6, 2005 | | | 2 | |
| Digital Recording Training | IT | March 23, 2006 | | | 2 | |
| Digital recording Training | IT | April 18, 2006 | | | 2 | |
| Digital Recording Training | IT | March 17, 2008 | | | 1 | |
| Dispute Resolution Principles & Techniques | American Bar Ass. | August 9, 2007 | 3 | | | ✓ |
| Early Start | Rick Ingraham, Manager, Children and Family Services | November 8, 2005 | 1.5 | | | |

3

| | Branch, DDS | | | | | |
|---|---|---|---|---|---|---|
| Ethics Orientation for State Offices | California Attorney General – Internet | Various 2006 | | | 2 | |
| Ethics Orientation for State Offices | California Attorney General – Internet | Various 2007 | | | 2 | |
| Evidence-Based Social Interventions at School | Connie Kasari, Ph.D. | April 7, 2008 | 1.5 | | | |
| Facilitation Skills | PTS | March 4, 2008 to March 6, 2007 | | | 24 | |
| FAPE and LRE | ALJ Brown | February 29, 2008 | 2 | | | |
| Funding for Profit Out of State Placements | State Department of MH | December 3, 2007 | 1.25 | | | |
| Hearing Room Control and Demeanor | Timothy Hallihan/ALJ Cohn | November 8, 2005 | | | 1 | |
| History of IDEA | PALJ Laba | February 25, 2008 | 2 | | | |
| How to Conduct a Pre Hearing Conference | PALJ Engeman and ALJ Hoover | October 6, 2005 | | | 2 | |
| How to Conduct a Pre Hearing Conference | ALJ Scarlett | November 14, 2005 | | | 3 | |
| How to Conduct and Administrative Hearing | ALJ Hoover | September 6, 2005 | | | 4 | |
| IDEA Basic Training | ALJ Skarda | April 19, 2006 | 6.5 | | | ✓ |
| IDEA Basic Training | ALJ Skarda | April 20, 2006 | 7 | | | ✓ |

4

| | | | | | |
|---|---|---|---|---|---|
| IDEA Basic Training | ALJ Skarda | May 1, 2006 | 6 | | ✓ |
| IDEA Regulations | Art Cenosia | January 30, 2007 and January 31, 2007 | 12 | | |
| IDEA Special Education Training | ALJ Skarda | November 1, 2005 | 6 | | |
| IDEA Special Education Training | ALJ Skarda | November 2, 2005 | 6 | | |
| Identification of the Emotionally Disturbed Child | Terry Tibbetts, Ph.D. | February 4, 2008 | 1.25 | | ✓ |
| Issues in Special Education Case | PALJ Engeman/ALJ Skarda/Laba | May 1, 2006 | 3 | | |
| Issues in Special Education Case | ALJ Laba | September 5, 2006 | 1 | | |
| Interim placements and Stay Put | ALJ Brown | November 9, 2005 | 1.25 | | |
| Judicial Writing | National Judicial College | March 26, 2006 to March 30, 2006 | | 40 | |
| Judicial Writing | National Judicial College | March 28, 2006 | | 7 | |
| Judicial Writing | National Judicial College | March 29, 2006 | | 7 | |
| Judicial Writing | National Judicial College | March 30, 2006 | | 7 | |
| Judicial Ethics | ALJ M. Anderson | November 6, 2006 | | 3.75 | |

5

| Judging Judges | Hon. Arthur Gilbert | November 7, 2006 | | 1 | |
|---|---|---|---|---|---|
| Lanterman Developmental Services Act | Ruth Janka | January 7, 2008 | 1.25 | | |
| Leadership for Government Executives | CSUS | November 2, 2007 | | 8 | |
| Leadership for Government Executives | CSUS | December 5, 2007 | | 8 | |
| Leadership for Government Executives | CSUS | January 11, 2008 | | 8 | |
| Leadership for Government Executives | CSUS | February 1, 2008 | | 8 | |
| Leadership for Government Executives | CSUS | March 7, 2008 | | 8 | |
| Leadership for Government Executives | CSUS | April 4, 2008 | | 8 | |
| Leadership for Government Executives | CSUS | May 2, 2008 | | 8 | |
| Leadership for Government Executives | CSUS | June 6, 2008 | | 8 | |
| Least Restrictive Environment | ALJ Skarda | November 9, 2005 | 1.25 | | |
| Legal Update for ALJs in Special Education | Perry Zirkel Ph. D. | November 15, 2007 | 3 | | |
| LRP's National Institute on Legal Issues of Educating Individuals with Disabilities | LRP | April 22, 2007 to April 25, 2007 | 32 | | ✓ |
| Managing the Hearing | OAH ALJ's | January 9, 2007 | | 6 | |
| Managing Skills for Presiding Judges | National Judicial College | June 26, 2006 to June 30, | | 40 | |

6

| | | | | |
|---|---|---|---|---|
| Managing Skills for Presiding Judges | National Judicial College | 2006 | | | |
| | | June 25, 2007 to June 29, 2007 | | 40 | ✓ |
| Mediating the Litigated Case | Pepperdine University, Strauss Institute | August 20, 2007 to August 25, 2007 | | 48 | |
| Mediation for Administrative Law Judges | National Judicial College | October 24, 2005 to October 28, 2005 | | 40 | ✓ |
| Mediation Refresher | Nancy Yeend | November 8, 2006 | | 4.25 | |
| Mediation Update | Nancy Yeend, The John Paul Jones Group | November 9, 2005 | | 6.5 | |
| Meet you at the Crossroads | DGS | March 6, 2006 | | | 8 |
| Meet you at the Crossroads | John Adkisson/ Luis Cespedes | June 22, 2006 | | | 8 |
| Meet You at the Crossroads/ All Together Now | Luis Cespedes | November 14, 2007 | | | 8 ✓ |
| Mental Health Issues | Maureen McCaustland | March 12, 2007 | 1.25 | | |
| Multiple Regression and Forecasting | CSUS | March 29, 2007 | | | 8 |
| Multiple Regression and Forecasting | CSUS | April 5, 2007 | | | 8 |
| National Academy for IDEA | Seattle University | May 15, 2007 to May 18, 2007 | 32 | | ✓ |

7

| Activity | Presenter / Location | Date | | | | Check |
|---|---|---|---|---|---|---|
| National Special Education ALJ and Mediator Training | University of San Diego, School of Law | March 10, 2008 to March 14, 2008 | 36.5 | | | |
| Observe and Conduct GJ Hearings and Write Decision | | Ongoing | | | | |
| Observe SE Matter | | Ongoing | | | | |
| Operation of CMH Agencies and Provision of Mental Health Services | Paul McIver | January 8, 2007 | 1 | | | |
| Out of State Residential Placement of 3632 Children | Joe Todd/ Stacey Wofford | December 3, 2007 | 1.25 | | | ✓ |
| Overview of Legal Issues in Special Education | ALJ Laba, ALJ Skarda and PALJ Engeman | May 8, 2006 | 3 | | | |
| Overview of Special Education Law and IDEA | PALJ Karl Engeman and ALJ Marilyn Woollard | August 15, 2005 to August 18, 2005 | 32 | | | |
| Overview of Special Education Law and IDEA | PALJ Karl Engeman and ALJ Marilyn Woollard | August 21, 2005 to August 24, 2005 | 32 | | | ✓ |
| PM, PAL and Travel | ALJ Johnson | February 26, 2008 | | 2 | | |
| Philosophy of Judging through Literature | Hon. Arthur Gilbert | November 13, 2007 | | 2.25 | | |
| Privacy Protection Training | Hon. James Brandlin | November 9, 2006 | | 4.25 | | |
| Procedural Safeguards | PALJ Laba | March 17, 2008 | 2 | | | |

8

| | | | | |
|---|---|---|---|---|
| Regional Center 101 | Brian Winfield, Chief Regional Center Operations, DDS | November 8, 2005 | 1 | |
| Remedies | ALJ Brown | March 18, 2008 | 1.5 | |
| Review SE Training Materials/ Case Law | | Ongoing | | ✓ |
| Role of the COE and SELPA | Sam Neustadt | September 10, 2007 | 1.25 | |
| Role of Regional Centers | LANCRC | January 7, 2008 | 1.25 | |
| Ruling on Notice of Insufficiency | PALJ Engeman | November 4, 2005 | 2 | |
| Ruling on Notice of Insufficiency | PALJ Engeman and ALJ Hoover | March 6, 2006 | 2 | |
| SE Motion Work | | Ongoing | | |
| Security Awareness | Internet | Various | 1 | |
| Santa Ana USD Autism Programs | Santa Ana USD/ Doreen Lohnes | October 15, 2007 | 2.5 | |
| Special Education Discussion Panel | | November 8, 2005 | 4 | |
| Special Education Discussion Panel | | November 8, 2006 | 3.75 | |
| Special Education Discussion Panel | Wendy Byrnes, Kathryn Dobel, Sam Neustadt, Karen Samman, Bill Tollestrup, Valerie Vanaman, Jim Wright, Perry A. Zirkel | November 15, 2007 | 4.5 | ✓ |

9

| Title | Presenter | Date | | | | |
|---|---|---|---|---|---|---|
| Special Ed. from Fed Perspective | Hon. Morrison Englund | November 8, 2006 | 1 | | | |
| Specific Learning Disability "Then, Now and Future" | Robert Patterson, Psy.D. | June 21, 2007 | 1.25 | | | ✓ |
| Speech and Language Presentation | Jane deGelleke | February 5, 2007 | 1.5 | | | ✓ |
| Statue of Limitations | ALJ Laba | May 1, 2006 | .5 | | | |
| Strategies for Handling pro per Litigants | ALJ Sarli | November 9, 2005 | | | 1 | |
| Strategies for Handling Difficult Attorneys/Contempt | | November 9, 2006 | | | 3.5 | ✓ |
| Strategies in Handling Difficult Attorneys and Parties | | January 8, 2007 | | | | |
| Student Discipline | Sherianne Laba | November 9, 2005 | 1.5 | | | |
| Sound and the Fury | Video | October 30, 2006 | 1.5 | | | |
| Teaching Students with Autism Spectrum Disorders | Educational Resources Services | January 29, 2007 to January 30, 2007 | 2.50 | | | ✓ |
| Teaching Students with Developmental Disorders | Dr. Shawn Stewart | January 30, 2008 | 6 | | | |
| The Orange County Juvenile Court System and the Handling of Spec. Ed. Children in the System | Superior Court Judge Robert Huston | September 10, 2007 | 2 | | | ✓ |
| The Philosophy of Judging Through Literature | Hon. Arthur Gilbert, | November 13, 2007 | | | 2.5 | ✓ |
| The Role of vision in Learning and Academic Achievement | Robert B. Sanet, O.D. | March 7, 2007 | 2 | | | ✓ |
| Understanding Govt Code Section 7586 | ALJ Kopec | August 7, 2006 | 1.25 | | | |

10

| | | | | | |
|---|---|---|---|---|---|
| Using Practice Manager | PALJ Laba/Phoenix Vigil | March 7, 2008 | | 4 | |
| Vision Therapy/Peer Review Research | ALJ Laba/Brown | June 5, 2006 | 2.5 | | |
| What do you do When…? | | November 16, 2007 | | 1.5 | |
| What you Should Know as a Kelly Officer | DGS | October 30, 2007 | | 8 | |
| Working with Pro Per Parents | | January 7, 2008 | 3 | | ✓ |

11

# EXHIBIT  6

OFFICE OF ADMINISTATIVE HEARINGS
NOVEMBER 2006 CONFERENCE

# SPECIAL EDUCATION DISCUSSION PANEL



## PANEL DISCUSSION TOPICS

1.  Law and Motion practice
    a.     Does OAH have the authority to hear pre-hearing motions other than notices of insufficiency that may be dispositive of a case, such as motions to dismiss or for summary judgment?
    b.     If such motions are going to be heard, what should be the extent of proof required?  Should motions only be entertained if they are based on pure legal arguments (such as a motion to dismiss) or should motions supported by evidence (such as an MSJ) be entertained?

2.  What is left of *Pardini v. Allegheny Intermed. Unit* (3rd Cir. 2005) 420 F.3d 181, after the adoption of new federal regulation 34 C.F.R. § 300.518(c)?

3.  What is the legal standard for the development of IEP goals and objectives?

4.  Remedies
    a.     What type of proof is required at hearing to support an order of monetary remedies?  Can the ALJ simply order the prevailing parents to submit receipts to the school district subsequent to the hearing or must specific evidence be presented in support of the reimbursement request?
    b.     What are the parties' obligations to provide evidence, including expert testimony, regarding the parameters of a request for compensatory education?

EX. 6
109

5. Statute of Limitations
    a.   Is it jurisdictional or must it be raised by the opposing party?
    b.   If it must be raised by the opposing party, are there any time limitations for doing so?

6. Unofficial tape-recording of hearings
    a.   Why do parties tape-record a proceeding?
    b.   The actual or potential legal ramifications of tape-recording hearings, including applicable civil and criminal statutes?
    c.   Should the practice be barred? If not, what, if any, suggestions does the panel have for ALJ'S regarding parameters for the recording?

7. Relevance, if any, of events which post date the due process request filing
    a.   Relevance if offered as evidence to remedies sought?
    b.   If the evidence appears to deal with events such as a subsequent IEP offer or subsequent agreements, should amendment of the due process request be required?

8. What is the effect, if any, of a settlement agreement on allegations of subsequent IDEA violations?

9. Issue of "reasonably calculated to provide educational benefit"
    a.   Is expert testimony required to prove the issue?
    b.   If so, who are the appropriate experts?
    c.   On what type of information/criteria should their expert opinion be based?

10. Expert Testimony in General
    a.   What should an ALJ consider in evaluating an expert's testimony?
    b.   How should an "expert" be determined; e.g., does the Evidence Code apply to that determination?
    c.   How does the requirement for peer – reviewed research affect expert testimony?

11. What degree of nexus, if any, needs to be established in the due process request between the problem(s) presented by petitioner and the proposed resolution?

12. Procedural Issues
    a.   Format of due process requests: are they too detailed or not detailed enough?
    b.   When, if ever, is a motion for stay-put necessary?
    c.   Compliance with pre-hearing orders?
    d.   Compilation of evidence: should the parties be required to submit one joint exhibit notebook?
    e.   Any complaints with the present format of ALJ decisions?

13. Are County Departments of Mental Health proper respondents in special education due process proceedings? Does OAH have jurisdiction over them?

14. OPEN FORMAT FOR QUESTIONS/ANSWERS

EX. 6
110

## PARTICIPANT BIOGRAPHIES

## THE ATTORNEYS:

**Christopher J. Fernandes** is a partner in the San Diego area office of Fagen Friedman & Fulfrost, LLP. Mr. Fernandes has practical school law experience in the areas of special education, student issues, labor and employment, charter schools, and real property. In his practice, he focuses primarily on special education and student issues. Mr. Fernandes has successfully argued before the Ninth Circuit Court of Appeals and has experience defending school districts in federal and state civil rights actions, mediations, and administrative proceedings such as expulsions, dismissals, and due process hearings. Prior to joining the firm, Mr. Fernandes completed an internship with the San Diego Unified School District's Office of General Counsel. He also worked for the San Diego County Office of Education, serving in the positions of Credentials Technician, STRS Accounting Clerk, and Teacher's Assistant for the Juvenile Court and Community Schools.

Mr. Fernandes has contributed to reports published in the California Regulatory Law Reporter, produced by the Center for Public Interest Law at the University of San Diego. In addition, he has made a number of presentations to school districts, county offices of education and professional groups and organizations.

Mr. Fernandes received his J.D. from the University of San Diego School of and holds a B.S. in Business Administration - Finance from San Diego State University. In addition, Mr. Fernandes spent a summer studying at the Universidad Autonoma de Guadalajara, through the Baylor Law School Study Abroad Program, focusing on North American Legal Systems and International Human Rights.

**Kathleen M. Loyer** is a solo practitioner with many years experience in advocating on behalf of children in the arena of public education. Ms. Loyer's practice focuses in the areas of Special Education (the Individuals with Disabilities Act [IDEA]), General Education, Civil Rights and Disability Law. Ms. Loyer assists families in accessing services for children with disabilities. Many of her clients have disabilities that range from mild learning disabilities (LD), Attention Deficit Disorder (ADD), to the severely emotionally and/or physically disabled. She also covers a range of issues in General Education. She handles negotiations and hearings involving disciplinary matters such as expulsions, suspensions and involuntary transfers. She represents children and their parents in mediations, fair hearings and all levels of negotiations regarding educational issues as well as appellate reviews in Federal District Court & the U.S. Court of Appeals for the Ninth Circuit. Ms. Loyer also handles issues relating to the Americans with Disabilities Act (ADA). The ADA protects children and adults from discrimination due to their individual disabilities. Issues include the provision of reasonable accommodations in higher learning institutions and the workplace. On occasion, her cases have received coverage in the local major media outlets such as the Los Angeles Times and the Orange County Register as well as a national TV magazine and PBS.

EX. 6
111

Prior to graduating from law school, Ms. Loyer acquired extensive experience as a workshop leader and public speaker and educational consultant to attorneys regarding issues of special education. She started her speaking career in 1979 as a seminar moderator with SmokEnders International, where she taught a smoking cessation program based in positive behavioral modification. Because of the individual, special needs of her family, she became very active in the arena of special education. Living in Massachusetts at the time, she founded and chaired the Attleboro Massachusetts Parent Advisory Council on Special Education and a local parent support group. She went on to serve on the Massachusetts Southeast Regional Advisory Committee. She was also a Commissioner on the Massachusetts State Advisory Commission on Special Education (SAC). She was appointed Secretary of the SAC shortly before moving to California. Her other activities in Massachusetts included the writing of several guests columns in the local newspaper on Special Education and related subjects. She authored a parent handbook on special education, published by the local school district. Kathy also acted as a volunteer educational advocate for many families in Massachusetts. She was nominated and received honorable mention as "The Boston Parent's Paper" child advocate of the year in 1989. In the same year was nominated for citizen of the year in Attleboro, Massachusetts.

Ms. Loyer has continued her advocacy work here in California. She has acted as a parent representative to the California Association of Private Special Education & Services (CAPSES) board of directors and in 1992 she was appointed to the California Department of Education Seriously Emotionally Disturbed Advisory Board. She founded Partners in Education, an educational collaborative that focused on the early identification and intervention of children with special needs. Ms. Loyer conducted teaching seminars on "Effective Communication Skills," "Understanding ADD, A Mother's Point of View," " Parents Rights & Responsibilities in Accessing Special Education Services for their Child," as well as consulting with other attorneys in the area of Education Law. She is a former member of the board of directors for the Alex Foundation for Traumatic Brain Injury and a former member of the Professional Advisory Board for the Alex Center, a non-public school and residential facility for children with traumatic brain injury. When the Alex Center closed its doors in August of 2003, she was instrumental in assisting the founders in establishing the Tustin Center for Traumatic Brain (now named SeaStar) to assure educational services to its student in the Fall of 2003. She is a frequent presenter at *Fiesta Educativa* and other educationally related parent support groups and community outreach efforts. She also participated in trainings for the California Department of Education

Ms. Loyer is a trained mediator (Mediation Center, Irvine CA) and has an excellent reputation in the educational community for her negotiation skills. She also offers her services as a volunteer attorney for the Orange County Bar Association's Public Law Center's Pro bono "ARC" (Attorneys Representing Children) program. She currently serves on Orange and San Bernardino Counties Juvenile Courts educational attorney panels, where she is called on to assist in matters relating to educational issues and/or children with special needs. Kathy graduated from law school as a "Distinguished Student". She received honorable mention from Soroptimist International of Capistrano Bay as a "Woman of Distinction" in 1995.

EX. 6
112

4

**Van T. Vu** is an associate in the Schools, Special Education and Litigation Practice Groups of Best Best & Krieger LLP. Ms. Vu's practice focuses on the representation of educational entities such as school districts, county offices of education, and special local plan areas in litigation, administrative proceedings, and mediations involving special education, Section 504 of the Rehabilitation Act, student discipline, personnel discipline and removal, and discrimination. Ms. Vu has experience in providing training to educators and administrators regarding various aspects of special education law and student discipline.

Prior to joining the firm, Ms. Vu was a senior hearing officer at the Institute for Administrative Justice, where she conducted special education due process hearings for the State of California and administrative hearings for the City of Sacramento. As an administrative hearing officer for almost seven years, Ms. Vu convened over a hundred and fifty hearings, wrote approximately sixty decisions and over five hundred orders, and held over two dozen prehearing conferences. Ms. Vu's special education decisions have been affirmed by a California Superior Court, the U.S. District Court - Central District of California, and the Ninth Circuit Court of Appeals. Additionally, she was involved in the initial and ongoing training of hearing officers in special education law and administrative procedures, and the review of hearing officer decisions and orders. Prior to working as a hearing officer, she was a mediator and case developer for four years with the Davis Community Mediation Service, where she assisted parties in resolving consumer/merchant, tenant/landlord, employer/employee, and interpersonal disputes. Ms. Vu's extensive hearing officer and mediator experience makes her especially qualified to consult with educational clients on ways to prevent and avoid costly litigation.

Ms. Vu received her Master of Laws in Government and Public Policy in 2004 from the University of the Pacific's McGeorge School of Law. Ms. Vu also received her Juris Doctorate and a Certificate in Governmental Affairs in 1998 from McGeorge School of Law, during which time she was a member of the Roger J. Traynor Honor Society. She attended the University of California at Davis for undergraduate studies and earned her Bachelor of Arts degree in 1995 in three subject areas: Psychology, Sociology, and Political Sciences. While at UC Davis, Ms. Vu served on the Campus Judicial Board, where she conducted administrative hearings regarding academic and social misconduct at the University. She is a member of the Sacramento County Bar Association, the California Bar Association and the American Bar Association.

