Ellen Dowd, Esq.
State Bar Number 141206
2658 Del Mar Heights Road #228
Del Mar, California 92014
(858) 342-8360
Fax (858) 755-6348
ellendowd@sbcglobal.net

**Attorney for Plaintiff, C.S.**

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.S., by and through his Conservator, MARY STRUBLE, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF EDUCATION, a State Agency, <br> Defendant. | CASE NO.: 08 CV 0226 W (AJB) <br><br> DECLARATION OF ELLEN DOWD, ESQ. IN REPLY TO CDE AND OAH OPPOSITIONS TO TEMPORARY RESTRAINING ORDER <br><br> Date: April 28, 2008 <br> Judge: Hon. Thomas J. Whelan |

I, Ellen Dowd, declare as follows:

1.    I am an attorney admitted and in good standing in all of the state and federal Courts in the State of California, including this honorable court.

2.    I am attorney of record for Plaintiff herein, and make this declaration on behalf of Plaintiff, and all others similarly situated, meanings disabled students and their parents who have, through a special education due process hearing before Office of Administrative Hearings (OAH's) ALJs, obtained less than complete relief sought, in Reply to CDE and OAH's Oppositions to Application for

Temporary Restraining Order (TRO), enjoining Defendant, "CDE" from renewing, awarding or otherwise contracting the Interagency Agreement for the provision of special education mediations and due process hearings for the term July 1, 2008-June 30, 2011 with OAH.

3.    I have personal knowledge of the facts stated herein, and, if called as a witness, I could and would testify competently thereto.

4.    I have been practicing law for 25 years, and am also admitted and in good standing in the state and federal courts in New York and New Jersey. I have had extensive civil litigation experience, including complex commercial litigation and Civil RICO. Since approximately 2001, I have concentrated my practice to representing students in special education mediations and due process hearings in California.

5.    On CDE's official website, CDE publishes a notice that it must enter into an interagency agreement with another state agency or contract with a nonprofit organization or entity to conduct mediation and due process hearings. (Ex. 1 hereto).

6.    On January 26, 2008 I did a Public Records Act request to OAH to obtain, among other things, copies of any and all writings consisting of Board Decisions, memorandum of understanding, request for bid/proposal, Interagency Agreement, General Terms and Conditions, Duty Statements, solicitations, applications, employment contracts received by OAH from CDE regarding the renewal of the Interagency Agreement (currently number 4427) upon the expiration of the Interagency Agreement on June 30, 2008;  copies of any and all writings consisting of letters, memorandum, proposals, solicitations,  requests, bids, proposals, applications, resumes, duty statements, employment contracts sent by OAH to CDE regarding the renewal of the Interagency Agreement (currently number 4427) upon the expiration of the Interagency Agreement on June 30, 2008; copies of any and all writings consisting of any internal memorandum,

08 CV 0226 W (AJB)
Declaration of Ellen Dowd, Esq.
In Reply to Opposition to
Temporary Restraining Order

correspondence, meeting notes, meeting agendas, sign in sheets, proposals, recommendations, amendments, agreements, requests, communications generated by OAH to OAH or anyone regarding the renewal of the Interagency Agreement (currently number 4427) upon the expiration of the Interagency Agreement on June 30, 2008. (Ex. 2 hereto).

7.    On February 21, 2008 I received a response fro OAH concerning this request, in which AOH denied the request on the basis of attorney-client privilege. (Ex. 3 hereto).

8.    On February 2, 2007, the United States Department of Education, Office of Special Education Programs (OSEP) sent a letter to CDE regarding a verification visit OSEP conducted in October, 2006.  In this letter, OSEP found CDE and OAH to be out of compliance with the 45-day statutory timeline for issuing Due Process Decisions. (Ex. 4 hereto).  The letter directed CDE to confirm compliance by February 1, 2008. (Ex. 4).

9.    On February 1, 2008, CDE issued its State of California Annual Performance Report to the U. S. Department of Education, in which, on page 136 (Ex. 5 hereto, p. 4) CDE states, "100 percent of due process requests were fully adjudicated within the 45-day timeline or a timeline that was properly extended by the hearing officer at the request of a party."  Except its not the party requesting the extension, it's the ALJ (see Ex. 6 hereto).

10.    The ongoing harm, deception, and collusion of OAH and CDE need to be abated by issuance of the TRO.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this 21th day of April, 2008 at San Diego, California.

Ellen Dowd

3

EXHIBIT 1



**California** Department of **EDUCATION**

Change Text Si

Search [        ]

Advanced | Site Ma

Curriculum & Instruction       Testing & Accountability       Professional Developm

Finance & Grants       Data & Statistics       Learning Support       Specialized P

Home » Resources » Laws & Regulations » Proposed Rulemaking & Regulations       Printer-frie

# Special Education Hearing Officer

Requires the CDE to enter into an interagency agreement with another state agency or contract with a nonpro
organization or entity to conduct mediation conferences and due process hearings.

- Notice of Proposed Rulemaking and Comment Period (Notice Published 26-Jan-2007)
    - 45-Day Public Comment Period Begins on 27-Jan-2007 and Ends on 22-Mar-2007
- Proposed Regulations (DOC; 91KB; 16pp.)
- Initial Statement of Reasons (DOC; 69KB; 9pp.)
- 15-Day Notice and Comment Period (Notice Published 19-Dec-2007; DOC; 67KB; 1p.)
    - 15-Day Public Comment Period Begins on 20-Dec-2007 and Ends on 03-Jan-2008
- 15-Day Notice Regulations (DOC; 73 KB; 12pp.)
- Rulemaking File Resubmitted to OAL on 25-Jan-2008
- Review of Rulemaking File by OAL To Be Completed On/Before 11-Mar-2008
- Rulemaking File Withdrawn on 29-Feb-2008

**Questions: Regulations Coordinator | regcomments@cde.ca.gov | 9:**

**Download I**

California Department of Education
1430 N Street
Sacramento, CA 95814

Contact Us | FAQ | Web Policy

Last Reviewed: Monday, March 03, 2008

EXHIBIT 2

**Ellen Dowd**
**Attorney At Law**
**State Bar # 141206**
**Special Education Legal Center**
**2658 Del Mar Heights Road #228**
**Del Mar, California 92014**
**(Tel) 858-342-8360  (Fax) 858-755-6348**

January 26, 2008

Phoenix R. Vigil
Public Records Review Officer
Office of Administrative Hearings
2349 Gateway Oaks Drive
Suite 200                                    VIA Fax # 916-263-0890
Sacramento, California 92833-4321              And U.S. Mail

Dear Ms. Vigil:

In accordance with Public Records Act, California Government Code §6250 et seq.
please provide me with the following documents:

Request # 1:

(1)     Copies of any and all rosters or lists or any written record of the names of the Special
Education Division ALJs who were employed by OAH assigned to Southern California between
January 1, 2007- March 31, 2007.

(2)     Copies of any and all rosters or lists or any written record of the names of the Special
Education Division ALJs who were employed by OAH assigned to Southern California between
April 1, 2007- June 30, 2007.

(3)     Copies of any and all rosters or lists or any written record of the names of the Special
Education Division ALJs who were employed by OAH assigned to Southern California between
July 1, 2007- September 30, 2007.

(4)     Copies of any and all rosters or lists or any written record of the names of the Special
Education Division ALJs who were employed by OAH assigned to Southern California between
October 1, 2007- December 31, 2007.

(5)     Copies of any and all rosters or lists or any written record of the names of the Special
Education Division ALJs who were employed by OAH assigned to Southern California between
January 1, 2008- March 31, 2008.

Request # 2:

(1)     Copies of any and all writings consisting of Board Decisions, memorandum of
understanding, request for bid/proposal, Interagency Agreement, General Terms and Conditions,
Duty Statements, solicitations, applications, employment contracts received by OAH from CDE

regarding the renewal of the Interagency Agreement (currently number 4427) upon the expiration of the Interagency Agreement on June 30, 2008.

(2)    Copies of any and all writings consisting of letters, memorandum, proposals, solicitations, requests, bids, proposals, applications, resumes, duty statements, employment contracts sent by OAH to CDE regarding the renewal of the Interagency Agreement (currently number 4427) upon the expiration of the Interagency Agreement on June 30, 2008.

(3)    Copies of any and all writings consisting of any internal memorandum, correspondence, meeting notes, meeting agendas, sign in sheets, proposals, recommendations, amendments, agreements, requests, communications generated by OAH to OAH or anyone regarding the renewal of the Interagency Agreement (currently number 4427) upon the expiration of the Interagency Agreement on June 30, 2008.

Request # 3:

(1)    Copies of any and all writings consisting of price quotes for ALJ training for between January 1, 2008-June 30, 2008.

(2)    Copies of any and all writings consisting of evidence of ALJ training from January 1, 2007-December 31, 2007, including sign in sheets, dates/times/duration of training sessions, training session topics, identities of the trainers, trainer resumes, agendas, printed training materials, bids, contracts, invoices for the trainings, and any post-training testing, quizzes, surveys or comments.