**Steven Wyner** is a partner in the law firm of Wyner & Tiffany, which specializes in representing special needs children with respect to their educational needs and civil rights litigation related thereto. Mr. Wyner has been, and continues to be, involved in multiple high profile special education cases, including:

(1) a published Ninth Circuit Court of Appeals Opinion holding that the California Special Education Hearing Office (SEHO) lacked jurisdiction to enforce its own prior order directing the parties to comply with the terms of a settlement agreement [Wyner v. Manhattan Beach Unified School District, 223 F.3d 1026 (9th Cir. 2002), cert. denied, 534 U.S. 1140 (2002)];

EX. 6
113

(2) a published Ninth Circuit Court of Appeals Opinion holding that parents can enforce decisions and orders issued by SEHO by filing suit directly in federal court and without first exhausting administrative remedies before the California Department of Education [Porter v. Board of Trustees of Manhattan Beach USD, 307 F. 3d 1064 (9th Cir. 2002), cert. denied, 537 U.S. 1134 (2003)];

(3) a record $6.7 million dollar settlement in favor of a special education student and his family in the aforementioned Porter case after it was remanded to U.S. District Court;

(4) a landmark decision issued by U.S. District Court holding a special education director personally liable for monetary damages based on a finding that the student's civil rights were violated when the special education director failed to comply with the Individuals with Disabilities Education Act [Goleta Union Elem. Sch'l Dist. v. Ordway, 248 F. Supp. 2d 936 (C.D. Cal. 2002) & 166 F. Supp. 2d 1287 (C.D. Cal. 2001)]; and,

(5) a U.S. District Court Order holding that a school district must comply with final administrative hearing office decision and provide the relief awarded to the student pending the school district's appeal of that decision in federal district court [Draper v. Atlanta Independent School System, 2006 U.S. Dist. LEXIS 40964 (N.D. GA 2006).

In addition, Mr. Wyner is a recipient of the prestigious California Lawyer Attorney of the Year ("Clay") Award for extraordinary achievement in 2005 in the area of Civil Rights litigation , as well as a Certificate of Recognition issued the California State Assembly for outstanding commitment to providing quality legal services to the people of California. Mr. Wyner graduated from King Hall School of Law, University of California, Davis in 1977, where he was Order of the Coif and an Editor on the Law Review.  Mr. Wyner received an LL.M. (in taxation) from New York University in 1981, where he was a Graduate Editor on the Tax Law Review.  He clerked for the Honorable William P. Gray, U.S. District Court for the Central District of California in 1977-78.

# THE ADMINISTRATIVE LAW JUDGES:

## Gary Geren

Judge Geren graduated from the University of the Pacific, McGeorge School of Law, in 1988, as a member of the Traynor Honor Society.

His constitutional law professor was Justice Anthony Kennedy.

Judge Geren began his legal career in 1988 as an attorney with the State of California, Department of Transportation.

At the Department of Transportation, Judge Geren led a five person litigation team, chaired the statewide appellate committee, and was a member of the National Transportation Committee on Tort Liability and Risk Management.  He authored several publications

EX. 6
114

regarding governmental tort liability and lectured at a number of regional and national conferences.

Judge Geren joined OAH, Special Education Division, Sacramento, in August 2005.

## Susan Ruff

Judge Ruff received her BA from San Diego State University 1979 and her JD from the University of San Diego School of Law in 1984.

Judge Ruff began her legal career as a civil litigator with a private law firm for approximately one year after graduation from law school. Judge Ruff than worked as a research attorney with the San Diego Superior Court for approximately 3 and 1/2 years. She then joined the California Attorney General's Office, working in the Licensing Section for 16 years. In connection with her work as a Deputy Attorney General in the Licensing Section, Judge Ruff practiced administrative law before the Office of Administrative Hearings.

Judge Ruff joined OAH, Special Education Division, Irvine, in October 2005.

## Darrell Lepkowsky (Moderator)

Judge Lepkowsky graduated Phi Beta Kappa from CAL Berkeley in 1978, with a BA in Spanish, emphasis on Latin American Studies, including a year abroad studying in Mexico. She received her JD from the University of San Francisco in 1981.

From October, 1981, until December, 1991, Judge Lepkowsky worked for the Agricultural Labor Relations Board, starting as a Graduate Legal Assistant before passing the bar exam, and progressing to Staff Counsel and then Regional Attorney. She moved to the Attorney General's Office at the beginning of 1992, working in the Correctional Law Section. She was promoted to Supervising Deputy Attorney General for that section in mid-1993, and supervised the section's offices in both San Diego and Los Angeles.

Judge Lepkowsky joined OAH, Special Education Division, Irvine, in January 2006.

EX. 6
115

*"And the Walls Came
Tumbling Down:"
Overcoming Impasse
in Mediation*

## OVERCOMING IMPASSE IN MEDIATION

I.     What is LATNA?
II.    Identifying Barriers to Settlement
III.   Tactics That Impede Settlement
IV.    Diffusing Tactics
V.     Arbitrating or Litigating the Dispute or Selected Issues
VI.    Refusing to Agree/Exit Strategies

## OVERCOMING IMPASSE IN MEDIATION

I.     LATNA?

    A.    What is it?

        1.    Consider the "best," "worst," and "most likely" alternative to a negotiated agreement = likely alternative to a negotiated agreement or LATNA

        2.    Serves as the rational starting point or basis for evaluating offers

        3.    Do not reject any settlement offer that is better than or exceeds one's LATNA (i.e., that delivers more value to a party than that party's most likely alternative to settling at mediation).

            a.    *Exception*: when one believes the other side(s) may offer something even better down the line.

        4.    Prior to mediation, one should speculate about the other sides' no-agreement alternatives.

    B.    Why is LATNA Such an Important Concept?

        1.    People often come to mediation with aspirations and "bottom lines" that do not reflect their true no-agreement alternatives.

        2.    They reject settlement offers because they have an artificial notion of what they *should* be entitled to pay or receive

EX. 6
116

3. They resist listening to information that might alter their assessment of their no-agreement alternatives.

KEY POINT: Your "bottom line" in *any* negotiation should reflect your LATNA. Your challenge will be to determine if there is anything you can offer to the other side that will exceed *their* LATNA

II. Identifying Barriers to Settlement

    A. Step into the mediator's shoes: diagnose the source of the impasse

        1. What is the principal barrier to settlement we are now facing?

        2. Is the barrier on our side or theirs?

III. Tactics That Impede Settlement

    A. Three Common Tactics

        1. *"Good cop - Bad cop":* One party acts outrageously to make his/her colleague appear more reasonable and attractive in contrast.

        2. *"Let me check with my manager":* Like a car salesperson, this party strikes a deal, writes it up and then calls a manager for final approval only to discover that the manager *insists* on just a few more concessions.

        3. *"The MAD negotiator":* This person hopes that the other side(s) will give up on rational negotiations and just try to appease him/her.

    B. Other tactics that impede resolution include:

        1. Misrepresenting one's own interests.

        2. Misrepresenting one's no-agreement alternatives.

        3. Misrepresenting one's constraints and/or bottom line.

        4. Raising new issues in the 11th hour as the parties are about to close on a settlement agreement.

        5. Pretending to search for win-win solutions to drag out the negotiations delay.

        6. Pretending not to be sensitive to litigation costs.

7.  Switching spokespeople mid-stream to confuse the other side(s) and to enable the client to distance him/herself from "unauthorized concessions.

8.  Threatening to walk out the door. Threatening to close the door forever on future settlement discussions.

IV.  **Diffusing Tactics**

A.  *Ignore the tactic and proceed as if nothing has happened* – avoid reinforcing the negative behavior and stay focused on settlement.

B.  *Calmly note the tactic and neutralize it* – this allows you to indicate that you recognize the tactic while enabling the other party to retreat from it without a huge loss of face.

C.  *When turning the other cheek is neither satisfying nor effective, it may be appropriate to mirror the tactic and respond in kind and proportion* – the key here is to respond *in proportion* so as not to escalate the dispute but to communicate to the other party that the behavior is not only ineffective, but will damage the entire process if it continues.

D.  *Finally, you may be tempted to call the person on his/her behavior and label it in some way to indicate that you recognize the ploy and will not be swayed by it.* There is a risk that the other party will deny employing a tactic and express offense. If that happens, link the label with a proposal to clarify the ground rules for the negotiation, and renegotiate the process if needed.

KEY POINT: Think about how you can prevent the use of tactics in the first place and what you can do if confronted with them during negotiations. Also, think about how the mediator can help you prevent or respond to these and other tactics.

EX. 6
118

IV.    Arbitrating the Dispute or Selected Issues

    A.    Upon Impasse - Consider a Focused Arbitration

        1.    Narrow the scope to one or two issues and submit those to a neutral decision-maker.

    B.    Upon Impasse – Consider a *Med-Arb*

        1.    Benefits

            a.    Efficiency

            b.    Faith in neutral's ability to decide issue(s) fairly and appropriately

        2.    Concerns

            a.    The mediator will have had access to confidential information and one or more parties may feel that such knowledge will "taint" the arbitrator's decision.

            b.    If parties anticipate using the mediator as an arbitrator, they may not share confidential information with the mediator - limiting the value the mediator can have in the mediation itself.

V.    Refusing to Agree/Exit Strategies

    A.    Think carefully about an exit strategy and the message you want to leave

    B.    Position yourself to be open to renegotiation if a truly substantial movement surfaces from the other side(s).

    C.    You also want to position yourself if your predictions about the case turn out to be wrong – it may be that it is *your* side that needs to make the next substantial move.

    D.    Avoid saying something you may need to retract later at the expense of your credibility such as "There is no way we would ever agree to X…".

**KEY POINT: Alienating the other parties will not serve you in the long run.**

© Copyright 2003 JAMS. All rights reserved. For more information, please visit our website at www.jamsadr.com, or call your local JAMS office at 1-800-352-5267.

CMR194
01/01/01

# Data to Knowledge to Results:

## BUILDING AN ANALYTIC CAPABILITY

Thomas H. Davenport, Jeanne G. Harris,
David W. De Long, and Alvin L. Jacobson

*California Management Review* Reprint Series
©2001 by The Regents of the University of California
*CMR*, Volume 43, Number 2, Winter 2001

EX. 6
120

# Data to Knowledge to Results:

## BUILDING AN ANALYTIC CAPABILITY

Thomas H. Davenport
Jeanne G. Harris
David W. De Long
Alvin L. Jacobson

A corporation in the information age has unprecedented access to transaction data, but all too rarely is that data sifted into the sort of knowledge that can inform business decisions and create positive results. Most firms are stuck with data, even overwhelmed with data. They have yet to develop the very capability that prompted them to gather it in the first place: the capability to aggregate, analyze, and use data to make informed decisions that lead to action and generate real business value.[1]

It is not that firms do not have the tools it takes to turn data into knowledge and results. Decision support, executive information systems, online analytic processing, and data mining were all designed to help organizations leverage transaction data.[2] It is also not that firms are not making the necessary monetary investments. According to one market research organization, the market for "business intelligence and data warehousing" tools and services is growing at an average rate of more than 50 percent and is expected to reach $113 billion by 2002.[3] It is not that some companies are not succeeding in turning data into results. Our research uncovered the following:

- Earthgrains, a $2 billion bakery products company, uses data from its SAP enterprise system in its Refrigerated Dough Division to analyze product profitability. This has led to the elimination of 20 percent of the division's product line and a 70 percent jump in the division's earnings during the first year that profitability data was available.

The authors would like to thank Accenture (formerly Andersen Consulting) and the Accenture Institute for Strategic Change for supporting the Data to Knowledge to Results research project.

EX. 6
121

Data to Knowledge to Results: Building an Analytic Capability

- Owens & Minor, a $3 billion distributor of health-care and medical sup-
plies, has the goal of reducing supply chain costs by providing customers
Web-based access to transaction data that can be used to analyze purchas-
ing practices. The company has already secured at least one major long-
term contract by showing a hospital chain how it could save over $100
million by changing its purchasing patterns.

- Wachovia Bank uses customer transaction data to support a modeling
process that evaluates each branch's current and long-term profitability.
In Atlanta, the bank's largest market, Wachovia showed significant per-
formance improvements when it used the outputs of the modeling
process as a basis to decide which of its 96 branches to close and in
which locations to open new ones.

The problem is that most companies are not succeeding in turning
data into knowledge and then results. Even those that do, are doing so only
temporarily or in a limited area. The companies mentioned above are excep-
tions. In the rush to use computers for all transactions, most organizations
have neglected the most important step in the data transformation process: the
human realm of analyzing and interpreting data and then acting on the insights.
While companies have emphasized important technology and data infrastructure
initiatives, they have virtually ignored the organizational, cultural, and strategic
changes necessary to leverage their investments.

This article presents a framework, developed out of our research in 20
companies, that identifies and articulates the primary success factors that must
be present in order to build broad organizational capabilities for transforming
electronic data into knowledge and then into business results.[4] The companies
studied and the research methods employed are detailed in Exhibit 1. A variety
of industries, decision-making domains, and data sources are represented.

## Evidence of the Problem

What is the evidence that companies have difficulties turning data into
knowledge? In both systematic study and casual observation, we have observed
the lack of data-derived knowledge and action across a number of different situ-
ations and environments. Nearly everywhere we looked, we found managers
who planned to eventually make effective use of transaction data, but had not
gotten around to it yet—in some cases despite more than a decade of activity.
Although we looked at companies using many different types of transaction
data, the following technological contexts were most pervasive:

- enterprise resource planning (ERP) systems
- customer relationship management efforts
- point-of-sale scanner data in retail stores
- web and e-commerce transaction data

EX. 6
122

Data to Knowledge to Results: Building an Analytic Capability

**EXHIBIT I.**   Companies and Methods in Our Research

| | |
|---|---|
| American Century Investments | Hewlett-Packard Company |
| Bank of America | J.D. Edwards & Company |
| Chase Manhattan Bank | Kraft Foods, Inc. |
| Citgo Petroleum Corporation | National Semiconductor |
| The Dow Chemical Company | Owens & Minor, Inc. |
| The Earthgrains Company | Pentair, Inc. |
| First Union Corporation | J Sainsbury plc |
| Fleet Bank | ShopLink Inc. |
| Harley Davidson, Inc. | U S WEST Inc. |
| Harrah's Entertainment, Inc. | Wachovia Bank |

In order to find companies that had made some progress in building an analytical capability, we conducted an extensive literature review and did screening interviews with over 100 firms. Initially, we conducted a series of exploratory interviews to better understand the conditions under which transaction data is successfully turned into knowledge and then into business results. From these interviews, we developed a hypothetical model that we then tested in twenty firms selected for extensive interviewing and case study development. These companies appeared to be making extensive efforts to gather, analyze, and synthesize business transaction data and turn it into knowledge. The complexities of both the companies studied and their multiple data-to-knowledge initiatives makes it extremely difficult, and somewhat misleading, to categorize the projects and applications. We visited all but two of the companies above, spending about a day at each site, and in the other two cases conducted telephone interviews. On average we interviewed about five different managers at each site. We employed a set of structured interview questions, but departed from them when necessary to develop case study detail or pursue unique facets of a company's approach. In our interviews we tried to first understand the existing technological and strategic context in which analytic capabilities were being developed. For example, what technology infrastructure was in place to provide data and what was the business purpose of the initiative? Then we focused on understanding the details of specific projects to ground the study and help us draw conclusions about which organizational elements were critical for building analytic capabilities. In addition to this research, we drew on several other related studies for cases and examples, which are described in notes 5 and 6. Our revised model is shown in Figure 1.

The first context involves enterprise systems, which are transaction technologies costing companies millions of dollars to install. One of us recently completed a research study of 60 companies to see whether the new, high-quality data supplied by ERP packages was being used to change management and decision-making processes, or whether it was simply being used to process basic business transactions. This study found that less than 10 percent of the firms had made substantial progress at turning data into knowledge or could give any specific examples of how decisions and actions had been affected by ERP data.[5]

The use of customer data also provides evidence of a general lack of analytic capabilities. Two multi-company studies confirmed that even though companies gather considerable customer data in their transaction systems, few summarize or synthesize it into a coherent picture of a customer across multiple transactions and observations.[6]

The story is the same for scanner data compiled by retail stores. One CIO of a grocery chain that is highly regarded for its use of IT confided to us that his company analyzed at most only 2 percent of its collected data. A different

EX. 6
123

grocery chain in the Midwest recently decided to simply throw its scanner data away after saving it for years in the hope that someday it would be analyzed.

Web transaction data is also not being utilized to a substantial degree. We interviewed managers from several small Internet-based firms with Web sites that generate substantial amounts of transaction data. Most said they plan to analyze the data at some point, but have not yet done so. According to another survey, few e-commerce firms acted on customer information to strengthen customer relationships.[7] Data is routinely accumulated, and routinely ignored, wasted for the want of human attention.

Thus, regardless of the source of transaction data—be it ERP systems, marketing data warehouses, point-of-sale scanners, the Web, or just about any other system—the emerging pattern is clear. Companies are investing billions of dollars in technologies that generate huge volumes of transaction data. However, these investments will not live up to their potential unless firms are able to build broad capabilities—both technical and human—to convert data into knowledge and then into business results.

## A Model for Turning Transaction Data into Knowledge and Results

Our model consists of three major elements: context, transformation, and outcomes (see Figure 1). *Context* includes the strategic, skill-related, organizational, cultural, technological, and data factors that must be present for an analytic effort to succeed. They may be viewed as the prerequisites of success in this process, though they are continually refined and affected by the other elements. The *transformation* element is where the data is actually analyzed and used to support a business decision. Finally, *outcomes* are the changes that result from the analysis and decision making. They include changes in behaviors, processes and programs, and financial conditions. Although the concept of moving from data to knowledge to business outcomes seems to imply a process view of the problem, we have chosen a cone shape to capture the critical elements in our model for several reasons. First, the hierarchical structure of the cone supports the idea that key contextual factors always underlie the processes actually used to transform data into business outcomes. Secondly, we wanted to emphasize the importance of a holistic view of the problem of building an analytic capability.

The model can be used at several different levels of an organization. At the simplest level, it can be applied to describe or understand a particular, one-time attempt to convert data into knowledge and results. For example, we used the model to understand an attempt by J Sainsbury, a U.K.-based retailer, to increase sales of cat food in its stores through more effective use of scanner data. In such instances, the presence or absence of the critical elements described in the model could help managers understand why business value was or was not created. Secondly, the model can be used to develop an ongoing capability in a

EX. 6
124

Data to Knowledge to Results:  Building an Analytic Capability

**FIGURE I.** A Model for Building an Analytic Capability



particular area of a business, with particular types of data and business objectives. Most of our research sites, for example, were working primarily in one area of their businesses—retail services in banks, marketing in casinos, catalog response in a high-tech firm. Finally, it is possible to use the model to help develop an organization's broader capabilities for turning data into knowledge and results, as we found a few companies, such as Dow Chemical and Earth-grains, were attempting to do.

## Contextual Factors in the Model

Decisions are not made in a vacuum. They are made in the context of a particular business strategy, a particular set of experience and skills, a particular

EX. 6
125

Data to Knowledge to Results: Building an Analytic Capability

culture and organizational structure, and a particular set of technology and data capabilities. Most companies, however, tend to focus on just two elements—technology and data—or none at all. Unless executives consciously address the remaining contextual elements, they will find it difficult to improve their firms' overall analytic capabilities.

*Strategy*

Without a strategic context, a company will not know on which data to focus, how to allocate analytic resources, or what it is trying to accomplish in a data-to-knowledge initiative. The business strategy at Harrah's Entertainment, for example, had clear data-to-knowledge implications. When the explosion of newly legalized gaming jurisdictions in the mid-1990s ground to a halt, Harrah's managers realized that growth could no longer come from the construction of new casinos. Rather, growth would need to come from existing casinos and from an increase of cross-market visits among Harrah's 18 properties. Harrah's new strategy is to drive growth through customer loyalty and data-driven marketing operations. The implementation of this strategy requires the use of the extensive transaction data that Harrah's has amassed on the gaming behaviors and resort preferences of existing customers.

Articulating a strategic business case for a data-to-knowledge initiative helps create organizational support and can be used to obtain funding. In the process, managers should ask themselves the following strategic questions: What are our core business processes? What key decisions in those processes, and elsewhere, need support from analytic insights? What information really matters to the business? How will knowing something help us perform better? What are the information and knowledge leverage points of the firm's performance? These types of choices constitute the strategic context for investing in new analytic capabilities.

The more clear and detailed a firm's business strategy, the more obvious what data and analytic capabilities it requires. In the same way, pre-defined measurement models tell us what we need to monitor. If, for example, a company tracks the success of its strategy with a formal performance metric such as a "balanced scorecard,"[8] it should be readily apparent what data needs to be compiled and summarized to assess the strategy.

*Skills and Experience*

Almost two-thirds of the companies we studied stated that recruiting, developing, and retaining highly skilled employees with analytic capabilities has been a major human resource challenge. The particular skills and experience essential for transforming data into knowledge depend, of course, upon individual roles and responsibilities. They also vary with the scope and sophistication of the firm's analytic capability. No one individual can possess all the skills needed to transform data into knowledge. Rather, people in specialized roles work together to achieve this transformation. The four key roles we observed are:

EX. 6
126

- The *Database Administrator* extracts data from multiple databases, loads it into a data warehouse or mart, and performs quality control checks.
- The *Business Analyst and Data Modeler* both work with data to convert it into information and knowledge that can be used by a decision maker. Data modelers draw on extensive statistical knowledge to build computer models, while data or business analysts interpret business problems, retrieve data to address them, analyze the results, and communicate the findings to others. Sometimes data analysis and data modeling functions are combined into one, but they are often separated because modelers' skills are more specialized.
- The *Decision Maker* uses the analysis to make a decision that will affect business performance. In our research, decision makers always came from a business unit. They could be senior executives, middle managers, or individual contributors such as salespeople.
- The *Outcome Manager*, although rarely a formal role, ensures that the decision is implemented and that outcomes are achieved. This is particularly important when many stakeholders are affected by a decision. Often the decision maker also serves as the outcome manager, but not always.