I have enclosed a check in the amount of $30.00 to cover the cost of photocopying and mailing these documents. If the cost is more than $30.00, I agree to be responsible for all additional charges.

Please send these to me within the statutory period. Thank for your anticipated cooperation.

Very truly yours,

Ellen Dowd

Encl.

2

EXHIBIT 3



OFFICE OF ADMINISTRATIVE HEARINGS                    State of California

2349 Gateway Oaks Drive, Suite 200, Sacramento, CA 95833-4231       Department of General Services
General Jurisdiction – (916) 263-0550 phone / (916) 263-0554 fax
Special Education – (916) 263-0880 phone / (916) 263-0890 fax
www.oah.dgs.ca.gov

February 21, 2008

*Via facsimile transmission and U.S. Mail*

Ellen Dowd
Special Education Legal Center
2658 Del Mark Heights Road, #228
Del Mar, CA 92014
Fax: 858-755-6348

Re: Public Records Act Request – 08-004

Dear Ms. Dowd:

Following up on our February 7, 2008, correspondence, with regard to your Request #1, the
Office of Administrative Hearings (OAH) has identified two pages of records that appear to
be responsive to this request.

With regard to your Request #2, OAH has identified documents that appear to be
responsive to this request. However, we are exempting those records pursuant to the
attorney-client privilege contained in Evidence Code section 954 and Government Code
section 6254(k). In addition, these records are preliminary drafts not ordinarily retained in
our ordinary course of business (Government Code section 6254(a)), and, pursuant to
Government Code section 6255, the public interest served by not disclosing the records
clearly outweighs the public interest served by disclosure of the records. Release of
records relating to an agency's deliberative process during the negotiation process would
have a chilling effect on what should be open and free dialogue without public scrutiny or
judgment and will significantly impede or impact an agency's deliberative process and ability
to effectively negotiate. It would inhibit the free and candid exchange of ideas necessary to
the decision-making process.

With regard to your Request #3, OAH has identified 470 pages of records which appear to
be responsive to this request; subject to the exemptions listed on our February 7, 2008
letter.

We will release a copy of these records to you upon payment of our copy charge in the
amount of $47.20 (472 pages x $0.10); less your prepaid check for $30.00, this leaves a
balance owing of $17.20. Please make your check payable to the Office of Administrative
Hearings.

Regional Offices

| Los Angeles | Oakland | San Diego | Laguna Hills | Van Nuys |
|---|---|---|---|---|
| 320 West Fourth Street | 1515 Clay Street | 1350 Front Street. | 23046 Avenida De La Carlota | 15350 Sherman Way |
| Suite 630 | Suite 206 | Suite 6022 | Suite 750 | Suite 300 |
| Los Angeles, CA 90013 | Oakland, CA 94612 | San Diego, CA 92101 | Laguna Hills, CA 92653 | Van Nuys, CA 91406 |
| (213) 576-7200 | (510) 622-2722 | (619) 525-4475 | (949) 598-5850 | (818) 904-2383 |
| Fax (213) 576-7244 | Fax (510) 622-2743 | Fax (619) 525-4419 | Fax (949) 598-5860 | Fax (818) 904-2360 |

Ellen Dowd
February 21, 2008
Page 2

Release of public records is subject to case-by-case analysis. Release of these particular records in response to your request shall not be deemed a waiver of the State's right to assert any appropriate exemptions on similar categories of documents under other circumstances.

Sincerely,

*Phoenix R. Vigil*

PHOENIX R. VIGIL
Public Records Review Officer
Office of Administrative Hearings

EXHIBIT 4

UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

February 2, 2007

Honorable Jack O'Connell
Superintendent of Public Instruction
California Department of Education
1430 N Street, Suite 5602
Sacramento, CA  95814

Dear Superintendent O'Connell:

The purpose of this letter is to inform you of the results of the recent verification visit to California conducted by the Office of Special Education Programs (OSEP). OSEP is conducting verification visits to a number of States as part of our Continuous Improvement and Focused Monitoring System (CIFMS) for ensuring compliance with, and improving performance under Parts B and C of the Individuals with Disabilities Education Act (IDEA). OSEP conducted a visit to California during the week of October 2, 2006.

The purpose of our verification reviews of States is to determine how they use their general supervision, State-reported data collection, and statewide assessment systems to assess and improve State performance and to protect child and family rights. The purposes of the verification visits are to:  (1) understand how the systems work at the State level; (2) determine how the State collects and uses data to make monitoring decisions; and (3) determine the extent to which the State's systems are designed to identify and correct noncompliance. In addition, OSEP piloted some approaches to monitoring for fiscal accountability during this visit. Because we are still developing these procedures, this letter does not address information reviewed or obtained as a part of this pilot.

As part of the verification visit to the California Department of Education (CDE), OSEP staff met with Mary Hudler, State Director of Special Education, and members of CDE's staff who are responsible for:  (1) the oversight of general supervision activities (including monitoring, mediation, complaint resolution, and impartial due process hearings); (2) the collection and analysis of State-reported data; and (3) ensuring participation in, and the reporting of student performance on statewide assessments. Prior to the visit, OSEP staff reviewed a number of documents[1] including the State's Part B Grant Award Application for Federal Fiscal Year (FFY) 2006; the Annual

---

[1] Documents reviewed as part of the verification process were not reviewed for legal sufficiency but rather to inform OSEP's understanding of your State's systems.

400 MARYLAND AVE., S.W., WASHINGTON, D.C. 20202
www.ed.gov

Our mission is to ensure equal access to education and to promote educational excellence throughout the Nation.

Performance Reports (APR) for FFY 2003 and FFY 2004; California's December 2, 2005 State Performance Plan (SPP); desk audits submitted by CDE; submissions of data under section 618 of the IDEA; and the CDE Special Education Division's (SED) website. OSEP also conducted a conference call on September 28, 2006, with a variety of the State's special education stakeholders to hear their perspectives on the strengths and weaknesses of the State's systems for general supervision, data collection, and statewide assessment.

The information that Ms. Hudler and other CDE staff provided during the OSEP visit, together with all of the information that OSEP staff reviewed in preparation for the visit, greatly enhanced our understanding of CDE's systems for general supervision, data collection and reporting, and statewide assessment.

### General Supervision

In looking at the State's general supervision system, OSEP collected information regarding a number of elements, including whether the State:  (1) has identified any barriers (e.g., limitations on authority, insufficient staff or other resources, etc.) that impede the State's ability to identify and correct noncompliance; (2) has systemic, data-based, and reasonable approaches to identifying and correcting noncompliance; (3) utilizes guidance, technical assistance, follow-up, and—if necessary—sanctions, to ensure timely correction of noncompliance; (4) has dispute resolution systems that ensure the timely resolution of complaints and due process hearings; and (5) has mechanisms in place to compile and integrate data across systems (e.g., section 618 State-reported data, due process hearings, complaints, mediation, large-scale assessments, previous monitoring results, etc.) to identify systemic issues and problems.

Based on the information provided to OSEP during the verification visit, it appears that CDE's general supervision system is reasonably designed to ensure the identification and timely correction of noncompliance. However, OSEP cannot, without also collecting data at the local level, determine whether the system is fully effective in identifying and correcting noncompliance.

### Monitoring

California has implemented a comprehensive statewide system of monitoring which encompasses annual collection and analysis of district information, monitoring reviews, evaluation and planning processes, training and technical assistance, and dispute resolution systems. OSEP reviewed the State's organization and functions chart (units in the special education division), which illustrates how the administrative structure integrates the State's monitoring system with policy and planning functions, California Special Education Management Information System (CASEMIS) data collection, technical assistance, and support services.

The State reported that there are approximately 1,050 school districts, 122 special education local plan areas (SELPAs), 58 county offices, approximately 671 charter

schools, and four State Operated Programs (SOPs). OSEP learned that the SED has divided the State among three focused monitoring and technical assistance (FMTA) teams, each of which is responsible for a specific region of the State. Consultants on these teams are assigned to specified SELPAs within their team's region, and they are responsible for coordinating all monitoring and technical assistance activities in those SELPAs.

The SED monitors local educational agencies (LEAs) using a focused monitoring approach. CDE's special education goals and key performance indicators (KPIs) play a central role in selecting districts for review and shaping the content of the review. The overall goal is to achieve appropriate educational outcomes for children with disabilities. The following discussion highlights the main components of the State's monitoring system.

*Annual collection and analysis of district information*
During the verification visit, CDE explained that it utilizes a multi-method review process to collect and analyze data on each school district every year. Each SELPA must submit a local plan consisting of an annual budget and service plan. Second, the CASEMIS data system generates indications of school district performance on State KPIs and Federal and State timeline compliance (e.g., annual review of individualized education programs (IEPs) and triennial reevaluations). Third, the State reported that it collects and analyzes ongoing school district complaint and due process histories to help ensure that State and Federal laws and regulations are implemented. Both CDE and districts utilize all the information gathered to identify concerns in order to focus the special education self-review (SESR) and verification review (VR) processes.