Our research identified five key competencies that must be developed to varying degrees for each of these roles if a firm wants to build strong analytic capabilities. The competencies are outlined below and described in detail in Exhibit 2.

- *Technology Skills.* These skills involve knowledge of the software and underlying systems used to extract, manipulate, analyze, and present data. Database administrators must have deep knowledge of the core technical system that produces the transaction data. Business analysts and data modelers, who work with decision makers to frame business problems and produce analytic outputs, need working knowledge of a variety of software tools that are needed to analyze and present data. Those making and implementing decisions will need to be comfortable with tools for displaying data as well as with data interpretation and presentation software.
- *Statistical Modeling and Analytic Skills.* Data modelers need expertise on the basic and sophisticated statistical techniques for data analysis. Business analysts, while needing less sophisticated modeling skills, must nevertheless be able to understand the model's constraints, run models, and assess results. Decision makers, while not needing to be proficient in statistics, need to understand the underlying analysis so that they can properly interpret and act on the findings.
- *Knowledge of the Data.* One marketing analyst in a credit card firm demonstrated knowledge of the data by saying: "There are 40 different types of activities recorded in our database, and I probably know 10 very well. That means I'm familiar with how the data is stored, the types of data

EX. 6
127

Data to Knowledge to Results: Building an Analytic Capability

**EXHIBIT 2.**  Skills and Experience Needed in Key Roles

| | DB Administrator | Business Analyst/ Data Modeler | Decision Maker/ Outcome Manager |
|---|---|---|---|
| **Technology Skills** | Data extraction<br>File import/export<br>Merge/purge/dumps<br>File and record formats<br>Find missing data | Data extraction<br>File import/export<br>Test files<br>Statistical, reporting software | Desktop queries<br>Data visualization<br>Database marketing |
| **Statistical Modeling and Analytic Skills** | Data requirements<br>Data validation<br>Data quality | Descriptive statistics<br>Multi-dimensional modeling<br>Regression<br>Factor/cluster analysis<br>Neural networks<br>Data mining<br>Data presentation and reports | Analytic conceptualization<br>Interpretation of findings<br>Limitations of statistical analysis |
| **Knowledge of the Data** | Layout of records<br>Data sources<br>Data formats<br>Changes in data fields and formats<br>Updating and refreshing schedule<br>History of file | Data availability<br>Data strengths and weaknesses<br>Data currency<br>Definitions of fields<br>Data validity | Data strengths and weaknesses<br>Definitions of fields<br>Data validity |
| **Knowledge of the Business** | Business strategy<br>General understanding of industry | Business strategy<br>Business model<br>Business drivers<br>Business objectives<br>Business terms | Business strategy<br>Business model<br>Business drivers<br>Critical issues<br>Competitive factors<br>Resource constraints<br>Implementation and acceptance |
| **Communication and Partnering Skills** | Listening<br>Teaching<br>Coordinating | Listening<br>Persuading<br>Teaching<br>Collaborating<br>Presentations to management | Teaching<br>Learning<br>Collaborate<br>Persuading<br>Presentations |

Note: We have combined decision maker and outcome manager roles in Exhibit 2 because their skill requirements are quite similar.

fields used for the activity, how they are updated, and the nuances. For example, is the field populated? Is it reliable? By looking at our 'address change' field, for instance, you can tell whether the card is active or cancelled. And by looking at another field in the customer's master record you can also tell. But I need to know which field is more reliable because sometimes they conflict."[9] A deep understanding of how the data is produced and transformed often only comes from experience in working

EX. 6
128

with the database. Much of this knowledge is tacit, changeable, and idio-syncratic, but without it the value that can be derived for decision making is very limited. It can take an analyst a year or longer to know the data in a large system. "Roger has been here 15 years and has lived through all the data transitions," said one manager of marketing information. "He knows the tribal lore. We rely on him to understand the data, and it's all in his head." Such an employee would obviously be difficult and costly to replace.

- *Knowledge of the Business.* Designing, producing, and presenting analytic outputs is also dependent on extensive contextual knowledge of the par-ticular industry involved and the business issues that the decision makers are concerned with. Although knowledge of the business is obviously essential for the decision maker and outcome manager, it is also impera-tive for the data modeler and business analyst. Such knowledge enables the modeler and analyst to effectively access data, as well as translating and refining decision makers' queries. "You need a kind of deep knowl-edge of our business processes, like how the ATM system works, for example, in order to know how that data is created," said a vice president for one major bank. "You can't get the data out of the data warehouse until you know the business."

- *Communication/Partnering Skills.* The most sophisticated analyses in the world are worthless if findings cannot be communicated to decision mak-ers in ways that will encourage their use. Likewise, if decision makers cannot communicate their needs to analysts, modelers, and outcome managers, or if database administrators cannot communicate with data modelers for that matter, then the entire data-to-knowledge process is at risk. A director of decision support for a consumer goods company says his biggest problem is getting business analysts to present their findings to product managers in ways that they will be understood and accepted as useful. The analysts tend to present their forecasting numbers as "the truth" and the only numbers managers should use, he said. Rather, he would like them to present a range of numbers, explain the probabilities, and leave it to the managers to decide.

Managers of firms seeking to build analytical capabilities must evaluate the level and structure of skills needed to support their organization's data analysis capabilities. If the skill levels of the business analysts, data modelers, and decision makers in an organization are inadequate, then a firm cannot be getting full value from its transaction data.

## Organization and Culture

In one informal survey we administered, over 62 percent of the managers responding indicated that organizational and cultural factors were the greatest barriers to achieving a significant return on their enterprise system investments.

Data to Knowledge to Results: Building an Analytic Capability

Two of the most important concerns raised in our interviews are structuring analytic resources and developing a data-oriented culture.

*Structuring Analytic Resources*

Where should analytic resources be located in a company? Should they be centralized, decentralized, or even outsourced? About 45 percent of the companies in our study had predominately centralized analytic groups, almost 33 percent had analysts working primarily in decentralized business units or functions, and about 25 percent had analysts and modelers working in both centralized and decentralized units.

Decisions about how to structure analytic resources are usually driven by three factors:

- *Sophistication of the analysis*—Complex modeling is better done in a centralized group, or even outsourced, because it demands cutting-edge statistical skills.

- *Amount of local knowledge needed*—If doing the analysis requires knowing a local market context or a specific product's history, then decentralized analysts are more effective.

- *Cultural orientation of the firm*—A culture like Hewlett-Packard's with highly autonomous business units will have a hard time supporting large amounts of centralized analytic resources, while more centralized firms like Fleet Bank will find it difficult to decentralize them.

We suspect that the current emphasis on centralized groups reflects the early stage of most firms' data-to-knowledge capabilities. Eventually, the distribution of analytic resources will probably be more balanced. One vice president of database marketing explained: "Over time the pressure will be to decentralize these resources because managers would rather deal with analytic resource constraints in their own units than deal with constraints imposed by a centralized group." Another manager at First Union Bank foreshadowed this evolving relationship between analysts and decision makers, saying: "The whole objective of training managers to access the data is to get people to do their own analysis and queries, so we can focus on deeper analysis. Then when they do come to us for assistance, their use of the system means they have a better understanding of the data."

Any approach to structuring analytical resources has trade-offs. Decentralization may allow analysts to better understand the business, the data, and the decision makers, but if companies go too far with it, they can lose the cutting-edge knowledge that may come from a more centralized group. This can reduce an organization's chances of attracting top-flight analysts who are inevitably drawn to working with the most sophisticated groups.

EX. 6
130

### Creating a Data-Oriented or Fact-Based Culture

At Wachovia Bank, one executive vice president explained how data and information were part of the intrinsic value system of the firm, saying, "Wachovia's competitive position depends upon our ability to use information faster and smarter than our competition." Creating a culture that values data-based decision making is an ongoing and highly challenging task. It is vital to maximizing an organization's analytic capabilities, because without solid values underlying analytic efforts, the already difficult-to-sustain behaviors necessary for success are easily neglected.

Not all of the companies in our study value data-based analysis and decisions as much as Wachovia. Senior management in one firm, for example, wanted its sales force to analyze purchasing history data to help customers improve ordering and inventory management practices. However, the salespeople were much more comfortable building and maintaining personal relationships with their customers' purchasing managers, so they resisted using the data to help customers make better supply chain-related decisions. For an analytic capability to really succeed, the entire organization needs to value data-based analysis and decision making.

### Technology and Data Context

The technology underlying analytic processes includes the specific hardware and software used in data capture, cleaning, extractions, and analysis, as well as the networking and infrastructure capabilities needed to transfer data and provide end-user access.

While the training and experience of most IT professionals is geared towards building efficient transaction systems, the methods, skills, and assumptions needed to develop the technical infrastructure for analytic capabilities are very different. For example, although an IT professional may be able to interview an order-entry clerk to determine the steps and data needed to "place a order," it will be much more difficult for the IT analyst to determine the sequence of events and data needed to "analyze our customer base." Unlike the order-entry process, there are several possible routes to achieve this end. Even more difficult is the need to anticipate less-structured analyses, such as "why are sales so volatile?" Moreover, the ability to choose and integrate analytic technologies is a rare and difficult skill, since a bewildering number of complex and unfamiliar hardware and software products are available that differ considerably from transaction systems.

Another difference between transaction systems and analytic technologies is that whereas the former require little human involvement, the latter often require a lot. While some vendors might still argue that new technologies can "automate" many analytic activities, the managers in our study disagreed. Analytic tools such as data mining are most effective when they are guided by

EX. 6
131

human insight. The managers at the mutual fund company American Century Investments (ACI), for example, used a variety of technologies to explore their hypotheses regarding customer values and segmentation. Without this strategic orientation, ACI would have been unable to make sense of the data relationships they observed. The companies in our study were focused on leveraging the effectiveness of skilled managers, not on eliminating them with automated analytic systems.

Our interviews showed that creating and maintaining a high-quality data context is a difficult, costly, and never-ending struggle that nevertheless must be waged. Suspect data will cost data-based decision making not only the allegiance of decision makers, but stakeholders in general.

Maintaining high levels of data quality—in terms of accuracy, completeness, reliability, accessibility, and currency—is also quite costly in monetary terms. According to industry estimates, 60-80 percent of the total cost of a data warehouse project is spent on cleaning up and integrating data from mainframe legacy systems and external sources, just to make the data acceptable for analysis and reporting.

## The Transformation Process

Given an initial set of strategies, skill and experience levels, organizational structures, and technological capacities, data becomes knowledge and affects policy through two iterative and intertwined phases: the *analytic process* and the *decision-making process*.

### The Analytic Process

The analytic process makes knowledge from data. It is essentially a transformation of quasi-finished data (quasi because there is often more cleaning, massaging, and augmenting of data necessary during the process) into useful insights and knowledge. The tools and techniques it employs include, among others, statistical analysis, generation and testing of hypotheses, construction of mental or mathematical models, and relating data-based knowledge to that derived from human interactions.

The analytic process varies considerably depending on how the question is structured. What may initially seem to be a highly structured question (e.g., "To whom should we mail the new product promotional materials in order to get the biggest response?") may be much less structured than it appears. What do we mean by "biggest response"? Is it the number of calls and/or return mail items from the promotional offering, the number of first-time buyers, the dollar amount of purchases, or the total number of purchases? How might other ongoing promotions distort the response to the mailings? Are we addressing direct channels only, or indirect also? The ambiguities can multiply quickly.

EX. 6
132

Data to Knowledge to Results: Building an Analytic Capability

**EXHIBIT 3.** Sample Questions Being Pursued by Companies in Our Research

| Highly-Structured Questions: | • Given current customer profiles, to which customers should we mail our new catalog?<br>• Which products did our customers purchase most frequently last month?<br>• How much inventory do we have of product X?<br>• What were sales last week in the Southwest region? |
|---|---|
| Unstructured Questions: | • What is the demographic and psychographic makeup of our potential high-value customers?<br>• Which hurts the bottom line more: inventory holding costs or hiring staff to handle frequent deliveries?<br>• How effective was our last marketing campaign?<br>• How do our customers migrate between segments? |
| Semi-Structured Questions: | • What is the most effective product and pricing mix for a specific product category?<br>• What is logically the next product we should offer to specific customers?<br>• How can we allocate our branch and ATM resources effectively?<br>• Given forecasted demand, how much should we be producing? |

While the level of structure in the question is clearly a continuum, the continuum is commonly broken into three points (see also the sample questions in Exhibit 3):

- *Highly-Structured Questions*—Questions of this kind tend to have only a few clearly defined variables. They are relatively uncomplicated and require minimal interactions with the decision maker for explanation and clarification. Increasingly, decision makers will access the data and do the analysis themselves for questions of this type.

- *Unstructured Questions*—In other cases, a decision maker may ask a question where there is considerable ambiguity in the question itself and in the definitions of key variables. On the other hand, he or she may not even have a specific question in mind, looking instead for lessons or trends that can be gathered from the data. For example, one marketing manager asked, "How many customers have we acquired in response to our magazine advertisements that we had previously marketed to by direct mail?" An analyst who receives a question like this must spend considerable time interacting with the decision maker trying to clarify his or her real information needs and the nature of the decision involved.[10] The analyst will also spend time with the IT staff, asking such questions as: How do we define how a customer was acquired in the database? Do we track responses to our specific magazine ads? How long do we store those responses in the database? With unstructured questions, it may be difficult and time-consuming to access data in the database, or even to

EX. 6
133

decide what data is relevant. Multiple variables are usually involved, and extensive interpretation of the quantitative outputs is required to make them meaningful for decision makers. Usually this involves the use of sophisticated statistical tools. Only the most capable "data mining" tools, for example, can identify patterns in data without specifying a hypothesis in advance. Even then, we found that a highly skilled analyst must tell the software where in the data to look, must reject spurious relationships, and must interpret findings for reasonableness and implications.

• *Semi-Structured Questions*—These sorts of questions characterize many analytic situations, and have long been the focus of the "decision support" literature and technology.[11] Our research suggests that the semi-structured analytic process is best described as a series of iterative steps that successively refine and approximate the decision maker's business needs. The result of such a process is usually represented in the form of a model or simulation. Although these iterations may eventually lead to a more structured and routine analytic process that can be automated to some degree, semi-structured analyses are initially labor intensive for both analysts and decision makers. Indeed, one of the common concerns managers of analytic units shared with us was how best to allocate very limited staff resources to the semi-structured analytic process. "Everything we do today is very ad hoc," complained one manager. "The challenge is how to make a lot of our work routine. What we want to be able to do is to make successful models a part of our business, and get out of this ad hoc thing."

A clear finding from our study is that managers and analysts addressing semi-structured or even more complex questions view their interactions as an evolving relationship. In virtually all of the companies we looked at, there was evidence that data-to-knowledge capabilities grew as the relationships between analysts and decision makers evolved. Understanding the implications of these evolving relationships is important for executives who must anticipate resource needs as the organization's use of data becomes more sophisticated.

An important characteristic of evolving relationships between analysts and decision makers is the tension that often arises when the two groups have different objectives, expectations, and time frames around a particular analytic problem. For example, after developing a product propensity model for its retail customers, the analytic staff of one bank we studied began testing it. They wanted to test the model in several counties whose demographics represented consumers state-wide. The marketing department, however, was under management pressure to "get the numbers up," so they wanted to conduct the pilot in two of the state's more populous counties, which also represented a larger share of the bank's retail revenues. The analytic team went along with the marketing group's preference. Following a highly successful pilot, marketing managers wanted to immediately roll the model out on a broader regional basis. However, the analytic group resisted, arguing that the model would have to be recalibrated for a totally different population. Commented one of the analysts on the team,

"They had no understanding or patience for our disciplined approach to the process. Marketing simply wanted to take the model and use it."

Another lesson analysts gain with experience is that decision makers process information differently depending on their cognitive styles. For example, outputs must be packaged with appropriate mixtures of graphics and text to satisfy a particular audience. As one Fleet Bank analyst put it, "there are chart people and there are numbers people." She had to design analytic outputs that satisfied both in order to communicate her findings.

Finally, decision makers are often surprised to find that as analytic processes mature and greater insights into the business are gained, their sense of uncertainty and ambiguity increases. Once the easy wins and "low hanging fruit" are picked off, deeper insights tend to force decision makers to confront fundamental beliefs about the organization's culture. For example, one bank discovered that some of its most profitable customers were not doctors, as they had always believed, but rather steady employees of a chain of pancake houses who did all of their financial business with the bank. This insight required new management decisions and strategies that were difficult for the bank's managers to accept.

### The Decision-Making Process

Management scholars over the past several decades have documented the sometimes tenuous link between data, decisions, and actions, and have even described the decision process with a "garbage can" model.[12] The decision-making process itself, largely invisible within the minds of managers, is difficult to understand, document, or improve. While it is at the center of the data-to-knowledge process, decision making may be the element of the process that is least subject to intervention. In our research, we found only a few examples of attempts to address data-driven decision processes. Decisions may be based on high-quality, well-analyzed data, or managers may gather data and not use it, or gather it, analyze it, and make decisions based on unrelated factors. However, if the results of data analyses are not used to inform decisions, then what is the point of capturing and managing the data in the first place?

With some well-structured problems, such as in the case of credit scoring models, this linkage may be automatic. A "yes" or "no" decision is rendered based on the model results. In other cases, such as customer segmentation, the decision will require more active human intervention. The influence of the larger organizational and cultural context will play an important part in influencing just how the decision-making process is configured.

There has been a tendency for organizations to treat managerial decision making as a "black box," subject to neither explanation nor review. However, several of the companies we studied were beginning to consider more active interventions around decision making. One firm, for example, was trying to implement "decision audits," in which not only the result of a decision, but

EX. 6
135

the information and data used to inform it would be evaluated retrospectively. Another firm was planning to record decisions and later return to evaluate them to consider what lessons might be learned. Still, these companies are at the very earliest stages of managing decisions, and the invisibility and irrationality of managerial decision making makes it a very difficult area to address. By becoming conscious of the decision-making process and learning from successes and failures, managers may be able to increase their effectiveness.

## Outcomes in the Model

Context and transformation count for little unless something changes in the organization as a result. It may be tempting to think of the end of the data-to-knowledge process as the point at which a decision is made, or even the point at which the last piece of analysis is completed. After all, it is not normally the responsibility of data access and analysis functions to make data-informed strategic decisions, much less to carry them out. We have included outcomes in our model because they are what bring value to the whole endeavor. Being aware of desired outcomes from the outset may influence what data is brought to bear, how it is analyzed, or what decisions are made. Neither analytic findings nor decisions themselves yield results. It is the process of implementing a decision and the results that determine the effect on organizational performance.

The three types of outcomes identified in our model are behaviors, processes and programs, and financial results. For many companies, financial results may be all that matter in the end. However, they probably will not be achieved without attention to intermediate outcomes, such as changes in behaviors and new processes or projects. It is these outcomes that transform the decision into action.

### Behaviors

Acceptance or adoption of the results of an analytic model by managers alone does not deliver results. Ultimately, improved financial outcomes depend upon the actions of the employees who do the work. A data-based decision to focus on cost control, for example, can require thousands or millions of individual behaviors to curtail spending. If these behaviors do not occur, then the point of the analysis and the decision is questionable.

New behaviors are most likely when those who need to perform them have a clear reason for doing so. Thus, those people "downstream" from the analytic process should know the results of the data-based analysis. For example, any program of customer or market segmentation involves a determination—based on data—of which customers are most profitable to serve. In order to achieve a successful outcome from segmentation, however, marketing and/or salespeople have to treat some customers differently than others. The most valuable customers must be given preferential treatment; the least valuable must be served less expensively, or even "fired." Those serving the customers may not

EX. 6
136

need to know the details of the analysis, but they must believe that it is credible. Other types of behavioral outcomes could include switching suppliers to a preferred vendor, or cross-selling certain products to customers when analysis of data reveals that they would be likely to buy.

### Processes or Programs

In order for data-driven decisions to yield business value, most organizations will need to initiate process and program changes. Often formed in part by an aggregation of behavior changes, process and program changes may be seen as intermediate outcomes of a particular decision.

Analysis of customer transaction data may reveal, for example, that a promotion is not working and that a new marketing initiative is needed. The programs needed may involve training of employees; communications about the promotion to customers, salespeople, or other affected parties; and even development of new computer systems to automate the process of using data to take action. Alternatively, new insights may even lead to the development of new products, such as a new investment fund for a newly identified customer group.

Business processes may also need modification or redesign. If data analysis suggests that a new product development process takes too long, for example, decisions may be taken to shorten it incrementally or radically. In initiatives with a financial objective of improved profitability, data analysis might also suggest the need to modify processes. Owens & Minor's data analysis, for example, revealed that profitability could be increased if supply chain processes were redesigned. Earthgrains similarly concluded from analysis of its ERP data that it needed to redesign the process for invoicing and deductions processing with its customers.

### Financial Impacts

It is important to specify the financial outcomes desired from an analytic initiative to help measure the success of a data-to-knowledge effort. Specific financial results may include improved profitability, higher revenues, lower costs, or improved market share or market value. Although increased revenue is a better value proposition, it is cost savings that usually sell a data-to-knowledge initiative because it is much easier to specify in advance how these will be achieved. Revenue increases, on the other hand, are difficult to predict and measure. Moreover, they are generally harder to attribute to an analytic effort, since many people are eager to take credit for revenue generation.

However they are attributed, we found multiple examples of financial results that could be correlated to specific data-to-knowledge initiatives. Fleet Bank saved $3-4 million dollars when a new market optimization model relying on usage pattern and market demand variables helped executives decide which branches to close. Fleet also exceeded its cost-saving goal of $12 million in 1999 as a result of its "Changing Channels" program, which encouraged customers to

EX. *6*
137

Data to Knowledge to Results: Building an Analytic Capability

switch from more costly channels, such as branch banking, to less costly ones, such as ATMs and Internet banking. This program was based on detailed analysis of transaction data. Earthgrains also saved more than $4 million a year by analyzing data to resolve many more invoice disputes with retail grocery chains in their favor.