*Special education self-review*
Each year, approximately one-quarter of California's school districts complete an SESR and report their findings to the CDE via customized software developed by CDE. Both the SESR and VRs use the CDE software to customize the reviews, which track the applicable Federal and State regulatory requirements. The SESR is a collaborative process between the SELPA and the district.

OSEP learned that there are three major stages to the SESR process. During stage one, the district team (which includes a parent representative) develops its *monitoring plan*, that includes a complete analysis of a variety of data sources (parent input, compliance history, complaint status, due process status, adequate yearly progress (AYP), and overdue annual IEP review and triennial reevaluation status), and the district's KPI data measures that are summarized by the district to generate data reports. Once the data are collected and analyzed, the district submits its monitoring plan to CDE for approval. Based upon the district's data, the SESR software identifies the specific Part B and State requirements that the district must address as part of its SESR. CDE informed OSEP that very small districts (where fewer than 20 students receive special education and related services) are not required to submit a monitoring plan. These districts must complete the educational benefit review process (see below) for up to five special education students and report the findings to CDE.

After CDE approves the monitoring plan, the district, with support from its SELPA, begins its monitoring review activities – stage two. During stage two, the district must select and review a random sample of student records; the minimum number of files that a district must review depends on the number of special education students enrolled in that district. The *student record review* process identifies both student-specific and systemic (system-wide pattern) noncompliance. CDE's monitoring procedures provide criteria for distinguishing between student-specific and systemic issues. While the corrective actions that a district must take are different for the two types of findings, districts must correct all noncompliance within one year of identification. In addition, the record reviews are used as part of the educational benefit and IEP implementation review processes.

During the *educational benefit* review process, student assessment and subsequent IEPs are chronologically screened according to the student's present levels of performance, goals, placements, services, and progress. These elements are analyzed to determine whether the student's program is reasonably calculated to result in educational benefit.

CDE reported that the failure to implement the IEP is the most frequent finding of noncompliance identified through the SED complaint process. To address this concern, CDE conducts an IEP implementation component to enable the district to verify if students receive all services contained in the IEP. In reviewing IEP implementation, CDE reported that it reviews up to ten student files, randomly selects five IEPs, and must review up to five files of students who are emotionally disturbed or receiving mental health services. A combination of observations and interviews with parents, service providers, and students provide evidence to determine if students' IEPs are implemented as written.

CDE explained that the *policy and procedure review* is another component of the monitoring review activities. Policies and procedures are reviewed for procedural (process issues such as timelines) compliance and to follow up on issues and concerns identified in the Monitoring Plan. The format for reviewing district policies and procedures is generated by the customized software. OSEP learned that all findings of noncompliance in this review are considered systemic.

Finally, each district is required to complete the *Local Plan Governance Review* to determine if the SELPA implemented the required components of the special education local plan, including annual budget, service plan, and local interagency agreements with the county mental health agency.

Any findings of noncompliance, together with an explanation of the reason for the noncompliance, are entered into the database software system, which generates a list of corrective actions. Stage three consists of an analysis of the results of the monitoring activities, development of corrective action plans, tracking of correction, and follow-up reviews. As noted above, CDE reported that it distinguishes between two types of findings of noncompliance: student level and systemic. OSEP learned that areas of

student level noncompliance are identified by a review of student records and through the IEP implementation process, and must be corrected within 45 days. Noncompliance regarding educational benefit is also addressed at the student level, and an IEP Team meeting is held promptly to review the educational benefit finding for the student and to consider the need for compensatory services. Systemic findings require a four-step process, and the first three must be completed within 90 days. The district must provide CDE with: (1) evidence that its policies and procedures are compliant with Federal law; (2) evidence that it has notified staff of policies and procedures; (3) evidence that it has conducted in-service training to staff and administrators; and (4) a list of all students who participated in the process after six months. In addition, a *six-month* or *one-year follow up review* is conducted to ensure that based on a random sample of student records, no new instances of noncompliance have been identified. CDE reported that items are cleared when there is evidence of correction and that in all cases, identified noncompliance must be corrected within one year of identification.

*Verification Reviews (VR)*
CDE reported that it conducts verification reviews for 20 districts annually. CDE selects districts for VRs in a variety of ways based on some of the following factors:  (1) districts that demonstrate significantly sub-average performance or low KPI values in stakeholder-selected areas (e.g., least restrictive environment, overidentification of children with disabilities, and academic performance); (2) the results of complaint investigations that indicate recurrent noncompliance; (3) data from CDE staff that allege violations of applicable regulations; (4) data from "triage" of SESRs that indicate the need for further review; and (5) districts that are randomly selected for further review. OSEP learned that the VRs contain all of the components of the SESR noted above, with the addition of parent, staff and administrator interviews. VR teams conduct interviews with parents, staff and administrators based on questions derived from the software from items included in the monitoring plan. In addition, teams are encouraged to add more questions to address specific concerns. VR teams spend approximately four to five days on-site followed by a post review meeting to review the findings and develop corrective action plans. Three reports are generated: superintendent summary, student corrective action plan, and systemic corrective action plan. CDE reported that it conducts at least one follow-up on-site per VR. In all cases, identified noncompliance must be corrected within one year. The review is not closed until the district has demonstrated sustained correction in all identified areas.

OSEP learned during the verification visit, that CDE conducts a follow-up visit to validate every systemic finding identified during a VR to ensure that the noncompliance has been corrected in a timely manner. For SESRs, CDE selects a sample of 5% of the districts that have participated in the SESR and conducts an on-site visit to validate if the data are accurate and to determine whether any identified noncompliance has been corrected. CDE selects the districts based on random sampling and data that may appear questionable.

Page 6 – Honorable Jack O'Connell

*Facilitated District Reviews*
CDE informed OSEP during the verification visit that facilitated district reviews (FDRs) are for school districts that have the lowest 15% of KPIs and that are identified as needing program improvement. OSEP learned that FDRs begin with the VR and proceed with site- and district-based intervention. Districts voluntarily agree to participate in a three-year process supported through a grant and support from the Riverside County Achievement Team (RCAT). CDE reported that eight districts have completed the first cohort of the FDRs and that there are an additional four districts participating in the second cohort.

*Monitoring of Nonpublic Schools*
CDE monitors nonpublic schools (NPS) that provide services to students with disabilities that are placed by public agencies through three activities: (1) self review; (2) on-site review; and (3) follow-up review. CDE reported that approximately one-third of the certified nonpublic schools are selected for a self-review each year. A standard review instrument with a parent survey is sent to the nonpublic school. The principal or designee and the LEA collaborate in completing the document. CDE informed OSEP that the NPS has 45 days to complete and return the report to CDE.

California State law requires on-site reviews of each NPS once every three years, or more frequently if necessary. CDE reported that an on-site review of an NPS begins with an entrance meeting, a review of documentation, and observations of teaching and learning. Upon completion of the review, the monitoring team holds an exit interview with school staff to make findings and develop plans to correct identified noncompliance. Within 60 days of the review, a written report is issued to the NPS and the contracting LEA. Areas of identified noncompliance are forwarded to the relevant FMTA unit for appropriate handling. CDE conducts follow-up reviews to ensure that any areas of noncompliance are corrected within one year. The follow-up review may include additional site visits to the NPS or technical assistance from CDE staff.

*Evaluation and Planning Processes*
CDE informed OSEP during the verification visit that it plans to use a unified planning process in which all State level planning in special education will be guided by the SPP. Currently, the State uses several diverse planning groups to address areas such as monitoring and accountability, personnel development, and fiscal management. Some of the primary activities associated with the new unitary planning process include: providing customized training and technical assistance to LEAs, parent groups, colleges and universities; updating the monitoring functions to address emergent issues/needs; the implementation of SPP improvement plans as part of the VR and SESR processes and as part of the request for training and technical assistance; and sponsoring statewide meetings, conferences, and web events.

*Training and Technical Assistance*
During the verification visit, OSEP learned that CDE offers training and technical assistance through a variety of methods that are based on Statewide and local needs, stakeholder input, and changes in statutes or regulations. CDE uses a number of

Page 7 – Honorable Jack O'Connell

contracted projects and SED consultants to provide varying levels of training, technical assistance, and resources to LEAs, parents and professionals to ensure compliance with Federal and State law and to improve student achievement and outcomes. Some of these projects include: California Services for Technical Assistance and Training (CAL Stat), Least Restrictive Environment (LRE) Resources Project, Special Education Early Childhood Administrators Project (SEECAP), and Special Education Early Delivery System Project (SEEDS). CDE reported that it provides training and technical assistance through on-site and follow-up visits, annual workshops, satellite conferences, web casts, and telephone contacts.

*Complaint Management*

The Part B regulations require that CDE issue a written decision on each Part B complaint within 60 days of the date that the complaint is filed, unless the timeline is extended due to exceptional circumstances with regard to a particular complaint (34 CFR §300.661(a) and (b)(1)) of the regulations that were in effect at the time of OSEP's verification visit[2]).