## Applying the Model in Practice

In a complex process such as this one, many companies need guidance in determining where to start and which paths are most effective. In Figure 2 we provide a decision tree with the key factors and action steps an organization should consider in building an analytical capability. Although the technology and data environments are overemphasized in many analytic efforts, firms do need to undertake an early assessment of whether or not they have a transaction data environment that is of sufficient quality and robustness to provide data for decision making. If a company is only at the beginning of installing such a system and currently has poor data, any thoughts about turning transaction data into knowledge should be postponed. At Dow Chemical, for example, efforts to install one of the first SAP systems in the U.S. began in the late 1980s. An initiative to turn SAP data into knowledge did not begin in earnest until the mid-1990s, when large amounts of the SAP transaction data became available.

Assuming that the organization has some data with which to work, there is another critical factor to assess before investing in greater analytic capabilities—whether or not senior executives are interested in data-based decision making. If they are not, no amount of data or knowledge is likely to change their minds, and the process of using data to manage the organization will, at best, be tactical. Middle managers who want to build the organization's analytic capability, but who lack supportive executives, are best off doing small projects that demonstrate the value of data-based decisions. If there is at least one sympathetic senior executive, he or she might sponsor an educational effort for other managers.

These two factors—a suitable transaction data environment and supportive senior executives—are go/no-go factors in actively pursuing a broad data-to-knowledge initiative. If they are both present, the organization should proceed with haste. The further choices involve the breadth of implementation of the process and the need for skill-building and cultural change. In terms of breadth, some firms we observed had an organization-wide need for increased analytical capability across multiple functions and units, and they undertook a broad program of data-based analysis, building a general capability that could address multiple business problems and potentially serve the entire enterprise. Kraft Foods sought to build such a generic capability that could address a variety of business issues related to marketing and customer relationships. Similarly, Fleet Bank built a corporate analytic group with more than 50 analysts to address a variety of problems across business functions.

EX. 6
138

Data to Knowledge to Results: Building an Analytic Capability

**FIGURE 2.** A Decision Tree for Implementing an Analytical Capability



EX. 6
139

Data to Knowledge to Results: Building an Analytic Capability

If there is only a focused need for data analysis, it makes sense to address a single business problem or function. Hewlett-Packard's Electronic Measurement Division, for example, used the data-to-knowledge process to address just the issue of maximizing catalog sales to customers. Harrah's was focused on the single issue of customer loyalty and making effective promotions to customers. Of course, firms that choose a single focus for the development of their analytic capabilities can later broaden their approach.

The final choice in the Figure 2 decision tree involves the need for organizational and cultural change, and development of individual analytical skills. Firms that want to progress on multiple fronts in turning data into knowledge may need to transform the culture to more of a data orientation and inculcate the analytical skills described earlier in this article. Such skills can be externally sourced in the short term, but need to be present internally for the organization that is committed to data-based decision making.

To create data-oriented cultures, senior executives must do more than simply sponsor data-to-knowledge initiatives. They must set strong examples with their own behaviors and insist that others make decisions and take actions based on data. Earthgrains is perhaps our best example of instilling such a culture. The company's CEO was known by his colleagues as "data hungry." He had a sign in his office saying: "In God we trust; all others bring data." He had pushed hard to develop norms that would encourage employees to behave as a data-driven organization. In recent years, the quality of management reviews had improved 100 percent, according to one senior manager, because executives were now much more reliant on numbers in explaining their performance and investments. This behavior had trickled down throughout the organization so that sales people were pushed to become users of data. Management assumed that if the sales force worked with the numbers themselves, they would be more confident in what they were presenting to customers.

Assuming that all of these decision tree questions can be answered positively, a firm can begin to integrate analytical capabilities into every aspect of the business. Data from multiple functions and units can be turned into knowledge and used to drive decisions and actions. At Wachovia Bank, for example, the focus was clearly on the holistic approach. Wachovia's analytic capabilities were tightly linked with its business strategy and were supported by a data-oriented culture. In addition, executives were concerned about managing the organizational changes needed to implement data-driven decisions and developing and maintaining a quality data infrastructure. Finally, senior managers pushed to expand use of the bank's evolving analytic capabilities into other parts of the business. At another company, one manager characterized the multiple components of its initiative as a "15-level chess game." Perhaps because the integrated approach requires long-term support from knowledgeable senior executives, we did not find many companies in this situation.

EX. 6
140

## Conclusion

As basic business processes become more automated and generate more transaction data, there will be an even greater need to transform the data they generate into meaningful insights. Some data analysis can actually be automated, and some results can even be turned into decisions and actions without direct human intervention. However, this will be practical for only the most structured and routine decision processes.

For important decisions, skilled human resources will be more important than ever. As transaction data proliferates, the question of where to allocate scarce human attention will become a pressing problem. By all accounts, broader analytic capabilities will be crucial to success. The ability to consider data collection and use within a larger strategic context will thus become more and more important. By applying our framework and starting now to develop data-to-knowledge capabilities, companies can prepare themselves for the deluge of data that is here and is bound to get worse. Astute development of an analytical capability will turn this onslaught into a business opportunity rather than a problem.

## Notes

1. It is the premise of this article that data can significantly help inform decisions and actions. Data-based decisions tend to reflect a reality that is often overlooked when decisions are based on experience, intuition, or other such factors alone. In general, data-based decisions tend to reduce bias and unreliable human traits such as memory. They thus tend to be more consistent, impersonal, and more cost efficient to replicate, transfer, and leverage. Data can also be modeled to predict the future, helping managers make decisions that are timely and responsive to their organization's environment.

2. One of the first books written on the subject of decision support was Peter G.W. Keen and Michael S. Scott Morton, *Decision Support Systems: An Organizational Perspective* (Reading, MA: Addison Wesley, 1978). A subsequent book written on the topic is J.W. Rockart and D.W. De Long, *Executive Support Systems: The Emergence of Top Management Computer Use* (Homewood, IL: Dow Jones-Irwin, 1998).

3. Market size figures are from the *1999 Business Intelligence and Data Warehousing (BI/DW) Program Competitive Analysis Report*, World Research, Inc., San Jose, CA.

4. From here on, we will use the words "analytic" and "data-to-knowledge" to describe the loosely structured process of using transaction data to produce insights that impact decision making and actions.

5. Results from this study, which was funded by the ERP vendor SAP AG, are described in Chapter 7 of Thomas H. Davenport, *Mission Critical: Realizing the Promise of Enterprise Systems* (Boston, MA: Harvard Business School Press, 2000).

6. The studies, in which one of the authors participated, include "Transforming Customer Data Into Information," American Productivity and Quality Center, Houston, TX, 1997, and "Managing Customer Knowledge," Concours Group, Kingwood, TX, 1998.

7. "Evaluating the Sticky Factor of E-Commerce Sites," Rubric, Inc., June 30, 1999, <www.rubricsoft.com>.

EX. 6
141

Data to Knowledge to Results: Building an Analytic Capability

8. Robert Kaplan and David Norton, *The Balanced Scorecard: Translating Strategy into Action* (Boston, MA: Harvard Business School Press, 1996).

9. From D.W. De Long, "'My Job Is in the Box': A Field Study of Tasks, Roles, and the Structuring of Data Base-Centered Work," dissertation, Boston University School of Management, 1997, UMI Catalog#981 1627.

10. One mistake managers and consultants often make is assuming decision makers always approach analysis with a well-formed question related to their business problem. In practice, the process of defining the analytic problem is messy, ambiguous, and hindered by managers and analysts who have very different language, ways of thinking, and views of the world.

11. See, for example, Keen and Scott Morton, op. cit.

12. For a more complete review of the extensive research on decision making see, for example, James G. March with the assistance of Chip Heath, *A Primer on Decision-Making: How Decisions Happen* (New York, NY: The Free Press, 1994); S.J. Miller, D.J. Hickson, and D.C. Wilson, "Decision-Making in Organizations," in S.R. Clegg et al., eds., *Handbook of Organizational Studies* (Thousand Oaks, CA: Sage Publications, 1996).

EX. 6
142



## Autism Programs
### Santa Ana Unified School District

presented by
Debbi Woods, Program Specialist
Marilynn Nehrbass, Program Specialist
Oct. 15, 2007



## Statistics

1 out of 125-150
children is diagnosed
with
Autism Spectrum Disorders
www.autism-society.org



- 1.5 million Americans today are believed to have some form of autism.

- Autism knows no racial, ethnic, social boundaries, family income, lifestyle, or educational levels and can affect any family, and any child.

- There appears to be a genetic predisposition (runs in families) on at least three chromosomes.

- It is four times more prevalent in boys than in girls.



## SAUSD Statistics

- Growth over the past 7 years
  - 2001 = 51 students with ASD
  - 2002 = 89 students
  - 2003 = 118
  - 2004 = 166
  - 2005 = 207
  - 2006 = 275
  - 2007 = 358
- Nearly 1/3 of these students are currently at the preschool level!



## What CAUSES Autism?

- There is no known cause for the condition, but the symptoms and characteristics are caused by abnormalities in brain functioning.

- Some research supports possible causes might be:

  - Exposure to toxic substances or hazardous chemicals
  - Mercury poisoning
  - Childhood vaccines (such as MMR)

- There is no known cure.



## What is Autism?

Autism is a complex neurological-developmental disability that typically appears during the first three years of life and affects the normal functioning of the brain.

It is manifested in deficits in some/all of these areas: **communication, cognition and learning, social interactions, behavior and sensory responses.**



## What is our response

## to these deficits?



### The S.U.C.S.E.S.S. Project

Systematic Utilization
of Comprehensive
Strategies for Ensuring
Student Success

---



### Where the road to SUCSESS began...

- Historical Perspective and Review
  - Interagency Autism Group
    - Started as an Advisory group for a preschool pilot program operated by the Orange County Department of Education. (1995)
    - Membership included: representatives from district and OCDE educational staff, SELPA Directors, Regional Center, parents, and professional agencies such as OC Mental Health and local physicians.



### The road to SUCSESS is always under construction...

The SUCSESS Project evolved out of the IAG as a response to the growing number of students with ASD, our responsibility to meet their unique needs, and as a vehicle to enhance collaboration in Orange County.

*Under the direction of Andrea Walker, SUCSESS project coordinator, OCDE.*

---



**13 Special Education Local Plan Areas (SELPAs) Participate in the SUCSESS Project (28 districts)**

| | |
|---|---|
| Anaheim City (1) | Northeast OC (2) |
| Capistrano (1) | Orange (1) |
| Garden Grove (1) | Santa Ana (1) |
| Greater Anaheim (5) | |
| Irvine (1) | South OC (2) |
| Newport-Mesa (1) | Tustin (1) |
| North OC - (5) | West OCCSE (5) |

### Quality Indicators of S.U.C.S.E.S.S.

- Staff Development
- Utilization of Various Instructional Strategies
- Curriculum
- Structured Environment
- Evaluation of Student Progress
- Supportive Services
- Support of Families

EX. 6
144

2



## S.U.C.S.E.S.S. Project Goals

- Effective *Assessment and Identification* of student needs for students across the Autism Spectrum through **Staff Development and Program Development**

- Effective and coordinated *Service Delivery Model* for students across the Autism Spectrum through **Staff Development and Program Development**



- **Address the *Core Deficits* of students with Autism through Staff Development and Program Development**
  - Communication
  - Social Thinking/Social Behavior & Interaction
  - Sensory Processing
  - Motor Planning
  - Cognitive Learning Style/Executive Functioning



## Trainers and Speakers

Bobbie Albanese - Attorney
Barbara Bloomfield - (Icon to I Can)
Dr. Andy Bondy and Lori Frost - (PECS)
Dr. Marjorie Charlop-Christy
 Claremont University
Dr. Rebecca Cox - UC Los Angeles
Dr. Roger Cox - Division TEACCH
Dr. Paul Dores - Clinical Psychologist
Dr. V. Mark Durand - U. of Albany
Dr. Pauline Filpek - UC Irvine
Dr. Lauren Franke - (Links to Language)
Dr. BJ Freeman - UC Los Angeles
Dr. Stanley Greenspan - (Floortime)
Dr. Sandra Harris - Rutgers University
Dr. Ron Huff - Regional Center. - No. Calif.
Drs. Koegel & Koegel - UC Santa Barbara
Dr. Ron Leaf - Autism Partnership

Dr. John McEachin - Autism Partnership
Dr. Gary Heniber - Division TEACCH
Dr. David Monkanth - (Social Skills)
Janette Merey - Occupational Therapist
Mary Owens - Cal State - Los Angeles
 Parent Panels
Pam Payne - (Links to Language)
Dr. Barry Prizant - Brown University
 PROMPT trainings
Dr. Gail Richard -E. Illinois University
Emily Rubin (SCERTS model)
Maureen Ryan - (Icon to I Can )
Dr. Laura Schreibman - UC San Diego
Dr. Bryna Siegel- UC San Francisco
Dr. Phil Strain - U. of Colorado
Dr. Roger Tigemerez - CCDE
Dr. Diane Twachtman-Cullen - Connecticut
Michelle Garcia-Winner - San Jose



While traveling down the road to SUCSESS, we have learned many things; not the least of which is how to make...



## Alphabet Soup

A B C D E F G H I J
K L M N O P Q R S
T U V W X Y Z



ABA = philosophy

IBI/DTT = strategy



## What is the difference between **ABA** – IBI/DTT

- Applied Behavioral Analysis
is the science in which tactics derived from the principles of behavior are applied systematically to improve socially significant behavior and experimentation is used to identify the variables responsible for behavior change.  **It is a psychological approach to changing human behavior.**

Applied Behavior Analysis, Cooper, John O. et al, Merrill Prentice Hall, 2007



## Components of ABA

- Change in behavior involves analyzing the relations between environment and behavior:
  - ANTECEDENT – a verbal or physical stimulus such as a command or request
  - BEHAVIOR – the individual's response
  - CONSEQUENCE – the outcome, conditional to the behavior



## IBI/DTT

- Intensive Behavioral Instruction/ Discrete Trial Training
**is a systematic instructional approach to changing human behavior based on the principles of ABA.**  The specific steps involved in the strategy are:

Stimulus – Response – Consequence – Interval



## DTT involves:

1. breaking a skill into smaller parts
2. teaching one sub-skill at a time until mastery
3. allowing repeated practice in a concentrated period of time
4. providing prompting and prompt fading as necessary
5. using reinforcement procedures



## ABA and IBI/DTT

The philosophy of ABA is what underlies the strategy of DTT to change and shape behavior, including new learning.

IBI/DTT is a strategy within the framework of ABA

(And, it is simply GOOD TEACHING!)



## Effective Instruction...

- respects the neurology of autism
- is structured
- is developmental and hierarchical
- is individualized (based on student performance data)
- facilitates independence
- builds "internal" competence
- is motivating
- generalizes across contexts
- includes practice of learned skills
- provides positive behavioral supports
- maintains active engagement
- promotes socialization
- is research based

Leslie Fagon – Program Specialist, ABC Unified School District - Cerritos CA



### SAUSD's Integrated Model

focuses on:

- Applied Behavioral Analysis/Discrete Trial Training
- TEACCH (Structured Teaching)
- Picture Exchange Communication System - (PECS)
- Links to Language - (Links)
- Behavioral Analysis for Successfully Initiating Change - (B.A.S.I.C.)
- Social Understanding/Social Thinking Instruction
- SCERTS model




### SAUSD Training/Staff Development

- DTT by Glenda McHale, Consultant, Greater Anaheim SELPA
  - 2 day didactic
  - 5 day intensive hands-on

  **Student Engagement — Motivation — Reinforcement and the strategy of DTT
  Stimulus — Response — Consequence — Interval**



### On-Going (in-district) Trainings and Staff Development

- Follow-up DTT
  - IBI curriculum
  - data collection
  - levels/schedules of reinforcement
  - levels/functions of prompts
  - mass trials
  - errorless learning
- Visual Supports
- Behavioral Supports
- Parent Trainings



### SAUSD's Supplemental (IBI) Curriculum

- Some sources:
  - Behavioral Intervention for Young Children with Autism by Catherine Maurice
  - A Work in Progress by Ron Leaf and John McEachin
  - Our Own Developmental Scope and Sequences and various other assessments and curricula
- 20 domains, up to 14 phases within various domains



# Where the road has taken us...



### SAUSD's model

- Personnel:
  - 2 Program Specialists
  - Autism Itinerant Resource Teacher
  - classified Lead Instructional Assistant
  - moderate-severe Teachers
  - moderate-severe Instructional Assistants
  - "roving" Independence Facilitators

EX. 6
147                                                5

 **Independence Facilitators**

Trained full and part time instructional assistants travel from school to school to support students in various educational settings with:

| | |
|---|---|
| IBI/DTT | visual supports |
| BSP/BIP | social skills |
| integration with typical peers | |

 **"Road Trip" Partners**

- Site Administrators
- School Psychologists
- Speech/Language Pathologists
- Adapted PE Teachers
- Occupational Therapists
- Physical Therapists
- AT/AAC Specialists
- NPA/NPS

 **Current Programs**

- Birth – 5 years old:
  - Early Start (birth – 3 years old)
  - SUCESS classes (Autism-specific)
    - Inclusion model
  - SDC (M-S/M-M) with SUCESS support
  - DTT Clinic
  - Social Skills groups
  - community-based preschools with Independence Facilitator
  - home ABA programs


- Elementary/Secondary Levels
  - S.U.C.S.E.S.S. classes (severe)
  - Moderate Autism Classes (moderate)
  - moderate-severe SDC with SUCESS aide
  - mild-moderate SDC with SUCESS aide
  - general education classes with independence facilitator
  - charter/fundamental schools
  - after-school tutoring/social skills groups
  - in-home programs
  - NPA support

 **Staff Support and Monitoring**

- Team Meeting/Coaching
  - weekly classroom staff
  - monthly program staff
- Individualized "Staff Needs" Plan
  - goals and objectives
- Total Staff Meetings each trimester
  - teachers/aides/rovers

 **Educational Placements**

- Students with Autism Spectrum Disorders are appropriately placed in:
  - general education classrooms with/without special education support
  - mild-moderate special education settings
  - moderate-severe special education settings
  - Autism-specific programs (SUCESS & MAC)
  - Settings outside of SAUSD

EX. 6
148

6



## Teaching Strategies used with all students, in all settings

- structured classroom setting
- direct instruction/teaching
- visual supports
- organizational structures
- cues/prompts/signals
- consistency/routines
- social opportunities



## Next steps down the road...

- Of Note:

  **Formation of Orange County SUCSESS Project Advisory Panel**

  **Guiding school districts in their continued effort to provide state of the art research-based programs in OC schools.**

EX. 6

## BIOGRAPHY OF JUSTICE ARTHUR GILBERT

**DATE OF BIRTH:**  December 29, 1937

**PLACE OF BIRTH:**  Los Angeles, California

**JUDICIAL:**  Presiding Justice Court of Appeal November 1999 – Present
Associate Justice Court of Appeal December 1982 – November
1999-Second District, Division 6

Los Angeles Superior Court, March 1980-1982
Assignments included Juvenile (Supervising judge, Inglewood),
Criminal, Civil and Law and Motion

Los Angeles Municipal Court, 1975-1980
Supervising Judge of Los Angeles Traffic Court 1976 to 1977
Instituted: Translations of traffic citations into Spanish;
        Educational programs for DUI offenders;
        Widespread community service programs.

**EDUCATION:**  California Center for Judicial
Education and Research, Judges
College, Berkeley, California, 1976

LLB University of California
at Berkeley, California, Boalt Hall,
1960-1963

Bachelor's Degree - University of
California, Los Angeles; Major in
English Literature, 1956-1960

**PAST LEGAL EXPERIENCE:**  Private Law Practice, specializing in commercial transactions and
civil and criminal litigation,  1965-1975

Deputy City Attorney, City of Los Angeles,
Trial Attorney in Criminal Division, 1964-1965

JUSTICE ARTHUR GILBERT
PAGE 3

HONORS:
Champions of Justice, Radio Interview
KRLA 870 AM, September 2006

"Distinguished Speaker"
The Stephen E. O'Neil Memorial Lecture Series
Loyola Law School, March 2005

Faculty, Program for Serbian Judges, Prague, Czech Rep.
"Judging in a Democratic Society."  Program under auspices of
Central and Eastern European Law Initiative (CEELI) 2001

Fellow of the Witkin Legal Institute, 1998 - Present

"Appellate Justice of the Year" 1997- Roger J. Traynor Memorial
Award Consumer Attorneys Association of Los Angeles

Faculty, Program for Russian Judges, Moscow, Russia.  What is a
Fair Trial?  Program under auspices of Central and Eastern
European Law Initiative (CEELI), 1995

Judicial Excellence Award- Criminal Courts Bar Association,
1994

Twice named "Appellate Justice of the Year" by California Trial
Lawyers Association, now Consumer Attorneys of California,
1993 and 1984

Distinguished Jurist Award-
Beverly Hills Bar Association, 1992

Guest speaker Budapest, Hungary -Symposium for Hungarian
Judges on American Jurisprudence, sponsored by Hungarian
Ministry of Justice and the Center for Democratic Legal
Institutions, 1991

Bernard S. Jefferson Award for contributions to legal education
by California Judges Association, 1987

EX. 6
151

JUSTICE ARTHUR GILBERT
PAGE 5

"Tempering the CSI Effect"
California Courts Review
Fall 2005

"The Truth About the Terri Schiavo Case"
Premier Edition of California Courts Review
Summer 2005

"Arts and Crafts" The Judges Journal
American Bar Association Fall 2003 Vol.42 No. 4

"Judicial Opinion – Notes to Myself"
California Litigation, Journal of the Litigation Section, State Bar
of California Volume 16 No. 22003

Editor and Contributor to 2005-1998 Supplements, Jefferson's
"California Evidence Benchbook," Third Edition

Member of Editorial Board and contributor to various chapters
Jefferson's "California Evidence Benchbook," Third Edition
(1997) published by Continuing Education of the Bar (CEB)

Consultant to Continuing Education of the Bar (CEB)
for publication of "California Civil Appellate Practice"
3rd Edition 1996

"The Terror of Harmless Error"
California Litigation Journal of the State Bar of California
Fall 1995

"A Conversation with B.E. Witkin" - Interview legendary legal
scholar Bernard Witkin on his life and philosophy.  Videotape
produced by the California Judges Association.  September 1994

"A Beacon of Justice" - Book Review of
*The Justice From Beacon Hill: The
Life and Times of Oliver Wendell Holmes
California Lawyer,* September 1991

"Civility - It's Worth the Effort"
*Trial,* Journal of the Association of Trial Lawyers of America
April 1991

EX. 6
152

The Story of
# MEASURE FOR MEASURE

THE Duke of Vienna, absenting himself from the city hastily and a little mysteriously, leaves his power in commission to Angelo, as deputy and, in lesser degree, to an elderly lord, Escalus. There is a buzz of conjecture among the Viennese gentry (including Lucio) as to the Duke's plans until their attention is distracted by the appearance of Mrs. Overdone, a bawd, worried about the decline of her trade and her man Pompey's advice that the bawdy-houses of the city are to be shut down.