In its December 2005 SPP, CDE provided data that indicated 52% compliance with the 60-day requirement for resolving State complaints, and identified strategies to address this noncompliance. In its March 22, 2006 response to the SPP, OSEP informed the State that it must ensure that the noncompliance regarding the issuance of timely complaint decisions was corrected within one year, and include data in the APR, due February 1, 2007, that demonstrate compliance with 34 CFR §300.661(a) and (b)(1). During the verification visit, CDE provided OSEP with a log of 593 State complaints received between January 1 and June 20, 2006. Of those 593 complaints: (1) the 60-day timeline was extended due to exceptional circumstances for 42 complaints; (2) 105 complaints were withdrawn by the complainant; (3) 14 complaints were resolved through the local resolution process; (4) 23 were held in abeyance pending a due process hearing on the same issue(s); and (5) the decision was issued beyond the 60-day timeline, without extension for 61 complaints. Of those 61 complaints, CDE issued the decision: (1) one to five days beyond the 60-day timeline for 23 complaints; (2) five to ten days beyond the 60-day timeline for 14 complaints; (3) 11 to 20 days beyond the 60-day timeline for 10 complaints; (4) 20 to 40 days beyond the 60-day timeline for nine complaints; and (5) more than 41 days beyond the 60-day timeline for five complaints. The CDE log showed that CDE resolved the remaining 348 complaints within the 60-day timeline. As noted above, CDE must include data in the APR, due February 1,

---

[2] These regulatory provisions have been redesignated, with several changes, as 34 CFR §300.152(a) and (b)(1) in the final Part B regulations which became effective on October 13, 2006. The requirement for a State's complaint procedures to include a time limit of 60 days after a complaint is filed to conduct specified actions with regard to the complaint is unchanged from prior regulations. In addition to the requirement that the State's procedures permit an extension of the 60-day timeline only if exceptional circumstances exist with respect to a particular complaint, the State's procedures must permit an extension of the 60-day timeline if "The parent (or individual or organization, if mediation or other alternative means of dispute resolution is available to the individual or organization under State procedures) and the public agency involved agree to extend the time to engage in mediation pursuant to paragraph (a)(3)(ii) of this section, or to engage in other alternative means of dispute resolution, if available in the State." 34 CFR §300.152(b)(1)(i)-(ii).

2007, that demonstrate compliance with the 60-day timeline for issuing complaint decisions as required by 34 CFR §300.152(a) and (b)(1) of the final Part B regulations. Failure to include the required data in the APR, due February 1, 2007, may affect the State's status under section 616(d) of the IDEA.

*Due Process Hearing System*
Prior to the verification visit, OSEP learned that as of June 1, 2005, the Office of Administrative Hearings (OAH) entered into an interagency agreement with CDE to administer the mandated special education dispute resolution program. OAH took over the operation of the dispute resolution program from the University of Pacific, McGeorge School of Law, Special Education Hearing Office (SEHO).

The Part B regulations at 34 CFR §300.511(a) and (c) (in effect when the State submitted the SPP and at the time of OSEP's verification visit), require that: (1) a final decision is reached in the hearing and a copy of the decision is mailed to each of the parties within 45 days of the receipt of a request for a hearing; and (2) a hearing officer may grant specific extensions of time beyond 45 days at the request of either party. Regulations for due process hearing timelines have been redesignated as 34 CFR §300.515(a) and (c) of the final Part B regulations. Under the reauthorized IDEA, generally, a 30-day resolution process must precede the initiation of the 45-day due process hearing timeline, with certain exceptions described in 34 CFR §300.510 of the final Part B regulations.

During the verification visit, CDE and OAH provided the following data to OSEP regarding the timeliness of due process hearing decisions: first quarter (January-March 2006) – 29% compliance level; second quarter (April-June 2006) – 59% compliance level; and third quarter (July-September 2006) – 72% compliance level. While data reviewed during the verification visit show substantial improvement from the first to the third quarter, the third quarter data show continuing noncompliance with Part B requirements.

By the FFY 2006 APR, due February 1, 2008, CDE must submit data demonstrating compliance with the due process hearing requirements in 34 CFR §300.515(a) and (c) of the final Part B regulations. Failure to demonstrate compliance at that time may affect the State's status under section 616(d) of the IDEA.

*Timely Correction of Noncompliance*
In the December 2005 SPP, CDE reported a 93.21% level of compliance related to the timely correction of monitoring findings and an 88.35% level of compliance related to the timely correction of noncompliance identified through complaints or hearings.

As noted earlier, OSEP learned that CDE's monitoring processes, including both the SESR and CDE's monitoring of LEAs, result in findings of noncompliance at the student and district levels, and CDE requires correction of all findings within one year of identification. During the verification visit, CDE informed OSEP that it had ensured that all findings of noncompliance that it made during 2004-2005 were corrected within one

year of identification. OSEP reviewed CDE's monitoring documentation for a number of districts, and found that CDE had clear documentation of: (1) the date on which it notified the district of noncompliance; (2) the follow-up procedures that CDE implemented to determine whether the noncompliance was corrected; (3) the date on which CDE notified the district that it had corrected the noncompliance; and (4) that the noncompliance was corrected within one year of identification. During the verification visit, CDE also informed OSEP that when it identifies noncompliance as a result of a complaint investigation, it records the findings in a complaints tracking database.

OSEP also learned that CDE staff members in each of the FMTA units are responsible for tracking the correction of individual findings of noncompliance for each complaint. CDE reported that it closes the complaint and sends out a closure letter to both the district and the complainant(s) only after sufficient evidence of correction is provided for all the corrective actions. In accordance with OSEP's March 22, 2006 response to the State's SPP, CDE must include data for Indicator 15 in the FFY 2005 APR demonstrating that CDE's general supervision system identifies and corrects noncompliance within one year of identification, including documentation demonstrating the timely correction of noncompliance identified through complaints and hearings, as required by 20 U.S.C. 1232d(b)(3)(E).

*Sanctions*
CDE has a variety of sanctions available to use in situations when LEAs are substantially out of compliance, fail to comply with corrective action orders, or fail to implement the decision of a due process hearing. CDE reported that the State Superintendent of Public Instruction may apply the following sanctions: corrective action plans or compliance agreements, special conditions, disapproval of local plans, withholding State and/or Federal funds, and seeking court enforcement of corrective actions. CDE provided OSEP with a sample notice of intent to withhold funds but reported that it has never had to apply sanctions.

### Data Collection Under Section 618 of the IDEA

In looking at the State's system for data collection and reporting, OSEP collected information regarding a number of elements, including whether the State: (1) provides clear guidance and ongoing training to local programs/public agencies regarding requirements and procedures for reporting data under section 618 of the IDEA; (2) implements procedures to determine whether the individuals who enter and report data at the local and/or regional level do so accurately and in a manner that is consistent with the State's procedures, OSEP guidance, and section 618; (3) implements procedures for identifying anomalies in data that are reported, and corrects any inaccuracies; and (4) has identified any barriers (e.g., limitations on authority, sufficient staff or other resources, etc.) that impede the State's ability to accurately, reliably and validly collect and report data under section 618.

OSEP learned that the CASEMIS is used to: (1) extract student level data from SELPAs and State Operated Programs (SOPs) for various reporting cycles; (2) verify

the accuracy of data files; (3) generate reports from various data tables; and (4) generate the data certification page. CDE reported that its CASEMIS has undergone substantial changes during the last two years. The system is moving toward coordinating special education data with general education data statewide. CDE reported that the State's ability to collect data from diverse systems would be facilitated by the assignment of unique student identifiers. Second, CDE informed OSEP that the CASEMIS has been expanded to include the additional SPP indicators required for APR submissions. The 2006-2007 student level database has four data tables: Table A: CASEMIS student data, Table B: Student Services Data, Table C: Discipline Data, and Table D: Post-secondary follow-up data.

OSEP learned during the verification visit that CDE utilizes a number of safeguards to ensure data accuracy. CDE explained that the CASEMIS software routinely verifies student data files for any logic inconsistency and produces a list of errors and warnings (if any). The errors must be corrected and the warnings must be verified. All errors must be corrected before the user can print a certification page. After the file is verified and determined error-free, reports are generated for the LEA. The LEA examines the reports for their accuracy and then submits a copy of the verified student data file to the State via the CASEMIS secured website submission process. LEAs can also submit data files on a diskette or CD-ROM. LEAs are also required to fax the certification page to the SED the same day the files are submitted.