The deputy's harsh enforcement of the law is apparent too in the arrest of one Claudio whose betrothed, Juliet, is pregnant although their betrothal is between the formalities of the marriage contract and the marriage proper. Claudio begs Lucio to ask his sister, Isabella, to intercede with Angelo on his behalf.

Meantime the Duke, it appears, has not left the city at all but, disguised as a Friar, chides himself for having been too slack in enforcing the law and allowing the city's license to grow. But he seems, in turning the problem of enforcement over to Angelo, to take some notion of testing Angelo as well.

Lucio discovers Isabella, a novice in a nunnery, ready to take her vows and has no difficulty enlisting her still not very confident aid as intercessor for Claudio's life.

Angelo answers old Escalus' doubts about his rigid enforcement of the law with sharp severity and looks on impatiently as Escalus hears a very confused case brought in by Elbow, an earnest but muddled constable whose charges are deflected systematically by the lively Pompey. As a consequence Elbow's case dissolves while the accused (Froth) goes off, like Pompey, with no more penalty than a word of warning from the indulgent Escalus.

Angelo admits Isabella and hears her eloquent plea with impatience, discovering with incredulous dismay as she proceeds that her innocence has uncovered a capacity for corruption in himself. He temporizes with her and asks her to return the next day.

The Duke (in a Friar's habit) gives counsel to the penitent but still proud Juliet.

Angelo, in an agony of self-discovery, but determined to possess Isabella, engages her in a fierce argument from which his purpose emerges at last, flat and ugly. Thunderstruck, Isabella at first demands a pardon lest she proclaim his infamy. With horrible ease Angelo leaves her ("Who will believe thee, Isabel?") and Isabella, sick with apprehension, goes off to see her brother in prison, now plainly bound to die.

Meantime the Duke strives to persuade Claudio that death is not to be feared and seems to have managed the task when Isabella arrives to tell her brother what has come of her plea to Angelo. Claudio, incredulous, is at the same time desperately sure that he wants to live even at the cost of his sister's honor. It is a price she cannot pay and she is leaving her despairing brother with contempt when the Duke (as Friar) intervenes and suggests an alternative in this grisly game of life and death, honor and infamy.

He insists that Angelo is concealing honorable intentions under his dreadful proposition and proposes a ruse ("the bed trick") as remedy. Angelo, it appears, was once affianced to one Mariana but avoided marriage when her dowry and her soldier-brother were lost in a shipwreck. He proposes that Isabella return to Angelo, apparently submissive, make the shameful arrangements and then that the wronged Mariana take her place. Isabella agrees.

Elbow appears haling Pompey into the prison. The Duke berates him as a bawd and, Lucio appearing, Pompey turns hopefully to him for help. Lucio refuses cheerfully and engages the "Friar" in a conversation about the Duke which is anything but flattering. The Duke muses on this calumny as officers bring Mrs. Overdone to jail. She has some unflattering things to say about her accuser, this same Lucio, and flings an accusation back at him. By her account he fathered a bastard by one Kate Keepdown, a child Mrs. Overdone has herself cared for since. The Duke introduces himself to Escalus as a special legate from the Pope, speaks sharply of

EX. 6
153



# MEASURE FOR MEASURE

## DUKE GOES UNDERCOVER; FANATICAL AGENT OF LAW AND ORDER EXPOSED AS FRAUD

**Period**

16th century

**Setting**

Vienna

Fundamentalists, fascists, and rigid authoritarians have something in common: they adhere to the letter of the law, not the spirit of it. With their inflexible moral stance, they often miss the point, stomping about in heavy boots, destroying what they claim to value.

As this play opens, everyone agrees that something must be done: Vienna is out of control. It is a city of vice, booming with bordellos and enduring a tsunami-sized crime wave. The duke, having ruled unsuccessfully from the top down, realizes he has lost control of the situation. He decides to dress in disguise and see the city from the bottom up to discern what can be done. To this end, he announces his departure and appoints Angelo as chief deputy.

Chief Deputy Angelo is rigidly obsessed with law and order, a stickler for detail. He decides to make an example of someone and, in a city teeming with con men and crooks, Angelo turns his vengeful eye on young Claudio. When Claudio and his sweetheart, Juliet, had premarital sex, two things happened that complicated their young lives: Juliet got pregnant, and the family lies postponed the wedding in a feud over the dowry. Awaiting their wedding day, the young lovers have been living together as husband and wife, like hundreds of other casual couples in the city. Technically, however, such an arrangement is an offense punishable by death.

Angelo brings the entire letter of the law down on the head of young Claudio. While thieves, gamblers, and bordello owners look on, Claudio is paraded through the streets as an example of immorality. In three days, he will be executed.

Desperate, for a reprieve, Claudio decides to ask his sister Isabella for help. Just a rosary bead away from

entering a convent, she judges her brother's sin harshly, but decides to go to brother's sin harshly, but decides to go to brother for Claudio's life. Cold-hearted Angelo takes one look at Isabella and melts. Telling her to return the next day, he thinks up a plan. If Isabella will surrender her virginity to him, he will spare her brother.

Angelo pitches his idea to Isabella the next day, saying, "redeem thy brother by yielding up thy body to my will." In short, the self-righteous deputy who demands illicit sex. Isabella is damned for having illicit sex. Isabella is appalled at the hypocrisy and refuses the deal. She's told to go away and think about it for one day. If she won't change her mind, Claudio will be tortured to death.

Isabella visits her brother in his prison cell and tells him about Angelo's insulting proposition. On the one hand, Claudio is outraged; on the other hand, he really wants to live. He contemplates his death and concludes:

*The weariest and most loathed
worldly life
That age, ache, penury and
imprisonment
Can lay on nature, is a paradise
To what we fear of death.*

Maybe, he suggests, Isabella could sleep with Angelo just this once. "Sweet sister, let me live." But it's not so easy. Isabella can't imagine being defiled by Angelo, the filthy fraud, even for a good cause.

The duke, exploring his city disguised as a friar, has overheard the whole sibling conversation. He tells the

brother-sister duo something that may help them. There is a woman named Mariana who is in love with Angelo, even though he dropped her when she lost her dowry. The friar/duke suggests that Isabella and Mariana pull a "bed-trick" on self-righteous Angelo. Maybe Mariana would be willing to pretend to be Isabella for a night in Angelo's bed. And willing she is: Isabella tells Mariana about the rendezvous with Angelo planned for that night. When Mariana shows up in the garden, Angelo doesn't know the difference between one woman and another. He thinks he's with Isabella.

After the tryst, his lust sated, the world-class hypocrite goes back on his word and, instead of freeing Claudio, secretly orders his beheading that night. When the friar/duke learns of this, he tries to find someone who might substitute for Claudio. This proves to be easier said than done. A condemned convict named Barnardine is asked if he'd mind losing his head, but the man protests that he's too drunk to die. He's spared. Luckily, a pirate died in the prison jail that morning, and it is his head that is chopped off and sent to Angelo. Although her brother's head is safe, Isabella is told he's been beheaded by the order of Angelo.

The duke decides he has seen enough and ceremoniously returns. He is met at the city gates by Isabella, who publicly accuses Angelo of his crimes. The chief deputy isn't worried; after all, it is her word against his. Then, Mariana steps forward to tell her part in the scheme. The duke once again puts on his disguise as friar to further the suspense. At an opportune moment, he pulls off the disguise and reveals that he

Name Dropping
By Anthony J. Mohr
600 S. Commonwealth Avenue
Los Angeles, CA 90005
818-766-3367
e-mail: amohr@lasuperiorcourt.org
5,258 words

The Defendant's motion for summary judgment in Henry Cough vs. Pacific States Transport, Inc. reached the Superior Court the first week of January. After stamping the papers and collecting the filing fee, the clerk logged the document onto the register of actions and set the matter on Judge Eldridge Hsieh's afternoon calendar. Next, she placed the eight volume case file on a pushcart. Following her break, she wheeled the mass of papers to Judge Hsieh's courtroom where Jennifer Hallstrom, the judge's law clerk, started her review of the motion. She brought it to her boss' attention after the opposing and reply papers came in. Judge Hsieh was fighting a cold. As Ms. Hallstrom mentioned the name of the case, the jurist started coughing, a series of dry hacks that persisted until he popped a cherry-flavored lozenge. Jennifer thought, absent-mindedly, that the cough drop matched the color of the judge's cardigan sweater.

"Well," he said lightly, "I won't forget the name of *this* plaintiff, will I?"

"Not likely, Your Honor," the law clerk replied with just the right touch of amusement.

"We don't have anyone named Sneeze or Hack on our docket, do we, Jennifer?"

"I don't think so, your Honor."

1

"Not in this case," Jennifer Hallstrom announced with authority. Before her clerkship she edited the USC Law Review and wrote an article about employment litigation. "His public policy arguments don't fit into Foley or Tammany. His contract claim falls into the Guz fact pattern. To be brief, the company did nothing wrong, like violating the law or retaliating against him. This guy may have worked there a long time, but he can't show you any evidence that they promised to keep him forever, or even for a number of years. Remember what the Supreme Court said in Guz vs. Bechtel." She looked down at her notes for a moment before continuing. "While the implied covenant of good faith and fair dealing requires mutual fairness in applying a contract's actual terms, it cannot change those terms. If the employment agreement allows either party to terminate for any reason or for no reason, the implied covenant cannot decree otherwise." She said it with the bearing of a law professor correcting an errant student.

"What about that supervisor, the one who said, 'We'll always value your loyalty and hard work?'" Judge Hsieh asked. "Listen to this again." He flipped the appropriate tab. The declaration he wanted lay beneath a hundred listened quietly pages of exhibits. The judge read the pertinent sentence to his law clerk.

When he finished, Jennifer Hallstrom leveled her green eyes at her boss. "It means nothing. First of all, they were having a beer after work. Second, the law is clear. This plaintiff cannot present any evidence that warrants a trial. He'll just be wasting valuable court resources." Jennifer said the buzzwords so professionally, with just the right inflection and emphasis. Valuable Court Resources — that scarce commodity to be cherished and guarded like a holy grail.

The judge rubbed his eyes.

Jennifer Hallstrom continued. "And the plaintiff does not obtain rights just because he told a co-worker what allegedly was occurring. He had to tell his direct supervisor. He never did."

Eldridge Hsieh looked beyond Jennifer to his ego wall. He saw his certificates and an autographed photo of the governor who appointed him to the Superior Court. He lingered over a plaque – the one below his Boalt Hall diploma – from Partners in Education. He represented them for free when he was in practice.

3

"Your Honor," Cough's attorney began in response. His eyes were blazing. He already was speaking too loudly. "My client does not pronounce his name like the word 'cough.' It is pronounced C-O-E." It was the first time anyone -- judge, clerk, staff -- knew how the plaintiff said his name. Jennifer glanced at her fellow law clerk. They stifled a titter. Robert the bailiff saw them and suppressed a grin. No one dared look at the court reporter. Tracy laughed too easily.

Judge Hsieh did not laugh. He responded politely, "Thank you for correcting me, counsel. I'll do my best to remember."

"I would hope you would remember, Your Honor. My client has a name. Henry Cough. That is my client's name." Counsel's voice was still too loud.

Judge Hsieh replied, calmly, "Please understand, counsel, that my staff and I have been working on this case for some time. No one told us the correct way to say his name. We'll try to remember from now on."

The lawyer flared. "My client is entitled to the dignity of his name, correctly pronounced."

The judge held his temper in check. "Indeed he is, counsel. Now shall we proceed with the merits of this argument?"

"Your Honor, Mr. Cough was waited a long time to be in front of you. He has endured threats. He has endured insults. Just read his deposition where defense counsel deliberately mispronounced my client's name, made fun of him, insulted him—"

"Shall we proceed with the merits, counsel?" Judge Hsieh cut in, his voice raised a decibel.

Mr. Cough's lawyer continued. "Look, right here in the transcript he says –"

The silver haired defense attorney was on his feet. "Judge, this is sheer nonsense what you're hearing. We never –"

Hsieh held up a hand, palm out. "You'll get your turn, Mr. Silliman. Now shall we address the merits?"

The shaved head's lips worked but for a second no words escaped. "Yes, Your Honor, we shall. Sorry for the emotion. My client has been under a lot of pressure." In the rear of the courtroom, Judge

5

division manager took over, he was justifiably concerned about the overhead. He sent out a memo warning that the division's overhead budget of $780,000 was, and I'm quoting from the plaintiff's own deposition where he admits this, 'positively our upper limit' and was 'subject to reduction since the real goal is considerably less than this figure.' They were constrained to eliminate the plaintiff's job. The reason he was selected for layoff was to reduce costs as well as a downturn in work. And that's documented. Look at Exhibits 35 through 42. Then his supervisor encouraged him to apply for another division. Airfreight. Water cargo. Rail. If that isn't enough, Judge, the plaintiff did not specifically apply for any of the other positions in the company and never let anyone know what other skills he had. They all thought he only knew about trucks. He never said anything different. And the plaintiff admits all of this in his deposition. Sure they hired Keith and Klabin to fill those openings in the other divisions, and both men are younger than the Plaintiff. But the Plaintiff never applied, never submitted a resume. Had he done so, he might have been retained. Bud Janzow acknowledges that at page 112 of his deposition testimony. But in any event, Your Honor, the Company Manual is very clear on this point. It's in the record as Exhibit 9, and if I may quote paragraph 5 to you—"

"I know what it says, counsel," Judge Hsieh interrupted, his voice a little more testy than he would have liked.

Silliman moved on, unfazed. He cited more nuggets from the same depositions his opposing counsel had used.

Judge Hsieh leaned back in his leather chair. He recalled an exercise in which he participated ten years ago, at the Judicial College. They showed the new jurists a video of a small claims dispute. Then they asked the group to vote. The split was almost even. "You're all correct," the instructor announced. "There is no right answer to this one."

Judge Hsieh paused a moment, then placed his hands on the bench. "Thank you both, counsel. Well argued. The matter will stand submitted."

A steady rain was falling by the time the judge reached his house. His front garden smelled sweet in the moist air. Lucille was preparing dinner. He kissed her and asked if she had made reservations for

7

"Well, dear, I'm spoken for tonight. If I don't finish this book by the meeting, they put me in the dunce corner." Lucille kissed her husband, then put feta cheese on top of the arugula.

Somewhere between his salmon and coffee, Judge Hsieh realized that he wanted to know more about Henry Cough. The feeling was odd. Usually he barely noticed the names of the litigants. They meant nothing other than to separate one case from the next. Tonight his mind kept skipping back to the start of oral argument. He replayed the image: head bowed, torso heaving silently. "My client has a name. Henry Cough. That is my client's name." His lawyer's cry looped through the judge's mind.

He joined his wife in bed shortly before the eleven o'clock news. "I read all the depositions. Henry Cough. His boss. His wife. Even the psychologist the defense hired. Did you know," he said to her, although his voice sounded as if he were addressing himself, "that Henry Cough was the second of six children? He came out to California with his parents on Route 66. They spent three nights in Oatman, Arizona. No one goes there anymore. Remember we passed through Oatman twenty years ago? There were donkeys in the streets. Then they drove across the desert. They were broke, and his father had to take an odd job in Amboy in order to buy a meal for the family. Henry Cough's father was killed in a car accident a week after they got to LA and found a place to live."

"That's sad," his wife replied. She did not know what else to say. Before tonight she never heard her husband talk this way about a case.

His voice remained a monotone. "Henry Cough never finished school. He had to drop out and get a job to support his family. His mother worked as a secretary until she got arthritis and couldn't type. Then she took in laundry. She died when he was seventeen. He had a paper route. He bagged groceries, and he mowed lawns. When he got older he worked in fast food places. He made enough money to put some away. He used his savings to pay the tuition for trucking school. He became a trucker the day he turned twenty-one. That's how old you have to be to be a trucker in California. Pacific States hired him immediately. He worked hard for them, drove the tough routes, got the loads in on time, often ahead of time. Someone recognized that he was responsible, and they started him up the ladder."

"That was a long time ago," Lucille said in her most soothing voice. "Does that have anything to

9

should? The judge sighed. Under the blankets he found Lucille's hand and squeezed it. "Oh honey," Lucille whispered as she embraced her husband. She felt his body tremble, but he said nothing. She lay still, her arms around the judge, stroking his gray hair.

Eldridge Hsieh could hear Henry Cough telling his siblings that he successfully completed that trucking school. He navigated a rig out of town, up the Cajon Pass, through the Apple Valley, and back down the pass. Like most truckers, he learned to drive in a manner more courteous than motorists realize.

"It's OK," Lucille whispered. "It has to affect you once in a while. All those cases? Somebody has to get to you now and then."

He lay silent. He feared he would cry if he uttered a word. He imagined Henry Cough standing awkwardly in his supervisor's office, hands folded in front of him, digging his feet in the shag carpet, facing a boss who was seated at a cheap desk. The office probably had imitation wood glued on the walls. The boss was congratulating him on being hired. As he spoke the words, he was giving Henry Cough a thick notebook with the words "Company Manual" on the cover. The boss gave it to Henry Cough the way you passed out candy while he continued talking about their bright future together.

Lucille kissed him lightly on the forehead. "You've always been sensitive, honey. It's OK. It's one of the reasons I love you."

The scene shifted in the judge's brain. Henry Cough was standing in a cubicle with a new, younger supervisor. A loose-leaf notebook lay open. The supervisor was pointing to Paragraph 5. Another man entered the cubicle. He wore a uniform. His eyes avoided Henry Cough's as he snatched away Henry Cough's keys. The judge's imagination jumped through the remaining scenes: Henry Cough at home sending out resumes. Henry Cough in waiting rooms with younger men and women, all there for job interviews. Henry Cough behind the wheel of a big rig at night on a two-lane highway, headlights coming on. The judge was falling asleep now. Numbers and columns and reports invaded his mind. Shortfalls. Budgets. More headlights. Then the judge pictured the resume that for some reason Henry Cough never sent to the other divisions of Pacific States Transport. It was the resume that should have been an exhibit to prove Cough would have qualified for the positions filled by Keith and Klabin. But the resume was not an

11

EX. 6
160

were conferring in chambers. "So Jennifer called you about lunch tomorrow," he said with a grin.

"I get the feeling she wants to recruit me for her law firm," Green answered confidently.

Judge Hsieh raised his eyebrows at him. "You could do a lot worse than work for her firm. They're a powerhouse. Please give her my regards. So tell me about this summary judgment motion we have for tomorrow." With that the judge picked up the file in Clark vs. Sidney Drucker, M.D.

Dennis had spent time on this one. "OK. The plaintiff's son was in the hospital. He was real sick. This guy Drucker operated on him to insert a shunt because he needed kidney dialysis. It was supposed to be a simple procedure but Drucker severed an artery. The son started bleeding internally. They called in a vascular surgeon who apparently saved his life. The mother's in a waiting room; she gets impatient because so much time is going by, so she sneaks down the hall to the operating room. I guess no one stops her. She sees at least some of what was going on. She saw them working on her son and claims his arm looked purple and blown up like a beach ball."

The judge thought for a moment. "So the plaintiff is proceeding on the bystander theory of negligent infliction of emotional distress, but she didn't see the surgical procedure in which the surgeon committed malpractice. If I remember right, the plaintiff has to be present at the scene. Sounds like she wasn't there, at least not at the operation itself."

"First of all, this isn't just 'any bystander.' This is his mother. The father's dead; the son's a little developmentally disabled; and they dote on each other. He's all she has. This is one of the closest mother-son relationships you'll see," Green said forcefully. Listen to what he—"

"They put *that* in the statement of facts?" Judge Hsieh interrupted.

"Yes, they felt it was important that we understand who we're dealing with—"

The judge all but spat his next sentence. "Ridiculous. It's irrelevant and their lawyer knows it. I don't care if we're dealing with an axe murderer. The question is whether she's present at the scene of the injury-producing event at the time it occurs and is aware that the event is causing injury to the victim."

His law clerk was ready. "That actually is not what the cases say. The language also covers someone like Katherine who saw —"

13

*ADVOCATE*

October 2005 Issue



By Honorable Arthur Gilbert
*Presiding Justice, CA Court of Appeal, 2nd Appellate District, Div. VI*

# Arts and crafts

"Treat your work as a craft, then master the craft, and you will be successful." Those words my grandfather, a builder of pianos, told me when, at the impressionable age of 14, I announced at a family dinner that I would be a jazz pianist. I remember my mother saying, "Please, not a musician." The type of music I would play was not relevant. To this day, the anguish of her tone lingers in my memory like a Miles Davis solo.

Through my teens and early adulthood, I considered still other unsuitable careers, which as luck or fate would have it, did not come to fruition. I did not become an English professor, a journalist, or a card-carrying member of the Musician's Union. I played gigs as an avocation and forced my views about literature on patient friends rather than hapless university students.