CDE reported on its process to eliminate duplicate data for students reported from more than one SELPA. Following the December reporting cycle, CDE verifies the statewide student data file by comparing selected demographic data fields (e.g., Last Name, First Name, Birthdate, and Gender) for all students. SELPAs listing matching data on students are required to examine their file for possible duplication. The State's CASEMIS 2006-2007 technical assistance guide delineates a five-step streamlined process to address elimination of duplication for both reporting deadlines: (1) CDE verifies to ensure that a student data file does not contain duplicate reporting of students following the submission reporting deadlines; (2) each SELPA showing possible duplicate reporting of students receives a cover letter and report and must verify the reports against their data file or IEP or any other sources of necessary data; (3) within two weeks, SELPAs are required to make the necessary corrections or submit a revised file; (4) CDE verifies the student data file again after the two-week period; and (5) if verification still shows a duplicate reporting of students between two SELPAs, CDE can correct a file by removing that student from the SELPA that failed to submit a revision or failed to meet the initial timeline.

CDE reported that new versions of the CASEMIS software are provided to SELPAs and SOPs at the beginning of the year to account for changes in State and Federal reporting requirements and for new features added to the system from the previous year. CDE further reported that: (1) trainings and workshops are conducted annually; (2) a detailed CASEMIS user guide is available online; (3) CDE staff assigned to data collection and oversight are available to provide technical assistance to local staff; and (4) SELPAs conduct monthly meetings concerning CASEMIS.

OSEP's instructions for reporting of data under section 618 require that a State may include students in its 618 count of students with disabilities graduating with a regular high school diploma that meet the same requirements for graduation as those for students without disabilities. CDE informed OSEP that the State's requirements for receiving a regular diploma include passing the California High School Exit Exam (CAHSEE) (beginning with students graduating in 2006) and earning a credit in algebra 1. However: (1) pursuant to State statute, students with disabilities graduating in 2006 and 2007 are exempted by their local school board from the CAHSEE requirement, and receive a regular diploma although they did not pass the CAHSEE, and students with disabilities with such an exemption are included in the State's section 618 data regarding students with disabilities graduating with a regular diploma; and (2) students with disabilities that do not pass algebra 1 can appeal to the district to request a waiver from California's State Board of Education permitting them to receive a high school diploma, and the State also includes these students in its section 618 data for students with disabilities graduating with a regular diploma. Within 60 days from the date of this letter, the State must submit its plan for ensuring that the State's next submission of graduation data under section 618 meets the reporting requirements in OSEP's instructions (i.e., includes only students with disabilities who meet the same requirements that all students must meet in order to receive a regular diploma).

With the exception of the graduation data issue noted above, OSEP believes that CDE's system for collecting and reporting data for Part B of IDEA is a reasonable approach to ensuring the accuracy of the data that CDE reports to OSEP under section 618 of the IDEA.

## Statewide and Districtwide Assessments

In looking at the State's system for statewide assessment, OSEP collected information regarding a number of elements, including whether the State: (1) establishes procedures for statewide assessments that meet the participation, alternate assessment, and reporting requirements of Part B, including ensuring the participation of all students, including students with disabilities, and the provision of appropriate accommodations; (2) provides clear guidance and training to public agencies regarding those procedures and requirements; (3) monitors local implementation of those procedures and requirements; and (4) reports on the performance of children with disabilities on those assessments, in a manner consistent with those requirements.

CDE provided documentation to OSEP showing that its assessment system is comprised of four standardized testing and reporting (STAR) components and the CAHSEE. These four components include: California Standardized Test (CST), California Achievement Test (CAT), California Alternate Performance Assessment (CAPA), and the Aprenda 3. OSEP learned that the CST assesses all students in grades 2-11 and the CST is administered to most students with disabilities under standard conditions. Students in grades 3 and 7 also take the CAT under standard conditions.

Students in grades 2-11 with the most significant cognitive disabilities who are not able to participate in the CST and CAT even with accommodations and modifications participate in the CAPA. CDE reported that the IEP Team determines whether students participate in the CAPA and the IEP Team uses a Participation Criteria worksheet in making this determination. A licensed or certified school staff member works individually with the student in administering the CAPA. The CAPA is administered at five different levels (I – V). CDE reported that there is no out-of-level testing allowed in the State except for the CAPA Level I assessment.

The Aprenda 3 is for Spanish-speaking English language learners enrolled in a U.S. school less than 12 months or receiving instruction in Spanish. Subjects are tested in grades 2-11.

The CAHSEE is California's high-stakes assessment, and beginning with the graduating class of 2006, students must pass the CAHSEE in order to receive a high school diploma. Students with disabilities are allowed to use testing accommodations and modifications if documented in their IEPs. If they earn the equivalent of a passing score, they may receive a diploma pursuant to a local waiver.[3] Students with disabilities were granted a one-year exemption if they met certain criteria and had an IEP or 504 Plan. Students are required to take this exam beginning in the tenth grade and can retake it in grades 11 and 12 and in adult education programs. CDE reported that the grade 10 census administration of the CAHSEE is used for AYP calculation purposes. Grade 10 CAPA scores are used for students with the most significant cognitive disabilities who do not take the CAHSEE. The CAHSEE is the only assessment that does not permit parent waivers for students with and without disabilities.

The State reported that there are three assistance levels for students with disabilities who require assistance when taking all statewide assessments. The three assistance levels are: test variation, accommodations, and modifications. The accommodations and modifications must be specified in the IEP or 504 Plan and must be used during classroom assignments during the year. The Matrix of test variations, accommodations, and modifications for administration of California statewide assessments is available on the CDE website at http://www.cde.ca.gov/ta/tg/sa/ .

OSEP learned that assessment results for system accountability for children with disabilities are used in the same manner as for children without disabilities. The scores are fully integrated into the accountability system. Participation and performance data for students with disabilities are sent to parents and guardians (by mail) to each student's home within 20 working days after the school district receives the reports. In addition, results are publicly reported via the Internet only when the group contains 11 or more students.

---

[3] Further, as explained in the data collection section of this letter, for the graduating classes of 2006 and 2007, students with disabilities are exempted by their local board of education from the CAHSEE requirement.

Page 13 – Honorable Jack O'Connell

The scores for all students who take the assessment with modifications are counted as far below basic on the CST summary reports. Accommodations have no effect on scores; scores are reported in the same way as for non-accommodated tests. The student Master List and Student Record Labels indicate if a student used accommodations. For the CAPA, examiners build any required accommodations or modifications students need into the tasks of the assessment.

The individual student reports for students with disabilities who use modifications when taking the CSTs or CAT/6 note that the student was tested with modifications. Results of students with disabilities who use modifications on the CSTs do not count in the AYP calculation under the No Child Left Behind Act (NCLB).[4]

OSEP learned during the verification visit that training on assessments is provided through workshops and the dissemination of various documents to school personnel. In addition, training information available on the CDE website includes STAR regulations, CAHSEE regulations, coordinator manuals, and pretest slides. The State also provides a matrix showing accommodations/modifications for State testing and this matrix reflects the State regulations.

*Public Reporting*
Part B requires, at 20 U.S.C. 1412(a)(16)(D)(i), that CDE must make available to the public, and report to the public with the same frequency and in the same detail as it reports on the assessment of nondisabled children, the number of children with disabilities participating in regular assessments, the number of those children who were provided accommodations in order to participate in those assessments, and the number of children with disabilities participating in alternate assessments, as well as data on the performance of children with disabilities on regular and alternate assessments, consistent with 20 U.S.C. 1412(a)(16)(D)(iv).

OSEP learned that while the State reports to the public the number of children with and without disabilities participating in regular assessments at the local level through LEA report cards, it does not, as required by 20 U.S.C. 1412(a)(16)(D)(i), report to the public, at the LEA level, the number of those children who were provided accommodations in order to participate in those assessments. By June 1, 2007, CDE must submit documentation that the State is meeting the requirement at 20 U.S.C. 1412(a)(16)(D)(i), and is reporting to the public the number of children with disabilities who were provided accommodations in order to participate in regular assessments with the same frequency and in the same detail as it reports assessment results for children without disabilities. Failure to submit the required documentation by that time may affect the State's status under section 616(d) of the IDEA.

*Relationship of Title I Assessment System to Part B Requirements*

---

[4] The regulations under the NCLB provide, at 34 CFR §200.20(c), that in order to make adequate yearly progress (AYP), a school or LEA must ensure that not less than 95 percent of its children with disabilities in the grades tested participate in the State assessments under 34 CFR §200.2.

Page 14 – Honorable Jack O'Connell

During the verification visit, CDE reiterated that the CAPA is not based on alternate achievement level standards but that there is an effort underway to develop tasks to link the CAPA to the California academic content standards at each grade level. Through discussion and review of the CAPA blueprint provided by CDE, OSEP learned that this assessment is anticipated for field-testing in each of the content areas at each level in the spring of 2007 and slated for operational administration in the spring of 2008. The Department's Title I Office also reported to OSEP that the Department's peer review of the standards and assessment system indicated that California still needed to submit evidence of an alignment study of the CAPA to the content standards. There are, however, alternate achievement standards in place, according to the evidence submitted for peer review.