Throughout the years, however, my grandfather's exhortation stayed with me. He believed that his conception of a craft applied to all endeavors, artistic or otherwise. I was dimly aware of a plausible parallel between the craft of bending the wood to make the perfect curve in a grand piano and my application of harmony and theory to create a piece of music. But music also involved touch, feeling and imagination. Was it therefore something more than a craft? I wish I had discussed this issue with grandfather before he died.

But I found his axiom particularly useful in my law practice. Though I drafted complaints, agreements, and motions, I was more than a mere draftsman. I saw my work as a craft of the highest order. Then I became a judge. When I took the oath of office, it occurred to me that protecting and defending the Constitution was an undertaking too lofty for a craft. Nevertheless, my judicial work bore obvious similarities to my work as a lawyer. Therefore I did not discard the notion that judging was a craft. Nor did I dwell on it. As to the nagging thought that

judging, like playing or writing music, was more than a craft, I tucked it away in a bottom drawer in my mind. But then a series of events forced me to open that drawer, wipe the dust from my vague doubt and consider it anew.

It all started when the Presiding Judge appointed me court historian. This was not a job I wanted, but I did not refuse. True, she had the absolute authority from which there was no appeal to assign judges to various departments and locales within our sprawling judicial district. But I accepted the job because, along with most everyone else on the court, I liked her. No doubt her engaging personality, as well as her ability, got her elected PJ. And besides, I thought the role of court historian would be a cinch. Little did I know this misconception would be short lived.

It was my responsibility to oversee the publication of a history of our court in celebration of its upcoming 100th anniversary. What does one include in a court's history? Of course the most tangible embodiment of a court is the courthouse. But it occurred to me that a court cannot be judged by its building, just as a book cannot be judged by its cover. This marvelously discerning perception I planned to include in the introduction.

That is not to say I would ignore the courthouse. I would include photographs of that grandly ornate structure with its Grecian columns. Our former courthouse, built in the early 1900s, stood only four blocks from our present mundane quarters before it had been razed decades ago ostensibly for "safety reasons." But I would emphasize something far more important, the lifeblood of any court, its judges.

All the sitting judges had written their own brief (some not so brief), judicial autobiographies for the court's Web site. With minor editing, I thought my work would be a breeze. In theory the Web site gave interested members of the public (that means voters) insight into

their local judiciary. A mere perusal of the biographies would lead any interested citizen to conclude that the judges of our court were without doubt the most brilliant, fair and worthy judges any concerned citizen could hope for. I didn't know whether to call it the Website of Insight or Foresight.

I thought I would include at least portions of these biographies in the publication. Editing them might create resistance from some of the judges, but with the judicious use of finesse, I thought I could accomplish the task without difficulty. But then I realized I must include in the history, short biographies of retired judges and those who had passed on to the great courtroom in the sky.

This involved compiling important statistics: date of birth and death (if applicable), law school, earlier education, when appointed, and maybe a benign anecdote or plaudit recalling an accomplishment that most likely no one remembers, other than the judge – provided that he or she is still alive.

The clerk's office supplied me with a list of all the judges who had served on our court. I obtained photographs of the four judges who sat when the courthouse first opened. Any one of the portraits could have adorned a box of Smith Brothers cough drops. If one could glean from these judicial portraits even a hint of a personality trait, it would not be mirth. Their severe expressions alone were a deterrent to crime.

The project consumed more time than I had anticipated, but my labors proved beneficial. It was in my efforts to gather data about the past judicial life of one judge who had retired about 30 years ago that I considered anew my vague notions about the so-called craft of judging. His name caught my attention: Judge L. Foote.

One of the judges on our court wrote a monthly column for a legal periodical

*See Gilbert, Next Page*



By Honorable Arthur Gilbert — continued from Previous Page

Judge Foote was a G.L.S. (Genuine Legal Scholar). "If his name called to mind one of the finest jurists ever to live, he was damned determined to have an encyclopedic knowledge of the law, and he did. He lived and breathed the law, religiously read the advance sheets, and relished asking counsel about cases not cited in points and authorities." Roy paused, "just occurred to me why he used the initial 'L.' A Court of Appeal opinion reversing him made reference to 'the learned trial judge.' I think he wanted to reduce the opportunities for the Court of Appeal, or anyone else for that matter, to have fun at his expense. But what can you expect from the C.A.J. – Court of Appeal Jerks."

I raised an eyebrow. But Roy said in an approving tone, "Well that's what he thought of them. O.I. often said that a statute meant what it said, not what some Court of Appeal judge wanted it to say. He had apoplexy when an appellate opinion said he had put a statute governing the treatment of mentally ill persons in a 'straight jacket.' He saw himself as a law professor in robes and railed against appellate courts for reading hidden meanings in statutes. I truly believe he thought he had mastered the C.O.J."

I waited, hoping he would explain these initials, but he did not. This time I would not give him the satisfaction of asking what they meant.

Our conversation lasted about an hour, and I thought I had learned a great deal about Judge Learned Foote. Like Cardozo he was a bachelor and a clear and concise writer who had a passion for the law. But I was puzzled by Judge Foote's sudden retirement.

"If Judge Foote loved the law so much, why did he retire?" I asked.

"Can't say for sure, but I believe it had something to do with his one other passion."

"So he did care for something other than the law?"

"I didn't say that, but what rivaled his passionate love for the law was his singular hatred of section 170.6."

Roy was referring to Code of Civil Procedure section 170.6, a peculiarity of

California law which allowed a lawyer to recuse a judge from hearing a case by filing a simple motion alleging judicial prejudice. No specific declaration detailing the judge's prejudice is required. A lawyer has only to timely file the affidavit with its boilerplate language and a different judge is assigned to the case. Roy told me that the code section so infuriated Foote that he continually hounded legislators on the judiciary committee to abolish it.

Roy added, "In a moment I will show you something that leads me to believe section 170.6 had something to do with Foote's retirement. But one day he simply did not show up for court. He called the Presiding Judge and said he had sent a letter to the governor informing him in what I am sure was a terse paragraph that effective that day he was resigning from the court. He had cleared his calendar, and that was that. He didn't say goodbye, didn't call anyone, just left. Well, when Foote retired I got his old courtroom. I have something that is immensely useful, but it will be of no use for your history book. Was it Henry Ford who said, 'History is bunk'?"

Roy shuffled out of the kitchen and returned with a folder. He handed me a copy of some notes scribbled on a piece of paper. Roy told me that when he moved into Foote's old courtroom, he had found a scrap of paper in Foote's desk.

It appeared to be part of the final page in a judicial diary that Foote had kept throughout most of his judicial career. It was only a fragment from the lower half of a page numbered 328. It read as follows: "An insult. Damn Stark! The statement of decision I crafted made the judgment bullet proof. And for my craft, another 170.6. 'Oh what may man within him hide, Though Angel on the outward side!' Yet I shall not 'slip so grossly, both in the heat of blood, And lack of tempered judgment afterward.' Finis."

"What the hell does it mean?" I asked.

"It means a great deal."

"And who is Stark?"

"Oh he's a lawyer who has not let age stop him. He still makes appearances now and then. He won a big case in Foote's court."

"So why does Foote damn him?"

"Can't say, but looks like Stark filed a 170.6 against him."

"Before or after the big win?"

"Good question, but who cares?"

"I do."

"Not worth the time. Look at what else he wrote."

"Quotes from Shakespeare."

"Indeed." A wave of his hand indicated he did not want to talk any more. "I'm tired," he said.

I said, "I.O."

This time Roy asked, "What's that?"

"Interview over," I answered.

Roy laughed. I thanked him for the tea and handed back to him the copy of Foote's notes. "No, keep them," he said. "I've made dozens of copies. This is very useful. Should be required reading for all judges, new and old alike."

"Why so?" I asked.

"Think about it," he said.

"Will my thinking about these enigmatic notes tell me something about Judge Foote?"

"Probably not, but they may tell you something about . . ."

"Myself?" I asked.

"Maybe," he replied with a grin.

And then it hit me what he meant by his earlier use of the initials, COJ: "It will tell me something about . . . the craft of judging."

Roy's grin widened.

"Do I have to reread all of Shakespeare?"

"Wouldn't hurt," he said, "but Measure for Measure is a good start. Think about it."

"OK, I'm thinking," I said as I walked out the door.

"Congratulations. Keep in touch and make sure I look good in the biography."

I left Roy's house feeling unsure if in fact I truly knew anything about Judge Foote. Through perseverance I was able to find a few lawyers who had known him. They admired his mind but detested try-

*See Gilbert, Next Page*

Stark sees him." I said.

"Possibly. But these words are a good reminder how not to practice the craft of judging. Remember, the word 'crafty' comes from craft."

"What about the other quote?" I asked. "Yet I shall not slip so grossly, both in the heat of blood, and lack of tempered judgment afterward."

"Also good advice to all judges."

"Maybe this is Foote's acknowledgement that despite his anger, he will keep a cool head and rule fairly and dispassionately."

"Could be. Could also be a recognition that he cannot temper his impatience, and therefore has no choice but to retire."

"That would make him honorable," I said. I altered Isabella's quote and said, "We do not know what man within him hide, though *devil* on the outward side."

Roy gave me a nod of approval. I told him about another useful quote I had found in the play. It is from Isabella's observation about "proud man" (woman too) being judges.

Dress'd in a little brief authority,
Most ignorant of what he's most assured,
His glassy essence,– like an angry ape,
Plays such fantastic tricks before high heaven
As makes the angels weep; who, with our spleens,
Would all themselves laugh mortal.

"Ah, perfect," said Roy. "If Foote had taken this to heart, we probably would not be here discussing his abrupt retirement."

We had finished our tea. I got up to leave.

"Before you leave, I want you to read something else." He left the room and soon returned with a book of poems by Edwin Arlington Robinson. He turned to the one entitled "Richard Corey." I remembered reading it in college. The short poem tells us that Richard Corey appears to everyone to be a perfect gentleman, rich, well spoken and refined. But the last two lines read, "And Richard Corey, one calm summer night, went home and put a bullet through his head."

"That's a P.P.," said Roy.

"Powerful Poem," I said.

"I knew you would appreciate it. After all you were a literature major."

We said our good-byes, and I promised to drop in on him again. He stood in the doorway as I walked down the steps and turned to wave to him. "How did you know I was a literature major?" I shouted.

"I read it in your biography," he yelled back.

A few weeks later I submitted my work on the court's history to the P.J. I told her about my fascination with Judge Foote, the fragment from his diary, and my conversations with Judge Roy Fessler. I handed her my entry on Foote's biography:

"Judge Learned Foote. Graduated Duke University Law School 1947. Law Review. Partner in law firm Babcock, Casares and Foote, 1948 to 1959. Superior Court Judge 1959 to 1970. A Poem, with apologies to Edwin Arlington Robinson.

Whenever Learned Foote took the bench,
Nervous counsel peered up at him.
He applied the law without a wrench.
He ruled with care, not with whim.
Mostly civil, he also glowered.
His rulings flavored with a quote,
Literati joined his ivory tower.
He lifted the law's heavy cloak.
His name, a source of fun and rumor,
But he declined a pseudonym.
Biting wit, his stab at humor.
He was proper, even prim.
Though quiet, someone heard him say,
He loved his work, he never tired.
And Judge Learned Foote, one fine summer day,
Signed a paper, and retired.

The P.J. studied it. Finally she said, "You know what? I'm going to go with this." She then asked if she could have a copy of the notes from Foote's diary.

"Of course," I said. "It provides insight into the craft of judging."

"Yes, ....and," the sparkle in her eyes enhanced her smile, "and.........there's a world of difference between the craft and the art of judging."

*Hon. Arthur Gilbert, Presiding Justice, California Court of Appeal, Second Appellate District, Division Six, obtained his LL.B. in 1963 from the University of California, Berkeley, Boalt Hall. After two years as a Deputy City Attorney in Los Angeles and 10 years in private practice, Justice Gilbert was appointed to the bench in 1982. In 1982 he was appointed an Associate Justice, Second Appellate District. He was appointed Presiding Justice in 1999.*

# The Road Not Taken

Two roads diverged in a yellow wood,
And sorry I could not travel both
And be one traveler, long I stood
And looked down one as far as I could
To where it bent in the undergrowth;
Then took the other, as just as fair,
And having perhaps the better claim,
Because it was grassy and wanted
wear;
Though as for that the passing there
Had worn them really about the same,
And both that morning equally lay
In leaves no step had trodden black.
Oh, I kept the first for another day!
Yet knowing how way leads on to way,
I doubted if I should ever come back.
I shall be telling this with a sigh
Somewhere ages and ages hence:
Two roads diverged in a wood, and I-
I took the one less traveled by,
And that has made all the difference.

EX. 6
165

**EXHIBIT  7**

Office of Administrative Hearings
Special Education Division
July – December 2005 Report


Under the terms of the May 25, 2005 Interagency Agreement (No. 4427) the Office of Administrative Hearings (OAH) is to provide the California Department of Education (CDE) with a quarterly report on information relating to mediations, due process hearings and other information described in the section of the agreement relating to data collection and reporting. Although the agreement required OAH to process only those cases filed on and after July 1, 2005, and the prior contractor McGeorge School of Law Special Education Hearing Office (SEHO) was to continue responsibility for matters previously filed, OAH agreed, at CDE's request, to take responsibility for all pending due process requests with SEHO performing only the mediation portion of the work.

As the figures recited below reflect, the additional cases (1081 of a total of 2275 cases processed) essentially doubled the number of cases for which OAH had responsibility in the first six months of the contract period. Moreover, virtually all of the due process hearings held related to cases filed with SEHO before July 1, 2005, which were in "off calendar" status until one or both parties requested a hearing date.

OAH recognizes that quite apart from the very specific requirements of the Interagency Agreement, carefully tracking case management activities is critical to assess performance and identify important trends. Unfortunately, the unanticipated significant increase in caseload required OAH to essentially "triage" case management responsibilities, assigning the highest priorities to the opening of new cases and those referred from SEHO, daily law and motion activity, and activities directly related to those due process hearings that were heard and decided. This was, in part, the reason for the delayed issuance of a report for the first quarter of the contract period.


I.    Case Filings.

The number of total filings of special education cases through December 2005 was 2,275. They include 1,194 new cases that were filed directly with OAH on or after July 1, 2005. The total also includes 1,081 matters that were pending with SEHO, and then referred to OAH for hearing. These are referred to as "pipeline cases" and although these cases were not technically "new" filings, OAH added them to the category of open files included in the combined total tracked over this period. The monthly breakdown of cases filed through December 2005 is set forth below:

| 2005 | Pipeline Cases | New Cases | Combined Total |
|------|----------------|-----------|----------------|
| July | 454 | 147 | 601 |
| August | 130 | 205 | 335 |
| September | 117 | 204 | 321 |
| October [1] | 101 | 161 | 262 |
| November | 43 | 247 | 290 |
| December | 236 | 230 | 466 |
| **TOTALS** | 1081 | 1194 | 2275 |

Of the combined total of 2275, ten districts account for 1066 cases, or 46.8 percent of the total. The number of cases by school district is included as an attachment. The largest number involves the Los Angeles Unified School District (LAUSD) with 734 cases or 32.26 percent of total cases filed. This is followed by Capistrano USD (64 cases), Newport-Mesa USD (43 cases), Long Beach USD (43 cases), San Diego USD (36 cases), San Francisco USD (36), Tustin USD (32), Poway USD (31 cases), Irvine USD (26 cases) and Corona-Norco USD (20 cases).

II.    Closed Cases.

Over the period July through December 2005, 1071 cases were closed. These include cases that were dismissed, withdrawn by request of the parties, or that were resolved successfully prior to or after hearing. Of the 1071 closed cases, 636 were cases that were initially filed with SEHO, and 435 were cases that were filed with OAH on or after July 1, 2005. OAH has collected data by disposition category on only the 435 cases filed with OAH from July 1, 2005, because cases filed on or after this date are the only ones from which baseline data from opening to closing could be tracked. Accordingly, data on the 636 closed "pipeline cases" are not included within the scope of this report.[2]

Of the 1194 new cases filed with OAH since July 1, 2005, 435 were closed through December 2005.[3] Of the 435 closed cases, the petitioners were parent/child in 394 (90.6 percent) cases, and the districts were petitioners in 41 (9.4 percent) cases. A very high percentage of cases (73.1 percent) settled. Approximately 60 percent settled during resolution session or mediation, and the balance settled at the time of hearing or otherwise. Approximately 10 percent of cases were dismissed by reason of insufficiency of pleadings or inactivity, and 16 percent were withdrawn. Two cases filed since July 1, 2005, went through hearing and decision over this period. There were actually 32 due process hearings that resulted in decision over this period, but these were largely cases filed before July 1, 2005, and they were therefore not included in the resolution totals tracked.

---

[1] Through October 27, 2005
[2] OAH will continue to track the number of SEHO cases closed, but not by disposition category.
[3] This number is a bit understated because a significant number of cases awaiting issuance of a notice of dismissal were not included in this figure.

EX. 7
167

The breakout of closed cases that were initially filed with OAH on or after July 1, 2005, by resolution categories are set forth below:

| Disposition | Total | Percent |
|---|---|---|
| Settled:  Resolution Session | 167 | 38.4 |
| Settled:  Mediation | 93 | 21.4 |
| Settled:  Hearing | 3 | .7 |
| Settled:  Otherwise | 55 | 12.6 |
| Dismissed:  Insufficient | 39 | 8.9 |
| Dismissed:  Inactivity | 6 | 1.4 |
| Withdrawn | 70 | 16.1 |
| Hearing/Decision | 2 | .5 |
| **TOTAL** | 435 | 100 |

III.    Mediations.

OAH held no mediations in special education cases prior to January 1, 2006, so there are no reportable data regarding mediations for the period July 1 through December 2005. The Interagency Agreement provides that OAH would refer those due process matters submitted between July 1, 2005, and December 31, 2005, in which the parties requested mediation to SEHO, which would assign a mediator.  OAH was not responsible for matters referred to SEHO for mediation until they were returned to OAH.  Once returned they were calendared for hearing following a telephone status and/or prehearing conference with all parties.  These cases often resolve prior to hearing following agreements reached between the parties, or after more formal settlement conferences before OAH.

IV.    Due Process Hearings.

During this period there have been 32 due process hearings which resulted in decisions.  Copies of all decisions have been provided to CDE and also posted on the OAH website.  The decisions average 15 pages in length.  The total days of hearing represented by these 32 cases number 96, with an average length of three days per hearing.  The length of hearings ranged from one to eight days.

Of the 32 hearings, 50 percent were rendered in favor of local educational agencies (LEAs) and 19 percent were rendered in favor of parents.  The remaining 31 percent were split decisions.  This compares to the previous quarter (April – June 2005) when no decisions were rendered in favor of parents, and 62 percent were in favor of the LEAs.

An attorney or advocate represented parents in 75 percent of the cases.  An attorney represented LEAs in 81 percent of cases.  The student demographic included high school (53%), middle school (12.5%), elementary school (19%), preschool (12.5%) and unknown (3%).