Under 20 U.S.C. 1412(a)(16)(A), CDE must ensure that "[a]ll children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965 (ESEA), with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs." Further, under 20 U.S.C. 1412(a)(16)(C)(ii)(I)-(II), guidelines for the participation of children with disabilities in alternate assessments must provide for alternate assessments that are aligned with the State's challenging academic content standards and challenging student academic achievement standards, and if the State has adopted alternate achievement standards permitted under section 1111(b)(1) of the ESEA, it must measure the achievement of children with disabilities against those standards. In a June 28, 2006 letter, the Department informed CDE that California's standards and assessment system was assigned approval pending status because of outstanding concerns with the alignment of the CSTs and the CAPA to grade level academic content and achievement standards and the lack of performance level descriptors that differentiate between three levels of proficiency for mathematics, English language arts and science. The June 28, 2006 letter also informed CDE that California was placed under Mandatory Oversight, pursuant to 34 C.F.R. §80.12. CDE must provide documentation to OSEP by June 1, 2007 that the CAPA meets IDEA requirements in 20 U.S.C. 1412(a)(16)(C)(ii), which cross references the Title I requirements that apply to States that have adopted alternate academic achievement standards. Failure to provide the required documentation at that time may affect the State's status under section 616(d) of the IDEA or the State's FFY 2007 grant award under Part B of IDEA.

*Districtwide Assessments*
CDE informed OSEP that while there are school districts that conduct districtwide assessments, CDE does not know which specific districts conduct such assessments. CDE further informed OSEP that the record review protocol for SESRs and VRs included an item regarding compliance with Part B requirements for "statewide and districtwide assessments," but that CDE did not know whether that item was sufficiently specific to ensure that districts conducting SESRs and CDE monitors conducting verification reviews, determined—in districts that do conduct districtwide assessments—whether the district did so in a manner consistent with the requirements of 20 U.S.C.

1412(a)(16) and 34 CFR §300.320(a)(6). CDE indicated during OSEP's verification visit that it would review and revise its monitoring procedures to more specifically address the requirements of 20 U.S.C. 1412(a)(16) and 34 CFR §300.320(a)(6) as they apply to districtwide assessments.

CDE reported that some of the challenges to implementing and ensuring an effective statewide and districtwide assessment system include: operationalizing the CAPA full-scale in 2008, developing the California Modified Assessment (CMA), providing local support in clarifying the difference between a waiver and an exemption, local control of the waiver process, and staff turnover at the local levels.

**Conclusion**

As discussed in the general supervision section of this letter, OSEP's March 22, 2006 response to the State's SPP required CDE to include in the FFY 2005 APR, due February 1, 2007: (1) data demonstrating compliance with the 60-day timeline for issuing complaint decisions, as required by 34 CFR §300.152(a) and (b) of the final Part B regulations; and (2) data for Indicator 15, demonstrating that CDE's general supervision system identifies and corrects noncompliance within one year of identification, including documentation demonstrating the timely correction of noncompliance identified through complaints and hearings, as required by 20 U.S.C. 1232d(b)(3)(E). Failure to provide the required documentation in the FFY 2005 APR may affect the State's status under section 616(d) of the IDEA.

By the FFY 2006 APR, due February 1, 2008, the State must submit data demonstrating compliance with the due process hearing requirements in 34 CFR §300.515(a) and (c) of the final Part B regulations. Failure to demonstrate compliance at that time may affect the State's status under section 616(d) of the IDEA.

Within 60 days from the date of this letter, CDE must submit its plan for ensuring that the State's next submission of graduation data under section 618 of the IDEA for students with disabilities graduating with a regular high school diploma meets the reporting requirements in OSEP's instructions and includes only students with disabilities who meet the same requirements for graduation as those for students without disabilities.

By June 1, 2007, CDE must submit to OSEP: (1) documentation that the State is meeting the requirement, at 20 U.S.C. 1412(a)(16)(D)(i), to report to the public the number of children with disabilities who were provided accommodations in order to participate in regular assessments, with the same frequency and in the same detail as it reports assessment results for children without disabilities, as required by 20 U.S.C. 1412(a)(16)(D)(i); and (2) documentation that the CAPA meets IDEA requirements in 20 U.S.C. 1412(a)(16)(C)(ii), which cross references the Title I requirements that apply to States that have adopted alternate academic achievement standards. Failure to provide the required documentation by that time may affect the State's status under section 616(d) of the IDEA or the State's FFY 2007 grant award under Part B of IDEA.

Page 16 – Honorable Jack O'Connell

We appreciate the cooperation and assistance provided by your staff during our visit. If you have any questions about this letter, please contact Perry Williams, OSEP's State Contact for the California Part B program at 202-245-7575. We look forward to our continued collaboration with California to support your work to improve results for children with disabilities and their families.

Sincerely,

/s/Alexa Posny

Alexa Posny, Ph.D.
Director
Office of Special Education Programs

cc: Mary Hudler

# EXHIBIT 5

Change Text Size: A A A

Search

Advanced | Site Map | A-Z Index

Curriculum & Instruction                Testing & Accountability
Professional Development                 Finance & Grants                Data & Statistics
Learning Support          Specialized Programs

Home » Specialized Programs » Special Education » Quality Assurance Process

# Quality Assurance Process

Resources to improve educational outcomes for students with disabilities while ensuring compliance with state and federal laws and regulations.

Focused Monitoring and Technical Assistance Contacts (Updated 13-Feb-2008)
Special Education Division consultants assignments by County

California State Performance Plan (SPP) - 2008 (Posted 01-Feb 2008; DOC; 482KB; 29pp.)
Revisions to Indicator #7 (Preschool Assessment) and Indicator #14 (Post School Outcomes)

> California State Performance Plan (SPP) - 2007 (Revised 01-Feb-2007; DOC; 1.9MB; 129pp.)
> Six year plan for special education required by IDEA 04

California Annual Performance Report - 2008 (Posted 01-Feb-2008; DOC; 2.19 MB ; 149pp.)
Describes the State's progress or slippage in meeting the measurable and rigorous targets established in the SPP; and any revisions to the State's targets, improvement activities or resources in the SPP and justifications for the revisions.

> California Annual Performance Report - 2007 (Posted 01-Feb-2007; DOC; 1.42MB; 136pp.)
> Describes the State's progress or slippage in meeting the measurable and rigorous targets established in the SPP; and any revisions to the State's targets, improvement activities or resources in the SPP and justifications for the revisions.

- DOE, Office of Special Education and Rehabilitative Services Response Letter (Posted 15-Jun-2007; DOC; 34.5KB; 3pp.)
- DOE, Office of Special Education and Rehabilitative Services Response Table (Posted 15-Jun-2007; DOC; 98KB; 15pp.)

Office of Special Education Program Letter Documenting Results of Verification Visit to California in October 2006 (Posted 05-Mar-2007; DOC; 127KB; 16pp.)

Quality Assurance Process (Posted 27-Sep-2005)
Detailed description of the process that assures that students with disabilities receive the programs and services they need, positive results are achieved, and procedural safeguards are provided.

**Procedural Safeguards and Referral Services**

Provides technical assistance information and resources for parents, school districts, advocates, agencies and others of procedural safeguards regarding students between ages 3 and 21 with disabilities and their educational rights.

Phone: 800-926-0648; TTY 916-323-9779; Weekdays, 9:00 a.m. to 4:00 p.m.
FAX: 916-327-3704

**Rights of Parents and Children**

Special Education Rights of Parents and Children Under the Individuals with Disabilities Education Act, Part B - Notice of Procedural Safeguards (English) (Updated 04-Feb-2008; DOC; 109KB, 16pp.) | PDF  (Updated 04-Feb-2008; 197KB; 18pp.)
This document complies with the final federal regulations, effective October 13, 2006, implementing the Individuals with Disabilities Education Act, as amended in 2004.
Available Translations of the Notice of Procedural Safeguards (Updated 04-Feb-2008)

Parents' Rights (Updated 23-Jul-2007)
A brief summary of Procedural Safeguards for students with disabilities receiving special education services.

**Procedural Safeguards Resources**

California Parent Organizations (Revised 03-Mar-2008)
List of California agencies providing resources for families of children with disabilities.

**Complaint Filing, Investigation and Resolution**

Complaint Process (Revised 03-Jan-2007; DOC; 66KB; 2pp.) | PDF  (Revised 03-Jan-2007; 49KB; 2pp.)
A tri-fold brochure providing an abbreviated summary of the complaint process under federal and state laws

Helpful Hints When Requesting Direct State Intervention (Revised 16-Jan-2007)

Request for Complaint Investigation (Revised Nov-2006; DOC; 33KB; 2pp.)
Form for filing compliance complaint that alleges violation of state or federal special education laws.