3

EX. 7
168

| District Name | Cases |
|---|---|
| LOS ANGELES U.S.D. | 734 |
| CAPISTRANO U.S.D. | 64 |
| NEWPORT-MESA USD | 43 |
| LONG BEACH U.S.D. | 43 |
| SAN DIEGO U.S.D. | 36 |
| SAN FRANCISCO U.S.D. | 36 |
| TUSTIN U.S.D. | 32 |
| POWAY U.S.D. | 31 |
| IRVINE U.S.D. | 26 |
| CORONA-NORCO USD | 20 |
| GARDEN GROVE U.S.D. | 20 |
| ORANGE USD | 19 |
| SANTA ANA U.S.D. | 19 |
| MT. DIABLO USD | 18 |
| SAN RAMON VALLEY U.S.D. | 17 |
| OAKLAND U.S.D. | 16 |
| SAN JOSE USD | 15 |
| PASADENA U.S.D. | 15 |
| SANTA MONICA-MALIBU USD | 14 |
| TEMECULA VALLEY U.S.D. | 14 |
| COMPTON U.S.D. | 14 |
| SAN DIEGO CITY SCHOOLS | 14 |
| MANHATTAN BEACH U.S.D. | 13 |
| ANAHEIM CITY S.D. | 13 |
| CHULA VISTA E.S.D. | 12 |
| PLACENTIA-YORBA LINDA U.S.D. | 11 |
| ELK GROVE U.S.D. | 11 |
| RIALTO U.S.D. | 11 |
| WEST CONTRA COSTA USD | 11 |
| GLENDALE U.S.D. | 11 |
| DEL NORTE U.S.D. | 11 |
| CHINO VALLEY U.S.D. | 11 |
| BERKELEY U.S.D. | 10 |
| SAN LUIS COASTAL U.S.D. | 10 |
| SIMI VALLEY U.S.D. | 10 |
| TORRANCE U.S.D. | 10 |
| LAS VIRGENES U.S.D. | 10 |
| SAN DIEGUITO UNION H.S.D. | 10 |
| CULVER CITY U.S.D. | 10 |
| SACRAMENTO CITY U.S.D. | 10 |
| OCEAN VIEW S.D. | 10 |
| ANAHEIM U.H.S.D. | 10 |
| DOWNEY U.S.D. | 10 |
| MONTEBELLO USD | 9 |
| ANTELOPE VALLEY U.H.S.D. | 9 |
| FULLERTON ELEMENTARY S.D. | 9 |
| NORWALK/LA MIRADA U.S.D. | 9 |
| PALMDALE S.D. | 9 |

EX. 7
169

| | |
|---|---|
| FOLSOM CORDOVA USD | 9 |
| BELLFLOWER U.S.D. | 9 |
| ALHAMBRA S.D. | 9 |
| ALTA LOMA S. D. | 8 |
| BELMONT-REDWOOD SHORES E.S.D. | 8 |
| HUNTINGTON BEACH CITY S.D. | 8 |
| ABC U.S.D. | 8 |
| EAST SIDE UNION H.S.D. | 8 |
| CARLSBAD U.S.D. | 8 |
| REDONDO BEACH U.S.D. | 8 |
| SADDLEBACK VALLEY U.S.D. | 7 |
| YUCAIPA-CALIMESA JT. U.S.D. | 7 |
| MANTECA U.S.D. | 7 |
| LA CANADA U.S.D. | 7 |
| HUNTINGTON BEACH U.H.S.D. | 7 |
| SAN JUAN U.S.D. | 7 |
| FREMONT U.S.D. | 7 |
| POMONA U.S.D. | 7 |
| VISALIA U.S.D. | 6 |
| CONEJO VALLEY U.S.D. | 6 |
| PALOS VERDES PENINSULA USD | 6 |
| ACALANES U.H.S.D. | 6 |
| EAST WHITTIER CITY S.D. | 6 |
| CENTRALIA S.D. | 6 |
| CUPERTINO UNION S.D. | 6 |
| HACIENDA LA PUENTE USD | 6 |
| TRACY JT. U.S.D. | 6 |
| SANTA BARBARA H.S.D. | 6 |
| EVERGREEN S.D. | 6 |
| WESTSIDE UNION E.S.D. | 6 |
| MORENO VALLEY U.S.D. | 6 |
| EL RANCHO UNIFIED S.D. | 6 |
| FULLERTON JOINT UNION H.S.D. | 5 |
| WALNUT CREEK S.D. | 5 |
| MURRIETA VALLEY U.S.D. | 5 |
| BUENA PARK S.D. | 5 |
| SAN BERNARDINO CITY USD | 5 |
| ENCINITAS U.S.D. | 5 |
| HAYWARD U.S.D. | 5 |
| KERN H.S.D. | 5 |
| INGLEWOOD U.S.D. | 5 |
| GROSSMONT UNION H.S.D. | 5 |
| CLOVIS U.S.D. | 5 |
| BEVERLY HILLS U.S.D. | 5 |
| WILLIAM S. HART UHSD | 5 |
| PARAMOUNT U.S.D. | 5 |
| SAN CARLOS S.D. | 5 |
| RIVERSIDE U.S.D. | 5 |
| WHITTIER UNION H.S.D. | 5 |
| LYNWOOD USD | 5 |

EX. 7
170

| | |
|---|---|
| NATOMAS U.S.D. | 5 |
| GRANT JT. UNION H.S.D. | 4 |
| DRY CREEK JT. E.S.D. | 4 |
| SYLVAN UNION S.D. | 4 |
| ARCADIA U.S.D. | 4 |
| LIVERMORE VALLEY JT. USD | 4 |
| BANNING U.S.D | 4 |
| LANCASTER S.D. | 4 |
| CHAFFEY JT. U.H.S.D. | 4 |
| JURUPA U.S.D | 4 |
| HAWTHORNE SCHOOL DISTRICT | 4 |
| SAN GABRIEL U.S.D. | 4 |
| PAJARO VALLEY U.S.D. | 4 |
| HEMET U.S.D. | 4 |
| VACAVILLE U.S.D. | 4 |
| OCEANSIDE U.S.D. | 4 |
| SAN MATEO-FOSTER CITY S.D. | 4 |
| PALO ALTO U.S.D. | 4 |
| COVINA-VALLEY U.S.D. | 4 |
| EXETER U.S.D. | 4 |
| ESCONDIDO U.S.D. | 4 |
| CAMPBELL U.H.S.D. | 4 |
| DAVIS JT. U.S.D. | 4 |
| FONTANA USD | 4 |
| TEHACHAPI U.S.D. | 4 |
| FRESNO U.S.D. | 4 |
| PALM SPRINGS U.S.D. | 4 |
| LAKE ELSINORE U.S.D. | 3 |
| SAN MARCOS U.S.D. | 3 |
| CYPRESS S.D. | 3 |
| BREA-OLINDA USD | 3 |
| WHITTIER CITY S.D. | 3 |
| FAIRFIELD SUISUN U.S.D. | 3 |
| ROSEVILLE E.S.D. | 3 |
| LAFAYETTE S. D. | 3 |
| ALAMEDA USD | 3 |
| GLENDORA U.S.D | 3 |
| LOS NIETOS S.D. | 3 |
| MODESTO CITY SCHOOLS | 3 |
| DUARTE UNIFIED S.D. | 3 |
| SAN RAFAEL CITY SCHOOLS | 3 |
| WESTMINSTER S.D. | 3 |
| OXNARD ELEMENTARY SCHOOL | 3 |
| COLTON JOINT U.S.D. | 3 |
| WASHINGTON UNIFIED SD (W SAC) | 3 |
| ROCKLIN U.S.D. | 3 |
| RIO LINDA UNION S.D. | 3 |
| NAPA VALLEY U.S.D. | 3 |
| MENIFEE UNION ESD | 3 |
| NEWHALL SCH DIST | 3 |

EX. 7
171

| | |
|---|---|
| ALBANY U.S.D. | 3 |
| BURBANK U.S.D. | 3 |
| WOODLAND JT. U.S.D. | 3 |
| NEW HAVEN U.S.D. | 3 |
| UPLAND U.S.D. | 3 |
| HOLLISTER S.D. | 3 |
| TAMALPAIS UNION H.S.D. | 2 |
| LOS GATOS/SARATOGA JT USD | 2 |
| MORGAN HILL USD | 2 |
| APPLE VALLEY U.S.D. | 2 |
| CALIF SCH FOR THE DEAF | 2 |
| SAN BRUNO PARK S.D. | 2 |
| JEFFERSON E.S.D. | 2 |
| VALLEY CENTER U.S.D. | 2 |
| VISTA U.S.D. | 2 |
| MENLO PARK CITY E.S.D. | 2 |
| CASTRO VALLEY U.S.D. | 2 |
| HANFORD E.S.D. | 2 |
| EL DORADO U.H.S.D. | 2 |
| SAN MIGUEL JT. U.S.D. | 2 |
| BASSETT USD | 2 |
| CERES U.S.D. | 2 |
| TEMPLE CITY U.S.D. | 2 |
| CLAREMONT U.S.D. | 2 |
| VICTOR E.S.D. | 2 |
| VICTOR VALLEY UNION H.S.D. | 2 |
| SWEETWATER UNION H.S.D. | 2 |
| CHARTER OAK U.S.D. | 2 |
| LAWNDALE S. D. | 2 |
| MOUNTAIN VIEW E.S.D. (ONTARIO) | 2 |
| SANGER U.S.D. | 2 |
| BAKERSFIELD CITY S.D. | 2 |
| EL SEGUNDO U.S.D. | 2 |
| MERCED COUNTY MENTAL HEALTH | 2 |
| VENTURA U.S.D. | 2 |
| LOS ALTOS U.S.D. | 2 |
| BURLINGAME E.S.D. | 2 |
| LODI U.S.D. | 2 |
| SAUGUS UNION S.D. | 2 |
| CORCORAN JT. U.S.D. | 2 |
| PLEASANTON U.S.D. | 2 |
| SONORA UNION H.S.D. | 2 |
| SAN LEANDRO U.S.D. | 2 |
| MONROVIA U.S.D. | 2 |
| FOUNTAIN VALLEY S.D. | 2 |
| ORANGE CO. HEALTH CARE AGENCY | 2 |
| GATEWAY U.S.D. | 2 |
| WEST COVINA USD | 2 |
| BONITA U.S.D. | 2 |
| SEBASTOPOL U.S.D. | 2 |

EX. 7
172

| | |
|---|---|
| ALVORD U.S.D. | 2 |
| MILPITAS USD | 2 |
| SANTA ROSA CITY SCHOOLS | 2 |
| CAMPBELL U.E.S.D. | 2 |
| REDLANDS U.S.D. | 2 |
| RIM OF THE WORLD U.S.D. | 2 |
| SPRECKELS U.S.D. | 2 |
| LAKEPORT U.S.D. | 2 |
| SULPHUR SPRINGS U.S.D | 2 |
| DESERT SANDS U.S.D. | 2 |
| PLEASANT VALLEY SD (CAMARILLO) | 2 |
| NORTH MONTEREY CO. U.S.D. | 2 |
| PANAMA-BUENA VISTA UNION S.D. | 2 |
| REDWOOD CITY E.S.D. | 2 |
| MOUNTAIN EMPIRE S.D. | 2 |
| LAKESIDE S.D. (LAKESIDE) | 2 |
| SANTA CLARA USD | 2 |
| AZUSA U.S.D. | 2 |
| NEWCASTLE E.S.D. | 1 |
| MOOR PARK U.S.D. | 1 |
| LEMON GROVE E.S.D. | 1 |
| AMADOR CO. USD | 1 |
| CAJON VALLEY U.S.D. | 1 |
| DIXIE E.S.D. | 1 |
| LUCIA MAR U.S.D. | 1 |
| LIBERTY UNION H.S.D. | 1 |
| MERCED UNION H.S.D. | 1 |
| DENAIR U.S.D. | 1 |
| SO. BAY U.S.D. (IMPERIAL BCH) | 1 |
| STANISLAUS UNION E.S.D. | 1 |
| OAK GROVE UNION S.D. | 1 |
| FALLBROOK UNION E.S.D. | 1 |
| COTATI ROHNERT PARK U.S.D. | 1 |
| NOVATO U.S.D. | 1 |
| YOLO CO. MENTAL HEALTH CHILD | 1 |
| MIDDLETOWN U.S.D. | 1 |
| NORTHERN HUMBOLDT U.H.S.D. | 1 |
| EUREKA UNION S.D. | 1 |
| SOUTH WHITTIER E.S.D. | 1 |
| OAK GROVE S.D. | 1 |
| ROSELAND S.D. | 1 |
| SNOWLINE JOINT U.S.D. | 1 |
| NEWARK U.S.D. | 1 |
| SANTA MARIA JOINT U.H.S.D. | 1 |
| GORMAN SCHOOL DISTRICT | 1 |
| LOS ALAMITOS U.S.D. | 1 |
| RESCUE UNION E.S.D. | 1 |
| YUBA CITY U.S.D. | 1 |
| CORONADO U.S.D. | 1 |
| EUREKA CITY S.D. | 1 |

EX. 7
173

| | |
|---|---|
| ENTERPRISE S.D. | 1 |
| LOWELL JT. S.D. | 1 |
| MARYSVILLE JT. U.S.D. | 1 |
| LITTLE LAKE CITY S.D. | 1 |
| WEST SONOMA CO. UNION HSD | 1 |
| HARMONY UNION S.D. | 1 |
| TULARE CO. SUPT. OF SCHOOLS | 1 |
| SANTA BARBARA CO. OFF. OF ED. | 1 |
| ATWATER E.S.D. | 1 |
| HERMOSA BEACH CITY E.S.D. | 1 |
| ORINDA UNION S.D. | 1 |
| SOUTH PASADENA U.S.D. | 1 |
| LUCERNE E.S.D. | 1 |
| PACIFIC GROVE U.S.D. | 1 |
| LOS ANGELES CO. OFFICE OF ED. | 1 |
| ONTARIO-MONTCLAIR S.D. | 1 |
| TAFT CITY S.D.. | 1 |
| SAN LORENZO U.S.D. | 1 |
| WISEBURN E.S.D. | 1 |
| PERRIS E.S.D. | 1 |
| DELHI UNIFIED SCHOOL DIST | 1 |
| RAVENSWOOD CITY S.D. | 1 |
| HESPERIA U.S.D. | 1 |
| EL TEJON U.S.D. | 1 |
| LINCOLN U.S.D. | 1 |
| LA MESA-SPRING VALLEY S.D. | 1 |
| LOMPOC U.S.D. | 1 |
| VAL VERDE USD | 1 |
| LAKESIDE UNION ESD (HANFORD) | 1 |
| ST. HELENA S.D. | 1 |
| SEQUOIA U.H.S.D. | 1 |
| OXNARD UNION H.S.D. | 1 |
| MORONGO U.S.D. | 1 |
| PLACER CO. OFFICE OF ED. | 1 |
| TULARE CO./OFFICE OF EDUC | 1 |
| MAGNOLIA ELEM SCH DIST | 1 |
| SAN JACINTO U.S.D. | 1 |
| SANTA CRUZ CITY S.D. | 1 |
| ANTIOCH USD | 1 |
| ETIWANDA S.D. | 1 |
| WALNUT VALLEY U.S.D. | 1 |
| BARSTOW U.S.D. | 1 |
| SOLANO BEACH U.S.D. | 1 |
| MADERA UNIFIED SCHOOL DISTRICT | 1 |
| BUCKEYE S.D. | 1 |
| BUTTE CO DPT BEHAVIORAL HEALTH | 1 |
| COLFAX E.S.D. | 1 |
| SALIDA U.S.D. | 1 |
| TWIN HILLS UNION S. D. | 1 |

EX. 7
174

| | |
|---|---|
| MONTEREY PENINSULA USD | 1 |
| GLENN COUNTY MENTAL HEALTH | 1 |
| OROVILLE UNION H.S.D. | 1 |
| FRUITVALE S. D. | 1 |
| MERCED CITY ELEM S.D. | 1 |
| NEWMAN-CROWS LANDING USD | 1 |
| BALDWIN PARK U.S.D. | 1 |
| RIVERSIDE CO. OFFICE OF ED. | 1 |
| PORTERVILLE U.S.D. | 1 |
| CLOVERDALE U.S.D. | 1 |
| LEMOORE U.H.S.D. | 1 |
| OAKLEY UNION E.S.D. | 1 |
| BONSALL UNION S.D. | 1 |
| COACHELLA VALLEY U.S.D. | 1 |
| WINDSOR U.S.D. | 1 |
| GOLETA U.S.D. | 1 |
| WESTERN PLACER USD | 1 |
| KERN CO. SUPT. OF SCHOOLS | 1 |
| LA HABRA CITY S.D. | 1 |
| CASTAIC UNION S.D. | 1 |
| SARATOGA U.S.D. | 1 |
| LAGUNA BEACH U.S.D. | 1 |
| GARVEY S.D. | 1 |
| BYRON UNION S.D. | 1 |
| SANTA BARBARA S.D. | 1 |
| ALPINE CO. U.S.D. | 1 |
| CABRILLO U.S.D. | 1 |
| OAK PARK USD | 1 |
| PLEASANT VALLEY ESD(PENN VLY) | 1 |
| REED UNION S.D. | 1 |
| LOS BANOS USD | 1 |

10

EX. 7
175

**EXHIBIT  8**



OFFICE OF ADMINISTRATIVE HEARINGS                                    State of California

560 J Street, Suite 300, Sacramento, CA, 95814                       Department of General Services
916 445-4926 phone | 916 323-6439 fax
www.oah.dgs.ca.gov

SPECIAL EDUCATION DIVISION
QUARTERLY REPORT – THIRD QUARTER 2005-06
January 1, 2006 – March 31, 2006

Effective June 1, 2005, the Office of Administrative Hearings (OAH) entered into an interagency agreement with the California Department of Education (CDE) to administer the mandated special education dispute resolution program. That agreement obligates OAH to provide certain specified dispute resolution services in conformance with 20 U.S.C. section 1415 et seq., and California Education Code section 56500.1 et seq., as well as requires OAH to collect particular data on the operation of the program. OAH is obligated to report on that data quarterly.

The interagency agreement further contemplates that during the 2005-06 fiscal year the operation of the special education dispute resolution program will be transitioned to OAH from the University of the Pacific, McGeorge School of Law (McGeorge or SEHO), which will also provide particular dispute resolution services during the 2005-06 fiscal year. To the extent that the data reported herein relies on or relates to McGeorge's activities during or prior to the completion of the transition period, OAH cannot vouch for its accuracy because OAH was neither privy to nor had oversight over McGeorge's operation.

During the first three quarters of the 2005-06 fiscal year, OAH's obligations under the interagency agreement have undergone a number of modifications. These modifications have resulted in significant, unanticipated changes in the nature and volume of the workload for which OAH is responsible. This too has resulted in some anomalies in the data.

The agreement, as originally entered, required OAH to provide hearings for all cases filed after June 30, 2005, for which a hearing was required. OAH was also obligated to take over all matters (hearings or mediations) still pending with McGeorge on June 30, 2006. Thereafter, from July 1, 2006, through June 30, 2008, OAH was required to provide all the services necessary to appropriately administer the special education dispute resolution program, as called for by the agreement and all applicable laws.

At the time the agreement was entered into, OAH was not obligated to provide any dispute resolution services (hearings or mediations) for cases filed prior to July 1, 2005. Also, the agreement precluded OAH from providing mediation services for any case filed between July 1, 2005, and December 31, 2005. OAH was required to refer those matters to McGeorge.

At CDE's request, OAH agreed to amend the agreement in two respects. First, OAH would agree to provide hearings for all cases in which a hearing was required and had not been commenced on or before the close of business on June 30, 2005. That included cases which had been filed with McGeorge prior to July 1, 2005, and for which OAH was not responsible under the original agreement.

EX. 8
176

Second, OAH would agree that commencing on January 1, 2006, it would provide mediation services for all cases unresolved as of that date. That included cases which had been filed with, or referred to McGeorge prior to December 31, 2005, and for which OAH was not responsible under the original agreement.

OAH agreed to assume these additional responsibilities because CDE advised that it was unable to reach an agreement with McGeorge to handle this work and because OAH is committed to making sure that the special education dispute resolution program is fully available to California's special education students. That includes those students whose cases would have been lost or unduly delayed had OAH not agreed to take on this additional work.

Apart from the increased workload associated with conducting the additional and unanticipated special education mediations and hearings, the manner and timing of transferring the cases from McGeorge to OAH has been difficult. It has necessitated countless hours inventorying, reviewing and processing all of the many hundreds of McGeorge case files, some dating back a number of years.[1] OAH has reprioritized its operation to process these "pipeline" cases in a way designed to best address the pressing needs of the children involved in these additional cases.

As noted above, OAH agreed to provide certain specified dispute resolution services. Such services include conducting mediations and/or hearings in special education cases, as well as addressing all the procedural matters attendant to those proceedings. Matters to be resolved in those proceedings generally include issues related to the identification, eligibility, assessment, and/or educational placement of a student as they relate to his or her right to a free appropriate public education.

As a procedural matter, the parties (usually parents and school districts) to a special education dispute may seek a resolution of their disagreement through mediation prior to filing a request for a hearing. They may also engage in informal, non-adversarial means of resolution after a request for hearing has been filed, or even after a hearing has commenced. Resolution sessions are initially convened by local educational agencies, without the assistance of OAH within 15 days of receiving the parents' hearing request. If such a resolution session does not resolve the parties' dispute, then the parties may pursue mediation and/or participate in settlement conferences conducted by an administrative law

---

[1] McGeorge encouraged the use of "off calendar" status to continue a matter while mediation efforts were undertaken or the parties attempted to reach a negotiated settlement on their own. These matters typically remained off calendar until one party asked that the matter be placed back on calendar for a hearing. The approximately 1,000 pipeline cases received by OAH from McGeorge in the last 6 months of 2005 included cases that had been off calendar and were going back "on calendar" for a hearing, as well as cases that had been settled while at McGeorge but needed a dismissal order issued by OAH which had exclusive authority to do so after July 1, 2005. During the same period, OAH, as required by the interagency agreement with CDE, referred virtually all new case filings to McGeorge. These matters were also generally placed in "off calendar" status by McGeorge. This resulted in a large number of cases with no scheduled hearings. Since receiving these cases on January 1, 2006, OAH has diligently worked to determine the status of each of the McGeorge pipeline cases. It is expected that by June 30, 2006, each of these pipeline cases will either be placed back on calendar or closed, depending on the status of the case.

EX. 8
177

judge from OAH. The administrative law judges at OAH are trained and experienced in resolving cases through these informal means. The vast majority of cases resolve through such informal processes, which obviates the need for the more formal and adversarial hearing process.

To put this in perspective, for the quarter addressed in this report, 31 cases were resolved pursuant to a hearing out of the 865 cases that were closed. Thus, approximately 96.5 percent of the cases were resolved without the need for a hearing.

To gain a better picture of this dispute resolution process this report provides figures for the third quarter of 2005-06, including numbers related to new case filings, case closures, mediations and due process hearings.[2]

At the present time, there are approximately 1200 matters pending before OAH. This figure is arrived at by adding the total number of cases previously reported, plus the new filings over the third quarter of 2005-06, less the number of closed cases. This report necessarily focuses on data collected over the third quarter of 2005-06. Generally speaking, case filing data looks at the universe of new cases filed on or after January 1, 2006. However, data on closed cases includes cases filed prior to January 1, 2006, including cases filed with McGeorge prior to July 1, 2005. As data is collected over a longer time period, OAH will be better positioned to provide a more accurate picture of how cases have resolved since OAH assumed responsibility for conducting mediation and due process hearings in special education cases.

I. Case Filings.

The total number of new case filings for the period of January 1, 2006 through March 31, 2006 was 883. The monthly break out follows:

---

[2] Under the terms of the interagency agreement OAH is to provide CDE with a quarterly report on information relating to mediations, due process hearings and other information described in the section of the agreement relating to data collection and reporting. It is anticipated that about 4,600 cases will be filed with OAH's Special Education Division in fiscal year 2005-06. As noted in the previous report, the total number of filings of special education cases through December 2005 was 2,275.

EX. 8
178

|                              | January | February | March | First Quarter 2006 |
|------------------------------|---------|----------|-------|--------------------|
| Student Filed Cases          | 322     | 191      | 192   | 705                |
| District Filed Cases         | 23      | 21       | 27    | 71                 |
| Expedited Cases              | 4       | 4        | 10    | 18                 |
| Mediation Only Requests      | 51      | 16       | 22    | 89                 |
| Total Number of New Cases    | 400     | 232      | 251   | 883                |

Of the combined total of 883 new cases, the largest number involves the Los Angeles Unified School District with 305 cases or 34.5 percent of total cases filed. This is followed by San Diego Unified School District with 21 new requests, Capistrano Unified School District with 16 requests, Newport-Mesa Unified School District with 14 new requests, Tustin and San Francisco Unified School Districts with 13 new requests each, and Long Beach Unified School District with 11 new requests. A complete breakdown by school district is attached and found at the end of this report.