Questions: Barbara McDonald | **bmcdonal@cde.ca.gov** | 916-327-3536
**Download Free Readers**

California Department of Education
1430 N Street
Sacramento, CA 95814

Contact Us | FAQ | Web Policy

Last Reviewed: Monday, March 03, 2008



# State of California
# Annual Performance Report
## for
# Federal Fiscal Year 2006
# (2006-2007)

# Individuals With Disabilities Education Act of 2004

Due: February 1, 2008

**APR Template – Part B (4)**

California
State

**Part B State Annual Performance Report (APR) for FFY 2006 (2006-07)**

---

| Monitoring Priority:  Effective General Supervision Part B / General Supervision |
|---|

**Indicator 17:**  Percent of fully adjudicated due process hearing requests that were fully adjudicated within the 45-day timeline or a timeline that is properly extended by the hearing officer at the request of either party. (20 U.S.C. 1416(a)(3)(B))

| Measurement:  Percent = [(3.2(a) + 3.2(b)) divided by 3.2] times 100. |
|---|

| FFY | Measurable and Rigorous Target |
|---|---|
| 2006 (2006-07) | One hundred percent of due process hearing requests will be fully adjudicated within the 45-day timeline or a timeline that is properly extended by the hearing officer at the request of either party |

**Actual Target Data for 2006 (2006-07):**

Table 7 of the required 618 Data Collection is attached. Section C regarding hearing requests are reproduced below:

| SECTION C: Hearing requests | |
|---|---|
| (3)  Hearing requests total | 2516 |
| (3.1)  Resolution sessions | 818 |
| (a)  Settlement agreements | 478 |
| (3.2)  Hearings (fully adjudicated) | 74 |
| (a)  Decisions within timeline | 14 |
| (b)  Decisions within extended timeline | 60 |
| (3.3)  Resolved without a hearing | 1735 |

100 percent of due process hearing requests were fully adjudicated within the 45-day timeline or a timeline that was properly extended by the hearing officer at the request of either party.

   **Calculation:**  [(14 + 60) / 74] *100 = 100%

**Discussion of Improvement Activities Completed and Explanation of Progress or Slippage that occurred for 2006 (2006-07):**

Compliance with the target increased from 33 percent in 2005-06, to 100 percent for 2006-07. This progress resulted from a combination of:

- Continued implementation of improvement activities identified in the 2005-06 APR, and
- The resolution of complications arising out of the transition from one contractor, the McGeorge School of Law, to the successor contractor, the Office of Administrative Hearings (OAH). These complications were reported in the 2005-06 APR and included, among others, an unanticipated addition of more than 1,000 cases to OAH's workload.

**Revisions, with Justification, to Proposed Targets / Improvement Activities / Timelines / Resources for 2006 (2006-07):**

| CONTINUING ACTIVITIES | | |
|---|---|---|
| Activities | Timelines | Resources |
| Hearing officers will receive training regarding IDEA, *Education Code* Section 56000 and related regulations. Trainings will be designed to ensure that all hearing officers meet the minimum training standards specified by law. | 2005-2011 | CDE staff, Outside contractors Type:  Monitoring |

**Part B State Annual Performance Report (APR) for FFY 2006 (2006-07)**

| CONTINUING ACTIVITIES | | |
|---|---|---|
| **Activities** | **Timelines** | **Resources** |
| Hearing officers will receive global skills training. | Annually 2005-2011 | Outside contractors |
| It will be determined when hearing officers have a working knowledge of the laws and regulations governing services to students who qualify for services under IDEA and related California laws and regulations, and the programmatic aspects of special education, services, and supports. | 2005-2011 | Office of Administrative Hearing (OAH) staff |
| Only hearing officers who have the level of expertise specified in the proposed regulations will be assigned mediation and hearing duties. Such monitoring activities will be provided on an ongoing basis by knowledgeable senior staff. | 2005-2011 | OAH senior staff |
| Data will be gathered pertaining to due process hearings to ensure that all due process hearing requests are fully adjudicated within the 45-day timeline or a timeline that is properly extended by the hearing officer at the request of either party. Such data will include the following items: 1) number of hearing requests total; 2) number of resolution sessions conducted; 3) number of settlement agreements; 4) number of hearings held (fully adjudicated); 5) Number of decisions within timeline; 6) number of decisions within extended timeline; 7) number of decisions issued after timelines and extension expired;8) number of hearings pending; 9) number of expedited hearings; and 10) number of hearing request cases resolved without a hearing. Regarding expedited hearing requests (related to disciplinary decision), the following data will be collected: 1) number of expedited hearing requests total; 2) number of resolution sessions; number of settlement agreements; number of expedited hearings (fully adjudicated); and number of change of placement ordered. | 2005-2011 | OAH and CDE staff |
| A new case management system will track decision due dates and be updated regularly. A tickler system will allow immediate access to decision timeline information on any given case. | 2005-2011 | OAH staff and external contractors |
| Administrative law judges will meet with their presiding judge to discuss decision timelines. At that time, due dates will be established for submission of a decision draft, usually within five days, and allowance will be made for additional time for decision review, feedback and revisions prior to preparation and issuance of the final decision draft. | 2005-2011 | OAH staff |
| The OAH management has communicated to all administrative law judges how absolutely critical it is that decisions be timely. It is an individual administrative law judge performance measure that is closely tracked. | 2005-2011 | OAH staff |



**Part B State Annual Performance Report (APR) for FFY 2006 (2006-07)**

| CONTINUING ACTIVITIES | | |
|---|---|---|
| **Activities** | **Timelines** | **Resources** |
| The OAH has provided and will continue to offer training on decision writing, portions of which will include efficient decision writing skills. | 2005-2011 | OAH senior staff and outside consultants |

The following improvement activities are being added to address both the number of filings and the process and strategies encompassing alternative dispute resolution. It is intended that OAH consult with its advisory group to identify 1) issues needing improvement and 2) identify potential strategies for addressing those issues. The advisory group will, in collaboration with OAH, be in the best position (and have the greatest vested interest) to analyze conditions, identify needs, and develop strategies to meet those needs.

| ADDED ACTIVITIES | | |
|---|---|---|
| **Improvement Activities** | **Timelines** | **Resources** |
| OAH's advisory group will recommend training materials to be developed, by OAH, for use by parents and interested others. | To occur during 2007-08 | OAH staff and its advisory group |
| OAH will, in consultation with its advisory group, develop and submit to CDE for review and approval, recommendations for system improvement. | To occur during 2007-08 | OAH staff and its advisory group |
| OAH will, in consultation with its advisory group, conduct or cause to be conducted, a workshop on alternative resolutions for resolving differences in a non-adversarial atmosphere, and with the goal of providing a free appropriate public education. | To occur during 2007-08 | OAH staff and its advisory group |

**Part B State Annual Performance Report (APR) for FFY 2006 (2006-07)**

| Monitoring Priority: **Effective General Supervision Part B / General Supervision** |
| --- |

**Indicator 18:** Percent of hearing requests that went to resolution sessions that were resolved through resolution session settlement agreements. (20 U.S.C. 1416(a)(3)(B))

| Measurement: Percent = (3.1(a) divided by 3.1) times 100. |
| --- |

| FFY | Measurable and Rigorous Target |
| --- | --- |
| 2006 (2006-07) | 62 percent of hearing requests that went to resolution sessions were resolved through resolution session settlement agreements. |

**Actual Target Data for 2006 (2006-2007):**

Table 7 of the required 618 Data Collection is attached. Section C regarding hearing requests is reproduced below:

| SECTION C: Hearing requests | |
| --- | --- |
| (3)  Hearing requests total | 2516 |
| (3.1)  Resolution sessions | 818 |
| (a)  Settlement agreements | 478 |
| (3.2)  Hearings (fully adjudicated) | 74 |
| (a)  Decisions within timeline | 14 |
| (b)  Decisions within extended timeline | 60 |
| (3.3)  Resolved without a hearing | 1735 |

59 percent of hearing requests that went to resolution sessions were resolved through resolution session settlement agreements.

**Calculation:**  (419 / 714) * 100 = 59%

**Discussion of Improvement Activities Completed and Explanation of Progress or Slippage that occurred for 2006 (2006-07):**

The target for 2006-07 was 62 percent, while actual achievement was 59 percent. This difference is likely due to having limited initial information upon which to establish subsequent annual targets, rather than to slippage. More specifically, annual targets were set during the transition from one contractor to another and reflect predictions based on a relatively new activity that had generated only six months of data.

In 2006-07, data regarding resolution sessions and settlement agreements deriving solely from those sessions was solicited by CDE directly from school districts with due process filings between July 1, 2006 and June 30, 2007. Districts reported in aggregate data the number of resolution sessions that were held and the number of those sessions that resulted in a settlement agreement. Because of the complexities of amending contracts, it was determined that soliciting data directly from districts would be a more timely and effective strategy for obtaining needed information than amending the contractor's form for requesting a due process hearing (which was the stated improvement activity in the 2005-06 SPP and APR).

**Revisions, with Justification, to Proposed Targets / Improvement Activities / Timelines / Resources for 2006 (2006-07):**

Revisions to proposed targets and timelines are required. Revisions are justified based on the availability of more complete data, as noted in the above section, upon which to make accurate projections.