II. Closed Cases.

Between January 1, 2006, and March 31, 2006, 865 cases were closed. These include cases that were dismissed, withdrawn by request of the parties, or that were resolved successfully prior to or after hearing. Of the 865 closed cases, 366 were cases that were initially filed with SEHO, and 499 were cases that were filed with OAH on or after July 1, 2005. Of the 865 cases closed during this quarter, 41 percent settled outside mediation and/or a resolution session and 17 percent settled in mediation,[3] for a total settlement rate of 57 percent. Success of the IDEA mandated resolution was minimal with only 12 cases being reported resolved in the mandated resolution session. A number of cases (16 percent) were withdrawn by the petitioner without a stated reason for withdrawal. A summary of the disposition status of these cases follows:

---

[3] Settlement during mediation is a case closure category, not a measure of success at mediation. For example, it does not encompass the significant number of matters that settled after progress toward settlement was made during mediation. The total number of closed cases also includes pipeline cases transferred to OAH after an unsuccessful mediation. Future quarterly reports will contain data on mediation success rates from the time a case is filed with OAH.

EX. 8
179

|                                                      | OAH Cases | SEHO Cases[4] |
|------------------------------------------------------|-----------|---------------|
| Settled Outside Mediation or Resolution Session      | 243       | 105           |
| Settled in Mediation                                 | 114 ·     | 32            |
| Settled in Settlement Conference                     | 0         | 3             |
| Resolved through Resolution Session                  | 12[5]     | 0[6]          |
| Withdrawn by Petitioner                              | 91        | 48            |
| Dismissed by Order of Administrative Law Judge       | 9         | 2             |
| Dismissed via Notice of Insufficiency                | 26        | 0             |
| Dismissed due to Inactivity                          | 4         | 176           |
| Total Number of Closed Cases                         | · 499     | 366           |

As earlier noted, OAH devoted considerable time and resources to identifying aged SEHO cases that were in off calendar status and placing those matters back on calendar. Status letters were sent to all parties for cases that were in off calendar status. Approximately 21 percent of cases were dismissed due to a failure to respond to the status letter. A very small percentage of cases (.03 percent) were dismissed through the Notice of Insufficiency (NOI) process. This process was added by amendments to the federal Individuals with Disabilities Education Act (IDEA) on July 1, 2005. It permits a party to challenge the sufficiency of a due process request (or "complaint" in the language of the IDEA). The NOI challenge must be made to OAH within 15 days and OAH has five days to rule on the sufficiency of the complaint. The number of NOIs and their disposition is noted in the statistics relating to law and motion set forth in section VI below.

III. Mediations.

OAH began holding mediations on January 1, 2006. For the third quarter of 2005-06, OAH received 883 mediation requests, of which 794 were related to due process hearings, and 89 were mediation-only requests. The latter are requests for mediation by parties who are not also seeking a due process hearing.[7] Mediations are pending in the bulk of these cases. Yet of those held, there have been 146 successful outcomes, 136 in mediations related to due process hearings, and 10 in mediation-only matters.[8]

---

[4] These were cases initially filed with SEHO before July 1, 2005, for which OAH ultimately assumed responsibility as explained above.

[5] This figure appears to be understated. OAH does not always receive notice when cases resolve during resolution session and there is no requirement that parties communicate outcomes of resolutions sessions to OAH. The reported figure of 12 is based upon documentation contained in files that were closed over the first quarter of calendar year 2006.

[6] Amendments to the federal Individuals with Disabilities Education Act (IDEA) included a mandatory resolution session for all requests for due process hearings filed by parents. The amendments became effective July 1, 2005, so cases filed with SEHO were not subject to this requirement.

[7] During the first quarter of calendar year 2006, 29 mediation-only cases were closed.

[8] Although not required by either the interagency agreement or applicable law, in the future OAH will update the data on mediations with a "pull-out" report for the quarter which more precisely tracks the dispositions in each of the mediations actually conducted. The report will include those which resulted in a mediation agreement on the day of the mediation, those in which the parties entered into an "interim agreement" (typically to conduct additional assessments, view a proposed placement, or conduct an additional individualized education program

EX. 8
180

The pertinent mediation only statistics are as follows:

| | |
|---|---|
| Total Number of Mediation Requests | 883 |
| Number of Mediation-Only Requests | 89 |
| Number of Mediation requests related to Due Process Hearings[9] | 794 |
| Number of Mediation-Only Requests Resolved through Mediation | 10 |
| Number of Mediations related to Due Process hearing resolved through Mediation | 136 |
| Total Number of Pending Mediations [10] | 737 |

IV. Due Process Hearings.

During the third quarter of 2005-06, OAH received 794 new requests for a due process hearing and 509 cases were resolved through settlement agreements reached between the parties. Due process hearings were held in 31 cases which resulted in a final written decision. Copies of all decisions have been provided to CDE and also posted on the OAH website. The decisions average 14.4 pages in length. The longest decision was 24 pages and the shortest was 3 pages. The average length of hearing was 3.4 days. The length of hearings ranged from one to seven days.

Students had positive outcomes in more than a quarter of the cases heard. Of the cases heard, 3 cases (10 percent) were decided fully in favor of the student, 23 cases (74 percent) were decided in favor of the district, and 5 cases (16 percent) were split decisions. Students were represented by an attorney or advocate in 21 cases (68 percent) and unrepresented in 10 cases (32 percent). Districts were represented by an attorney or advocate in 27 cases (87 percent) and were unrepresented in 4 cases (13 percent).

Cases involving preschool students represented 6 percent of the cases heard, with 48 percent involving elementary school students, 19 percent involving middle school students, and 27 percent involving high school students. The issues for hearing involved students identified as specific learning disabled (9 cases), autistic-like (8 cases), other health impaired (7 cases), emotionally disturbed (3 cases), deaf (1 case), mentally retarded (1 case), speech and language disabled (1 case), and blind (1 case).

The districts brought two cases seeking approval to conduct assessments of students. The other issues addressed at hearing included denial of "free appropriate public education"

---

(IEP) meeting), those that concluded with agreement in principle to be reduced to an enforceable written agreement, and those in which parties remained at impasse and a due process hearing was anticipated.

[9] In no case did the parties waive mediation at the time of requesting a due process hearing. For the fourth quarter of 2005-06, OAH will track the number of due process hearing and mediation requests in which mediation was initially requested but waived prior to hearing.

[10] This number represents the total number of cases requested, less the number of cases settled. In actuality, the total number of pending cases is a combination of the total number of cases reported previously plus the new filings reported here, less the number of closed cases. Based on that calculation, it is estimated that OAH currently has approximately 1200 matters pending.

EX. 8
181

(FAPE) claims (68 percent), eligibility for special education services (13 percent), and validity of assessments (29 percent). Of the remedies requested, 26 percent of cases requested reimbursement for services, 19 percent requested reimbursement for assessments, and 26 percent requested compensatory education.

Of the 31 decisions issued in the third quarter of 2005-06, 9 were rendered within the 45 day or extended timelines. Of the 31 decisions issued, 19 involved cases filed with SEHO, and 12 involved cases originated with OAH. For the 19 cases originated with SEHO the average timeline for decision was 42 days. For the cases originated with OAH, the average timeline for decision was 21 days.

Specific hearing statistics are summarized below:

| | |
|---|---|
| Total Number of Hearing Requests[11] | 883 |
| Number of Cases resolved through settlement | 509 |
| Number of Decisions Issued | 31 |
| Number of Decisions within 45 day timeline | 0 |
| Number of Decisions within extended timeline | 9 |
| Number of Decisions issued after timelines and extension expired | 22 |
| Number of pending matters[12] | 1200 |
| Number of expedited Hearings | 2 |
| Number of Hearing Requests resolved without a hearing | 865 |

V. Expedited Hearing Requests

For the third quarter of 2005-06, OAH received 18 requests for expedited hearings. An expedited hearing is a hearing that involves a parent's challenge to the school district's determination that misconduct was not the "manifestation" of the student's disability or the disciplinary placement. Under the IDEA, expedited hearings are to be held within 20 school days of the request for hearing. A decision in expedited cases is to be issued within 10 schools days after the hearing is concluded. Two cases proceeded to hearing on the expedited issues and 9 cases were settled without the need for a hearing. The specific statistics related to expedited hearings are as follows:

---

[11] This number represents the total number of new cases requested.
[12] As discussed in footnote 10 above.

| Total Number of Expedited Hearing Requests | 18 |
|---|---|
| Number of Settlement Agreements | 6 |
| Number of Expedited Hearings Held | 2 |
| Number of change of placement ordered | 0 |

## VI. Motions

Prehearing motions and Notices of Insufficiency (NOI) comprise a substantial amount of the work completed by administrative law judges. For the first quarter 2006, 264 prehearing motions and 141 NOIs were considered and ruled upon by OAH. The breakdown of NOIs is as follows:

|  | Sufficient | Insufficient | Partially Sufficient | Other [13] | Total |
|---|---|---|---|---|---|
| NOI | 43 | 47 | 12 | 1 | 103 |
| 2nd NOI | 16 | 11 | 1 | 0 | 25 |
| 3rd NOI | 9 | 4 | 0 | 0 | 13 |
| 4th NOI | 1 | 0 | 0 | 0 | 1 |

Motions for a stay put order, dismissal or continuance comprise nearly half of motions heard by OAH. The breakout of motions by type and number received is set forth below:

| Type Of Motion | Number Received |
|---|---|
| Add Party | 11 |
| Amend Complaint | 17 |
| Compel Production | 2 |
| Consolidate | 17 |
| Continue | 39 |
| Dismiss Case | 41 |
| Dismiss Party | 19 |
| Dismiss Issues | 11 |
| Expedite | 5 |
| Extend Time | 14 |
| Reconsideration | 17 |
| Reopen | 8 |
| Stay Put | 44 |
| Miscellaneous | 19 |
| Total | 264 |

---

[13] Represents cases that were withdrawn or settled before a ruling on the NOI was issued.

EX. 8
183

The above data provides an accurate picture of the special education dispute resolution process over the third quarter of 2005-06. OAH has successfully processed 865 cases through closure during this period, and issued hearing decisions in 31 other cases. Thus, 96.5 percent were resolved without the need for a due process hearing and decision. The vast majority of cases clearly resolve through informal processes, and without the need for more formal adjudication and decision. OAH has also diligently worked to address the considerable backlog of SEHO pipeline cases it inherited, all of which are expected to be placed back on calendar or closed by June 30, 2006. At the present time, there are approximately 1200 matters pending before OAH's Special Education Division.

## ATTACHMENT ONE

### NUMBER OF CASES FILED BY SCHOOL DISTRICT

| School District | Filings 01/01/06 To 03/31/06 |
|---|---|
| LOS ANGELES U.S.D. | 305 |
| SAN DIEGO U.S.D. | 21 |
| CAPISTRANO U.S.D. | 16 |
| NEWPORT-MESA USD | 14 |
| SAN FRANCISCO U.S.D. | 13 |
| TUSTIN U.S.D. | 13 |
| LONG BEACH U.S.D. | 11 |
| POWAY U.S.D. | 9 |
| ANAHEIM U.H.S.D. | 9 |
| COMPTON U.S.D. | 9 |
| TEMECULA VALLEY U.S.D. | 9 |
| SANTA ANA U.S.D. | 9 |
| PLACENTIA-YORBA LINDA U.S.D. | 8 |
| MURRIETA VALLEY U.S.D. | 8 |
| NATOMAS U.S.D. | 7 |
| ELK GROVE U.S.D. | 7 |
| SACRAMENTO CITY U.S.D. | 7 |
| YUCAIPA-CALIMESA JT. U.S.D. | 7 |
| WEST CONTRA COSTA USD | 6 |
| DUBLIN U.S.D. | 6 |
| CORONA-NORCO USD | 6 |
| ANTELOPE VALLEY U.H.S.D. | 6 |
| CHULA VISTA E.S.D. | 6 |
| IRVINE U.S.D. | 6 |

EX. 8
184

| | |
|---|---|
| MORENO VALLEY U.S.D. | 5 |
| CLOVIS U.S.D. | 5 |
| CONEJO VALLEY U.S.D. | 5 |
| VISTA U.S.D. | 5 |
| REDWOOD CITY E.S.D. | 5 |
| SAN RAMON VALLEY U.S.D. | 5 |
| SANTA MONICA-MALIBU USD | 5 |
| SIMI VALLEY U.S.D. | 5 |
| SADDLEBACK VALLEY U.S.D. | 4 |
| SAN DIEGUITO UNION H.S.D. | 4 |
| SAN JUAN U.S.D. | 4 |
| WESTSIDE UNION E.S.D. | 4 |
| SOUTH PASADENA U.S.D. | 4 |
| TORRANCE U.S.D. | 4 |
| CULVER CITY U.S.D. | 4 |
| EAST WHITTIER CITY S.D. | 4 |
| FAIRFIELD SUISUN U.S.D. | 4 |
| CHINO VALLEY U.S.D. | 4 |
| PASADENA U.S.D. | 4 |
| ORANGE USD | 4 |
| PALMDALE S.D. | 4 |
| JURUPA U.S.D | 4 |
| MANHATTAN BEACH U.S.D. | 4 |
| MODESTO CITY SCHOOLS | 4 |
| MANTECA U.S.D. | 3 |
| LANCASTER S.D. | 3 |
| LAS VIRGENES U.S.D. | 3 |
| HEMET U.S.D. | 3 |
| HOLLISTER S.D. | 3 |
| HUNTINGTON BEACH U.H.S.D. | 3 |
| PAJARO VALLEY U.S.D. | 3 |
| PALM SPRINGS U.S.D. | 3 |
| MT. DIABLO USD | 3 |
| OAKLAND U.S.D. | 3 |
| OCEAN VIEW S.D. | 3 |
| BONITA U.S.D. | 3 |
| DUARTE UNIFIED S.D. | 3 |
| FREMONT U.S.D. | 3 |
| GARDEN GROVE U.S.D. | 3 |
| GARVEY S.D. | 3 |
| GLENDALE U.S.D. | 3 |
| EAST SIDE UNION H.S.D. | 3 |
| CUPERTINO UNION S.D. | 3 |
| SEQUOIA U.H.S.D. | 3 |
| VALLEJO CITY U.S.D. | 3 |
| SWEETWATER UNION H.S.D. | 3 |
| VENTURA U.S.D. | 3 |
| SAN JOSE USD | 3 |
| REDLANDS U.S.D. | 3 |
| SANTA CLARA USD | 2 |

EX. 8
185

| | |
|---|---|
| SAUGUS UNION S.D. | 2 |
| SAN LEANDRO U.S.D. | 2 |
| RIO LINDA UNION S.D. | 2 |
| RIVERSIDE U.S.D. | 2 |
| WILLIAM S. HART UHSD | 2 |
| WOODLAND JT. U.S.D. | 2 |
| SYLVAN UNION S.D. | 2 |
| TAMALPAIS UNION H.S.D. | 2 |
| TEHACHAPI U.S.D. | 2 |
| STOCKTON U.S.D. | 2 |
| VALLEY CENTER U.S.D. | 2 |
| FRESNO U.S.D. | 2 |
| FULLERTON ELEMENTARY S.D. | 2 |
| FULLERTON JOINT UNION H.S.D. | 2 |
| ESCONDIDO U.S.D. | 2 |
| FOLSOM CORDOVA USD | 2 |
| BELMONT-REDWOOD SHORES E.S.D. | 2 |
| BERKELEY U.S.D. | 2 |
| BERRYESSA U.S.D. | 2 |
| BEVERLY HILLS U.S.D. | 2 |
| ALHAMBRA S.D. | 2 |
| CAMPBELL U.H.S.D. | 2 |
| CHAFFEY JT. U.H.S.D. | 2 |
| CARLSBAD U.S.D. | 2 |
| BANNING U.S.D | 2 |
| BYRON UNION S.D. | 2 |
| NORTH SACRAMENTO S.D. | 2 |
| HAYWARD U.S.D. | 2 |
| MORGAN HILL USD | 2 |
| OXNARD ELEMENTARY SCHOOL | 2 |
| PALO ALTO U.S.D. | 2 |
| PALO VERDE U.S.D. | 2 |
| PALOS VERDES PENINSULA USD | 2 |
| PLEASANT VALLEY SD (CAMARILLO) | 2 |
| PARAMOUNT U.S.D. | 2 |
| POMONA U.S.D. | 2 |
| HORIZON INTRUCT SYST CHT SCHL | 2 |
| HUNTINGTON BEACH CITY S.D. | 2 |
| LAWNDALE S. D. | 2 |
| KERN H.S.D. | 2 |
| LA CANADA U.S.D. | 2 |
| MOJAVE UNIFIED S.D. | 2 |
| MONROVIA U.S.D. | 2 |
| MONTEREY PENINSULA USD | 2 |
| MORAGA ELEM SCH DIST | 1 |
| LOWELL JT. S.D. | 1 |
| LUCIA MAR U.S.D. | 1 |
| MONTEBELLO USD | 1 |
| LAS LOMITAS E.S.D. | 1 |

11

EX. 8
186

| | |
|---|---|
| LOS ALTOS U.S.D. | 1 |
| MARTINEZ U.S.D. | 1 |
| MENIFEE UNION ESD | 1 |
| LA MESA-SPRING VALLEY S.D. | 1 |
| LAKE ELSINORE U.S.D. | 1 |
| LIBERTY UNION H.S.D. | 1 |
| LODI U.S.D. | 1 |
| IMPERIAL U.S.D. | 1 |
| HOLTVILLE U.S.D. | 1 |
| HERMOSA BEACH CITY E.S.D. | 1 |
| RANCHO SANTA FE S.D. | 1 |
| PLEASANTON U.S.D. | 1 |
| PASO ROBLES JOINT UNIFED S.D. | 1 |
| PERRIS U.H.S.D. | 1 |
| PANAMA-BUENA VISTA UNION S.D. | 1 |
| PACIFICA SCHOOL DISTRICT | 1 |
| MORONGO U.S.D. | 1 |
| NEVADA CO. OFFICE OF ED. | 1 |
| NEW HAVEN U.S.D. | 1 |
| NEWARK U.S.D. | 1 |
| NEWHALL SCH DIST | 1 |
| NORWALK/LA MIRADA U.S.D. | 1 |
| NORTH MONTEREY CO. U.S.D. | 1 |
| OCEANSIDE U.S.D. | 1 |
| OLD ADOBE UNION S.D. | 1 |
| CABRILLO U.S.D. | 1 |
| CALIFORNIA VIRTUAL ACADEMIES | 1 |
| BELLA VISTA E.S.D. | 1 |
| CASCADE UNION E.S.D. | 1 |
| CENTRALIA S.D. | 1 |
| CARDIFF E.S.D. | 1 |
| CHARTER OAK U.S.D. | 1 |
| CHICO U.S.D. | 1 |
| COLUSA U.S.D. | 1 |
| CLAREMONT U.S.D. | 1 |
| ALUM ROCK UNION E.S.D. | 1 |
| ANAHEIM CITY S.D. | 1 |
| ACALANES U.H.S.D. | 1 |
| ACTON-AGUA DULCE USD | 1 |
| ALAMEDA USD | 1 |
| APPLE VALLEY U.S.D. | 1 |
| BAKERSFIELD CITY S.D. | 1 |
| BREA-OLINDA USD | 1 |
| BUENA PARK S.D. | 1 |
| BURLINGAME E.S.D. | 1 |
| FONTANA USD | 1 |
| FREMONT UNION H.S.D. | 1 |
| GLENDORA U.S.D | 1 |
| GRANT JT. UNION H.S.D. | 1 |
| GREENFIELD U.S.D.(BAKERSFIELD) | 1 |

EX. 8
187

| | |
|---|---|
| HACIENDA LA PUENTE USD | 1 |
| HAWTHORNE SCHOOL DISTRICT | 1 |
| DESERT SANDS U.S.D. | 1 |
| DRY CREEK JT. E.S.D. | 1 |
| COVINA-VALLEY U.S.D. | 1 |
| ENCINITAS U.S.D. | 1 |
| EL MONTE U.H.S.D. | 1 |
| EL SEGUNDO U.S.D. | 1 |
| EL TEJON U.S.D. | 1 |
| TWAIN HARTE/LONG BARN U.S.D. | 1 |
| UNION S. D. | 1 |
| VACAVILLE U.S.D. | 1 |
| VAL VERDE USD | 1 |
| TEMPLE CITY U.S.D. | 1 |
| TEMPLETON U.S.D. | 1 |
| YOUTH AUTHORITY - SPECIAL ED | 1 |
| YUBA CITY U.S.D. | 1 |
| VICTOR E.S.D. | 1 |
| WEST COVINA USD | 1 |
| WEST SIDE UNION H.S.D. | 1 |
| WHITTIER CITY S.D. | 1 |
| WHITTIER UNION H.S.D. | 1 |
| ROSEMEAD S.D. | 1 |
| SAN LORENZO U.S.D. | 1 |
| SAN MARCOS U.S.D. | 1 |
| SAN MATEO UNION HSD | 1 |
| SAN MATEO-FOSTER CITY S.D. | 1 |
| SAN RAFAEL CITY SCHOOLS | 1 |
| SALINAS UNION H.S.D. | 1 |
| SAN DIEGO CO. OFF OF ED | 1 |
| REED UNION S.D. | 1 |
| RIALTO U.S.D. | 1 |
| RIO ELEM SCH DIST | 1 |
| SCOTTS VALLEY USD | 1 |
| SANTA ROSA CITY SCHOOLS | 1 |
| SISKIYOU UNION H.S.D. | 1 |
| SO. BAY U.S.D. (IMPERIAL BCH) | 1 |
| SOLANA BEACH U.S.D. | 1 |
| SONOMA VALLEY U.S.D. | 1 |
| SANTA CLARA CO. OFFICE OF ED. | 1 |
| SAN YSIDRO S.D. | 1 |
| **TOTAL** | **883** |

EX. 8
188