**(Note: CDE is permitted to consider ranges of values for these targets and may switch before December 15th submission)**

Part B State Annual Performance Report for 2006
(OMB NO: 1820-0624 / Expiration Date: 08-31-2009)

**Part B State Annual Performance Report (APR) for FFY 2006 (2006-07)**

| FFY | Measurable and Rigorous Targets |
|---|---|
| 2007-08 | 61 percent of hearing requests that go to resolution sessions will be resolved through resolution session settlement agreements. |
| 2008-09 | 64 percent of hearing requests that go to resolution sessions will be resolved through resolution session settlement agreements. |
| 2009-10 | 67 percent of hearing requests that go to resolution sessions will be resolved through resolution session settlement agreements. |
| 2010-11 | 71 percent of hearing requests that go to resolution sessions will be resolved through resolution session settlement agreements. |

The following improvement activities replace those reported during the previous year:

| CONTINUING ACTIVITIES | | |
|---|---|---|
| Activities | Timelines | Resources |
| Obtain data, on resolution sessions and settlement agreements deriving solely from those sessions, directly from school districts with due process filings during 2007-08. | Ongoing | CDE staff and OAH/contractor staff |
| OAH/contractor will conduct or cause to be conducted, a workshop on strategies for resolving differences in a non-adversarial atmosphere, and with the goal of providing a free appropriate public education. | To occur during 2007-08 | OAH/contractor staff |
| OAH's advisory group will recommend training materials to be developed, by OAH, for use by parents and interested others. | To occur during 2007-08 | OAH staff and its advisory group |
| OAH will, in consultation with its advisory group, develop and submit to CDE for review and approval, recommendations for system improvement. | To occur during 2007-08 | OAH staff and its advisory group |



Part B State Annual Performance Report (APR) for FFY 2006 (2006-07)

**Monitoring Priority:  Effective General Supervision Part B / General Supervision**

**Indicator 19:**  Percent of mediations held that resulted in mediation agreements.  (20 U.S.C. 1416(a)(3)(B))

**Measurement:**  Percent = [(2.1(a)(i) + 2.1(b)(i)) divided by 2.1] times 100.

| FFY | Measurable and Rigorous Target |
|---|---|
| 2006 (2006-07) | At least 57 percent of mediation conferences will result in mediation agreements. |

**Actual Target Data for 2006 (2006-07):**

Table 7 of the required 618 Data Collection is attached.  Section B regarding mediation requests is reproduced below:

| SECTION B: Mediation requests | |
|---|---|
| (2)  Mediation requests total | 2747 |
|    (2.1)  Mediations | |
|      (a)  Mediations related to due process | 1393 |
|        (i)   Mediation agreements | 570 |
|      (b)  Mediations not related to due process | 231 |
|        (i)  Mediation agreements | 122 |
|    (2.2)  Mediations not held (including pending) | 1123 |

43 percent of mediation conferences resulted in mediation agreements.

**Calculation**:  [(570+122) / 1,624] * 100 = 43%

**Discussion of Improvement Activities Completed <u>and</u> Explanation of Progress or Slippage that occurred for 2006 (2006-07):**

The target for 2006-07 was 57 percent, while actual measured achievement was 43 percent. Similar to the discrepancy described for Indicator 18, this difference is likely attributable to the limited availability of data upon which to establish accurate annual targets, rather than to slippage. Again, annual targets were established during the transition from one contractor to another and reflect predictions based on significantly limited data/knowledge.

The contractor's new case/data management system became operational during the second half of 2006-07. Through combined use of the predecessor and new case management systems, the contractor was able to report mediation-related data for 2006-07.

**Revisions, <u>with Justification</u>, to Proposed Targets / Improvement Activities / Timelines / Resources for 2006 (2006-07):**

The following proposed targets are being added. The original target of 57 percent has been revised downward to reflect the recent availability of more accurate data.

**(NOTE: CDE is permitted to revise these targets into ranges and may consider changing these targets before the December 15th submission)**

| FFY | Measurable and Rigorous Targets |
|---|---|
| 2007-08 | At least 46 percent of mediation conferences will result in mediation agreements. |
| 2008-09 | At least 49 percent of mediation conferences will result in mediation agreements. |
| 2009-10 | At least 52 percent of mediation conferences will result in mediation agreements. |

**Part B State Annual Performance Report (APR) for FFY 2006 (2006-07)**

| FFY | Measurable and Rigorous Targets |
|-----|--------------------------------|
| 2010-11 | At least 56 percent of mediation conferences will result in mediation agreements. |

The following improvement activities are being added to 1) increase the probability of disputes being resolved under circumstances more informal than through mediation and 2) accentuate the contractor's ability to facilitate successful mediations when such become necessary:

| ADDED ACTIVITIES | | |
|---|---|---|
| **Activities** | **Timelines** | **Resources** |
| Implement standards for the <u>training</u> of OAH/contractor staff functioning as mediators. | Ongoing | CDE staff and OAH/contractor staff |
| Implement standards for the <u>qualifications</u> of OAH/contractor staff functioning as mediators. | Ongoing | CDE staff and OAH/contractor staff |
| Implement standards for the <u>supervision</u> of OAH/contractor staff functioning as mediators. | Ongoing | CDE staff and OAH/contractor staff |
| Develop and distribute a parent manual that provides guidance regarding mediations and due process hearings. | Manual to be completed during 2007-08. | OAH/contractor staff |
| OAH's advisory group will recommend training materials to be developed, by OAH, for use by parents and interested others. | To occur during 2007-08 | OAH staff and its advisory group |
| OAH will, in consultation with its advisory group, develop and submit to CDE for review and approval, recommendations for system improvement. | To occur during 2007-08 | OAH staff and its advisory group |
| OAH will, in consultation with its advisory group, conduct or cause to be conducted, a workshop on alternative resolutions for resolving differences in a non-adversarial atmosphere, and with the goal of providing a free appropriate public education. | To occur during 2007-08 | OAH staff and its advisory group |

EXHIBIT 6

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of:<br><br>EMILY ANNE WOOLEY,<br><br>          Petitioner,<br><br>V.<br><br>VALLEY CENTER-PAUMA UNIFIED<br>SCHOOL DISTRICT,<br><br>          Respondent. | OAH CASE NO. N2007080145<br><br><br>**STIPULATION TO EXTEND TIME FOR DECISION** |

The parties herein, by their attorneys, hereby stipulate to waive the 45 day time limit for the Administrative Law Judge to issue his decision and agree that the decision will be due December 17, 2007.

Dated: November 29, 2007

Ellen Dowd, Esq.
Special Education Legal Center
Attorney for Emily Anne Wooley

Peter A. Sansom
Lozano Smith
Attorneys for Valley Center-Pauma
Unified School District



State of California • Department of General Services • Arnold Schwarzenegger, Governor

# OFFICE OF ADMINISTRATIVE HEARINGS

| | | | | | |
|---|---|---|---|---|---|
| Sacramento-General. Jurisdiction | 2349 Gateway Oaks Drive #200 | Sacramento, Ca | 95833 | (916) 263-0550 | (916) 263-0554 fax |
| Sacramento-Special Education | 2349 Gateway Oaks Drive #200 | Sacramento, Ca | 95833 | (916) 263-0880 | (916) 263-0890 fax |
| Los Angeles-General Jurisdiction | 320 W. Fourth Street, 6th Fl #630 | Los Angeles, Ca | 90013 | (213) 576-7200 | (213) 576-7244 fax |
| Oakland-General Jurisdiction | 1515 Clay Street, Suite 206 | Oakland, Ca | 94612 | (510) 622-2722 | (510) 622-2743 fax |
| San Diego-General Jurisdiction | 1350 Front Street, Rm. 6022 | San Diego, Ca | 92101 | (619) 525-4475 | (619) 525-4419 fax |
| Van Nuys-Special Education | 13350 Sherman Way #300 | Van Nuys. Ca | 91406 | (818) 904-2383 | (818) 904-2360 fax |

## FAX TRANSMITTAL INFORMATION PAGE

# OFFICE OF ADMINISTRATIVE HEARINGS
## SPECIAL EDUCATION DIVISION

DATE: 11/29/07     TIME: 9:45 AM     NO. OF PAGES: 2
TO:                                  (INCLUDING COVER SHEET)

NAME:       Ellen, Dowd Esq.

OFFICE:     Special Ed legal Center

LOCATION:

FAX NO:     858-755-6348     PHONE NO: 858-342-8360

**FROM:**

NAME:       Michelle Imperial – Office Technician

OFFICE:     Office of Administrative Hearings – Special Education Division

LOCATION:   23046 Avenida De La Carlota #750,  Laguna Hills, CA 92653

FAX NO:     (949) 598-5860     PHONE NO:  (949) 598-5866

## MESSAGE / INSTRUCTIONS

Re: **Emily Anne Wooley OAH Case NO N2007080145**

Please see attached Stipulation To Extend Time For Decision.  Please sign and fax to our office as soon as possible.

Thank you, ☺